**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

RICHARD ROE,

VICTOR VOE, and

OUTSERVE-SLDN, INC.

       *Plaintiffs,*

    v.

JAMES N. MATTIS, in his official capacity as
Secretary of Defense; HEATHER A. WILSON,
in her official capacity as Secretary of the Air
Force; and the UNITED STATES
DEPARTMENT OF DEFENSE,

       *Defendants.*

CIVIL ACTION NO._____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Richard Roe, Victor Voe, and OutServe-SLDN, Inc. (collectively, "Plaintiffs"),

by and through their attorneys, bring this action for declaratory and injunctive relief stemming

from Roe's and Voe's unconstitutional and improper impending discharges from the United States

Air Force.  Roe and Voe are being discharged despite the contrary recommendations of their

commanding officers and physicians solely because they have tested positive for the human

immunodeficiency virus ("HIV")—even though they are asymptomatic, they adhere to a treatment

regimen that has been scientifically established to halt the progression of HIV, and their viral loads

are undetectable.  As such, their discharges violate the U.S. Constitution and federal statutes and

regulations. (In order to protect their medical privacy and to reduce further stigma and

discrimination if their HIV diagnoses were made public, Plaintiffs Roe and Voe have sought leave to proceed under pseudonyms simultaneously with this complaint.)

## STATEMENT OF THE CASE

1.      Members of the U.S. Armed Forces embody the best of the American spirit.  They serve and defend us for love of country and community.  Our military treats Service members' wounds and illnesses, and, when able, they continue to serve.  When military physicians determine that Service members are unable to continue serving, they are afforded a process to be medically separated or to retire.

2.      Service members with HIV, however, do not enjoy the same treatment. Asymptomatic HIV has been diagnosed in a significant number of active-duty Service members. Contrary to widespread misunderstandings about HIV, a new diagnosis does not have the same ramifications it did when HIV first entered the public consciousness decades ago.  For most people living with HIV, medication renders their HIV inconsequential to their daily lives.  Those who adhere to these medication regimens have no symptoms or significant effects on their immune systems.  The number of copies of the virus in their blood is suppressed to a level so low that they can no longer transmit it to others.  Service members with HIV continue to contribute meaningfully to the military and to their country, just as any other Service member would.

3.      Dating back to 1988—at the height of the AIDS crisis—and continuing today, the Department of Defense ("DoD") has had clear policies and regulations favoring the retention of Service members who are diagnosed with HIV while on active duty.  While these policies unduly (and unnecessarily) restrict the ability of Service members living with HIV to deploy and change duty stations or assignments, even as of late 2017, the Air Force allowed at least 13 Airmen living with HIV to serve overseas and support vital missions.  According to DoD publications, from 2011 to 2016, the Air Force diagnosed 181 Airmen and the Navy diagnosed 388 sailors with HIV.  In

2016, 119 of those Airmen—more than 65 percent—and 266 of those sailors—more than 68 percent—were still serving.  In 2011, the U.S. Army counted 480 soldiers with HIV serving on active duty, with some serving for more than 20 years after they were diagnosed. Indisputably, these Service members are fit for duty, have the skills they need to contribute, and are able to manage their HIV without it affecting their ability to perform their duties.

4.     Unfortunately, current military policies make Service members with HIV who are allowed to deploy the exception rather than the rule, even though one's HIV status has no effect on deployability for the vast majority of Service members with HIV.  Requiring Service members to secure a waiver or exception to policy from those who lack both medical training and a complete understanding of HIV in 2018 often invites or facilitates discrimination.  This case highlights two such examples: Air Force personnel ignored the recommendations of their own medical officers and operational commanders and instead arbitrarily and wrongly decided to separate Airmen based solely on their HIV status.

5.     Plaintiff Roe fulfilled a childhood dream—and a family legacy—by enlisting in the Air Force in 2012.  He has been stationed in two foreign countries.  The Air Force recognized Roe's leadership skills and outstanding job performance by promoting him to a non-commissioned officer position earlier than anticipated.  He aspires to one day commission as an officer.  But his dream was placed in peril when he was diagnosed with HIV in October 2017.

6.     Roe began treatment immediately and his viral load was soon undetectable.  Yet under current regulations he is restricted from deploying outside the continental United States solely because of his HIV status.

7.     Because of his HIV status, Roe underwent a standard medical evaluation process to determine whether he should be retained or separated from the Air Force.  Despite the

recommendations of Roe's doctor and commanding officer that he be returned to duty, the Secretary of the Air Force ("SAF") decided that he must be discharged. Accordingly, the Air Force will soon separate him solely because of his HIV status.

8.      Plaintiff Voe enlisted in 2011 and has spent almost all of his adult life in the Air Force. He has been stationed in two foreign countries and deployed to the Middle East twice. In fact, in an effort to further the Air Force's mission and support his comrades, Voe cut short his "dwell time" between deployments so that he could return to the Middle East sooner than scheduled.

9.      Voe was diagnosed with HIV in March 2017. He quickly began treatment, and his viral load was undetectable within months. Nevertheless, solely because of his HIV status, under current regulations Voe is restricted from deploying outside the continental United States.

10.      Because of his HIV status, Voe underwent a standard medical evaluation process to determine whether he should be retained or separated from the Air Force. Despite the recommendations of Voe's doctors and commanding officer that he be returned to duty, the SAF decided that he must be discharged. Accordingly, the Air Force will separate him imminently, likely in early 2019, solely because of his HIV status.

11.      The SAF's actions as to Roe and Voe violate the Administrative Procedures Act because they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Moreover, the SAF's actions, as well as DoD and Air Force policies and practices that treat Roe and Voe—and others living with HIV—differently from other Service members (including those with manageable chronic medical conditions that have no effect on their ability to serve), violate Roe's and Voe's rights of equal protection under law, and are therefore contrary to the United States Constitution.

4

12.     In early 2018, the DoD issued a policy memorandum mandating that all Service members who are not worldwide-deployable for 12 consecutive months be separated from military service.  (Memorandum from Robert L. Wilkie, Under Secretary of Defense for Personnel and Readiness, to the Secretaries of the Military Departments et al. (Feb. 14, 2018) (announcing interim guidance regarding "DoD Retention Policy for Non-Deployable Service Members") (hereinafter "Deploy or Get Out Policy" or "DOGO Policy")).  This directive arguably would have applied to almost all Service members living with HIV.  *See* Department of Defense Instruction 6490.07 ("Medical Conditions Usually Precluding Contingency Deployment"), Encl. 3(e)(2), at p. 11 (classifying HIV as a "medical condition[] usually precluding contingency deployment").

13.     Then, in July 2018, the DoD issued DoDI 1332.45 (the "DOGO Instruction"), which provides that Service members living with HIV will be categorized as "deployable with limitations."

14.     Air Force officials determined that Roe and Voe have severely limited deployability, and therefore will be separated from the Air Force, yet other Airmen living with HIV have been retained and continue to serve.

15.     If the military is not required to re-examine its irrational and arbitrary policies and practices regarding the deployability of Service members living with HIV and bring those policies into compliance with the Constitution and federal law, Roe, Voe, and others in the same situation will be forced out solely because of their HIV status—even though hundreds of individuals living with HIV, including Roe and Voe, have served honorably in the Armed Forces after being diagnosed with HIV.

16.     At best, DoD and Air Force policies singling out Service members living with HIV for starkly different treatment are an unfortunate vestige of a time when HIV was untreatable and

invariably fatal.  These anachronistic policies are no longer justified in light of modern medical science.  Whether the policies reflected animus at the time they originally were created, now that the original justification for them has been undermined, they currently constitute outright discrimination.  When faced with other conditions or illnesses, each Service member is given due consideration that takes into account his or her circumstances and physical condition.  By contrast, when Roe and Voe attempted to simply maintain the status quo and continue to serve in their present capacities while living with HIV, they faced ill-informed, categorical limitations on their deployability that will have the consequence of prohibiting them from serving at all.

17.    Defendants' purported justifications for discharging otherwise-fit Service members like Roe and Voe are supported by neither the law nor the facts.  This case seeks to correct that injustice and prevent Roe, Voe, and others with HIV or who may acquire it in the future from being subjected to the same mistreatment.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1343, and 2201–02.  This case poses federal questions that arise under the U.S. Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06.

19.    Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(b) and (e)(1).  On information and belief, a substantial part of the events and omissions giving rise to these claims occurred in this district.

20.    This court has personal jurisdiction over Defendants because their enforcement of the service restrictions for people living with HIV occurs within the Eastern District of Virginia.

# THE PARTIES

## A. Plaintiffs

21.     Plaintiff Roe is a Staff Sergeant who has served in the Air Force since 2012.  Roe proceeds under a pseudonym not only for reasons of medical privacy but also because of the stigma, discrimination, and common misconceptions associated with HIV.

22.     Plaintiff Voe is a Senior Airman who has served in the Air Force since 2011.  Voe proceeds under a pseudonym not only for reasons of medical privacy but also because of the stigma, discrimination, and common misconceptions associated with HIV.

23.     Roe and Voe are members of Plaintiff OutServe-SLDN, Inc.

24.     Plaintiff OutServe-SLDN, Inc., formed through the merger of OutServe and the Servicemembers Legal Defense Network, is a nationwide, non-partisan, non-profit, legal services, watchdog, and policy organization that represents the LGBTQ+ military community—Service members, veterans, civilian DoD, and their spouses and families—worldwide.  The organization's mission is to address and end—through litigation, policy advocacy, and education—all forms of unequal or unfair treatment against members of its community on the basis of sexual orientation, gender identity, or HIV status.

25.     OutServe-SLDN is, in part, a membership organization, or the functional equivalent of a membership organization. It has well over 7,000 members—veterans, active-duty Service members, and civilian DoD workers throughout the world who identify as LGBTQ+ or are living with HIV—and more than 54,000 supporters.  It operates more than 54 chapters worldwide, including 35 in the United States covering every region of the country.  It has 20 additional special group forums, one of which is the "Positive Forum" for people living with HIV. These group forums are not just social groups: because Service members who are LGBTQ+ and/or

living with HIV are minority groups that are still sometimes marginalized, stigmatized, or ostracized in the military, the chapters allow these Service members to establish emotional support networks and to exchange information that is important for career advancement and professional growth. The chapters also provide a direct link for Service members to access services and programs that OutServe-SLDN offers.

26. OutServe-SLDN provides pro-bono advocacy and legal services for members of the military living with HIV. Advocacy work includes working with Congress to change or approve legislation and regulations affecting Service members with HIV, as well as working directly with the DoD, the Secretary of Defense, and the service Secretaries on the same issues. Legal services work includes writing and submitting amicus briefs in cases involving HIV-related issues (e.g., *United States v. Forbes*, Court of Appeals for the Armed Forces Case No. 18-0304/NA); filing and litigating impact litigation to change Department of Defense policies; directly representing Service members with HIV in administrative-separation and court-martial proceedings; and providing cultural-competency assistance, education and information, and training to Judge Advocate General defense lawyers in all service branches.

27. In this action, OutServe-SLDN represents the interests of its members currently living with HIV, including Roe and Voe, as well as those who may acquire HIV in the future, and therefore are or will be adversely affected by the challenged regulations and policies.

**B. Defendants**

28. Defendant James N. Mattis is the Secretary of the Department of Defense. He leads the DoD and is responsible for the administration and enforcement of the challenged policies and practices.

29.     Defendant United States Department of Defense is an executive branch department of the U.S. federal government comprising the office of the Secretary of Defense; the Joint Chiefs of Staff; the Joint Staff; the Departments of the Army, Navy, and Air Force; the unified and specified combatant commands; such other offices, agencies, activities, and commands as may be established or designated by the President or by law; and all offices, agencies, activities, and commands under any of their control or supervision. Under the direction of Secretary Mattis, the Department of Defense is also responsible for administration and enforcement of the Department's service restrictions on people living with HIV.

30.     Defendant Heather A. Wilson is the Secretary of the U.S. Air Force.  She is the leader of the Department of the Air Force and is responsible for its regulations and the actions taken against Roe and Voe.

31.     All Defendants are sued in their official capacities, and the counts below are alleged against the Defendants as enumerated therein.

## BACKGROUND

### A.  Regulatory Background

32.     Several sets of regulations are relevant to active duty service members who are diagnosed with HIV: Department of Defense Instructions ("DoDIs") DoDI 6490.07, Medical Conditions Usually Precluding Contingency Deployment (February 5, 2010); DoDI 6485.01, Human Immunodeficiency Virus (HIV) in Military Service Members (June 7, 2013); DoDI 1332.18, Disability Evaluation System (DES) (August 5, 2014); and DoDI 1332.45, Retention Determinations for Non-Deployable Service Members (July 30, 2018), as well as Air Force Instructions ("AFIs") AFI 44-178, Human Immunodeficiency Virus Program (March 4, 2014, certified current June 28, 2016); AFI 10-403, Air Force Guidance Memorandum to Air Force

Instruction 10-403, Deployment Planning and Execution (February 23, 2018); and AFI 48-122, Deployment Health (revised August 18, 2014).

33.    DoDI 6490.07, "Deployment-Limiting Medical Conditions for Service Members and DoD Civilian Employees" describes the standard for assessing whether a medical condition is deployment-limiting:

> (1) The condition is not of such a nature or duration that an unexpected worsening or physical trauma is likely to have a grave medical outcome or negative impact on mission execution.
>
> (2) The condition is stable and reasonably anticipated by the pre-deployment medical evaluator not to worsen during the deployment in light of physical, physiological, psychological, and nutritional effects of the duties and location.
>
> (3) Any required, ongoing health care or medications anticipated to be needed for the duration of the deployment are available in theater within the Military Health System.  Medication must have no special handling, storage, or other requirements (e.g., refrigeration, cold chain, or electrical power requirements). Medication must be well tolerated within harsh environmental conditions (e.g. heat or cold stress, sunlight) and should not cause significant side effects in the setting of moderate dehydration.
>
> (4) There is no need for routine evacuation out of theater for continuing diagnostics or other evaluations. (All such evaluations should be accomplished before deployment.)
>
> (5) In the case of civilian employees covered by The Rehabilitation Act of 1973, as amended, it is determined, based upon an individualized assessment, that the employee can perform the essential functions of the position in the deployed environment, with or without a reasonable accommodation, without causing undue hardship. In evaluating undue hardship, the nature of the accommodation and the location of the deployment must be considered.  Further, the employee's medical condition must not pose a significant risk of substantial harm to the employee or others taking into account the condition of the relevant deployed environment.

DoDI 6490.07, Sec. 4(b).

34.    In Enclosure 3 to DoDI 6490.07, the DoD makes categorical deployability determinations in the form of a list of conditions for which a waiver is required before a Service member would be permitted to deploy.

35.     "A diagnosis of human immunodeficiency (HIV) antibody positive with the presence of progressive clinical illness or immunological deficiency" is included on the list in Enclosure 3.

36.     On information and belief, Defendants require a waiver for Service members with a confirmed diagnosis of HIV to deploy, regardless of whether there is the "presence of progressive clinical illness or immunological deficiency."  Neither Roe's nor Voe's medical condition is characterized by "the presence of progressive clinical illness or immunological deficiency" beyond that required to confirm the accuracy of a positive HIV antibody test.

37.     DoDI 6490.07 contemplates that Service members will be able to continue to serve despite restrictions on their *deployability*.

38.     DoDI 6485.01 states that active-duty Service members are to be retained if they clear medical evaluations.

39.     DoDI 6485.01, titled "Human Immunodeficiency Virus (HIV) in Military Service Members," provides that "[a]n [active-duty] Service member with laboratory evidence of HIV infection will be referred for appropriate treatment and a medical evaluation of fitness for continued service in the same manner as a Service member with other chronic or progressive illnesses."  The Instruction presumes that some Service members will be "fit for duty" and "will be allowed to serve."

40.     DoDI 1332.18 (referenced in DoDI 6485.01) presumes that a return to duty is a possibility when a Service member is otherwise fit for duty.

41.     DoDI 1332.45, the Deploy or Get Out ("DOGO") Instruction, applies to Defendants' assessments and determinations regarding the retention or separation of Service members living with HIV that are based on deployability.

42.     The DOGO Instruction states that "Service members with a medical condition that requires additional medical screening, or Combatant Command approval prior to deployment outside the continental United States, will be categorized as Deployable with Limitations.  This includes, but is not limited to, conditions referred to in DoDI 6490.07 ["Deployment-Limiting Medical Conditions for Service Members and DoD Civilian Employees"]."

43.     According to the DOGO Instruction, Service members classified as "Deployable with Limitations" may be retained for service despite limitations on their deployability.

44.     HIV is a condition referred to in DoDI 6490.07.   Therefore, according to Defendants' own policies, people living with HIV should be classified as "Deployable with Limitations" *and not separated*.

45.     Attachment 9 of AFI 44-178 directs retention for active-duty Service members living with HIV.

46.     AFI 44-178, titled "Human Immunodeficiency Virus Program," sets forth the Air Force's procedures following a positive HIV test.  Active-duty Airmen who test positive are first "counseled by a physician" about "the significance of a positive test," "precautions to mitigate transmission," and "prognosis."   They are also "administered an order to follow preventive medicine requirements."

47.     Under AFI 44-178, active-duty Airmen who test positive for HIV "must [then] undergo medical evaluation for the purpose of determining status for continued military service." After an initial evaluation and return visit at six months, they are required to be tested "yearly thereafter" while they remain on active duty.  This provision presumes Airmen living with HIV who are serving on active duty may continue to do so indefinitely.

48.     AFI 44-178 also provides that "HIV seropositivity alone is not grounds for medical separation or retirement for [active-duty Air Force] members."   Procedures for retention and separation are governed by an attachment to the Instruction providing that Airmen living with HIV must be retained as long as they "are able to perform the duties of their office, grade, rank and/or rating."   They "may not be separated solely on the basis of laboratory evidence of HIV infection."

**B.  Treatment of HIV**

49.     The landscape of HIV treatment and prevention, the ramifications of an HIV diagnosis, and the prognosis for people living with HIV have all changed dramatically since the virus was first identified in the 1980s.

50.     In 1996, the advent of new antiretroviral medications to prevent the virus from replicating transformed the landscape of HIV treatment and prevention and radically shifted health outcomes for people living with HIV.

51.     The effectiveness of these antiretroviral medications is measured by the reduction in the number of copies of the virus in a milliliter of a person's blood, which is referred to as the "viral load."   While a person in the acute or secondary stage of infection could have a viral load of one million or more, a person in successful treatment will have a viral load of less than 200, which is considered "virally suppressed," or a viral load of less than 48 to 50, which is referred to as an "undetectable" viral load.

52.     With adherence to these medications, people living with HIV are restored to good health.   Over time, researchers and clinicians have been able to refine the use of these medications to make treatment adherence easier and health outcomes even better.   Though the side effects of the initial antiretroviral drugs were generally tolerable, researchers have developed new medications that have few or no discernible side effects for most people.   The standard of care

shifted to starting treatment with antiretroviral drugs almost immediately after diagnosis—a recognition that the benefits of treatment far outweighed any negative consequences of being on these medications.

53.     Today, though still incurable, HIV is a chronic, manageable condition rather than the terminal diagnosis it once was.  In fact, the average life span of a 25-year-old who is diagnosed in a timely fashion and provided appropriate treatment is only a few months shorter than that of a 25-year-old who does not have HIV.

54.     Furthermore, medical researchers have now established that a person with a suppressed viral load is incapable of transmitting HIV.  Even without viral suppression, contrary to popular belief, HIV is not easily transmitted.  The Centers for Disease Control and Prevention ("CDC") estimates that, in the absence of treatment or other preventive measures, such as condom use, the risk of HIV transmission through a single act of receptive anal sex—the riskiest sexual activity—is approximately 1.38 percent.  The per-act risk of transmission for other sexual activities is between zero and 0.08 percent.  However, *with adherence to HIV medications and the resulting viral suppression, the risk of transmission is essentially zero for any sexual activity*.  Antiretroviral treatment therefore not only dramatically improves personal health outcomes, but also improves public health outcomes by reducing the rate of transmission and the number of new cases.

55.     Transmission of HIV is extremely rare outside of the context of sexual activity, sharing of injection drug equipment, blood transfusion, needle sticks, or perinatal exposure (including breastfeeding).  For all other activities—including biting, spitting, and throwing of body fluids—the CDC characterizes the risk as "negligible" and further states that "HIV transmission through these exposure routes is technically possible but unlikely and not well documented."  The

theoretical possibility of HIV transmission in these other contexts is eliminated entirely by adherence to medications and the viral suppression that results.

56.     In sum, HIV is not the same disease it was once perceived to be.  But despite the tremendous breakthroughs in the treatment and prevention of HIV, people living with HIV continue to be subjected to stigma, ostracism, and discrimination rooted in misconceptions, fear, and ignorance that are deeply rooted in our society's collective consciousness.

## C.  Roe's Impending Discharge from the Air Force

57.     From a young age, Roe dreamed of serving in the military, as his parents had.  He enlisted in the Air Force in June 2012 at the age of 18.

58.     The Air Force has recognized Roe's leadership ability and work ethic.  When he was a Senior Airman stationed in Germany, he was placed in charge of a Small Arms Light Weapons Program—a position normally reserved for a non-commissioned officer.  Roe was promoted to Senior Airman earlier than expected, which enabled him to test for Staff Sergeant sooner than the average Airman, and he was successful in achieving a non-commissioned officer rank upon his first test.  He enjoys serving as a mentor to the Airmen he supervises and has sought out additional opportunities for leadership and responsibility, such as training to become a certified Sexual Assault Victim Advocate when he was stationed in South Korea.

59.     In October 2017, Roe was diagnosed with HIV while on active duty and immediately started a course of antiretroviral treatment ("ART").  The first time he was tested after beginning ART, his viral load was undetectable.  It has remained so ever since.  Roe's current ART treatment regimen consists of a single pill taken by mouth once a day.  The pills are stored in ordinary pill bottles, do not require any special storage conditions, and are refilled every 90 days like many other long-term medications.

60.     Even though Roe's doctors have never recommended that his work be restricted in any way, he is no longer considered worldwide-deployable under DoDI 6490.07 and AFI 44-178, solely on account of his HIV status.

61.     As a result of his HIV status, AFI 44-178 required that Roe undergo a standard medical evaluation process to determine whether he would be retained in or separated from the Air Force.  *See* AFI 44-178, ¶ 2.4, at p. 5.

62.     Roe's commanding officer wrote an evaluation recommending retention on the grounds that Roe was fit to serve and was "a valued team member."  Roe's primary care doctor also recommended that he be returned to duty.

63.     Despite these recommendations, on February 22, 2018, Roe's local Informal Physical Evaluation Board ("IPEB") concluded that his "condition is not compatible with the fundamental expectations of military service," because it is "subject to sudden and unpredictable progression and will result in deployment restrictions."  The IPEB recommended that Roe be discharged.

64.     The IPEB's determination was contrary to current medical science, under which the progression of Roe's condition *is* predictable: as long as he continues his once-daily medication regimen, which is required by the Air Force as a condition of continued service and as Roe has done since his diagnosis, his condition is not expected to progress.

65.     Roe appealed to the Formal Physical Evaluation Board ("FPEB") of the Air Force, located at Randolph Air Force Base near San Antonio, Texas.  In preparation for the FPEB hearing, Roe's commanding officers and colleagues wrote letters of support requesting that he be retained. Lt. Col. Jason Okulicz, Director of the HIV Medical Evaluation Unit at San Antonio Military

Medical Center, stated that there was "[no] medical reason to explain why [Roe] would not be returned to duty."

66.     Roe traveled from his duty station to San Antonio to attend the FPEB hearing.  He was dismissed from the hearing in less than 30 minutes, however.

67.     Although Roe had been told it would likely take weeks or months for the FPEB to reach its determination, he learned just three hours after the hearing concluded that the FPEB had affirmed the IPEB's decision.  Reasoning that Roe's condition "place[d an] increased burden on others within his career field" because he was no longer worldwide-deployable, the FPEB recommended that he be discharged with a 10 percent disability rating.

68.     Roe appealed to the SAF.  On November 9, 2018, he received a memorandum dated November 7, 2018, from John K. Vallario, Deputy Director of the SAF Personnel Council, which is part of the Air Force Personnel Board ("AFPB").  The memorandum informed Roe that the AFPB had rejected his appeal and directed that he be discharged.

69.     The SAF acknowledged that Roe had been "compliant with all treatment, is currently asymptomatic, and has an undetectable human immunodeficiency virus (HIV) viral load."  The SAF further noted that Roe is "able to perform all in garrison duties, has passed his most recent fitness assessment without any component exemptions, and his commander strongly supports his retention."

70.     Nevertheless, the memorandum stated that Roe was "unfit for continued military service" because his condition precludes him from being designated worldwide-deployable without a waiver.  Accordingly, the SAF concluded that Roe is to be discharged with a disability rating of 10 percent.

71.     Roe is currently awaiting notice of his date of separation from the Air Force, which will most likely occur in early- to mid-2019.

72.     In the meantime, Roe continues support of the Air Force's mission as a logistics specialist, in his regular capacity and with no physical restrictions.

73.     Roe's physicians do not foresee any restrictions on his work as a result of his condition, which is under control; he is virally suppressed and will remain so as long as he continues his ART.

74.     Roe wishes to continue to serve with pride and would like to be classified as worldwide-deployable.  He intends to make the Air Force his lifelong career and aspires to commission as an officer.  But for the medical evaluation process that began with his HIV diagnosis, Roe would have re-enlisted for an additional term of service in the Air Force.  However, the more than year-long evaluation and appeals process described above prevented him from doing so.  His term of service originally expired almost six months ago but has been extended twice during the pendency of the medical evaluation process.

75.     The regulations restricting Roe's deployability do not accurately reflect his health status or ability to serve.  As Roe's case illustrates, Defendants' regulations preventing Service members living with HIV from deploying do not further any legitimate governmental interest.  Instead, they have the effect of separating able-bodied, committed individuals from a future dedicated to the Armed Services.

76.     Roe is currently awaiting notice from the Air Force Personnel Center ("AFPC") of his separation date.  This notice will arrive any day.

**D.  Voe's Impending Discharge from the Air Force**

77.     Voe enlisted in the Air Force in 2011, at the age of 19, and trained to become a munitions systems technician.

18

78.     Voe was deployed for six months to the Middle East to support the Air Force's mission there.   Upon his return, he sought and received special approval from the Wing Commander to cut short his "dwell time," during which returning Service members are non-deployable to give them an opportunity to rest and enjoy the comforts of home, to return to the Middle East a few months early for a second deployment.

79.     In March 2017, Voe was diagnosed with HIV while on active duty.  He began ART within two weeks, and by August 2017 his viral load was undetectable.   It has remained undetectable ever since.

80.     Voe's ART regimen consists of two pills taken at the same time, once per day.  The pills are stored in ordinary pill bottles, do not require any special storage conditions, and are refilled every 90 days like many other long-term medications.

81.     Even though Voe's doctors have never recommended restricting his work in any way as a result of his diagnosis, he is no longer worldwide-deployable under DoDI 6490.07 and AFI 44-178 on account of his HIV status.

82.     As a result of his HIV status, AFI 44-178 required that Voe undergo a standard medical evaluation process to determine whether he would be retained in or separated from the Air Force.  His commanding officer called Voe a "valuable [Air Force] asset" and recommended his retention.  Voe's doctors offered the opinion that his medical condition—including his HIV status—did not affect his ability to do his job.

83.     In October 2017, Voe was notified that his local IPEB recommended that he be discharged from the Air Force based on his HIV status.  This decision was medically unsound, as Voe's condition has been under control since shortly after his diagnosis and can be expected to remain so for as long as he is in treatment, as required under AFI 44-178.

84.     Voe appealed the IPEB's recommendation to the FPEB and went on temporary duty to travel to San Antonio to attend the December 2017 hearing.  The hearing lasted only 20 minutes.  After just half an hour of post-hearing deliberation, the FPEB recommended that Voe be separated based on his HIV status.

85.     Voe appealed the FPEB's recommendation to the SAF.  On November 15, 2018, Voe received a memorandum dated November 7, 2018 from John K. Vallario of the AFPB denying his appeal and directing on behalf of the SAF that he be discharged.

86.     The SAF reached this decision even though the memorandum acknowledged that Voe was "compliant with all treatment, is currently asymptomatic, and has an undetectable human immunodeficiency virus (HIV) viral load."  The memorandum also noted that Voe is "able to perform all in garrison duties, has passed his most recent fitness assessment without any component exemptions, and his commander strongly supports his retention."  Even so, the SAF concluded that because Voe's condition precludes him from deploying worldwide without a waiver, it renders him "unfit for continued military service."  Accordingly, the SAF directed that Voe be discharged with a disability rating of 10 percent.

87.     Consequently, Voe must separate from the Air Force even though he is able to and wishes to continue to serve in his regular capacity with no physical restrictions.  Voe would like to be classified as worldwide-deployable.

88.     Before his HIV diagnosis, Voe intended to re-enlist for another term of service in the Air Force.  However, the year-long evaluation and appeals process described above prevented him from doing so.  His term of service originally expired almost a year ago but has been extended three times during the pendency of the medical evaluation process.

89.     Voe is currently awaiting notice from the AFPC of his separation date.  This notice will arrive any day.  His separation could occur as soon as mid-February 2019.

*        *        *

90.     Plaintiffs are capable and willing to deploy to any geographic location across the globe and wish to be classified as worldwide-deployable.  Predetermined and arbitrarily-applied categorical bars rooted in anachronistic biases and stigmas should not interfere.  Categorical bars requiring a special waiver in order for Service members living with HIV to deploy violate the federal Constitution and the Administrative Procedures Act.

91.     In the alternative, to the extent that any limitations on the deployment of Service members living with HIV, in general, or Plaintiffs, in particular, are appropriate, determinations that they should be separated from service based solely on deployment limitations resulting from their HIV status alone violate the Constitution and the Administrative Procedures Act.

## CLAIMS FOR RELIEF

## COUNT  I

**Violation of Equal Protection Under the Fifth Amendment's Due Process Clause (Based on HIV Status) Against All Defendants**

92.     All prior paragraphs are incorporated as if fully set forth here.

93.     The Fifth Amendment to the United States Constitution provides that no person shall be deprived of life, liberty, or property without due process of law.  The Due Process Clause includes within it a prohibition against the denial of equal protection by the federal government, its agencies, its officials, or its employees.

94.     Defendants' policies limiting the deployability of Airmen and other Service members living with HIV discriminate impermissibly against people living with HIV, both on their

face and as applied, and preclude otherwise-qualified individuals from further service based solely on their HIV status.

95. Defendants routinely permit similarly situated individuals who do not have HIV, including but not limited to people with comparable chronic, manageable conditions, to deploy worldwide and to continue to serve.

96. Defendants have determined that Roe and Voe are not worldwide-deployable and, therefore, are to be discharged solely on the basis of their HIV status.

97. Although some individuals living with HIV may qualify under certain statutory schemes as having a disability or as being disabled, discrimination targeting people based on their HIV-positive status warrants a more rigorous degree of scrutiny than was described in *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985).

98. Government discrimination against individuals living with HIV bears all the indicia of a suspect classification requiring heightened scrutiny by the courts.

   a. People living with HIV have suffered through a unique history of misinformation, stigma, ostracism, and discrimination for decades, and continue to suffer such discrimination to this day.

   b. People living with HIV are a discrete and insular group and lack the political power to protect their rights through the legislative process. A small minority of the overall population is currently living with HIV. People living with HIV fear to disclose their status, rarely choose to live openly with HIV, and continue to lack representation at any level of the federal government. For the first decade of the HIV epidemic, the needs of people living with and at higher risk for HIV were ignored and/or not adequately resourced by federal, state, and local governments. Even today, many

people living with HIV do not have access to care, and there are aspects of the criminal law that unfairly single out and discriminate against people living with HIV.

c.  Particularly in light of dramatic medical advances—the benefits of which have only recently been fully understood and documented—a person's HIV status bears no relation to that person's ability to contribute to society.

d.  Even with medical treatment rendering their viral load undetectable, a person cannot change their HIV status.  While HIV is treatable and manageable, it is not curable. There is no available course of treatment that a person could undergo to change their HIV status as a condition of equal treatment.

99.    Defendants' disparate and unfavorable treatment of Plaintiffs Roe and Voe, as well as other individuals living with HIV, deprives them of their right to equal dignity and treats them as second-class citizens in violation of the Constitution's guarantee of equal protection.

100.    Now that HIV can be managed like other chronic medical conditions, there is no longer a valid justification for this disparate treatment between Airmen living with HIV and Airmen who are not.  Nor is the classification at issue—HIV status—adequately tailored to serve any governmental interest.  This disparate treatment is not even rationally related to a legitimate governmental interest, let alone serving an important or compelling governmental interest, or being substantially related or narrowly tailored to such an interest.  Thus, the policies discriminating against Airmen with HIV cannot withstand any form of scrutiny and are invalid.

## COUNT II

**Violation of the APA**
**Against Wilson as to Deployability and Separation Determinations**
**as Contrary to Law**

101.    All prior paragraphs are incorporated as if fully set forth here.

102.   Plaintiffs have no adequate or available administrative remedies and/or have exhausted them; in the alternative, any effort to obtain an administrative remedy would be futile.

103.   Defendant failed to abide by DoD and Air Force regulations in deciding that Roe and Voe should be separated.  Had the Air Force followed applicable regulations, Roe and Voe would have been retained, returned to duty, and allowed to deploy worldwide.

104.   DoDI 6490.07 sets forth general standards for determining the deployability of Service members with potentially deployment-limiting medical conditions. (DoDI 6490.07, Sec. 4(b)).

105.   In Enclosure 3 to DoDI 6490.07, the DoD makes categorical deployability determinations in the form of a list of conditions for which a waiver is required before a Service member would be permitted to deploy.

106.   "A diagnosis of human immunodeficiency virus (HIV) antibody positive with the presence of progressive clinical illness or immunological deficiency" is included on the list in Enclosure 3.

107.   On information and belief, Defendant requires a waiver for Service members with a confirmed diagnosis of HIV to deploy, regardless of whether there is "the presence of progressive clinical illness or immunological deficiency" beyond that required to confirm an HIV diagnosis.

108.   Neither Roe's nor Voe's medical condition is characterized by "the presence of progressive clinical illness or immunological deficiency" beyond that required to confirm an HIV diagnosis.  Both Roe and Voe are HIV positive, but have a suppressed or undetectable viral load, and are otherwise healthy.

109.   The application of 6490.07 to both Roe and Voe, classifying them as non-deployable without a waiver, is therefore contrary to law in violation of the APA.

110.   Defendant also failed to abide by the DoD's own regulations in deciding that Roe and Voe should be separated.  Had Defendant followed the DoD's own regulations, Roe and Voe would have been retained and returned to Duty.

111.   Specifically, Defendant's determinations that Roe and Voe should be separated is contrary to DoD regulations requiring that Service members living with HIV be classified as "Deployable with Limitations" and not separated because of non-deployability.   Defendant's determinations are also contrary to DoD representations about the prospective application of DoDI 1332.45.

112.   On information and belief, DoDI 1332.45, the DOGO Instruction, applied to Defendant Wilson's assessments and determinations regarding the separation of Roe and Voe insofar as those assessments centered on deployability restrictions.

113.   The DOGO Instruction states that "Service members with a medical condition that requires additional medical screening, or Combatant Command approval prior to deployment outside the continental United States, will be categorized as Deployable with Limitations. This includes, but is not limited to, conditions referred to in DoDI 6490.07."

114.   DoDI 6490.07 lists HIV "with progressive clinical illness or immunological deficiency" as one of these conditions.

115.   According to the DOGO Instruction, Service members classified as "Deployable with Limitations" are to be retained, not separated based on deployability restrictions.

116.   Though it should have been part of Defendant Wilson's assessments and determinations regarding the retention or separation of Roe and Voe, insofar as those assessments centered on deployability restrictions, the DOGO Instruction (DoDI 1332.45) was not referenced

nor its application (or lack of applicability) explained in the decisions ordering the separation of Roe and Voe.

117.   Through the acts and omissions alleged above, the decisions to separate Plaintiffs from service based on purported restrictions to their deployability as a result of their HIV status were not guided by DoDI 1332.45 and are therefore arbitrary, capricious, an abuse of discretion and/or otherwise not in accordance with law.

118.   Defendant further failed to abide by the Air Force's own regulation in deciding that Roe and Voe should be separated.  Had Defendant Wilson abided by this regulation, Roe and Voe would have been retained and returned to duty.

119.   Specifically, Defendant's determination that Roe and Voe should be separated is contrary to AFI 44-178, which sets forth the Air Force's procedures following a positive HIV test.

120.   Though it should have been part of Defendant Wilson's assessments and determinations regarding the retention or separation of Roe and Voe insofar as those assessments centered on deployability restrictions, AFI 44-178 was not referenced nor its application (or lack of applicability) explained in the decisions ordering the separation of Roe and Voe.

121.   AFI 44-178 provides that "HIV seropositivity alone is not grounds for medical separation or retirement for [active-duty Air force] members."  They "may not be separated solely on the basis of laboratory evidence of HIV infection."  Rather, procedures for retention and separation are governed by an attachment to the Instruction providing that Airmen living with HIV may be retained if they "are able to perform the duties of their office, grade, rank and/or rating."

122.   Roe's and Voe's commanding officers confirmed their ability to continue performing their duties.  Roe's and Voe's doctors imposed no work restrictions as a result of their

diagnoses.  Therefore, Roe and Voe "are able to perform the duties of their office, grade, rank and/or rating."

123.   Roe and Voe were separated because they were classified as non-deployable.  But Roe and Voe were classified as non-deployable not because there is any physical or medical reason they cannot deploy, but solely because they are HIV seropositive.  Roe and Voe were therefore separated "solely on the basis of laboratory evidence of HIV infection."

124.   The decisions to separate Roe and Voe are, in this way, contrary to the provisions of AFI 44-178, and therefore arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law.

125.   Through the actions and omissions above, Defendant Wilson violated the APA, 5 U.S.C. § 706(2)(A).

## COUNT III

### Violation of the APA
### Against Wilson as to Deployability and Separation Determinations as Arbitrary and Capricious or an Abuse of Discretion

126.   All prior paragraphs are incorporated as if fully set forth here.

127.   Plaintiffs have no adequate or available administrative remedies and/or have exhausted them; in the alternative, any effort to obtain an administrative remedy would be futile.

128.   Defendant Wilson applied the Air Force's own regulations inconsistently in discharging Roe and Voe.  Had she applied the regulations consistently, Roe and Voe would have been retained and returned to duty, like other similarly situated Airmen living with HIV.

129.   The November 7, 2018 memoranda notifying Roe and Voe of the SAF's discharge decisions in both of their cases state that their HIV diagnoses "preclude[] [them] from being able to deploy worldwide without a waiver and render[] [them] ineligible for deployment to the Central

Command (CENTCOM) Area of Responsibility (AOR), where the majority of Air Force members are expected to deploy," and that "[d]eployability is a key factor in determining fitness for duty."

130.    This decision was different from other recent SAF decisions involving similarly situated Airmen living with HIV.

131.    In a memorandum dated January 22, 2018, the SAF directed that an Airman living with HIV who had been placed on a two-medication ART regimen and "remained symptom free and with an undetectable viral load" since March 2016 would be retained and returned to duty. This was so even though the SAF acknowledged that the Airman "may require an Assignment Limitation Code 'C' and, if so, [she] would require waivers to deploy."

132.    Reaching such different conclusions in cases involving similarly situated Airmen is arbitrary and capricious and an abuse of discretion.

133.    Further, the decisions to separate Roe and Voe, regardless of the SAF's decisions in similar cases, are on their own arbitrary and capricious, and an abuse of discretion, because the SAF failed to consider the advances that have been made in the treatment and prevention of HIV, and the physical and medical conditions of Roe and Voe, and ultimately made decisions that run counter to the evidence that individuals living with HIV are physically and medically capable of deploying.

134.    For these reasons, Roe's and Voe's classifications as non-deployable and impeding discharges on the basis of their HIV status are arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law.

135.    Through the actions and omissions above, Defendant Wilson violated the APA, 5 U.S.C. § 706(2)(A).

**COUNT IV**

**Violation of the APA**
**Against Defendants United States Department of Defense and Mattis**
**as to DoDI 6490.07**

136.   All prior paragraphs are incorporated as if fully set forth here.

137.   Plaintiffs have no adequate or available administrative remedies and/or have exhausted them; in the alternative, any effort to obtain an administrative remedy would be futile.

138.   On information and belief, Defendants' classification of Roe and Voe as unable to deploy was based, at least in part, on DoDI 6490.07.

139.   Yet the provisions of DoDI 6490.07 that limit the deployability of Service members living with HIV are based on outdated thinking that does not comport with the current state of HIV medical science.

140.   Defendants' failure to update DoDI 6490.07, as it relates to the deployability of Service members living with HIV, to reflect the current state of HIV medical science, is arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law.

141.   Through the actions and omissions above, Defendants DoD and Mattis violated the APA, 5 U.S.C. § 706(2)(A).

**COUNT V**

**Violation of the APA**
**Against Defendant Wilson as to AFI 10-403, AFI 48-122, and AFI 44-178**

142.   All prior paragraphs are incorporated as if fully set forth here.

143.   Plaintiffs have no adequate or available administrative remedies and/or have exhausted them; in the alternative, any effort to obtain an administrative remedy would be futile.

144.   AFI 10-403, AFI 48-122, and AFI 44-178, to the extent that they limit the deployability of Airmen living with HIV, are based on outdated thinking that does not comport

with the current state of HIV medical science.  Because of their failure to comport with current medical science, these provisions are indefensible.

145.   These regulations as they currently stand, and Defendant's failure to update these regulations, are arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law.

146.   Through the actions and omissions above, Defendants violated 5 U.S.C. §706(2)(A).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.  Preliminarily enjoin Defendant Wilson from involuntarily separating Roe and Voe during the pendency of this matter and through final judgment;

B.  Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Roe's and Voe's impending discharges are arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law;

C.  Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Roe's and Voe's impending discharges are unconstitutional;

D.  Vacate and set aside the decisions to discharge Roe and Voe;

E.  Enter an injunction directing the Department of Defense to permit Plaintiff Roe to re-enlist and to continue to serve as a Staff Sergeant; or, in the alternative, requiring the Air Force to re-evaluate Roe's eligibility for continued service in light of any order of this Court enjoining enforcement of the regulations identified below;

F.  Enter an injunction directing the Department of Defense to permit Plaintiff Voe to re-enlist and to continue to serve as a Senior Airman; or, in the alternative, requiring the

Air Force to re-evaluate Plaintiff Voe's eligibility for continued service in light of any order of this Court enjoining enforcement of the regulations identified below;

G. Enjoin the Department of Defense from applying or enforcing the HIV-specific provision on the list of "Medical Conditions Usually Precluding Contingency Deployment" (DoDI 6490.07, Enclosure 3, subsection (e)(2)), thereby allowing Service members with HIV to be considered deployable as a default and evaluated, if clinically indicated, on a case-by-case basis under DoDI 6490.07, subsection 4(b);

H. Enjoin the Air Force from applying or enforcing the HIV-specific portions of AFI 10-403, AFI 48-122, and AFI 44-178 in a manner that limits the deployability of Airmen diagnosed with HIV while on active duty;

I. Award Plaintiffs reasonable costs and attorneys' fees; and

J. Award such further relief as this Court deems appropriate.

Dated: December 19, 2018

Peter Perkowski*
OUTSERVE-SLDN, INC.
1133 19th St. NW
Washington, DC 20036
T: (800) 538-7418
PeterP@outserve.org

Scott A. Schoettes*
Kara N. Ingelhart*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
105 W. Adams Street, Suite 2600
Chicago, IL 60603
T: (312) 663-4413
SSchoettes@lambdalegal.org
KIngelhart@lambdalegal.org

Respectfully submitted,

/s/   Andrew R. Sommer
Andrew R. Sommer (Virginia Bar No. 70304)
Lauren Gailey*
Laura J. Cooley** (Virginia Bar No. 93446)
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006
T: (202) 282-5000
F: (202) 282-5100
ASommer@winston.com
LGailey@winston.com
LCooley@winston.com

Julie A. Bauer*
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
T: (312) 558-5600
JBauer@winston.com

*Attorneys for Plaintiffs*
*\*Pro hac vice application forthcoming*
*\*\* Application for admission forthcoming*