**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

RICHARD ROE, ET AL.,

                Plaintiffs,

    v.

PATRICK M. SHANAHAN, ET AL.,

            Defendants.

CIVIL ACTION NO. 1:18-cv-10565

**MEMORANDUM IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.  INTRODUCTION ..................................................................................................... 1
II.  STATEMENT OF FACTS ...................................................................................... 2

 A. Overview of the Human Immunodeficiency Virus ....................................... 2
 B. Defendants' Policies and Regulations Regarding HIV ................................ 4
 C. Defendants' Regulations Lead to Separations Based Solely on HIV Status. ................. 7

  1. Richard Roe's Air Force Service ....................................................... 7
  2. Victor Voe's Air Force Service ......................................................... 9

III.  LEGAL STANDARD .......................................................................................... 11
IV.  ARGUMENT ....................................................................................................... 12

 A. Plaintiffs Are Likely To Succeed on the Merits of Their Equal Protection Claim. ..... 12

  1. The military's restrictions on military service for people living with HIV are not even rationally related to military effectiveness. ...................................... 13

   a. HIV does not affect a person's fitness, deployability, effectiveness, or lethality. 13
   b. Service members living with HIV who are deployed can readily be provided with necessary medical care ........................................................ 15
   c. Other purported justifications for restrictions on service for HIV-positive individuals do not pass muster. ...................................... 17

 B. Plaintiffs Are Likely To Succeed on the Merits of Their APA Claims. ..................... 18

  1. The decisions to separate Roe and Voe because of their HIV status are arbitrary, capricious, and contrary to law because they violate the Air Force regulation preventing the separation of Service members with HIV based solely on their HIV status. ...................................................................................... 19
  2. The decisions to separate Roe and Voe are arbitrary and capricious because they are inconsistent with decisions regarding other similarly situated members of the Air Force, failed to consider important facts, and run counter to the evidence. ................. 21
  3. The portions of the Air Force's and DoD's regulations limiting the deployment of Service members with HIV and preventing their retention based on those purported limitations are themselves arbitrary and capricious because they fail to take into consideration the current state of HIV medical science. ............................. 24

 C. Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction .................... 27
 D. The Balance of the Equities Weigh in Favor of Plaintiffs .......................... 28
 E. The Public Interest Favors an Injunction ..................................................... 29

V.  CONCLUSION .................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Dream Act Coal. V. Brewer*,
855 F. 3d 957 (9th Cir. 2017)………………………………………………..……………..27

*Aziz v. Trump*,
234 F. Supp. 3d 724 (E.D. Va. 2017)……………………………………….……………28, 29

*Banks v. Ball*,
705 F. Supp. 282 (E.D. Va. 1989)…………………………………………….…..………...18

*Centro Tepeyac v. Montgomery Cty.*,
722 F.3d 184 (4th Cir. 2013)…………………………………………………………………28

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)…………………………………………………………………....………24

*Crawford v. Cushman*,
531 F.2d 1114 (2d Cir. 1976)…………………………………………………………...……..12

*Defenders of Wildlife v. N.C. Dep't of Transp.*,
762 F.3d 374 (4th Cir. 2014)…………………………………………………………....……18, 19

*Elrod v. Burns*,
427 U.S. 347 (1976)…………………………………………………………………...…………28

*Elzie v. Aspin*, 841 F. Supp. 439 (D.D.C 1993)……………………………………….……………28

*Emory v. Sec'y of Navy*,
819 F.2d 291 (D.C. Cir. 1987)………………………………………………………...……...12

*Etelson v. Office of Pers. Mgmt.*,
684 F.2d 918 (D.C. Cir. 1982)……………………………………………………...…………22

*Evancho v. Pine-Richland Sch. Dist.*,
237 F. Supp. 3d 267 (W.D. Pa. 2017)……………………………………………...……………28

*Fischman v. Paolucci*,
628 F. app'x 797 (2d Cir. 2015)……………………………………………………………………28

*Giovani Carandola, Ltd. V. Bason*,
303 F.3d 507 (4th Cir. 2002)…………………………………………………………….……………29

*Goldman v. Weinberger*,
475 U.S. 503 (1986)……………………………………………………...………..11, 12

*Harrison, et al. v. Shanahan, et al.*,
No. 1:18-cv-00641 (E.D. Va. 2018)…………………………………………..……1, 13

*J.E.C.M. ex rel. Saravia v. Lloyd*,
--- F. Supp. 3d ---, 2018 WL 6004672 (E.D. Va. 2018)………………………..……..18

*Karnoski v. Trump*,
No. C17-1297-MJP, 2017 WL 6311305 (W.D. Wash. Dec. 11 (2017)…………………………27

*Kreis v. Sec'y of the Air Force*,
406 F.3d 684 (D.C. Cir. 2005)…………………………………………….………19, 22

*Larsen v. U.S. Navy*,
486 F. Supp. 1319 (E.D. Cal. 1993)…………………………………….……………..12

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014)……………………………………………...………..11

*Matthews v. Lucas*,
427 U.S. 495 (1976)……………………………………………………..………13

*Mem. Hosp. v. Maricopa County*,
415 U.S. 250 (1974)…………………………………………………...………………17

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)……………………………………………………….…………18

*Stone v. Trump*,
280 F. Supp. 3d 747 (D. Md. 2017)…………………………………….………..27

*Thomas Jefferson Univ. v. Shalala*,
512 U.S. 504 (1994)…………………………………………………….……………18

*Thompson v. United States*,
119 F. Supp. 3d 462 (E.D. Va. 2014)……………………………..……………..18

*U.S. Dep't of Agric. V. Moreno*,
413 U.S. 528 (1973)……………………………………………………….…………13

*United States v. South Carolina*,
720 F.3d 518 (4th Cir. 2013)……………………………………………...…………..11

*Wilson v. Office of Civilian Health and Med. Program of Uniformed Servs.*,
866 F. Supp. 931 (E.D. Va. 1993)……………………………………….………………..23, 24

**Statutes**

5 U.S.C. § 706……………………………………………………………..………………..1, 18

**Regulations**

AR 600-110……………………………………………………………………………..…5

AFI 44-178 (March 4, 2014)……………………………………...………5, 6, 19, 20, 21, 24, 26

DoDI 1332.45………………………………………………………….……………6, 7, 19, 20, 21

DoDI 6130.03 (May 6, 2018)………………………………………………………15, 23, 26

DoDI 6485.01 (1991)…………………………………………………..………...4, 15

DoDI 6485.01 (2012)……………………………………………………………………..5

DoDI 6490.07 (Feb. 5, 2010)…………………………………………….……..5, 7, 15, 20, 23, 25

SECNAVINST 5300.30E (Aug 13, 2012)……………………..........…………………………….5

## LISTING OF EXHIBITS

| Exhibit | Description |
|---|---|
| A | Declaration of Richard Roe |
| A1 | Declaration of Richard Roe from *Harrison, et al. v. Shanahan, et al*, No. 1:18-cv-00641 |
| A2 | Richard Roe's Informal Physical Evaluation Review |
| A3 | Letter from Richard Roe's doctor |
| A4 | Richard Roe's Formal Physical Evaluation Review |
| A5 | Memorandum issued to Richard Roe by the Air Force Personnel Board on behalf of the Secretary of the Air Force denying his appeal and directing his discharge |
| A6 | Memorandum issued to another Service member living with HIV by the Air Force Personnel Board on behalf of the Secretary of the Air Force directing her retention |
| B | Declaration of Victor Voe |
| B1 | Victor Voe's Informal Physical Evaluation Review |
| B2 | Victor Voe's Formal Physical Evaluation Review |
| B3 | Memorandum issued to Victor Voe by the Air Force Personnel Board on behalf of the Secretary of the Air Force denying his appeal and directing his discharge |
| B4 | Victor Voe's Separation Orders |
| C | Declaration of Peter Perkowski on behalf of OutServe-SLDN, Inc. |
| C1 | Memorandum issued to another Service member living with HIV by the Air Force Personnel Board on behalf of the Secretary of the Air Force denying his appeal and directing his discharge |
| C2 | Memorandum issued to another Service member living with HIV by the Air Force Personnel Board on behalf of the Secretary of the Air Force denying his appeal and directing his discharge |
| C3 | Memorandum issued to another Service member living with HIV by the Air Force Personnel Board on behalf of the Secretary of the Air Force denying his appeal and directing his discharge |
| C4 | Memorandum issued to another Service member living with HIV by the Air Force Personnel Board on behalf of the Secretary of the Air Force denying his appeal and directing his discharge |
| D | Expert Declaration of Carlos Del Rio, M.D. from *Harrison, et al. v. Shanahan, et al*, No. 1:18-cv-00641 |
| E | Expert Declaration of Trevor Hoppe, MPH, PhD from *Harrison, et al. v. Shanahan, et al*, No. 1:18-cv-00641 |
| F | Expert Declaration of Craig W. Hendrix, M.D. from *Harrison, et al. v. Shanahan, et al*, No. 1:18-cv-00641 |
| G | AFI 44-178 |
| H | DoDI 6490.07 |
| I | DoDI 1332.45 |
| J | DoDI 6485.01 |

## I.      INTRODUCTION

Plaintiffs Richard Roe and Victor Voe are members of the United States Air Force who have served honorably for years.  Now, however, they face involuntary separation based on anachronistic Department of Defense ("DoD") and Air Force regulations rooted in misconceptions about HIV.  In this action, Roe and Voe—along with Plaintiff OutServe-SLDN, Inc., which represents the interests of members of the military or those seeking to serve in the military who are living with HIV—seek declaratory and injunctive relief from these regulations, which violate the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

While this action is pending, Plaintiffs and others similarly situated need this Court to prevent their imminent separations from the United States Air Force—separations that, five months ago, Defendant DoD erroneously created the strong impression would not occur.  This case squarely presents many of the same issues raised in Plaintiff's Motion for Preliminary Injunction in *Harrison, et al. v. Mattis, et al.,* No. 1:18-cv-00641 (E.D. Va. July 19, 2018).  In response to that motion, the Defendants—the Secretary of Defense and DoD, both Defendants here—argued that the requested injunction should be denied because there was "no policy at either the DoD or Military Department level that requires the automatic discharge of Service members solely because of their HIV status."  Defendants' Opposition [Dkt. 43] at 2, *Harrison, et al. v. Mattis, et al.*, No. 1:18-cv-00641 (E.D. Va. Aug. 16, 2018).  In support, Defendants pointed to recently-issued DoDI 1332.45 ("Retention Determinations for Non-Deployable Service Members"), arguing that under that new regulation, Service members with HIV were not at risk of imminent discharge.  *Id.* at 16.  Indeed, Defendants argued that "the Air Force is able to deploy HIV-positive airmen to certain locations and merely assigns them a limitation code

1

indicating that they are required to have medical clearance for any PCS or deployment." *Id.* at 16. Defendants further argued that the named plaintiff there—Nicholas Harrison, an Army Sergeant—was not at risk of imminent discharge and thus could not establish a risk of irreparable harm. *Id.* at 17.

Notwithstanding these representations, shortly before Thanksgiving, Roe and Voe received notice from the Secretary of the Air Force directing that they be discharged in contravention of long-standing military policy not to separate Service members based solely on their HIV status. With their discharges now looming, irreparable harm to Roe and Voe is imminent. Moreover, since filing the Complaint in this action, four additional members of the Air Force have contacted Plaintiff OutServe-SLDN because they too are facing imminent separation based on their HIV status. *See* Perkowski Decl. (Ex. C). Plaintiffs therefore seek a preliminary injunction to preserve the status quo by preventing the separation of Roe and Voe, as well as any other similarly situated Service member classified as anything less than worldwide deployable based solely on their HIV status. Further, because final disposition in this matter may take years, Plaintiffs also request that Defendants be enjoined from restricting Plaintiffs and others similarly situated from being promoted, changing duty station, or re-training on the same terms as Service members with HIV who have been retained.

## II.     STATEMENT OF FACTS

### A.     Overview of the Human Immunodeficiency Virus

Until the mid-1990s, HIV was a universally terminal condition. Del Rio Decl. ¶ 21 (Ex. D). The virus operates by gaining a foothold in the blood, hijacking the cells of the body's immune system, and using them to create copies of itself. *Id*. ¶ 12. These copies then target and destroy CD4 T-cells, which are critical to the human body's ability to fight infections. *Id*. ¶ 14.

2

If left untreated, the virus multiplies to levels that allow it to reduce the overall quantity of CD4 cells, and the body becomes progressively more prone to "opportunistic infections." *Id.* A person who has fewer than 200 CD4 T-cells per milliliter of blood and an opportunistic infection has progressed to the third stage of the disease and is diagnosed with Acquired Immune Deficiency Syndrome (AIDS).[1]

In 1996, new antiretroviral medications that attack the virus and prevent it from replicating transformed the landscape of HIV treatment and prevention. *Id.* ¶ 16. Successful treatment reduces a person's "viral load"—which can measure as high as one million copies per milliliter of blood—to less than fifty copies per milliliter. *Id.* Medical professionals refer to having less than 200 copies per milliliter as a suppressed viral load and less than fifty copies per milliliter as an "undetectable" viral load. *Id.*

Antiviral drugs have radically improved health outcomes for people living with HIV. *Id.* ¶ 16. Once a suppressed or undetectable viral load is reached, the immune system recovers, and the individual—even one with advanced HIV—is restored to good health.[2] In fact, a person "who is diagnosed with HIV in a timely manner and adheres to their prescribed antiretroviral therapy has very nearly the same life expectancy as a person who is not living with HIV."[3] *Id.* ¶

---

[1] *See* U.S. Centers for Disease Control and Prevention (CDC), *About HIV/AIDS,* https://www.cdc.gov/hiv/basics/whatishiv.html.
[2] Selina Corkery, *Factsheet: Diagnosed with HIV at a Low CD4 Count,* NAM AIDSMap (March 2016), http://www.aidsmap.com/Diagnosed-with-HIV-at-a-low-CD4-count/page/2182215/.
[3] Samji et al., *Closing the Gap: Increases in Life Expectancy Among Treated HIV-Positive Individuals in the United States and Canada*, 8(1) PLoS ONE (2013), http://journals.plos.org/plosone/article?id=10.1371/journal.pone.0081355.

21.  Most people experience few to no side effects from this treatment.[4]  HIV is now a chronic

but manageable condition, rather than a terminal diagnosis.[5]

Scientists and doctors have also made great strides in understanding the transmission of

HIV.[6]  Contrary to popular belief, HIV is not easily transmitted.  Without treatment, the riskiest

sexual activity has only a 1.38 percent per-act chance of transmitting HIV.[7]  Outside of sexual

activity, the only activities that present a measurable risk of HIV transmission are the sharing of

injection drug equipment, blood transfusion, needle sticks, and perinatal exposure.[8]  For all other

activities—including biting, spitting, throwing of body fluids, or blood spatter—the CDC

characterizes the risk as negligible, which it defines as "technically possible but unlikely and not

well documented."[9]  But if a person adheres to treatment and achieves viral suppression, the risk

of transmission is essentially zero for any sexual activity, as well as all other activities for which

the baseline risk is the same or lower.  Del Rio Decl. ¶¶ 25, 27.

### B.      Defendants' Policies and Regulations Regarding HIV

The military instituted its first regulations restricting the service of people living with

HIV in the late 1980s, well before the advent of effective antiretroviral therapy.[10]  Although the

---

[4] U.S. DHHS, *Fact Sheets: Side Effects of HIV Medicines* (Oct. 9, 2017),
https://aidsinfo.nih.gov/understanding-hiv-aids-/fact-sheets/22/63/hiv-medicines-and-side-
effects.
[5] HIV.gov, *What Are HIV and AIDS?* (May 15, 2017), https://www.hiv.gov/hiv-
basics/overview/about-hiv-and-aids/what-are-hiv-and-aids.
[6] *See* CDC, *Effectiveness of Prevention Strategies To Reduce the Risk of Acquiring or
Transmitting HIV*, https://www.cdc.gov/hiv/risk/estimates/preventionstrategies.html (updated
Mar. 7, 2017).
[7] *See* CDC, *HIV Risk Behaviors: Estimated Per Act*,
www.cdc.gov/hiv/risk/estimates/riskbehaviors.html (updated Dec. 4, 2015).  Per-act risk for
other sexual activities is between zero and 0.08 percent.
[8] *Id.*
[9] *Id.*
[10] DoDI 6485.01 (1991).

regulations have been modified somewhat over the years, the military still issues regulations specifically aimed at people living with HIV.  DoDI 6485.01 currently provides that Service members who first test positive for HIV while on active duty are allowed to continue serving "in a manner that ensures access to appropriate medical care."[11]  With the exception of the Navy—which has recently allowed Service members to deploy on certain overseas vessels—the various service branches have interpreted this regulation to require that people living with HIV be stationed within the continental United States, Alaska, Hawaii, or Puerto Rico.[12]  In addition to DoDI 6485.01, DoDI 6490.07 specifically identifies HIV as a medical condition that limits a Service member's deployability.[13]  This instruction states that individuals with a "diagnosis of human immunodeficiency (HIV) antibody positive with the presence of progressive clinical illness or immunological deficiency" are non-deployable unless a waiver is granted.[14]

The Air Force has implemented the regulation requirements of DoDI 6485.01 and DoDI 6490.07 as Air Force Instruction ("AFI") 44-178, which sets forth the Air Force's Human Immunodeficiency Virus Program, "including the responsibilities and procedures for identification, surveillance, and administration of Active Duty Air Force personnel."[15]  Under AFI 44-178, "HIV seropositivity alone is not grounds for medical separation or retirement for [active duty Air Force] members."[16]  Instead, "[m]embers with laboratory evidence of HIV

---

[11] DoDI 6485.01 (2012), ¶ 2.c.
[12] SECNAVINST 5300.30E, ¶ 9.b; AFI 44-178, ch. 2.42; AR 600-110, ch. 1-16.f.
[13] DoDI 6490.07 (Feb. 5, 2010), https://www.dcms.uscg.mil/Portals/10/CG-1/cg112/cg1121/doc/pdf/MedicalConditionsDeployments.pdf ("DoDI 6490.07").
[14] *Id.* ¶ e(2).
[15] AFI 44-178 (March 4, 2014), https://static.e-publishing.af.mil/production/1/af_sg/publication/afi44-178/afi44-178.pdf ("AFI 44-178").
[16] *Id.* ¶ 2.4.1.

infection who are able to perform the duties of their office, grade, rank, and/or rating" are to be "evaluated for continued military service."[17]

Under AFI 44-178, HIV-infected members who are retained should receive an Assignment Limitation Code.[18]  This instruction further provides that active duty members of the Air Force who test positive for HIV "must undergo medical evaluation for the purpose of determining status for continued military service."[19]  After an initial evaluation and a return visit at six months, they are required to be tested "yearly thereafter" while they remain on active duty.[20]  Finally, AF 44-178 provides that the "Secretary of the Air Force may, on a case-by-case basis, further limit duties and assignment of members to protect the health and safety of the HIV-infected member or other members."[21]

On February 14, 2018, the DoD issued a new policy stating that all Service members who are non-deployable for 12 consecutive months would be discharged beginning on October 1, 2018.[22]  However, this policy was replaced in mid-2018 by DoDI 1332.45, which states instead that "Service members who are considered non-deployable for more than 12 consecutive months will be evaluated for . . . [a] retention determination by their respective military departments . . . [and, a]s appropriate, referral into the Disability Evaluation System."[23]  In making this evaluation, Secretaries of the military departments are empowered to "[r]etain in service those Service members whose period of non-deployability exceeds the 12 consecutive month limit"—

---

[17] *Id.* ¶¶ A9.1.1, A9.1.2.
[18] *Id.* ¶ A9.1.2.
[19] *Id.* ¶ 2.4.
[20] *Id.*
[21] *Id.* ¶ 2.4.2.
[22] *Department of Defense Retention Policy for Non-Deployable Service Members* (Feb. 14, 2018), https://dod.defense.gov/Portals/1/Documents/pubs/DoD-Universal-Retention-Policy.PDF.
[23] *Id.* ¶ 1.2(b).

including Service members living with HIV—"if determined to be in the best interest of the Military Service."[24]  Furthermore, DoDI 1332.45 states that Service members with any of the medical conditions identified in DoDI 6490.07 (regarding deployment-limiting conditions), which includes HIV, "will be categorized as Deployable with Limitations," and, therefore, not subject to a retention review and potential separation from service under DoDI 1332.45.[25]

**C.      Defendants' Regulations Lead to Separations Based Solely on HIV Status.**

**1.      Richard Roe's Air Force Service**

From a young age, Plaintiff Roe desired to follow in his parents' footsteps and pursue a career in the United States military.  Roe Decl. ¶ 2 (Ex. A1).  Roe fulfilled that dream at the age of 18 when he joined the Air Force in 2012.  *Id*.  He has been serving his country honorably for the past six years, has received numerous awards for his service, and was promoted to Senior Airman ahead of schedule, allowing him to test early to become a staff sergeant and succeed his first time.  *Id.* ¶ 4.

In October 2017, Roe was diagnosed with HIV while on active duty.  *Id.* ¶ 7.  In accordance with Air Force regulations, Roe immediately began antiretroviral treatment.  *Id.* ¶ 8.  Soon thereafter, his viral load was undetectable.  *Id*.  His condition is under control and can be expected to remain so for as long as he is in treatment.  *Id.* ¶ 13.  His treatment regimen requires that he take just one pill once a day.  Roe Supp. Decl. (Ex. A) ¶ 8.  This medication is issued in a 90-day supply, and does not require any special storage conditions.  *Id*.  While consistently taking his medication, Roe's viral load is expected to remain suppressed.  *Id*.

---

[24] *Id.* ¶ 2.4(b)(1).
[25] *Id.* ¶ 3.3.

As a result of his diagnosis, Roe was referred to the local Informal Physical Evaluation Board ("IPEB"), which reviewed his records to determine whether he should be retained for service or medically discharged.  Roe Decl. ¶ 10.  Roe's commanding officer and his primary care doctor both recommended to the IPEB that he be retained.  *Id.* ¶ 11.  In spite of these recommendations, and though none of his doctors ever recommended that his daily work be restricted in any way because of his diagnosis, *id.* ¶ 8, the IPEB decided Roe should be discharged because his "condition is not compatible with the fundamental expectations of military service," as it is "subject to sudden and unpredictable progression and will result in deployment restrictions."  *See* Ex. A2.

Roe appealed this decision to the Formal Physical Evaluation Board ("FPEB").  Roe Decl. ¶ 14.  While waiting for his appeal, Roe collected letters of support from his commanding officers and colleagues.  *Id.* ¶ 15.  All requested that he be retained.  *Id.*  Among the recommenders was Lt. Col. Jason Okulicz, the Director of the HIV Medical Evaluation Unit at San Antonio Military Medical Center, who stated that there was "[no] medical reason to explain why [Roe] would not be returned to duty."  *See* Ex. A3.

Roe attended his FPEB hearing.  Roe Decl. ¶ 16.  Roe describes the hearing as pro forma. *Id*. ¶ 17.  It lasted only a few minutes, and only one question was asked of Roe regarding a logistical error that had delayed the receipt of a particular test result.  *Id*.  Although Roe had been told before the hearing that it would take weeks or months for the FPEB to reach a decision, he received a determination approximately three hours after the hearing.  *Id*. ¶ 18.  The FPEB determined that because Roe was no longer worldwide deployable, he "place[d an] increased burden on others within [his] career field."  *See* Ex. A4.  The FPEB therefore—despite the

recommendations of Roe's doctors, colleagues, and commanding officers—upheld the decision of the IPEB and recommended Roe's discharge.  *Id.*

Roe wrote a letter of appeal to the Secretary of the Air Force.  Roe Decl. ¶ 14.  In response, Roe received a memorandum from John K. Vallario of the Air Force Personnel Board ("AFPB") on behalf of the Secretary of the Air Force, dated November 7, 2018, denying his appeal and directing that he be discharged.  Roe Supp. Decl. ¶ 2.  The AFPB noted in the memorandum that Roe has been "compliant with all treatment, is currently asymptomatic, and has an undetectable . . . viral load," and that he is "able to perform all in garrison duties, has passed his most recent fitness assessment without any component exemptions, and his commanding officer strongly supports his retention."  *Id.*  The justification for the AFPB's decision was that Roe is not worldwide deployable.  *Id.*  As things currently stand, Roe will be separated from the Air Force in accordance with the AFPB's decision on March 28, 2019.  Roe Supp. Decl. ¶ 6.

### 2.    Victor Voe's Air Force Service

Plaintiff Voe has served in the Air Force for the past seven years, since enlisting at the age of 19 in 2011.  Voe Decl. ¶ 1.  He has dedicated himself to serving his country and sought special approval to deploy to the Middle East for a second time earlier than he would otherwise have been eligible, forgoing the rest period afforded to members of the Air Force when they return from deployment.  *Id.* ¶ 6.

On March 1, 2017, Voe was diagnosed with HIV.  *Id.* ¶ 11.  In compliance with Air Force policy, he began antiretroviral therapy almost immediately after his diagnosis.  *Id.*  Voe had an undetectable viral load within a few months.  *Id.*  It has remained undetectable ever since. *Id.*  His treatment regimen requires that he take two pills at the same time once a day.  *Id.* ¶ 12.

These pills are issued in 90-day supply, and do not require any special storage conditions.  *Id.*

As long as he consistently adheres to his treatment, his viral load can be expected to remain at an

undetectable level.  *Id*. ¶ 15.

As a result of his diagnosis, Voe was referred to the IPEB, which reviewed his records to

determine whether he should be retained for service or medically discharged.  *Id*. ¶ 13.  His

commanding officer supported his retention, and his doctors informed the IPEB that his

condition does not affect his ability to do his job.  *Id*.  In October 2017, Voe received notification

that the IPEB was recommending he be separated based on his HIV status.  *See* Ex. B1.  Voe

appealed the IPEB's decision to the FPEB.  Voe Decl. ¶ 16.  Voe attended the FPEB hearing,

which lasted only twenty minutes, and received a decision after only thirty minutes of

deliberation.  *Id*.  The FPEB also recommended that Voe be separated based on his HIV status.

*See* Ex. B2.

On December 27, 2017, Voe appealed the FPEB's recommendation to the Secretary of

the Air Force.  Voe Decl. ¶ 17.  Nearly a year later, on November 7, 2018, the AFPB issued a

memorandum to Voe, written by John K. Vallario on behalf of the Secretary of the Air Force,

denying his appeal and directing his discharge.  *Id*. ¶¶ 17–18.  The AFPB noted, in language

identical to that of the memorandum issued to Roe, that Voe has been "compliant with all

treatment, is currently asymptomatic, and has an undetectable . . . viral load."  Ex. B3.  It further

noted that he is "able to perform all in garrison duties, has passed his most recent fitness

assessment without any component exemptions, and his commander strongly supports his

retention."  *Id*.  Nevertheless, the AFPB determined that Voe's condition precludes him from

being designated worldwide deployable, and therefore renders him "unfit for continued military

10

service." *Id.* Voe received notice of his date of separation on December 20, 2018. Voe Decl. ¶ 21. His date of separation is February 25, 2019. Ex. B4.

Since the Complaint in this action was filed, five additional members of the Air Force who are members of Outserve-SLDN have contacted OutServe-SLDN, informing it that they too are being separated on the basis of their HIV status. Ex. C. Plaintiffs are aware of at least one relatively recent decision in which the AFPB decided to retain the member living with HIV. *See* Ex. A6. Roe and Voe, on the other hand, are being separated for the very same condition.

Roe and Voe desire nothing more than to be allowed to continue to serve their country, for which they are physically and medically capable. They seek relief in this lawsuit under the Administrative Procedure Act and the equal protection guarantee of the U.S. Constitution. Plaintiffs ask this Court to enjoin Defendants from discharging Roe, Voe, and others similarly situated—as well as from otherwise acting to impede their military careers—while this action is pending.

## III.    LEGAL STANDARD

To obtain a preliminary injunction, a moving party must show: (1) a clear likelihood of success on the merits; (2) a clear likelihood that he or she will suffer irreparable harm in the absence of such relief; (3) that the balance of equities tips in plaintiff's favor; and (4) that an injunction is in the public interest. *United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013). "While plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits, they 'need not show a certainty of success.'" *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

With respect to Plaintiffs' constitutional claims, although "constitutional review" of military regulations is often "more deferential than [such] review of similar . . . regulations

designed for civilian society," *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986), military personnel decisions are subject to equal protection constraints.  *See, e.g.*, *Emory v. Sec'y of Navy*, 819 F.2d 291, 294 (D.C. Cir. 1987) ("The military has not been exempted from constitutional provisions that protect the rights of individuals. It is precisely the role of the courts to determine whether those rights have been violated."); *Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976)  ("[T]he military is subject to the Bill of Rights and its constitutional implications."); *Larsen v. U.S. Navy*, 486 F. Supp. 2d 11, 18–19  (D.D.C. 2007) (rejecting Navy's contention that "its personnel decisions are immune from judicial scrutiny where constitutional wrongs are alleged"); *Dahl v. Sec'y of U.S. Navy*, 830 F. Supp. 1319, 1328 (E.D. Cal. 1993) ("the essence of individual constitutional rights . . . remain[s] intact" in the military).

## IV.    ARGUMENT

The Plaintiffs are entitled to a preliminary injunction because they are likely to succeed on their claims regarding deployability and retention under the U.S. Constitution (Section IV.A); on their claims regarding only retention under the APA (Section IV.B.1); and/or on their claims regarding deployability and retention under the APA (Sections IV.B.2 and IV.B.3).

### A.    Plaintiffs Are Likely To Succeed on the Merits of Their Equal Protection Claim.

The military's deployment regulations and policies with respect to people living with HIV violate the equal protection guarantee of the Constitution.  Although Plaintiffs maintain that people living with HIV meet all of the criteria defining a suspect or quasi-suspect class, and that regulations and policies that single them out for disparate treatment should therefore be subjected

12

to heightened scrutiny, that analysis is not necessary here.[26]   That is because Defendants'
deployment regulations and policies applicable to people living with HIV lack even a rational
relationship to a legitimate government interest.  Plaintiffs are likely to succeed under any level of
review.

Plaintiffs do not dispute that Defendants have legitimate interests here: for example,
protecting the health/safety of the force; military readiness; and building and maintaining an
effective military.  But the challenged regulations and decisions at issue in this case—restricting
people with HIV from deploying and separating them from service as a result—are not rationally
related to those interests.

> 1.   **The military's restrictions on military service for people living with
> HIV are not even rationally related to military effectiveness.**

Under even the lowest level of review, to be valid, a law must bear a rational relationship
to a legitimate government interest.  *See, e.g.*, *U.S. Dep't of Agric. v. Moreno*, 413, U.S. 528, 534
(1973).  This standard is "not a toothless one."  *Mathews v. Lucas*, 427 U.S. 495, 533 (1976), and
the regulations fail to meet it.  Because of advances in HIV treatment, there is no longer a
rational relationship between deployment restrictions on Service members with HIV and any
legitimate government interest related to military effectiveness, readiness, lethality, or other
purported justification.

> a.   **HIV does not affect a person's fitness, deployability,
> effectiveness, or lethality.**

The military's restrictions on deployability are not rationally related to military

effectiveness or readiness, because a person's physical capabilities are not generally affected by

---

[26] This argument is more fully briefed in the memorandum in support of plaintiffs' motion for a
preliminary injunction in *Harrison, et al. v. Mattis, et al.*, No. 1:18-cv-00641 (E.D. Va. July 19,
2018).  Plaintiff's Motion for Preliminary Injunction [Dkt. 25].

an HIV diagnosis.  Before the availability of antiretroviral therapy in 1996, physical limitations

likely would develop once an individual was diagnosed with AIDS, often years after initial

diagnosis.  Now, however, someone who receives treatment will not experience ill health or

physical limitations.  *See* Hendrix Decl. ¶¶ 26–27 (Ex. F).  Even the Defense Health Agency—

the medical arm of Defendant DoD—has recognized this, stating: "In the past 30 years, HIV-1

infection has gone from an untreatable disease marked by inexorable clinical progression through

extreme debility to death to a treatable disease that is compatible with active service throughout a

full career in the U.S. military."[27]  The DoD itself admitted more than a decade ago that "[t]here

is no evidence that HIV infection, per se, affects physical fitness."[28]  And in a study evaluating

the physical fitness characteristics of active duty Air Force members with HIV, the medical

researchers found that over a 10-year period, "USAF members with HIV had similar composite

[physical fitness] test scores compared with HIV-uninfected controls."[29]  In fact, the study

actually revealed "improved performance in several test components after HIV diagnosis, which

suggests that members may have increased their physical conditioning as part of improved

health-seeking behaviors."[30]  These results demonstrate "that impaired physical fitness is not a

barrier to continuing military service for USAF member[s] with HIV.."[31]

---

[27] J. Brundage, D. Hunt & L. Clark, *Durations of Military Service After Diagnoses of HIV-1 Infections Among Active Component Members of the U.S. Armed Forces 1990-2013*, Vol. 22 No. 8, Medical Surveillance Monthly Report, Vol. 22, No. 8 (Defense Health Agency, Aug. 2015), https://health.mil/Reference-Center/Reports/2015/01/01/Medical-Surveillance-Monthly-Report-Volume-22-Number-8.
[28] Office of the Assistant Sec'y of Def., *Health Affairs Policy Mem. – Human Immunodeficiency Virus Interval Testing* (Mar. 29, 2004), https://www.health.mil/Reference-Center/Policies/2004/03/29/Policy-Memorandum---Human-Immunodeficiency-Virus-Interval-Testing.
[29] *See* Asha De, et al., *supra* note 26.
[30] *Id.*
[31] *Id.*

14

Staff Sergeant Roe and Senior Airman Voe demonstrate that an HIV diagnosis has no impact on physical abilities.  The Secretary of the Air Force acknowledged that both Roe and Voe are "able to perform all in garrison duties, [and have] passed [their] most recent fitness assessment[s] without any component exemptions."  Ex. A5; Ex. B3.  Thus, neither Roe's nor Voe's HIV has impacted their physical abilities or fitness to serve.

**b.      Service members living with HIV who are deployed can readily be provided with necessary medical care.**

The military's purported concerns regarding the risks posed to Service members with HIV while deployed are unfounded given current capabilities for medically managing HIV. Medical care for people living with HIV has changed dramatically since the DoD issued its first version of Instruction 6485.01 in 1991.[32]  Effective treatment became widely available in 1996, and today HIV medications generally consist of a one or two tablet regimen, "which is literally one pill taken once a day."  Hendrix Decl. ¶ 23.  This is no different from the daily dose of medication that those with dyslipidemia (high cholesterol)—who are permitted to enlist and deploy per current military policies—must take daily, or the anti-malarial medication that many deployed Service members are given by the military.[33]

Medical monitoring of individuals with HIV has also advanced to the point that there is no longer any HIV-related risk to personnel with HIV while serving and deploying.  Viral load

---

[32] DoDI 6485.1 (1991).

[33] *See* DoDI 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services*, Encl. 4, § 5.24(n), p. 39 (May 6, 2018); *see* Assistant Secretary of Defense, Health Affairs, *Memorandum re Guidance on Medications for Prophylaxis of Malaria*, (April 15, 2013), https://health.mil/Reference-Center/Policies/2013/04/15/Guidance-on-Medications-for-Prophylaxis-of-Malaria); *see, e.g.,* DoDI 6490.07, Encl. 3, para. g (stating that hypertension "not controlled with medication or that requires frequent monitoring" is "usually" precluding of contingency deployment, implying that hypertension that is controlled by medication is usually *not* precluding).

15

testing generally is required only twice per year for those who are virally suppressed.  This

testing is routine and entails drawing and testing a blood sample.  Hendrix Decl. ¶ 23.  When

testing facilities are not available in theater, blood samples may be shipped to a lab.  *Id.*  But

point-of-care viral load testing that is cost-effective and returns results within 90 minutes is also

becoming increasingly available.  *Id.*

In addition, the on-site care of people living with HIV who have a suppressed viral load

is relatively minimal, and physicians can provide the requisite level of care for individuals with

HIV, regardless of where they are stationed.[34]  *Id.* ¶ 25.  In the unusual event that on-site medical

personnel do not feel capable of providing the necessary care, an infectious disease specialist

may consult via telemedicine.  *Id.*  In sum, individuals with HIV who receive treatment are not at

any greater risk than, and can access care in a manner similar to, other individuals serving in the

military.

The cost of providing health care to Service members with HIV is also not a legitimate

basis for Defendants' discriminatory regulations and decisions, which are centered on restrictions

on deployment. For decades, the military has borne the costs of providing care to Service

members diagnosed with HIV. That is not going to change regardless of the outcome of this

case: allowing Service members to deploy will not alter the financial cost of providing them care.

And while separating Service members with HIV, including Plaintiffs, will reduce the DoD's

health care costs, neither the challenged regulations nor Defendants' decision to separate

Plaintiffs is based on cost. But if they are, costs alone are an insufficient reason to justify

---

[34] In fact, while Air Force policies generally prohibit overseas assignments without a waiver, one of the Service members being separated here has been serving abroad during the two years since his diagnosis. (Perkowski Decl. ¶¶ 7-29.)

discriminatory regulations that otherwise represent a clear violation of equal protection.  The

government may not "protect the public fisc by drawing an invidious distinction between

classes" of persons.  *Mem. Hosp. v. Maricopa County*, 415 U.S. 250, 263 (1974).

> **c.  Other purported justifications for restrictions on service for HIV-positive individuals do not pass muster.**

Plaintiffs are likely to show that other purported justifications also lack merit.  To date,

there is no documented evidence of a battlefield transmission ever having taken place.  Hendrix

Decl. ¶ 21.  Moreover, given the known effect of a suppressed or undetectable viral load on

sexual transmission risk, there is an "extremely low—and possibly only theoretical—risk of

transmission via blood splash and other non-injection activities."  Del Rio Decl. ¶ 27.  In the

highly unlikely event that such an exposure occurred, post-exposure prophylaxis could be

administered, further decreasing whatever minimal risk of exposure existed.  Hendrix Decl. ¶ 22.

As a result, there is no basis to conclude that someone with HIV would present a danger to other

military personnel.  *Id.*

Allowing individuals with HIV to serve and deploy overseas also does not jeopardize the

safety of military blood supplies.  People living with HIV are instructed not to act as blood

donors and any risk to blood supplies from those who are unaware they have HIV would remain

constant.  *Id.* ¶ 30.  Eliminating the military's discriminatory HIV-related regulations will have

no impact on the so-called "walking blood bank," *i.e.*, donations from Service members in

emergency situations.  Emergency battlefield transfusions are relatively rare.  *Id.* ¶ 31 n.31.  As it

currently stands, not all Service members can serve as donors, given that "various other factors

that often disqualify individuals as emergency blood donors, such as blood type—making people

living with HIV no different from these other groups who are allowed to serve and deploy."  *Id.*

Furthermore, the future availability of blood substitutes should also diminish the military's need

to rely on the "walking blood bank." *Id.*

### B.       Plaintiffs Are Likely To Succeed on the Merits of Their APA Claims.

Plaintiffs are also likely to succeed on the merits of their APA claims, because

Defendants have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision or action is

not in accordance with law if it is "inconsistent with [an agency] regulation." *Thomas Jefferson*

*Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *see also J.E.C.M. ex rel. Saravia v. Lloyd*, --- F.

Supp. 3d ---, 2018 WL 6004672, at *13 (E.D. Va. 2018) ("[W]here an agency's decision does

not comport with governing statutes or regulations, that decision is 'not in accordance with law'

and must be set aside."). Whether an agency's decision or action is arbitrary and capricious, on

the other hand, depends on whether the agency provided "a rational connection between the facts

found and the choice made." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*

*Ins. Co.*, 463 U.S. 29, 43 (1983). The rationale for the agency's decision must be "both

discernable and defensible." *Banks v. Ball*, 705 F. Supp. 282, 285 (E.D. Va. 1989) (quoting

*Trans-Pacific Freight v. Fed. Mar. Comm'n*, 650 F.2d 1235, 1251 (D.C. Cir. 1980)). A decision

is arbitrary and capricious if "the agency . . . entirely failed to consider an important aspect of the

problem, [or] offered an explanation for its decision that runs counter to the evidence."

*Defenders of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 396 (4th Cir. 2014); *see also*

*Thompson v. United States*, 119 F. Supp. 3d 462, 467 (E.D. Va. 2014). A decision may also be

arbitrary if inconsistent with decisions made regarding similarly situated individuals. *Kreis v.*

*Sec'y of the Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005). Courts should therefore "ensure that

the agency has examined the relevant data and articulated a satisfactory explanation for its

action." *Defenders of Wildlife*, 762 F.3d at 396 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009)).

In deciding to separate Roe and Voe based on their purported inability to deploy on a worldwide basis, Defendants have acted in an arbitrary and capricious manner. First—and most important to the injunction Plaintiffs seek—Defendants' decision to discharge Roe and Voe, as well as the others similarly situated, is inconsistent with DoD and Air Force regulations against separating Service members based on HIV status alone. Second, the Air Force's decisions conflict with decisions regarding similarly situated Service members and offer no explanation for such inconsistent application of Air Force regulations. Third, in determining that Roe and Voe (and others) are not worldwide deployable, the Air Force failed to take into account the current state of HIV medical science and, therefore, made decisions that run counter to the evidence. Fourth, the Air Force's and DoD's regulations limiting the deployability of Service members living with HIV are themselves arbitrary and capricious for the same reasons. Thus, Plaintiffs are likely to succeed on the merits of their APA claims.

> 1. **The decisions to separate Roe and Voe because of their HIV status are arbitrary, capricious, and contrary to law because they violate the Air Force regulation preventing the separation of Service members with HIV based solely on their HIV status.**

Defendant Wilson's decision to separate Roe and Voe because of their purportedly limited deployability are contrary to DoD and Air Force regulations. These regulations—AFI 44-178 and DoDI 1332.45—do not allow for the separation of active duty Air Force members based on an HIV diagnosis alone. Nevertheless, both Roe and Voe were separated for no reason other than their HIV status.

Defendant Wilson acted in a manner directly contrary to the Air Force's own regulation. Section 2.4.1 of AFI 44-178 states that "HIV seropositivity alone is not grounds for medical

separation or retirement for [Active Duty Air Force] members."[35]  The SAF memoranda state that Roe's and Voe's separations are based on purported restrictions on their ability to deploy. But their purported inability to deploy worldwide is based solely on their HIV status, not on any negative effects of HIV itself.  Their separation is not based on any finding of physical disability, nor that Roe and Voe are in any way unfit to perform their duties.  If, according to the Air Force, HIV seropositivity alone places restrictions on a member's ability to deploy, and restricted deployability alone is grounds for separation, then HIV seropositivity alone is the grounds for separation.

The Air Force's actions are also not in alignment with DoDI 1332.45.  DoDI 1332.45 states that: "Service members with a medical condition that requires additional medical screening, or Combatant Command approval prior to deployment outside the continental United States, will be categorized as Deployable with Limitations.  This includes, but is not limited to, conditions referred to in DoDI 6490.07."  HIV is one of the conditions referred to in DoDI 6490.07.  Service members classified as "deployable with limitations" are not subject to the retention reviews required under DoDI 1332.45.  The Government has represented to this Court that it would be appropriate to classify people living with HIV as "deployable with limitations" under this new regulation.  At the very least, Roe and Voe—and this Court—deserve an explanation as to why they were not placed in this category and, thereby, retained by the Air Force.  The decisions made with respect to Roe and Voe, and others—without such an explanation or even a reference to DoDI 1332.45—are arbitrary and capricious.

---

[35] AFI 44-178, ¶ 2.4.1.

Furthermore, the proper application of Section 2.4.1—preventing the separation of Service members based on HIV-positive status alone—is completely consonant with the remaining sections of AFI 44-178 and other relevant DoD Instructions.  AFI 44-178, DoD 6485.01, and DoD 6490.07 all contemplate the continued service of Service members living with HIV despite the deployment restrictions placed on them by DoDI 6490.07.  The determinations that Plaintiffs are not worldwide deployable (which Plaintiffs also separately challenge as unconstitutional and a violation of the APA) are not incompatible with the mandate that Service members in the Air Force will not be separated based solely on their HIV status.  In other words, the Air Force need not choose between the application of two different regulations to comply with AFI 44-178 and retain the Plaintiffs and others similarly situated.

Thus, the Air Force acted in a manner inconsistent with its own policy as set forth in AFI 44-178 and DoDI 1332.45 in violation of the APA, making these decisions arbitrary, capricious, and contrary to law.

**2.      The decisions to separate Roe and Voe are arbitrary and capricious because they are inconsistent with decisions regarding other similarly situated members of the Air Force, failed to consider important facts, and run counter to the evidence.**

Defendant Wilson's characterizations of Roe and Voe as less than worldwide deployable and the decisions to separate them based on those purported restrictions are arbitrary and capricious.  The rationale for discharging Roe and Voe is indefensible because it is inconsistent with decisions made regarding other Service members living with HIV; fails to consider important facts, such as the current state of HIV medical science; and contravenes the evidence that Roe and Voe are physically and medically capable of deploying.

When it comes to application of agency regulations, "[i]t is axiomatic that an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to

do so." *Kreis*, 406 F.3d at 687. In fact, the "Government is at its most arbitrary when it treats similarly situated people differently." *Etelson v. Office of Pers. Mgmt.*, 684 F.2d 918, 926 (D.C. Cir. 1982). Defendant Wilson's decisions to characterize Roe and Voe as less than worldwide deployable and to separate them as a result—decisions that are inexplicably inconsistent with decisions regarding other members of the Air Force living with HIV—are therefore arbitrary and capricious. Other Service members, despite having the same supposed limitations on their deployment, have been retained for service. Ex. A6; Voe Decl. ¶¶ 4–5. In one decision in particular of which Plaintiffs are aware, the SAF found that because the member "remained symptom free and with an undetectable viral load," the member would be retained and returned to duty. Ex. A6. But Roe and Voe have also remained "asymptomatic, and [have] an undetectable viral load." Ex. A5; Ex. B3. The Air Force has offered no explanation for treating Roe and Voe differently from these similarly situated Service members. Such unjustified inconsistency makes Defendant Wilson's decisions to separate Roe and Voe impermissibly arbitrary and capricious.

The Air Force's actions in discharging Roe and Voe are arbitrary and capricious because they failed to consider the current state of HIV medical science and run counter to the evidence that HIV-positive individuals with access to health care lead healthy lives with few to no limitations. Reliance on inaccurate and outdated information can make an agency's decision arbitrary and capricious. *Wilson v. Office of Civilian Health and Med. Program of Uniformed Servs.*, 866 F. Supp. 931, 936 (E.D. Va. 1994) (finding Defendants' actions arbitrary and capricious in part because they "relied on material that was not up to date").

The Air Force cites Plaintiffs' purported inability to deploy worldwide as the reason they are unfit for continued military service. Ex. A5; Ex. B3. But, from a medical standpoint,

Plaintiffs are able to deploy worldwide.  In the current medical landscape, individuals living with

HIV do not require an inordinate amount of medical care while deployed.  Hendrix Decl. ¶ 23.

HIV is now an easily managed condition.[36]  This treatment regimen is the same as treatment for

high blood pressure or hypothyroidism, conditions which do not, under DoD regulations, limit

accession (enlistment or commissioning) or deployability.[37]

Furthermore, under this simple treatment regimen, a person living with HIV will not

experience physical limitations.  *See* Hendrix Decl. ¶¶ 26–27.  As a military report has noted,

HIV is now "a treatable disease that is compatible with active service throughout a full career in

the U.S. military."[38]  Roe and Voe exemplify these results.  The doctors who examined Plaintiffs

first-hand could find no medical reason they could not continue to serve in their present

capacities, Ex. A5; Ex. B3, and there is no medical reason that would prevent them from doing

their jobs on deployment.  The Air Force said itself that both Roe and Voe are "able to perform

all in garrison duties, and [] passed [their] most recent fitness assessment[s] without any

component exemptions."  Ex. A5; Ex. B3.

---

[36] HIV.gov, *What Are HIV and AIDS?* (May 15, 2017), https://www.hiv.gov/hiv-basics/overview/about-hiv-and-aids/what-are-hiv-and-aids.

[37] *See* DoDI 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services*, Encl. 4, § 5.24(n), p. 39 (eff. May 6, 2018).  *See, e.g.,* DoDI 6490.07, Encl. 3, para. g (stating that hypertension "not controlled with medication or that requires frequent monitoring" is "usually" precluding of contingency deployment, implying that hypertension that is controlled by medication is usually *not* precluding).

[38] J. Brundage, D. Hunt & L. Clark, *Durations of Military Service After Diagnoses of HIV-1 Infections Among Active Component Members of the U.S. Armed Forces 1990-2013*, Armed Forces Health Surveillance Center, Medical Surveillance Monthly Report, Vol. 22, No. 8 (Aug. 2015), https://health.mil/Reference-Center/Reports/2015/01/01/Medical-Surveillance-Monthly-Report-Volume-22-Number-8.

With respect to Roe and Voe, therefore, there have been "clear error[s] of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  Defendant Wilson, in deciding to designate Roe and Voe as less than worldwide deployable and in deciding to separate Plaintiffs based on these purported restrictions on their ability to deploy, did not consider the advances made in the treatment of HIV over the past three decades; did not consider that HIV is an easily managed condition; and made a decision counter to the evidence that Roe and Voe *are* healthy and physically and medically capable of deploying.  The Defendants' decisions are therefore arbitrary and capricious.

3.     **The portions of the Air Force's and DoD's regulations limiting the deployment of Service members with HIV and preventing their retention based on those purported limitations are themselves arbitrary and capricious because they fail to take into consideration the current state of HIV medical science.**

Even if it was not a violation of the APA for Defendants to ignore Section 2.4.1 of AFI 44-178, the decisions to separate Roe and Voe—and others similarly-situated—are a violation of the APA because the portions of the Air Force and DoD regulations under which Roe and Voe were classified as non-deployable (and then separated) are themselves arbitrary and capricious. These regulations make categorical determinations that individuals living with HIV are limited in their ability to deploy.  But, like the decisions with respect to Roe and Voe, the regulations are impermissibly based on outdated and inaccurate information.  *Wilson*, 866 F. Supp. at 936 (finding Defendants' actions arbitrary and capricious in part because they "relied on material that was not up to date").  As a result, the regulations fail to consider an important aspect of the issue—the contemporary treatment options for HIV and the positive impact of those

treatments—and reached a result that runs counter to the evidence that HIV is no longer

necessarily a limiting condition.  These regulations are therefore arbitrary and capricious.

DoDI 6490.07 states that "[i]n general, individuals with . . . [a] diagnosis of human

immunodeficiency virus (HIV) antibody positive with the presence of progressive clinical illness

or immunological deficiency . . . shall not deploy unless a waiver is granted."[39] It further states

that: "The cognizant Combatant Command surgeon shall be consulted in *all* instances of HIV

seropositivity before medical clearance for deployment."  *Id.*  Roe and Voe do not have

"progressive clinical illness or immunological deficiency" in the way those terms are commonly

defined [I will find where those terms are defined in other military policies—I learned over the

past couple of days that they are.], but this regulation is interpreted to apply to all Service

members living with HIV, regardless of the status of their immunological health.  This

regulation, along with others requiring the immediate reassignment of Service members with

HIV to the continental United States, is based on the outdated notion that a person with HIV has

an illness that will result in the progressive deterioration of their health.  This kind of thinking

hails back to the days when an AIDS diagnosis was irreversible, and HIV was a universally

terminal condition.  Del Rio Decl. ¶ 21 (Ex. D).  But with modern treatment, once a person has a

suppressed or undetectable viral load, they will remain virally suppressed and in good health as

long as they adhere to treatment.  Voe Decl. ¶ 151; Roe Decl. ¶ 13.  A policy based on current

HIV medical science would not classify individuals living with HIV—even those with some

degree of progressive clinical illness or immunological deficiency—as permanently non-

deployable when they likely will be, in a matter of months, virally suppressed and without any

---

[39] DoDI 6490.07, Encl. 3, § 2(e).

meaningful or significant progressive clinical illness or immunological deficiency.  These individuals are perfectly capable of deploying and fulfilling their duties.

The reassignment provision of AFI 44-178 is similarly outdated.  This provision states that Active Duty Members living with HIV "must be assigned within the continental United States . . . [or] Alaska, Hawaii, and Puerto Rico."[40]  The Secretary of the Air Force is also permitted to, "on a case-by-case basis, further limit duties and assignments of members to protect the health and safety of the HIV-infected member or other members."[41]  In the current medical landscape, where a Service member's HIV can be controlled through a simple one or two pill regimen, Hendrix Decl. ¶ 23, there is no justifiable reason to limit Service members to assignment within the continental United States, Alaska, Hawaii, and Puerto Rico.  Service members can easily carry their prescriptions with them while performing duties that keep them away from a location to which such medications could be shipped.[42]  Furthermore, for an individual with a suppressed or undetectable viral load, there is no reason to further limit their duties and assignments, either for their own safety or the safety of others.  An individual living with HIV, especially one with a suppressed viral load, is no less capable of safely performing their duties and assignments than a person without HIV.  Hendrix Decl. ¶¶ 26–27.  A Service member with a suppressed HIV viral load is also not capable of transmitting HIV to others, even in the rare instance that they might make open wound to open wound contact.  Del Rio Decl. ¶¶ 25, 27.  There is therefore no reason—at least not one grounded in modern HIV medical science—to restrict the assignment of Service members living with HIV to the continental

---

[40] AFI 44-178, ¶ 2.4.2.

[41] *Id.*

[42] *See* DoDI 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services*, Encl. 4, § 5.24(n), p. 39 (eff. May 6, 2018).

United States, Alaska, Hawaii, and Puerto Rico, nor to further limit Service members' assignments and duties for their own safety or the safety of others. These regulations are therefore arbitrary and capricious.

### C.     Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction

Without a preliminary injunction, Plaintiffs Roe and Voe—and others who are similarly situated—will be separated during the pendency of this case. If they are separated, they will not be able to secure all of the relief they seek in their Complaint. Though Plaintiffs adamantly disagree, the Air Force has determined that Roe and Voe are unable to deploy because of their HIV status. Ex. A5; Ex. B3. They have already received final decisions from the Secretary of the Air Force directing their separation and bringing their military careers to an abrupt end. Roe Decl. ¶ 7; Ex. B4. Voe will be separated on February 25, 2019, and Roe will be separated on March 28, 2019. Roe Decl. ¶ 7; Ex. B4. Without a preliminary injunction, Plaintiffs Roe and Voe—along with other Service members with HIV who find themselves in the same position, *see* Ex. C1; Ex. C2; Ex. C3; Ex. C4—will be irreparably harmed. *See Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 977 (9th Cir. 2017) ("[L]oss of opportunity to pursue one's chosen profession constitutes irreparable harm.").

Where a military regulation or policy poses a credible threat of discharge, harm— adequate to warrant a preliminary injunction—is present. *Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305, at *4 (W.D. Wash. Dec. 11, 2017), *appeal dismissed*, No. 17-36009, 2017 WL 8229552 (9th Cir. Dec. 30, 2017) (finding adequate harm to grant a preliminary injunction where "[a]s a result of [a military directive], [some plaintiffs] face[d] a credible threat of discharge."). *See also*, Stone v. Trump, 280 F. Supp. 3d 747, 769 (D. Md. 2017) (finding that

military members who alleged they were being unconstitutionally banned from serving in the

military because they are transgender were going to be irreparably harmed).

 Individuals who are discharged from military service stand to lose medical benefits and a

portion of their retirement pay.  *See Elzie v. Aspin*, 841 F. Supp. 439, 443 (D.D.C. 1993).  The

deprivation of medical benefits "is exactly the sort of irreparable harm that preliminary

injunctions are designed to address."  *Fishman v. Paolucci*, 628 F. App'x 797, 801 (2d Cir.

2015).

In addition, the stigma suffered by Plaintiffs in being separated from the Air Force is also

an irreparable harm that warrants a preliminary injunction.  Courts have recognized that there is a

certain "stigma of being removed from active duty."  *Elzie*, 841 F. Supp. at 443. Additionally,

the violation of constitutional rights "unquestionably constitutes irreparable injury."  *See Elrod v.

Burns*, 427 U.S. 347, 374 (1976).  The DoDI's and Air Force's regulations, and the application

of those regulations to Service members like Roe and Voe, create a regime in which otherwise

qualified, HIV-positive Service members are prohibited from serving in any capacity.  They

"stigmatize members of a disfavored group as innately inferior."  *Evancho v. Pine-Richland Sch.

Dist.*, 237 F. Supp. 3d 267, 294 (W.D. Pa. 2017) (citing *Heckler v. Mathews*, 465 U.S. 728, 739

(1984)).

### D.      The Balance of the Equities Weigh in Favor of Plaintiffs

The balance of equities weighs strongly in favor of granting the requested relief. The

Government "is in no way harmed by issuance of a preliminary injunction which prevents the

state from enforcing restrictions likely to be found unconstitutional.  If anything, the system is

improved by such an injunction." *Aziz v. Trump*, 234 F. Supp. 3d 724, 737 (E.D. Va. 2017); *see

also Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 192 (4th Cir. 2013) (citing *Doran v.

*Salem Inn, Inc.*, 422 U.S. 922, 934 (1975)).  Similarly, the government cannot be harmed by the issuance of a preliminary injunction that prevents them from enforcing regulations and actions that violate the APA.  Because Plaintiffs are likely to succeed in their constitutional challenges to DoDI and Air Force regulations, and in their APA challenges to the decision to separate them from the Air Force, the government cannot claim to be harmed.

Furthermore, the government cannot point to any significant harm it would suffer from an injunction.  As of June 2017, there were 1,194 Service members with HIV in the military.[43]  This number accounts for just 0.027 percent of all active duty Service members.[44]  *See* Hendrix Decl. ¶ 31.  Retaining this number of individuals until these issues can be litigated is a minimal burden. This is especially true when one considers that the Air Force has, in the past, retained at least 172 Service members living with HIV.[45]

### E.     The Public Interest Favors an Injunction

As this Circuit and Court have made clear, "upholding constitutional rights surely serves the public interest."  *Aziz*, 234 F. Supp. 3d at 738; *see also Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).  The public interest is also served by preventing discrimination based solely on HIV status as a principle of justice, permitting dedicated Service

---

[43] *See* DoD, *Update: Routine Screening for Antibodies to Human Immunodeficiency Virus, Civilian Applicants for U.S. Military Service and U.S. Armed Forces, Active and Reserve Components*, (Jan. 2012–Jun. 2017), 24 MED. SURVEILLANCE MONTHLY RPT. 8, 8–14 (Sept. 2017).

[44] *See* L. Ferdinando, *Pentagon Releases New Policy on Nondeployable Members*, U.S. Dep't of Defense (Feb. 16, 2018), https://www.defense.gov/News/Article/Article/1443092/pentagon-releases-new-policy-on-nondeployable-members/.

[45] *See* Asha De, et al., *supra* note 26 (studying the physical fitness of 172 Air Force members living with HIV between 2004 and 2014, demonstrating that between 2004 and 2014, the Air Force retained at least 172 individuals living with HIV).

members to continue serving their country, and receiving adequate medical care while awaiting a decision on the merits.

In addition, there is a significant public health interest in demonstrating to the broader public—particularly those at higher risk for HIV—that they will not face stigma or discrimination if they seek testing and treatment for HIV.  The CDC has indicated that "[m]ore than three decades after the first HIV diagnoses were made, stigma remains a barrier to addressing HIV in the United States."[46]  The issuance of a preliminary injunction to prevent continuing discrimination against people living with HIV will enhance efforts to educate the public about HIV transmission, prevention, and treatment.

## V.      CONCLUSION

For the reasons set forth above, Plaintiffs are entitled to an injunction preventing their separation from the Air Force pending a determination on the merits of this case.

---

[46] *See* CDC, *Act Against AIDS*, https://www.cdc.gov/actagainstaids/campaigns/lsht/index.html.

Dated:   January 11, 2018

/s/  Scott Schoettes
Scott Schoettes*
SSchoettes@lambdalegal.org
Kara Ingelhart*
KIngelhart@lambdalegal.org
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
105 W. Adams St., Suite 2600
Chicago, IL 60603
T: (312) 663-4413

Peter E. Perkowski*
PeterP@outserve.org
OUTSERVE-SLDN, INC.
P.O. Box 65301
Washington, DC 20035-5301
T: (800) 538-7418

*Attorneys for Plaintiffs*
*pro hac vice*

Respectfully Submitted

/s/  Andrew R. Sommer
Andrew R. Sommer
Virginia State Bar No. 70304
ASommer@winston.com
Lauren Gailey *
LGailey@winston.com
Laura Cooley
Virginia State Bar No. 93446
LCooley@winston.com
WINSTON & STRAWN LLP
1700 K St., NW
Washington, DC 20006
T: (202) 282-5000

Julie A. Bauer*
JBauer@winston.com
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
T: (312) 558-5600