IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

RICHARD ROE, et al.,                    )
                                        )
            Plaintiffs,                 )
                                        )
    v.                                  )
                                        )    1:18-cv-1565 (LMB/IDD)
PATRICK M. SHANAHAN, in his             )
    official capacity as Acting         )
    Secretary of Defense, et al.,       )
                                        )
            Defendants.                 )

## MEMORANDUM OPINION

Plaintiffs Richard Roe ("Roe") and Victor Voe ("Voe")[1] are members of the United

States Air Force who have been diagnosed with the human immunodeficiency virus ("HIV") and

who face imminent separation from service. Roe and Voe—together with plaintiff OutServe-

SLDN, Inc. ("OutServe"), an organization representing the interests of veterans, active-duty

servicemembers, and civilian employees of the U.S. Department of Defense ("DoD") who are

LGBTQ+ or HIV positive—bring this action for declaratory and injunctive relief against the

Secretary of Defense, the Secretary of the Air Force, and the DoD. Plaintiffs' complaint contains

five counts. Count I, asserted against all defendants, alleges that defendants' policies with respect

to the deployment and separation of HIV-positive servicemembers, on their face and as applied

to Roe and Voe, violate the equal protection component of the Fifth Amendment's Due Process

Clause. Counts II and III, which are asserted only against the Secretary of the Air Force, allege

that the decisions to separate Roe and Voe were arbitrary and capricious, an abuse of discretion,

---

[1] Roe and Voe are proceeding pseudonymously. To protect their identities, all documents
containing identifying information have been filed under seal, and redacted versions have been
made part of the public record.

and contrary to law in violation of the Administrative Procedure Act ("APA"). Finally, Counts IV and V allege that several of defendants' policies "are based on outdated thinking that does not comport with the current state of HIV medical science" and that defendants' failure to update those policies amounts to an independent violation of the APA.[2]

Plaintiffs have moved for a preliminary injunction preventing Roe and Voe, along with similarly situated servicemembers, from being discharged[3] because of deployment restrictions due to their HIV status. Plaintiffs argue that injunctive relief is necessary to preserve the status quo pending final disposition of their constitutional and administrative law claims. Defendants oppose plaintiffs' motion and have moved to dismiss the complaint for lack of subject matter jurisdiction, arguing that plaintiffs' claims are premature and nonjusticiable; that plaintiffs are not entitled to injunctive relief; and that the scope of any relief granted must be limited to Roe and Voe.[4] The parties have fully briefed and argued their motions.[5] For the reasons stated below,

---

[2] Count IV is asserted against the DoD and the Secretary of Defense; Count V is asserted against the Secretary of the Air Force.

[3] The terms "discharge" and "separation" are used interchangeably throughout this Opinion.

[4] Defendants' memoranda have mostly focused on the named plaintiffs and have not devoted significant attention to OutServe, the institutional plaintiff asserting the interests of its HIV-positive members who, like Roe and Voe, face imminent separation. Plaintiffs, too, have blurred the lines between Roe's and Voe's claims on the one hand and OutServe's on the other. For the most part, the parties' motions may be resolved by focusing on Roe and Voe; however, where appropriate, reference is also made to similarly situated members of OutServe.

[5] The parties' substantive written submissions consist of the Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 34] ("Pls.' Memo."); the Memorandum in Support of Defendants' Motion to Dismiss and Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction [Dkt. No. 50] ("Defs.' Memo. & Opp'n"); Plaintiffs' Opposition to the Motion to Dismiss and Reply in Support of Their Motion for a Preliminary Injunction [Dkt. No. 60] ("Pls.' Opp'n & Reply"); and the Reply in Support of Defendants' Motion to Dismiss [Dkt. No. 70] (Defs.' Reply."). Oral argument was held on February 15, 2019.

defendants' motion to dismiss will be denied, and plaintiffs' motion for a preliminary injunction will be granted in part and denied in part.

## I. BACKGROUND

### A. **Factual Background**[6]

1. Richard Roe

Roe enlisted in the Air Force in 2012. Compl. for Declaratory & Injunctive Relief [Dkt. No. 1] ("Compl.") ¶ 57. He enjoyed early signs of success, including being promoted to Senior Airman ahead of schedule and successfully testing for Staff Sergeant, a noncommissioned officer rank, on his first try. Id. ¶ 58. Roe hoped to make the Air Force his lifelong career and one day commission as an officer. Id. ¶ 74.

Roe's upward trajectory was halted in October 2017, when he was diagnosed with HIV while on active duty. Compl. ¶ 59. He began antiretroviral treatment immediately. Id. That treatment requires him to take one pill per day; the pills are stored in an ordinary pill bottle, and his prescription is refilled every 90 days. Id. Ever since he began treatment, Roe's "viral load"—the number of copies of the HIV virus per milliliter of his blood—has registered as "undetectable."[7] Id. ¶¶ 51, 59. He alleges that because of his successful treatment, he remains physically and mentally capable of continuing to serve in the Air Force. See id. ¶¶ 72-75.

---

[6] The following facts are drawn from the allegations in the complaint and from official documents appended to the parties' memoranda, which the Court may consider without converting defendants' motion to dismiss into one for summary judgment. Kerns v. United States, 585 F.3d 187, 192-93 (4th Cir. 2009).

[7] An untreated person with HIV may have a viral load in the thousands or even above one million. A viral load under 200 is classified as "virally suppressed"; a load under 48 to 50 is considered "undetectable." See Compl. ¶ 51.

Because Roe had tested positive for HIV, Air Force regulations required that he "undergo [a] medical evaluation for the purpose of determining [his] status for continued military service." Air Force Instruction ("AFI") 44-178, § 2.4, at A298-99.[8] In late November 2017, he received a Duty Limiting Condition Report restricting his deployability pending a Medical Evaluation Board's ("MEB") determination of his fitness for duty. A568. The MEB was convened in January 2018. A554. Roe's commanding officer submitted an impact statement to the MEB affirming that despite Roe's diagnosis, he could "perform all duties without work-arounds, restrictions or limitations." A556. The commanding officer's recommendation was unambiguous: "[Roe] is a valued team member. Recommend retention." A557. The commanding officer made clear that his recommendation would not change even if Roe were to be put on an assignment limitation code that could restrict his deployability. Id. Several other servicemembers likewise submitted letters on Roe's behalf. A562-66. Also before the MEB was a physician assistant's report prepared in January 2018 after a physical examination of Roe. The physician assistant wrote that although Roe would require ongoing antiretroviral treatment, he was asymptomatic and complication-free. A586-88. In response to a question asking whether "any of [Roe's] HIV-related illnesses or complications affect his . . . ability to work," the physician assistant selected "No." A588. An earlier report by an Air Force physician, also part of the record before the MEB, recommended that Roe be returned to active duty. A574.

The MEB did not order Roe retained and returned to duty. Instead, it opted to refer Roe's case to an Informal Physical Evaluation Board ("IPEB"). A554. The IPEB issued its findings and

---

[8] References in the form "A___" are to the documents attached to defendants' motion to dismiss. Some of those documents were filed under seal [Dkt. Nos. 55-58], and publicly available redacted versions have been filed as well [Dkt. No. 67].

recommendation on February 22, 2018. A549. Although the IPEB's report "acknowledge[d] the commander's recommendation for retention and statement that [Roe] is able to perform his daily in-garrison duties," it also asserted that Roe's condition "is subject to sudden and unpredictable progression"[9] and would "result in deployment restrictions that prevent him from being fully worldwide qualified." A550. As a result, the IPEB concluded that Roe's HIV status was "unfitting" and "[in]compatible with the fundamental expectations of military service." Id. The IPEB recommended that Roe be discharged from the Air Force. A549.

Roe appealed the IPEB's decision to the Formal Physical Evaluation Board ("FPEB"). Compl. ¶ 65. As part of the formal record of his appeal, Roe submitted a letter from the director of the HIV medical evaluation unit and infectious disease service at a military medical center. In the letter, the director opined that Roe "has no physical limitation that would prevent him from conducting his duties" and recommended that he be returned to active duty. A484. Roe also submitted letters from fellow servicemembers in support of his retention, a recent fitness report reflecting good scores, and commendations he had received during his time in service. See A482-548. A formal hearing was held before the FPEB in early April 2018. A481. The hearing lasted less than 30 minutes, and the FPEB affirmed the IPEB's decision roughly three hours later. Compl. ¶¶ 66-67. The FPEB, like the IPEB before it, recognized that Roe was successfully being treated and was asymptomatic. A481. It also acknowledged the commanding officer's recommendation that Roe be retained as well as Roe's "record of performance during his five years of military service and the numerous letters of support for his retention." Id. Nonetheless, the FPEB stated that under military regulations, Roe's HIV status was "disqualifying for

---

[9] The IPEB did not point to any evidence or documents in the record before it to support this assertion.

5

deployment" to the Central Command ("CENTCOM") area of responsibility,[10] which "would have [a] significant effect on his career progression and place [an] increased burden on others within his career field." Id. Accordingly, the FPEB concluded that Roe's condition "is <u>unfitting</u> for continued military service" and reaffirmed that he should be discharged. A480-81 (emphasis in original).

Roe appealed the FPEB's findings and recommendation to the Secretary of the Air Force, arguing that his condition "is simple to manage and does not place an undue burden on the Air Force." A471. He also argued that the FPEB's analysis was inconsistent with applicable Air Force regulations, which provide that "HIV seropositivity alone is not grounds for medical separation" and that HIV-positive servicemembers "who are able to perform the duties of their office, grade, rank and/or rating . . . may not be separated solely on the basis of laboratory evidence of HIV infection."[11] Id. Finally, he challenged the assertion that his condition rendered him nondeployable, asserting that under the applicable regulations, HIV renders a servicemember nondeployable only "with the presence of progressive clinical illness or immunological deficiency"[12]—both of which he claimed were absent in his case. A471-72. Counsel was also appointed to represent Roe before the Secretary. Roe's counsel argued that the IPEB and the FPEB were "feign[ing] fealty to the DoD (and by extension Air Force) policy on retaining HIV[-]infected members, but us[ing] the bludgeon of world-wide qualification to effectively bash the policy aside." A465.

---

[10] CENTCOM is "a theater-level Unified Combatant Command with responsibility for military operations across North Africa, Central Asia, and the Middle East, including Iraq and Afghanistan, within the Department of Defense." A423.

[11] See AFI 44-178, § 2.4.1, at A299; id. § A9.1.1, at A329.

[12] See Department of Defense Instruction ("DoDI") 6490.07, enclosure 3, § e(2), at A97.

The deputy director of the Secretary of the Air Force Personnel Council ("SAFPC"),

acting on authority delegated by the Secretary of the Air Force, rejected Roe's appeal on

November 7, 2018. The decision, which refers to Roe as "the member," states in relevant part:

> [Roe's] case was considered by the Air Force Personnel Board (AFPB), which made a recommendation regarding its disposition. The following rationale is provided for the final decision in this case. The Board considered the member's contention that he is fit and should be returned to duty. The Board noted the member has been compliant with all treatment, is currently asymptomatic, and has an undetectable [HIV] viral load. Additionally, he is able to perform all in[-]garrison duties, has passed his most recent fitness assessment without any component exemptions, and his commander strongly supports his retention. However, the Board noted the member's condition precludes him from being able to deploy world-wide without a waiver and renders him ineligible for deployment to the [CENTCOM] Area . . . , where the majority of Air Force members are expected to deploy. Deployability is a key factor in determining fitness for duty and the Board recognized the member belongs to a career field with a comparatively high deployment rate/tempo. Therefore, based on his inability to deploy and considering his current career point, the Board determined he is unfit for continued military service and shall be discharged with severance pay.

A460. Roe was advised that he had the "right to pursue further appeal" by applying to the Air

Force Board for Correction of Military Records ("AFBCMR"). A462. He has not done so.

Roe is scheduled to be discharged from the Air Force on March 28, 2019. Pls.' Memo.

Ex. A [Dkt. No. 44] ¶ 7. His term of service had been set to expire in mid-2018 but was twice

extended as he underwent the medical evaluation and administrative appeals process. Compl.

¶ 74. But for his impending discharge date, Roe's term of service (considering the extensions he

received) would have expired on June 25, 2019. Pls.' Memo. Ex. A [Dkt. No. 44] ¶ 6. He alleges

that he intended to reenlist for an additional term of service but was prevented from doing so

because of the separation process. Id.

2. Victor Voe

Voe enlisted in the Air Force in 2011. Compl. ¶ 77. He has served in several countries

overseas and in 2014 was deployed to the Middle East. Id. ¶ 78. Like Roe, Voe is dedicated to

service in the Air Force. Indeed, after his first period of service in the Middle East, Voe voluntarily cut short the "dwell time" between deployments so that he could return for a second tour ahead of schedule. Id.

Voe was diagnosed with HIV in March 2017. Compl. ¶ 79. He immediately began antiretroviral treatment, and since August 2017 his viral load has remained undetectable. Id. Voe takes two pills, at the same time, per day; those pills are stored in ordinary pill bottles and are refilled every 90 days. Id. ¶ 80. Voe claims that because of the treatment, he is asymptomatic and wishes to continue serving.

After his diagnosis, Voe's case proceeded in lockstep with Roe's. Voe's deployability was restricted, and his case was referred to an MEB for initial evaluation. See A768. Voe's commanding officer prepared an impact statement for the MEB in which she stated that Voe was "fully capable of performing any activity/function" necessary for his career field. A763. The commanding officer endorsed Voe unreservedly: "Member superiorly performs all primary duties and has also volunteered with enthusiasm for several on/off base organizations/ function[s]. He is overall a valuable [Air Force] asset. Retain." A764. The commanding officer indicated that her recommendation would not change even if Voe were to be placed on an assignment limitation code that could limit his deployability. Id.

The MEB found that Voe's HIV status made his "qualifications . . . for worldwide duty questionable" and referred his case to an IPEB. A761. The IPEB acknowledged the recommendation of Voe's commanding officer but found that Voe's

> medical condition prevents him from reasonably performing the duties of his office, grade, rank or rating; represents a medical risk to the health of [Voe] or the health/safety of others with continued service; is subject to progression; requires frequent follow-up with a medical specialist; and limits [Voe's] ability to meet mobility requirements.

8

A758.[13] Accordingly, the IPEB concluded that Voe's condition was "unfitting" and

"incompatible with the rigors of military service" and recommended that he be discharged.

A757-58.

Voe appealed to an FPEB. His formal hearing before the FPEB lasted only twenty

minutes. Compl. ¶ 84. Less than an hour after the hearing had concluded, the FPEB affirmed the

IPEB's recommendation that Voe be discharged. Id. The FPEB acknowledged that Voe's

"condition is welled [sic] controlled" and that he was asymptomatic. A756. But the FPEB found

that because Voe would need "frequent follow-up[s] with a specialist"[14] and had been classified

as nondeployable, his HIV condition made him "unfitting for continued military service." Id.

(emphasis in original).

Voe appealed to the SAFPC, which (acting on authority delegated by the Secretary of the

Air Force) rejected the appeal on November 7, 2018—the same day Roe's appeal was rejected.[15]

A748. The reasons given for denying Voe's appeal were identical to those provided in Roe's case:

> [Voe's] case was considered by the Air Force Personnel Board (AFPB), which
> made a recommendation regarding its disposition. The following rationale is
> provided for the final decision in this case. The Board considered the member's
> contention that he is fit and should be returned to duty. The Board noted the member
> has been compliant with all treatment, is currently asymptomatic, and has an
> undetectable [HIV] viral load. Additionally, he is able to perform all in[-]garrison
> duties, has passed his most recent fitness assessment without any component
> exemptions, and his commander strongly supports his retention. However, the
> Board noted the member's condition precludes him from being able to deploy
> world-wide without a waiver and renders him ineligible for deployment to the

---

[13] The IPEB did not identify any scientific evidence or documents in the record before it to
support these conclusions.

[14] Again, the FPEB did not cite evidence in the record before it supporting this assertion.

[15] It appears the SAFPC disposed of many HIV-positive servicemembers' appeals on the same
day and with virtually identical statements of reasons. In addition to Roe and Voe, at least two
other members of OutServe had their appeals rejected that day. See Pls.' Memo. Ex. C1 [Dkt.
No. 40-1]; id. Ex. C4 [Dkt. No. 40-4].

[CENTCOM] Area . . . , where the majority of Air Force members are expected to deploy. Deployability is a key factor in determining fitness for duty and the Board recognized the member belongs to a career field with a comparatively high deployment rate/tempo. Therefore, based on his inability to deploy and considering his current career point, the Board determined he is unfit for continued military service and shall be discharged with severance pay.

A747. Voe was advised of the right to appeal to the AFBCMR, A749, but has not done so.

Voe's term of service was set to expire in early 2018 but was extended during the pendency of his physical evaluation and administrative appeals process. Compl. ¶ 88. Voe has been unable to apply for reenlistment for another term of service, id., and is set to be discharged from the Air Force on February 25, 2019, Pls.' Memo. Ex. B [Dkt. No. 44-7] ¶¶ 20-21. But for Voe's impending discharge, his term of service (taking into account the extensions he received) would extend until June 2019. Id. ¶ 20.

### 3. The Human Immunodeficiency Virus (HIV)

HIV epidemiology has undergone drastic changes since the disease first came to the public's attention in the 1980s. Compl. ¶ 49. The first sea change involved the means of treatment. Beginning in the mid-1990s, antiretroviral medications were developed that, if taken consistently, can effectively reduce a patient's viral load to zero. Id. ¶¶ 50-51. Those medications have negligible side effects and can prevent the type of immunological deficiencies and opportunistic infections typically associated with HIV and the Acquired Immunodeficiency Syndrome ("AIDS"). Id. ¶¶ 51-52. HIV remains incurable but is no longer a death sentence. When diagnosed promptly and treated appropriately, it "is a chronic, manageable condition" that does not substantially reduce a person's life expectancy. Id. ¶ 53.

Another major development in the science and study of HIV relates to methods of transmission. HIV is not as easily transmitted as many people believe. For example, the highest-risk sexual activity—engaging in an act of receptive anal sex with an untreated HIV-positive

person without using a condom or other means of prophylaxis—carries a risk of transmission of only 1.38%. Compl. ¶ 54. Other sexual activities pose transmission risks ranging from 0% to 0.08%. Id. Apart from sexual activities, only sharing needles, blood transfusions, and perinatal exposure pose a nonnegligible risk of transmission. Id. ¶ 55. According to the Centers for Disease Control and Prevention ("CDC"), HIV transmission through other means such as biting or accidental contact with bodily fluids "is technically possible but unlikely and not well documented." Id. Moreover, when an individual's viral load has been effectively suppressed by antiretroviral treatment, the risk of transmission is essentially reduced to zero. Id. ¶¶ 54-55.

**B. Regulatory and Administrative Background**

An intricate web of regulations, policies, and procedures govern the Armed Forces's treatment of servicemembers diagnosed with HIV. Understanding how those sources interact is crucial to analyzing the parties' arguments in this litigation.

1. DoD Regulations

Department of Defense Instruction ("DoDI") 6490.07 is designed to ensure that servicemembers "are medically able to accomplish their duties in deployed environments." DoDI 6490.07, § 1, at A87. The instruction sets out standards governing under what circumstances a medical condition will restrict a servicemember's deployability:

> DoD personnel with existing medical conditions may deploy . . . if all of these conditions are met:
>
> (1) The condition is not of such a nature or duration that an unexpected worsening or physical trauma is likely to have a grave medical outcome or negative impact on mission execution.
>
> (2) The condition is stable and reasonably anticipated by the pre-deployment medical evaluator not to worsen during the deployment in light of physical, physiological, psychological, and nutritional effects of the duties and location.

(3) Any required, ongoing health care or medications anticipated to be needed for the duration of the deployment are available in theater within the Military Health System. Medication must have no special handling, storage, or other requirements (e.g., refrigeration, cold chain, or electrical power requirements). Medication must be well tolerated within harsh environmental conditions (e.g. heat or cold stress, sunlight) and should not cause significant side effects in the setting of moderate dehydration.

(4) There is no need for routine evacuation out of theater for continuing diagnostics or other evaluations. (All such evaluations should be accomplished before deployment.) . . .

Id. § 4(b), at A89. A trained healthcare provider, in assessing whether a servicemember is

deployable under these guidelines, must consider whether the condition "would put the

individual at increased risk of injury or illness" or would be "likely to significantly worsen in the

deployed environment." Id. enclosure 2, § 2, at A93.

DoDI 6490.07 also identifies certain medical conditions that categorically prevent

individuals from deploying unless a waiver is granted. DoDI 6490.07, § 4(c), at A89. The listed

conditions are divided into several types, including those that affect a servicemember's ability to

receive immunizations or wear protective equipment, id. enclosure 3, § a, at A96; those that

would require ongoing care or impair duty performance in a manner inconsistent with the nature

or duration of the deployment, id. § b, at A96-97; those that cause sudden incapacitation, id. § c,

at A97; pulmonary, sensory, cardiovascular, and mental-health disorders, id. §§ d, f-h, at A97-

98; and infectious diseases, which are defined to include "[a]ctive tuberculosis or known blood-

borne diseases that may be transmitted to others in a deployed environment" and "[a] diagnosis

of human immunodeficiency (HIV) antibody positive with the presence of progressive clinical

illness or immunological deficiency." Id. § e, at A97.

DoDI 6485.01 establishes the DoD's policies and procedures for "the identification,

surveillance, and management of members of the Military Services infected with HIV." DoDI

6485.01, § 1, at A79. HIV-positive individuals are ineligible "for appointment, enlistment, pre-appointment, or initial entry training for military service." Id. § 3(a). Each military department must screen servicemembers periodically for evidence of HIV infection. Id. § 3(b). Active-duty servicemembers who test positive for HIV must be "referred for appropriate treatment and a medical evaluation of fitness for continued service in the same manner as a Service member with other chronic or progressive illnesses," and anyone "determined to be fit for duty will be allowed to serve in a manner that ensures access to appropriate medical care." Id. enclosure 3, § 2(c), at A85. Those found to be unfit for duty must be "separated or retired" pursuant to the Disability Evaluation System ("DES"). See id. § 2(e).

DoDI 1332.18 governs the DES, which is a multilevel system under the supervision of the secretary of each of the military departments. DoDI 1332.18, enclosure 3, § 1(a), at A15. The DES comprises (i) the MEB, a board of two or more physicians responsible for reviewing "all available medical evidence" and referring servicemembers with conditions "that will prevent them from reasonably performing the duties of their office, grade, rank, or rating" to the physical evaluation board process, id. § 2(a)-(b), (d), at A16; (ii) the IPEB, which is composed of two to three military personnel and which is responsible for making "initial findings and recommendations," id. § 3(a)-(b), (d)(1), at A18-19; and (iii) the FPEB, which is composed of (at minimum) a military officer, a medical officer, and a line officer, and which is responsible for conducting a formal hearing[16] in the event a servicemember challenges the IPEB's

---

[16] Servicemembers appearing before the FPEB have a number of rights, among which are the right to be represented by appointed counsel; the right to introduce witnesses, conduct cross-examination, and present evidence; and the right to access all records received by the FPEB before, during, and after the hearing. DoDI 1332.18, enclosure 3, § 3(h), at A19-20.

determinations, id. § 3(c), (d)(2). The instruction also requires each military department to provide appellate review of the FPEB's findings and recommendation. Id. § 3(*l*), at A21.

Finally, DoDI 1332.45—sometimes referred to as the "deploy or get out," or "DOGO," instruction,[17] e.g., Compl. ¶ 41—establishes the Armed Forces-wide policy that "[t]o maximize the lethality and readiness of the joint force, all Service members are expected to be deployable." DoDI 1332.45, § 1.2(a), at A62. Servicemembers who are deemed nondeployable for more than 12 consecutive months will be evaluated for retention, referral into the DES, or processing for administrative separation. Id. § 1.2(b). DoDI 1332.45 tempers this seemingly categorical rule in several ways. It gives the secretary of each military department the discretion to retain nondeployable servicemembers if doing so is found to be "in the best interest of the Military Service." Id. § 2.4(b)(1), at A64.[18] Additionally, "Service members with a medical condition that requires additional medical screening, or Combatant Command approval prior to deployment outside the continental United States, will be categorized as Deployable with Limitations." Id. § 3.3, at A66. Medical conditions triggering the "deployable with limitations" classification include those "referred to in DoDI 6490.07," id.—which, as discussed above, identifies conditions, including HIV under certain circumstances, that preclude deployment without a waiver.[19]

---

[17] DoDI 1332.45 cancelled and replaced an earlier memorandum issued in February 2018 by the Office of the Under Secretary of Defense for Personnel and Readiness. See A59. Many felt that under the terms of the February 2018 memorandum, all servicemembers living with HIV would be classified as nondeployable and subject to automatic separation. See Compl. ¶ 12.

[18] The secretary also has discretion to initiate immediate separation processing, even if the servicemember in question has not been nondeployable for 12 consecutive months, if "the Military Service determines there is a reasonable expectation that . . . the Service member will not become deployable" in that time period. DoDI 1332.45, § 2.4(b)(3), at A64.

[19] DoDI 1332.45 does not otherwise define or explain the significance of the classification "deployable with limitations." An August 2018 report prepared by the Office of the Under Secretary of Defense and sent to Congress clarifies that "members with HIV infection may be considered deployable with limitations" because "[a]ll Services currently permit HIV positive

2. <u>Air Force Regulations</u>

Each military department has its own set of regulations and policies with respect to the treatment of HIV-positive servicemembers. The Air Force's main policy is set out in AFI 44-178, which implements DoDI 6485.01 with respect to the "identification, surveillance, and administration" of Air Force members diagnosed with HIV. A294. HIV-positive individuals may not enlist in the Air Force. AFI 44-178, § 2.2.1, at A298. Active-duty servicemembers who contract HIV after enlisting "must undergo medical evaluation for the purpose of determining status for continued military service." <u>Id.</u> § 2.4. Testing positive for HIV does not automatically trigger discharge: "HIV seropositivity alone is not grounds for medical separation or retirement." <u>Id.</u> § 2.4.1, at A299. But servicemembers living with HIV are limited to assignment within the continental United States, Alaska, Hawaii, or Puerto Rico, and may not be deployed beyond those territorial limits absent a waiver. <u>See</u> <u>id.</u> § 2.4.2.

Attachment 9 to AFI 44-178 sets out the Air Force's policy on the retention or separation of servicemembers diagnosed with HIV. It echoes the instruction's clear mandate, providing that servicemembers "who are able to perform the duties of their office, grade, rank and/or rating . . . may not be separated solely on the basis of laboratory evidence of HIV infection." <u>Id.</u> § A9.1.1, at A329. Instead, HIV-positive servicemembers are evaluated for retention or separation in accordance with the Air Force's DES. <u>See</u> <u>id.</u> § A9.2.1. Those who are retained are given an appropriate assignment limitation code and are returned to duty. <u>Id.</u> § A9.1.2.

The Air Force has released additional guidance documents on the treatment of HIV-positive servicemembers. For years, "nearly all cases of asymptomatic HIV resulted in a return to

---

Service members to deploy for purposes other than combat or a contingency operation, or to be assigned for duty in certain overseas locations, subject to receipt of a waiver." A385.

duty." A416. That changed in 2017, when the Air Force issued a memorandum stating that any asymptomatic HIV-positive servicemember would be medically evaluated and possibly referred to the DES. A341. The memorandum reiterates AFI 44-178's policy that "[a]symptomatic HIV alone is not unfitting for continued service." Id. The Air Force reaffirmed that policy in a memorandum issued in June 2018, A338, and provided that all HIV-positive members would be evaluated for continued service in the same manner "as any Airman with a chronic and/or progressive disease," id. Under the terms of the 2018 memorandum, no servicemember may be referred into the DES unless specific criteria are met. Id. Those criteria are set out in DoDI 1332.18:

> [M]edical authorities will refer eligible Service members into the DES who:
>
> (1) Have one or more medical conditions that may, individually or collectively, prevent the Service member from reasonably performing the duties of their office, grade, rank, or rating . . . ;
>
> (2) Have a medical condition that represents an obvious medical risk to the health of the member or the health or safety of other members; or
>
> (3) Have a medical condition that imposes unreasonable requirements on the military to maintain or protect the Service member.

DoDI 1332.18, enclosure 3, app. 1, § 2(a), at A26. Most recently, in September 2018, the Air Force reemphasized that servicemembers with asymptomatic HIV are to be "retained or separated on a case by case basis" based on the factors listed in DoDI 1332.18. A339.

## II. DEFENDANTS' MOTION TO DISMISS

Defendants have moved to dismiss plaintiffs' complaint on the ground that subject matter jurisdiction is lacking. First, they argue that plaintiffs have failed to exhaust administrative remedies, rendering this lawsuit premature. Second, they contend that plaintiffs' claims raise nonjusticiable questions of military policymaking committed solely to the discretion of the executive branch. Finally, they argue that the plaintiffs lack standing to seek relief.

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, an action must be dismissed if the court lacks subject matter jurisdiction. The plaintiff, as the party asserting jurisdiction, bears the ultimate burden of proving such jurisdiction. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). If "a complaint simply fails to allege facts upon which subject matter jurisdiction can be based[,] . . . all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." Id. But in the event of a factual dispute over the jurisdictional allegations in the complaint, the court may consider evidence outside the complaint "without converting the proceeding to one for summary judgment," id., and "the presumption of truthfulness normally accorded a complaint's allegations does not apply," Beck v. McDonald, 848 F.3d 262, 270 (4th Cir. 2017) (citation omitted).

## A. **Exhaustion of Remedies**

Defendants first argue that in failing to appeal to the AFBCMR before filing their complaint, plaintiffs have attempted to "bypass" intraservice remedies "to obtain premature review in federal court." Defs.' Memo. & Opp'n 7. Generally, plaintiffs seeking to challenge military policy or decisions must exhaust "available intraservice corrective measures." Williams v. Wilson, 762 F.2d 357, 359 (4th Cir. 1985) (quoting Mindes v. Seaman, 453 F.2d 197, 201 (5th Cir. 1971)). Like all exhaustion requirements, this rule helps to avoid "premature interruption of the administrative process," McKart v. United States, 395 U.S. 185, 194 (1969), and allows "interested parties [to] obtain notice of the claims and have the potential to resolve disputes more quickly and inexpensively than may typically be accomplished through litigation," United States v. Unisys Corp., 178 F. Supp. 3d 358, 374 (E.D. Va. 2016) (citing Sydnor v. Fairfax County, 681 F.3d 591, 593 (4th Cir. 2012)). Plaintiffs respond by arguing that they are

not required to pursue any additional administrative remedies, that an appeal to the AFBCMR would be futile, and that the burdens of requiring further exhaustion here would far outweigh the benefits. Plaintiffs have the better argument.

At the outset, it must be emphasized that defendants do not rely on an explicit statutory exhaustion requirement.[20] Instead, they rely on a judge-made doctrine developed in response to the unique nature of claims involving military policy. That distinction is significant. Where Congress has adopted an explicit exhaustion regime, courts may not "add unwritten limits onto the[] rigorous textual requirements." Ross v. Blake, 136 S. Ct. 1850, 1857 (2016). But "judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions." Id.; see McKart, 395 U.S. at 193 ("The doctrine of exhaustion of administrative remedies . . . is, like most judicial doctrines, subject to numerous exceptions."). Deciding whether to enforce a judicially created exhaustion requirement is a highly fact-sensitive inquiry,

---

[20] Plaintiffs seek declaratory and injunctive relief against defendants for what they allege are violations of the Constitution and the APA. Because the APA waives the federal government's sovereign immunity with respect to claims for prospective relief, see 5 U.S.C. § 702, and authorizes courts to set aside agency action that is "contrary to constitutional right, power, privilege, or immunity," id. § 706(2)(B), plaintiffs' constitutional claims may be subsumed within the APA framework. But cf. John F. Preis, In Defense of Implied Injunction Relief in Constitutional Cases, 22 Wm. & Mary Bill Rts. J. 1, 52-53 (2013) (arguing that federal courts retain equitable powers "to imply injunctive relief in constitutional cases" even where the APA "fails to provide a plaintiff with a remedy" (citation omitted)). And "where the APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review only when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review." Darby v. Cisneros, 509 U.S. 137, 154 (1993) (emphasis omitted).

Although it is a statute that empowers the AFBCMR to correct military records, see 10 U.S.C. § 1552(a)(1) ("The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice."), that provision's language is purely permissive and does not evince a congressional intent to make appeal to the AFBCMR a mandatory precursor to judicial review. Cf. Ross v. Blake, 136 S. Ct. 1850, 1856-57 (2016) (discussing the mandatory language requiring exhaustion in 42 U.S.C. § 1997e(a)).

"requir[ing] an understanding of its purposes and of the particular administrative scheme involved." McKart, 395 U.S. at 193. If the burdens of enforcing an exhaustion requirement seriously outweigh the benefits in a particular case, that requirement may be excused.[21]

Although defendants cite several cases to support their exhaustion argument, plaintiffs correctly point out that those cases are distinguishable insofar as they involved parties who sought access to federal court at the first sign of disagreement with a military decision. See Guerra v. Scruggs, 942 F.2d 270, 272-73 (4th Cir. 1991) (involving a plaintiff who sued to prevent his discharge for cocaine use and intoxication without having availed himself of either of the available administrative review mechanisms); Williams, 762 F.2d at 358-59 (involving a plaintiff who after receiving a notice that he would be evaluated for separation filed suit in federal court "[b]efore any administrative follow-up on the notice of review had occurred"). In both cases, the lawsuit posed a genuine risk of preempting the agency's deliberative processes and wasting crucial resources, and accordingly the policy concerns underlying the exhaustion doctrine were at their apex.

Those concerns are diminished to the vanishing point in this case. Roe and Voe did not seek judicial review without having given the Air Force a meaningful opportunity to examine its policies and decisions. To the contrary, they presented their claims to a complex, tiered administrative review process—one that involved medical evaluations, written submissions, and formal hearings—culminating in an extensive administrative record and final written decisions by the SAFPC. See A460 ("The following rationale is provided for the final decision in this

---

[21] In that sense, the exhaustion-of-intraservice-remedies requirement operates as a prudential limitation on the exercise of jurisdiction rather than as a true subject-matter jurisdictional limitation. The Fourth Circuit has described that species of requirement as a matter of "comity." See McDonald v. Centra, Inc., 946 F.2d 1059, 1063 (4th Cir. 1991) (citation omitted).

case."); A747 (same); see also AFI 36-3212, §§ 5.1-.9 (setting out procedures for the SAFPC's "final review and disposition" of a servicemember's appeal (capitalization altered)). Indeed, an official whose affidavit defendants submitted characterized the SAFPC "as the decision authority for a wide array of personnel decisions made by the Air Force" and "as, effectively, the final appeal authority for Airmen evaluated by the DES prior to their separation from Active Duty." A420. Thus, Roe and Voe substantially exhausted the administrative review mechanisms available to them, a fact which undercuts defendants' argument that this lawsuit is premature.

Although Roe and Voe stopped short of applying to the AFBCMR, plaintiffs have persuasively demonstrated that requiring appeals to the AFBCMR as a prerequisite to pursuing this lawsuit would be inappropriate. First, the AFBCMR's ambit is relatively limited; it serves to interpret "the content and effect of military regulations" and decide "whether [a] military tribunal's decision was in error or unjust." Navas v. Gonzalez Vales, 752 F.2d 765, 769-70 (1st Cir. 1985). In accordance with that mission, it can reverse an order of separation, edit a servicemember's military record, and issue back pay, see 10 U.S.C. § 1552(a), (c); however, it cannot adjudicate a claim that the Air Force's policies and regulations themselves are unconstitutional or otherwise unlawful. That an appeal to the AFBCMR could not address the heart of plaintiffs' claims changes the exhaustion calculus. Defendants respond that there is no categorical rule in this circuit exempting constitutional or facial claims from exhaustion requirements. See, e.g., Nationsbank Corp. v. Herman, 174 F.3d 424, 429 (4th Cir. 1999). But "that exhaustion can be useful even where a constitutional issue is presented," Volvo GM Heavy Truck Corp. v. U.S. Dep't of Labor, 118 F.3d 205, 215 (4th Cir. 1997) (emphasis added), does not mean it is automatically required.

Additional considerations weigh in favor of excusing Roe and Voe from having to appeal to the AFBCMR before proceeding in federal court. Parties may be exempt from judicially imposed exhaustion requirements upon showings of futility or irreparable injury. See McDonald v. Centra, Inc., 946 F.2d 1059, 1063 (4th Cir. 1991); see also Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 12-13 (2000) ("Doctrines of 'ripeness' and 'exhaustion' contain exceptions, however, which exceptions permit early review when, for example, the legal question is fit for resolution and delay means hardship, . . . or when exhaustion would prove futile" (internal quotation marks and citations omitted)). Although excusal of exhaustion on these grounds is a "high bar," Haramalis v. Lengyel, No. 1:17-cv-946, 2018 WL 476156, at *4 (E.D. Va. Jan. 18, 2018), plaintiffs have cleared that bar. The MEB, IPEB, FPEB, and finally the SAFPC assessed Roe's and Voe's cases in exactly the same way. They recognized that Roe and Voe were being successfully treated, were asymptomatic, and had the support of their commanding officers; nonetheless, they concluded that Roe and Voe could not be deployed to CENTCOM and thus were unfit for continued military service. Because of that consistent and unyielding line of reasoning, Roe and Voe face imminent discharge from the Air Force. Defendants have steadfastly defended that reasoning in this litigation. Nothing suggests that the AFBCMR would depart from the conclusions of multiple Air Force decisionmakers and conclude that Roe's and Voe's discharge determinations contained an "error" to "correct" or an "injustice" to "remove." Exhaustion need not be required where it would constitute an empty formality— particularly where, as here, the plaintiffs face imminent separation from the branch of the armed forces in which they have served honorably and in which they want to continue serving.

Further, under Air Force regulations, the AFBCMR may only issue nonbinding recommendations, AFI 36-2603, §§ 2.1, 4.10, and it is the Secretary of the Air Force (or her

designee) who must decide whether to act, see id. §§ 1.1, 5. Yet the SAFPC's determinations that Roe and Voe should be discharged were expressly made on behalf of the Secretary of the Air Force. See A461, A747. Accordingly, even if the AFBCMR were to agree with Roe's and Voe's arguments, plaintiffs' ability to secure relief would still depend on the same decisionmaker who has already rejected those arguments.

Finally, an appeal to the AFBCMR may take as long as 18 months, see 10 U.S.C. § 1557(b), if not longer, see Pls.' Opp'n & Reply Ex. C [Dkt. No. 60-3] 2-4 (explaining that the boards for correction of military records have experienced notable increases in the time to decision). For example, sergeant Nick Harrison—the plaintiff in a companion case before this Court, see Harrison v. Shanahan, No. 1:18-cv-641—petitioned the Army Board for Correction of Military Records for relief from the decision preventing his commissioning as a JAG officer due to his HIV status. Harrison did not receive the board's decision—a rejection of his appeal—for nearly two years. Pls.' Opp'n & Reply Ex. C [Dkt. No. 60-3] 3-4. The Court may take the decisional timeline into account in deciding whether to require further exhaustion for plaintiffs who, like Roe and Voe, allege imminent and immeasurable harm stemming from the challenged actions.[22]

Deciding whether exhaustion is required is a matter of discretion. It requires a careful balancing between respect for internal administrative decisionmaking processes on the one hand

---

[22] As is the case with most of their arguments, defendants focus entirely on Roe and Voe and do not address the exhaustion analysis as to OutServe, which has identified four additional active-duty members of the Air Force who face imminent discharge because of HIV-related deployment restrictions. All four of those servicemembers are identically situated to Roe and Voe in that they pursued unsuccessful appeals of those decisions up through the SAFPC. See Pls.' Memo. & Opp'n Ex. C [Dkt. No. 40] 3-8; id. Exs. C-1 to -4. Accordingly, the Court's analysis with respect to Roe and Voe equally applies to the members on whose behalf OutServe is asserting associational standing.

and an individual's ability to protect his rights in federal court on the other. Under the circumstances of this case, no further exhaustion of intraservice remedies is required.

**B. Military Controversy**

Defendants next argue that plaintiffs' complaint must be dismissed for failure to present a justiciable controversy. Defendants contend that under the balancing framework established by the Fifth Circuit in Mindes, 453 F.2d 197, and adopted by the Fourth Circuit in Williams, 762 F.2d 357, their policies with respect to servicemembers living with HIV—and the application of those policies to Roe and Voe—are altogether immune from judicial scrutiny.

"The military is a specialized society separate from civil society with laws and traditions of its own [developed] during its long history." Schlesinger v. Councilman, 420 U.S. 738, 757 (1975) (alteration in original) (internal quotation marks and citation omitted). The military's separate status and unique institutional interests have often made courts reluctant "to second-guess judgments requiring military expertise" or to "substitute court orders for discretionary military decisions," lest judicial interference "stultify the military in the performance of its vital mission." Mindes, 453 F.2d at 199. Yet neither can the military be wholly free from judicial scrutiny. See id.; see also, e.g., Emory v. Sec'y of the Navy, 819 F.2d 291, 294 (D.C. Cir. 1987) (per curiam) ("The military has not been exempted from constitutional provisions that protect the rights of individuals. It is precisely the role of the courts to determine whether those rights have been violated." (citation omitted)).

To accommodate this tension between deference and judicial review, courts developed a balancing framework designed to capture under what circumstances it is appropriate to adjudicate claims related to military policies. Under that framework, the court must first be satisfied that the plaintiff has appropriately exhausted intraservice remedies and has alleged a

23

violation of the Constitution, applicable statutes, or military regulations. Mindes, 453 F.2d at

201. If that showing is made, the court must then balance four factors:

> 1. The nature and strength of the plaintiff's challenge to the military determination. . . .
>
> 2. The potential injury to the plaintiff if review is refused.
>
> 3. The type and degree of anticipated interference with the military function. Interference per se is insufficient since there will always be some interference when review is granted, but if the interference would be such as to seriously impede the military in the performance of vital duties, it militates strongly against relief.
>
> 4. The extent to which the exercise of military expertise or discretion is involved. Courts should defer to the superior knowledge and experience of professionals in matters such as promotions or orders directly related to specific military functions.

Guerra, 942 F.2d at 276 (alteration in original) (quoting Mindes, 453 F.2d at 201-02). How those

factors should be balanced in each case is left to the trial court's discretion. See Mindes,

453 F.2d at 202.

To begin, it is unclear whether the Mindes balancing test remains good law. In a recent

decision, a panel of the Fourth Circuit called its viability into question. See Aikens v. Ingram,

811 F.3d 643, 648 & n.5 (4th Cir. 2016). Since adopting the test in 1985, see Williams, 762 F.2d

at 359-60, the Fourth Circuit has applied it only once in a published opinion, in 1991, see Guerra,

942 F.2d at 276.[23] Other courts of appeals have rejected the rule on the theory that it

"erroneously 'intertwines the concept of justiciability with the standards to be applied to the

merits of the case.'" Knutson v. Wis. Air Nat'l Guard, 995 F.2d 765, 768 (7th Cir. 1993)

(quoting Dillard v. Brown, 652 F.2d 316, 323 (3d Cir. 1981)). Those courts that have questioned

---

[23] The Fourth Circuit has applied the rule in several unpublished opinions. See Downey v. U.S. Dep't of the Army, 685 F. App'x 184, 191-93 (4th Cir. 2017), cert. denied, 138 S. Ct. 645 (2018); Wilt v. Gilmore, 62 F. App'x 484, 487-88 (4th Cir. 2003) (per curiam); Scott v. Rice, No. 92-2463, 1993 WL 375664, at *2 (4th Cir. Sept. 23, 1993) (per curiam).

Mindes have done so for good reason: Its four-factor test, which weighs the plaintiff's case and injuries against military independence and expertise, speaks more to the merits and the appropriate scope of equitable relief than the threshold matter of justiciability.

Nonetheless, even assuming the Mindes test remains good law and applies to this dispute,[24] it does not require dismissal here. To be sure, whether a servicemember is fit for continued military service is a question that implicates military discretion, and one in which courts have little expertise. Yet other factors weigh heavily in favor of finding this dispute to be justiciable. For one, plaintiffs' claims are not weak. At this preliminary stage, they have made a strong showing that defendants' policies are irrational, based on a flawed understanding of HIV epidemiology, and inconsistently applied. Although Roe and Voe advance as-applied claims limited to the application of the military's polices in their cases, they (along with OutServe) also seek relief on behalf of a broader class of HIV-positive servicemembers, all of whom are now confronted with the polices that plaintiffs claim are unlawful. The far-reaching nature of these

---

[24] A conceptually distinct issue is whether Mindes applies to all claims related to military policy or only a subset of those claims. When the Fourth Circuit adopted Mindes, it did so in the context of a claim that the West Virginia Army National Guard had failed to follow its own regulations in ordering that the plaintiff be separated after 20 years of service. See Williams, 762 F.2d at 358. Likewise, Guerra involved a challenge to the procedures through which the Army had decided to discharge the plaintiff for cocaine use and alcohol intoxication. See 942 F.2d at 271-72. The Fourth Circuit has suggested that whatever the viability of the test with respect to "internal personnel matters such as challenges to convening of retention boards and military discharge," Mindes is "an ill fit" where the plaintiff has alleged "unconstitutional, ultra vires actions" by the defendant. Aikens, 811 F.3d at 648. Although that distinction has intuitive appeal, it may be difficult to square with Mindes itself, which involved constitutional claims and clearly anticipated its application to constitutional questions, see 453 F.2d at 201-02. In fact, Aikens may have more to do with rejecting Mindes in suits for damages under 42 U.S.C. § 1983 than with any administrative–constitutional distinction.

In any event, it is unclear on which side of Aikens's line this case would fall. Plaintiffs have advanced facial and as-applied claims. Some are constitutional; others are more administrative in nature. And plaintiffs seek equitable relief, not damages. Because at least some of plaintiffs' claims fall within the Guerra and Williams line of cases, the Court will apply the Mindes test.

claims surely counsels in favor of judicial review. For the reasons explained below, plaintiffs have also made a strong demonstration that they face imminent, serious cognizable injuries because of defendants' policies. This is not one servicemember's protest of a technical glitch in the military's decisionmaking process; it is a challenge claiming that HIV-positive servicemembers, who wish to serve their country on equal terms with others, are being irrationally and arbitrarily swept from the ranks. Finally, the gravamen of plaintiffs' complaint is that they have not been evaluated in the personalized, case-by-case manner guaranteed by the applicable regulations, but rather face discharge because of an untailored determination that they are not deployable beyond the continental United States. By requesting only that military decisionmakers evaluate whether they are fit for service with more careful attention to their individual characteristics, plaintiffs give significant breathing space to "the exercise of military expertise [and] discretion," Guerra, 942 F.2d at 276 (citation omitted). For these reasons, this case presents a justiciable controversy properly subject to judicial review.

## C. **Standing**

The federal judicial power extends only to "Cases" and "Controversies." U.S. Const. art. III, § 2. To satisfy the case-or-controversy requirement, a plaintiff must have standing—that is, he must have "alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Warth v. Seldin, 422 U.S. 490, 498-99 (1975) (citation omitted). Standing "is built on separation-of-powers principles" and "prevent[s] the judicial process from being used to usurp the powers of the political branches." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013). Accordingly, the standing inquiry is "especially rigorous when reaching the merits of the

dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." Raines v. Byrd, 521 U.S. 811, 819-20 (1997).

The test for Article III standing is well established:

> Th[e] "irreducible constitutional minimum" of standing requires: (1) that the plaintiff have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it will be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Bennett v. Spear, 520 U.S. 154, 167 (1997) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)). Plaintiffs bear the burden of establishing standing to support each of their claims. South Carolina v. United States, 912 F.3d 720, 726 (4th Cir. 2019). They must satisfy that burden "in the same way as any other matter on which [they] bear[] the burden of proof" during each successive stage of the litigation. Lujan, 504 U.S. at 561.

Defendants' argument that plaintiffs lack standing is, as is often the case, a matter of characterization. In their view, the Article III injury on which plaintiffs rely is that "they have been prevented from continuing to serve in the Air Force." Defs.' Memo. & Opp'n 14. Defendants argue that because "Roe and Voe have both completed their terms of enlistment," both would have to reenlist to continue to serve. Id. at 11, 14. They conclude that this is fatal to plaintiffs' standing, both in terms of injury-in-fact and redressability, because there is no guaranteed right to reenlist in the Air Force and because reenlistment "is a separate process independent of both the medical evaluation and the underlying regulations challenged by" plaintiffs. Id. at 14-15. Plaintiffs label this argument a "Catch-22," arguing that Roe's and Voe's

"terms have expired only because Defendants' illegal policies forced them into the medical discharge process and prevented them from reenlisting." Pls.' Opp'n & Reply 15.[25]

The key fact with respect to Roe's and Voe's standing to sue is that although their terms of service were originally set to expire in 2018, they were extended through June 2019. Compl. ¶¶ 74, 88; see Pls.' Memo. Ex. A [Dkt. No. 44] ¶¶ 6-7; id. Ex. B [Dkt. No. 44-7] ¶¶ 20-21. But as a result of defendants' policies, Voe and Roe are now set to be discharged on February 25 and March 29, 2019, respectively. That both named plaintiffs will be separated—and thus deprived of the economic, medical, and nonpecuniary benefits associated with active-duty service—earlier than as provided by the extensions they received amounts to classic injury-in-fact sufficient to support Article III standing.

Although it is true that if the Court were to grant Roe and Voe the relief they seek,[26] they could conceivably again be ordered discharged for different reasons, that remote possibility does not make their injuries nonredressable. The burden imposed by the redressability requirement "is not onerous," and "[p]laintiffs need not show that a favorable decision will relieve [their] every injury." Deal v. Mercer Cty. Bd. of Educ., 911 F.3d 183, 189 (4th Cir. 2018) (second alteration in original) (internal quotation marks and citation omitted). It is enough to show that a favorable decision would be likely to remedy their injury. Plaintiffs have met that burden.

---

[25] Plaintiffs argue as an alternative that they have demonstrated with sufficient certainty that Roe and Voe would have been recommended and selected for reenlistment but for the medical evaluation and separation process. See Pls.' Opp'n & Reply 15 n.2. For the reasons stated below, the Court need not consider that alternative basis for standing.

[26] Plaintiffs have not sought an order preventing Roe and Voe from being separated from service for any reason whatsoever. Instead, they seek an injunction preventing defendants from separating them solely "because of restrictions on deployability due to HIV status" [Dkt. No. 34-1].

Additionally, even if defendants were correct that the expiration of Roe's and Voe's terms of service deprives them of standing, defendants' argument would still fail because OutServe has standing separate from and independent of the named plaintiffs. Although OutServe does not allege any injury to itself <u>qua</u> institutional entity, it may

> bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

<u>Hunt v. Wash. State Apple Advert. Comm'n</u>, 432 U.S. 333, 343 (1977).

Defendants concede that OutServe meets the requirements for associational standing but argue that because the complaint contains allegations only about Roe and Voe, OutServe's standing must be coterminous with Roe's and Voe's. Defs.' Memo. & Opp'n 16. Yet OutServe has identified several additional members who face imminent separation for similar reasons as Roe and Voe but whose terms of service have not yet expired. Pls.' Opp'n & Reply 17; <u>see</u> Pls.' Memo. Ex. C [Dkt. No. 40] ¶¶ 8-27.

Defendants protest that those OutServe members are not mentioned in the complaint, arguing that "parties cannot amend their complaints through briefing or oral advocacy." Defs.' Memo. & Opp'n 16 n.5 (quoting <u>S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC</u>, 713 F.3d 175, 184 (4th Cir. 2013)).[27] Defendants misstate the law. In adjudicating a factual challenge to subject matter jurisdiction, "the trial court [has] the discretion

---

[27] Defendants also suggest that OutServe "has not demonstrated that any of the individuals claimed as members are in fact members of the[] organization, an independent jurisdictional flaw." Defs.' Reply 12 n.7. Plaintiffs and their affiants have in fact averred that the four identified servicemembers are OutServe members. <u>See</u> Pls.' Memo. 11; Pls.' Opp'n & Reply Ex. C [Dkt. No. 60-3] 1. In the context of a factual challenge to subject matter jurisdiction at the pleadings stage, no more is required.

to go beyond the allegations of the complaint and . . . determine if there are facts to support the jurisdictional allegations." <u>Beck</u>, 848 F.3d at 270 (internal quotation marks and citation omitted); <u>accord</u> <u>White Tail Park, Inc. v. Stroube</u>, 413 F.3d 451, 459 (4th Cir. 2005) ("When a defendant raises standing as the basis for a motion under Rule 12(b)(1) . . . , the district court may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." (internal quotation marks and citation omitted)).[28] Accordingly, OutServe may assert associational standing on behalf of its members who face imminent separation because of their HIV status, including those whose terms of service have not yet expired.

In sum, plaintiffs filed a timely lawsuit after Roe and Voe, and others like them, had proceeded through a lengthy administrative appeals process culminating in a final decision on behalf of the Secretary of the Air Force; plaintiffs' claims present a justiciable controversy subject to judicial review; and both the named plaintiffs and OutServe have a sufficient Article III stake in the outcome of this litigation to advance those claims. Accordingly, defendants' motion to dismiss under Rule 12(b)(1) will be denied.

---

[28] <u>Southern Walk</u>, on which defendants rely, cites two cases for the proposition that "parties cannot amend their complaints through briefing or oral advocacy." <u>See</u> 713 F.3d at 184-85. Both involved motions to dismiss for failure to state a claim under Rule 12(b)(6), not subject-matter jurisdictional challenges under Rule 12(b)(1). <u>See</u> <u>E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.</u>, 637 F.3d 435, 449 (4th Cir. 2011); <u>Car Carriers, Inc. v. Ford Motor Co.</u>, 745 F.2d 1101, 1107 (7th Cir. 1984). Moreover, the Fourth Circuit's comment in <u>Southern Walk</u> was just one part of a broader discussion of why the plaintiff's jurisdictional allegations were insufficient, which included that the plaintiff had failed to meaningfully distinguish between "injury in its own right and representational standing based on injury to its members" and had relied on inappropriately vague allegations. <u>See</u> 713 F.3d at 185.

In their reply brief, defendants attempt to recharacterize their motion to dismiss, claiming that it was brought under Rule 12(b)(6) as well as 12(b)(1). <u>See</u> Defs.' Reply 11. This is wholly contrary to how defendants framed their motion in their opening brief. <u>See</u> Defs.' Memo. & Opp'n 6. Because defendants' arguments address only the subject matter jurisdiction of the Court, the standards governing Rule 12(b)(1) apply here.

### III. PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Having resolved defendants' motion to dismiss, the Court now turns to plaintiffs' request for a preliminary injunction preventing Roe and Voe, along with other similarly situated servicemembers, from being separated because of their HIV status. "A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017). To be entitled to such relief, plaintiffs must show "that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest." Metro Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc., 722 F.3d 591, 595 (4th Cir. 2013).

In light of the "strong judicial policy against interfering with the internal affairs of the armed forces," courts have generally held that "military discharge proceedings should be enjoined only in exceptional circumstances." Chilcott v. Orr, 747 F.2d 29, 33 (1st Cir. 1984). This case presents such exceptional circumstances. Even bearing in mind the deference owed to the military, the Court concludes that plaintiffs have made a clear showing that a carefully tailored injunction is appropriate and in the public interest.

### A. **Likelihood of Success on the Merits**

A party seeking a preliminary injunction must establish that he is likely to succeed on the merits of at least one claim. Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011). To satisfy this requirement, the party must demonstrate more than "a grave or serious question for litigation," Sarsour v. Trump, 245 F. Supp. 3d 719, 729 (E.D. Va. 2017) (emphasis and citation omitted), but need not show "a certainty of success," League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014) (citation omitted). At least at this

stage, plaintiffs have made a strong and clear showing that defendants' policies are irrational, outdated, and unnecessary and their decisions arbitrary, unreasoned, and inconsistent. As such, they have demonstrated a likelihood of success as to Counts I, II, and III of the complaint.[29]

1. Standards of Review

Count I of plaintiffs' complaint alleges that the decisions to order Roe and Voe discharged, along with the policies that produced those decisions, violate their right to equal protection. "[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is 'so unjustifiable as to be violative of due process.'" Schneider v. Rusk, 377 U.S. 163, 168 (1964) (quoting Bolling v. Sharpe, 347 U.S. 497, 499 (1954)). Fifth Amendment equal protection claims are analyzed under the same framework as claims brought under the Fourteenth Amendment's Equal Protection Clause. Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975).

The right to equal protection under the law serves "to secure every person . . . against intentional and arbitrary discrimination." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam) (citation omitted). As a baseline, all governmental classifications must be "rationally related to a legitimate governmental interest." U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 533 (1973).[30] Although classifications need not "be drawn with precise mathematical nicety," id. at 538 (internal quotation marks and citation omitted), rational basis review is not "toothless," Mathews v. Lucas, 427 U.S. 495, 510 (1976). The government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the

---

[29] This conclusion renders it unnecessary to assess whether plaintiffs have demonstrated a likelihood of success as to Counts IV and V.

[30] Plaintiffs do not dispute that maintaining a ready, effective military force and protecting the health and safety of servicemembers are legitimate government interests.

distinction arbitrary or irrational." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 446 (1985); see Bankers Life & Cas. Co. v. Crenshaw, 486 U.S. 71, 83 (1988) ("[A]rbitrary and irrational discrimination violates the Equal Protection Clause under even our most deferential standard of review."). Nor may a classification be based on "irrational prejudice," City of Cleburne, 473 U.S. at 450, or a "bare . . . desire to harm a politically unpopular group," Moreno, 413 U.S. at 534.[31]

Counts II and III of the complaint invoke the judicial review provisions of the APA, which authorize courts to "hold unlawful and set aside agency action, findings, and conclusions" determined to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an

---

[31] Plaintiffs have argued with respect to their equal protection claim that defendants' policies should be subject to more searching judicial scrutiny because HIV status is a suspect or quasi-suspect classification under the four-factor framework outlined in Windsor v. United States, 699 F.3d 169 (2d Cir. 2012), aff'd on other grounds, 570 U.S. 744 (2013). The Windsor framework asks whether the class "has been historically subjected to discrimination," "has a defining characteristic that frequently bears [a] relation to ability to perform or contribute to society," "exhibits obvious, immutable, or distinguishing characteristics that define them as a discrete group," and is "a minority or politically powerless," id. at 181 (alteration in original) (internal quotation marks and citations omitted). Plaintiffs' argument faces an uphill climb. The Supreme Court has not recognized a suspect or quasi-suspect classification since 1977. Kenji Yoshino, The New Equal Protection, 124 Harv. L. Rev. 747, 757 (2011). Moreover, the Fourth Circuit has broadly stated that "classifications based on disability are subject to minimal scrutiny," Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 486 (4th Cir. 2005) (citing City of Cleburne, 473 U.S. at 446), as have other federal courts of appeals, see, e.g., Toledo v. Sánchez, 454 F.3d 24, 33 (1st Cir. 2006); Lee v. City of Los Angeles, 250 F.3d 668, 687 (9th Cir. 2001). And the Fourth Circuit has held, albeit in a decades-old opinion, that HIV status is not a suspect classification. Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1267 (4th Cir. 1995). Whether, given a clean slate, HIV status would qualify as a suspect classification—and, if so, whether Doe would nonetheless require a contrary conclusion—can be left for another day. Plaintiffs are correct that answering those questions "is not necessary here," Pls.' Memo. 12-13, because they have demonstrated a likelihood of success even assuming that rational basis review applies to their equal protection claim.

explanation for its decision that runs counter to the evidence before the agency, or
is so implausible that it could not be ascribed to a difference in view or the product
of agency expertise.

Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43

(1983). Although arbitrary-and-capricious review is necessarily deferential and narrow in scope,

the standard "does not reduce judicial review to a rubber stamp." Ergon-W. Va., Inc. v. U.S.

EPA, 896 F.3d 600, 609 (4th Cir. 2018) (citation omitted). To the contrary, courts "must conduct

a searching and careful review to determine whether the agency's decision was based on a

consideration of the relevant factors," whether the agency "examine[d] the relevant data and

articulate[d] a satisfactory explanation for its action," and whether the agency committed "a clear

error of judgment." Perez v. Cissna, No. 18-1330, 2019 WL 350328, at *3 (4th Cir. Jan. 29,

2019) (alterations in original) (internal quotation marks and citations omitted). The agency's

rationale must be "both discernible and defensible," Trans-Pac. Freight Conf. of Japan/Korea v.

Fed. Mar. Comm'n, 650 F.2d 1235, 1251 (D.C. Cir. 1980), and the agency "must treat similar

cases in a similar manner unless it can provide a legitimate reason for failing to do so," Kreis v.

Sec'y of the Air Force, 406 F.3d 684, 687 (D.C. Cir. 2005) (citation omitted).

The standards governing Counts I, II, and III substantially overlap because "rational-basis

[r]eview of an equal protection claim in the context of agency action is similar to that under the

APA." Cooper Hosp./Univ. Med. Ctr. v. Burwell, 179 F. Supp. 3d 31, 47 (D.D.C. 2016)

(alteration in original) (internal quotation marks and citation omitted), aff'd per curiam, 688 F.

App'x 11 (D.C. Cir. 2017). Accordingly, in analyzing defendants' policies and decisions, the

question is the same for both the equal protection and APA claims: "whether the defendants'

treatment of [Roe and Voe] was rational (i.e., not arbitrary and capricious)." Ursack, Inc. v.

Sierra Interagency Black Bear Grp., 639 F.3d 949, 955 (9th Cir. 2011). In asking that question,

the Court must defer "to the professional judgment of military authorities concerning the relative importance of a particular military interest." Goldman v. Weinberger, 475 U.S. 503, 507 (1986); see also Winter v. Nat. Resources Def. Council, Inc., 555 U.S. 7, 24 (2008) (requiring deference to "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force" (citation omitted)).

    2. Analysis

Plaintiffs have challenged the determinations, made as part of the Air Force's retention and disability evaluation system, that Roe and Voe should be separated from service. Those discharge determinations were entirely dependent on the antecedent findings that Roe and Voe were subject to deployment restrictions. Defendants have recognized as much, arguing that Roe and Voe are to be discharged not because they are HIV positive, but rather because their condition makes them ineligible for deployment to an area of operation where servicemembers of their rank and responsibilities are frequently deployed. The deployment policy is thus the driving factor and must be analyzed first.

    i. The Deployment Policy

DoDI 6490.07 is the Armed Forces-wide instruction intended to provide "baseline guidance on medical deployability for the DoD." See A424. It states that a servicemember is not subject to deployment restrictions so long as his medical condition is stable, not subject to sudden worsening, not reliant on medication with special handling or storage requirements, and not dependent on routine evacuation for ongoing treatment or evaluation. DoDI 6490.07, § 4(b), at A89. Roe and Voe appear to satisfy all of section 4(b)'s requirements. Defendants do not contest, and no evidence in the record contradicts, plaintiffs' assertions that Roe and Voe are asymptomatic and that their viral loads are suppressed, meaning that their conditions are stable

and not subject to sudden worsening so long as they maintain their course of treatment. Although they require daily medication, there is no evidence in the record contradicting plaintiffs' description of that medication as requiring "no special handling, storage, or other requirements" and causing no "significant side effects," id. § 4(b)(3). Roe and Voe must undergo medical evaluations every few months,[32] but nothing suggests that such a requirement qualifies as a "need for routine evacuation," id. § 4(b)(4). Indeed, that active-duty servicemembers with a high risk of HIV exposure are administered pre-exposure prophylaxis ("PrEP") treatment—which, according to one of plaintiffs' medical experts, Dr. W. David Hardy, gives rise to a need for medical evaluations every three months, see Pls.' Opp'n & Reply Ex. D [Dkt. No. 60-5] ("Hardy Decl.") ¶¶ 19-23[33]—but are nonetheless allowed to deploy suggests the opposite.

Section 4(c) of the instruction identifies certain conditions that bar a servicemember from deploying without a waiver. DoDI 6490.07, § 4(c), at A89. Although HIV is listed, the instruction provides the caveat that a waiver is required for HIV only "with the presence of progressive clinical illness or immunological deficiency." Id. enclosure 3, § e(2), at A97. As the record shows, neither Roe nor Voe falls within the terms of that provision. Because of their successful antiretroviral treatment, their conditions are not "increasing in scope or severity," see Progressive, Dorland's Illustrated Medical Dictionary (26th ed. 1981), and their immune systems are not compromised in the way associated with untreated or advanced-stage HIV or AIDS. At

---

[32] See Pls.' Memo. Ex. F [Dkt. No. 40-7] 10-11 (explaining that HIV-positive servicemembers generally require screenings every three to four months, a period which may be extended to six months "for individuals whose viral load has been suppressed for more than 2 years and whose clinical and immunologic status is stable").

[33] Hardy is Chair of the HIV Medicine Association and Adjunct Professor of Medicine at the Johns Hopkins University School of Medicine. He has over 30 years' experience in the care and treatment of individuals living with HIV. See Hardy Decl. 2.

least under DoDI 6490.07, it appears Roe and Voe should not have been classified as nondeployable at all.[34]

The Court recognizes that an altogether different standard governs deployment to CENTCOM, the "theater-level Unified Combatant Command with responsibility for military operations across North Africa, Central Asia, and the Middle East." A423. Under Modification Thirteen to USCENTCOM Individual Protection and Individual-Unit Deployment Policy ("MOD 13"), "[c]onfirmed HIV infection is disqualifying for deployment." See A425. Kevin Cron ("Cron"), CENTCOM's primary waiver action officer, submitted a declaration in support of defendants stating that servicemembers who deploy to CENTCOM "must be medically, dentally and psychologically fit" and cannot have medical conditions "requiring highly specialized medical personnel, treatments, or medications." A424-25. Otherwise disqualified servicemembers may deploy to CENTCOM if they secure a waiver; however, Cron has "n[ever] granted a deployment waiver for a[n] HIV-positive Service member," having concluded in every case "that the risks of deploying a[n] HIV-positive Service member were too great to justify waiver approval." A426-27 ("It is highly unlikely that either . . . Roe or Voe would be granted a waiver to deploy to the CENTCOM [area]."). In essence, then, the rule that prohibits HIV-positive servicemembers from deploying to CENTCOM is a categorical one. See A460 (the SAFPC stating that being HIV positive "precludes [a servicemember] from being able to deploy world-wide without a waiver and renders him ineligible for deployment to [CENTCOM]" (emphasis added)).

---

[34] This interpretation of DoDI 6490.07 is consistent with guidance that the DoD provided to Congress in 2014, which stated that HIV-positive servicemembers would not be separated or even referred into the DES unless their conditions had "deteriorate[d]" in a way that interfered with the successful performance of their military occupation. A376.

This rule fails to pass muster under even the most deferential form of scrutiny. Because of advances in medicine and science, HIV is no longer a progressive, terminal illness. A study published in 2015 in a peer-reviewed journal under the auspices of the DoD recognized as much, finding that HIV "has gone from an untreatable disease marked by inexorable clinical progression through extreme debility to death to a treatable disease"—one "that is compatible with active service throughout a full career in the U.S. military." Pls.' Memo. 14 (quoting John F. Brundage et al., Durations of Military Service After Diagnoses of HIV-1 Infections Among Active Component Members of the U.S. Armed Forces, 1990-2013, 22 Med. Surveillance Monthly Rep. 9, 12 (2015)). It is thus unsurprising that until very recently, "nearly all cases of asymptomatic HIV resulted in a return to duty." A416. Roe and Voe are cases in point: Their commanding officers have unreservedly supported their retention, stating that despite being HIV positive they are physically and mentally capable of performing all duties required of them.

To be sure, HIV remains incurable, and Roe and Voe must take daily medication to ensure that their viral loads remain suppressed. But that fact does not justify the categorical prohibition at issue here. Although HIV-positive individuals who suddenly stop antiretroviral treatment are vulnerable to "viral rebound," A444, appreciable physical effects are not immediate. According to Dr. Hardy, it "often takes weeks" for an individual's viral load to return to clinically significant levels, and even then, the virus "enters a period of clinical latency that can last years," often with no "symptoms or negative health outcomes." Hardy Decl. ¶¶ 11, 14. What is more, plaintiffs have identified several serious medical conditions treated with daily medication that do not subject servicemembers to the same categorical denial of deployability to

CENTCOM. These include dyslipidemia,[35] which (unlike HIV) does not preclude an individual from enlisting or deploying provided the condition is under "medical management" with "no medication side effects," see DoDI 6130.03, § 5.24(n); hypertension, which is listed as a disqualifying condition only where it is "not controlled with medication" or "requires frequent monitoring," DoDI 6490.07, enclosure 3, § g(1), at A98; and asthma, which does not preclude deployment unless it persists "despite appropriate therapy," requires frequent hospitalization, or requires "daily systemic (not inhalational) steroids," id. § d, at A97. Servicemembers who require daily antimalarial medicine likewise are not barred from deploying to CENTCOM; they are simply instructed to "deploy with either enough medication for their entire deployment or with enough to cover approximately half of the deployment with plans to receive the remainder of their medication in theater." A349-50. More generally, MOD 13 allows "personnel who require medication and who are deploying to the CENTCOM" area to deploy "with no less than a 180[-]day supply (or appropriate amount for shorter deployments)," with provisions made to obtain refill prescriptions through the Armed Forces's Deployment Prescription Program. A349. Thus, although defendants emphasize that deployability determinations must account for "reasonably anticipated contingencies, such as loss, theft, or destruction of medication," Defs.' Memo. & Opp'n 24, there appears to be no reason why asymptomatic HIV is singled out for treatment so different from that given to other chronic conditions, all of which are subject to worsening upon disruption of daily medication.[36]

---

[35] "Dyslipidemia is elevation of plasma cholesterol and/or [triglycerides] or a low [high-density lipoprotein] level that contributes to the development of atherosclerosis." The Merck Manual of Diagnosis and Therapy 1295-1309 (Mark H. Beers et al. eds., 18th ed. 2006).

[36] Cron suggests that "features of HIV . . . make it difficult to compare to other conditions" because HIV medications "are highly specialized." A427. Cron does not explain that statement in any way, and as the record reflects, the opposite is true: Antiretroviral treatment requires

Defendants also suggest that their policy is justified by the fact that HIV-positive individuals may require checkups every few months. But as plaintiffs' expert Dr. Craig W. Hendrix explains, those checkups do not require "highly specialized medical personnel," A425, and are consistent with deployment in a forward area; all that is needed is a blood sample, which may be shipped to a laboratory if none is available on site. Pls.' Memo. Ex. F [Dkt. No. 40-7] ("Hendrix Decl.") 11.[37] Dr. Hendrix also explains that point-of-care viral load testing "is becoming increasingly prevalent and cost efficient." Id. Finally, as discussed previously, the Armed Forces's policy of administering PrEP to certain deployed servicemembers undercuts defendants' reliance on the argument that the need for testing every few months bars deployability. See Hardy Decl. 1 ("[P]roviding PrEP to members of the Armed Services is more logistically and medically demanding than providing antiretroviral medications to service members living with HIV would be.").

Nor do other considerations supply the critical missing link in defendants' chain of reasoning. Defendants do not dispute that antiretroviral treatment is highly "effective[] in preventing HIV transmission." A374. Uncontroverted evidence from another of plaintiffs' experts, Dr. Carlos del Rio, demonstrates that when an individual's viral load is suppressed, he cannot transmit the virus to another. Pls.' Memo. Ex. D [Dkt. No. 40-5] ("Del Rio Decl.") 8

---

taking one or two pills per day, and those pills are kept in standard pill bottles without special storage requirements. And as plaintiffs' medical expert Dr. Craig W. Hendrix makes clear, "[t]he HIV medications commonly prescribed today have no special handling, storage or other requirements" and "generally tolerate hard conditions, such as hot or cold stress and sunlight, well." Pls.' Memo. Ex. F [Dkt. No. 40-7] 10.

[37] Hendrix is a Professor of Medicine and Pharmacology and Molecular Sciences at the Johns Hopkins University School of Medicine. He also served in the Air Force on active duty for 10 years and previously was Director of the HIV Medical Evaluation Unit and HIV Program at an Air Force medical center. See Hendrix Decl. 2-3.

(citing a 2017 "Dear Colleague" letter from the CDC).[38] The expert evidence presented by plaintiffs supports the conclusion that even in the case of a sustained disruption in treatment long enough for the viral load to rebound to clinically significant levels, an individual's risk of transmitting HIV during military service remains vanishingly low. Defendants have not identified a single recorded case of accidental transmission of HIV on the battlefield, which is unsurprising given the uncontroverted evidence that even without effective treatment, the risk of transmission through nonintimate contact such as blood splash is negligible. See id. at 8-9; see also A375 (describing the Navy's policy allowing HIV-positive servicemembers to deploy on certain vessels in part because there is "no demonstrated risk of transmission of infection in normal daily activities"). And in the extraordinarily unlikely event of accidental or battlefield exposure, advances in PrEP treatment have made it possible to prevent that exposure from leading to infection.

Defendants respond by pointing to another potential risk: that of transmitting HIV through a "battlefield blood transfusion." Defs.' Memo. & Opp'n 25. But defendants' argument compares apples to oranges. The risk they identify is that a servicemember unaware he is HIV positive might donate blood. See A429 (explaining that this possibility was one of the main impetuses for the military's decision to start screening servicemembers for HIV in the 1980s). That concern fades from view after a servicemember has been diagnosed with HIV and thus knows that he cannot give blood, especially if he has been subject to disruptions in his antiretroviral treatment.

---

[38] Del Rio is the Hubert Professor and Chair of the Development of Global Health, Professor of Epidemiology at the Rollins School of Public Health, and Professor of Medicine in the Division of Infectious Diseases at Emory University School of Medicine, as well as Principal Investigator and co-Director of the Emory Center for AIDS Research. He primarily focuses "on early diagnosis, access to care, engagement in care, compliance with antiretrovirals and prevention of HIV." Del Rio Decl. 2-3.

Defendants have not argued that every deployed servicemember must be able to donate blood. Nor could they: Many servicemembers cannot give blood for various reasons, including blood type and allergies, but are not barred from deploying to CENTCOM or elsewhere. Instead, they are simply issued medical alert tags. Pls.' Memo. 17-18; Pls.' Opp'n & Reply 27.

Defendants have not offered any cogent response to plaintiffs' experienced medical experts, all of whom persuasively explain why the effectively categorical rule declaring all HIV-positive servicemembers ineligible for deployment to CENTCOM is inconsistent with the state of science and medicine and with the way the military treats other chronic but manageable conditions. Indeed, rather than attempting to respond to plaintiffs' experts, defendants rely only on conclusory assertions about their "professional military and medical judgment," Defs.' Memo. & Opp'n 27, and on circular restatements of their policies. For example, defendants argue that "[a]s explained in DoD's 2014 Report to Congress, HIV infection has the potential to undermine a Service member's medical fitness and the readiness of the force." Id. 21 (citing A376). But the portion of the report defendants cite simply does not support their argument. In fact, it amounts to nothing more than a description of the Armed Forces's DES as it relates to HIV-positive servicemembers; it contains no evidence, whether anecdotal or otherwise, of the effect of HIV on a servicemember's medical fitness or the military's readiness. See A376. The same is true for defendants' assertion that the "need for regular treatment and monitoring could impair the ability of an HIV-positive Service member to serve worldwide," Defs.' Memo. & Opp'n 27 (citing A384). The page defendants cite contains no scientific data, evidence, or real-life accounts, but rather is a mere recitation of defendants' policies. In sum, while plaintiffs have presented considerable evidence in support of their arguments, defendants rely on little more than ipse dixit. Based on this record, plaintiffs have made a strong preliminary showing that the

deployment policy applied to asymptomatic HIV-positive servicemembers cannot withstand rational basis review.

      ii.   The Discharge Decisions

In addition to arguing that the deployment policy is irrational, plaintiffs also argue that the decisions to discharge Roe were arbitrary and capricious. Plaintiffs are likely to succeed on this argument as well.

First, that Roe and Voe were even referred for a separation determination in the first place is arguably inconsistent with defendants' own policies. DoDI 1332.45 establishes that servicemembers classified as "nondeployable" for more than 12 consecutive months—or whose nondeployability would not change within the 12-month period—would be evaluated for retention, referred into the DES, or processed for separation. See DoDI 1332.45, § 1.2(b), at A62; id. § 2.4(b)(3), at A64. But servicemembers with conditions identified in DoDI 6490.07, including HIV (at least with the presence of progressive clinical illness or immunological deficiencies, as discussed above), are classified as "deployable with limitations." Id. § 3.3, at A66. As DoD made clear in a 2018 report to Congress, "nondeployable" and "deployable with limitations" were intended to be meaningfully distinct categories, with "the retention determination process applying to the former but not the latter." A386. As such, DoDI 1332.45 clearly suggests that servicemembers with HIV—even those whose health conditions are much graver than Roe's or Voe's—would not be subject to review for separation. In this respect, plaintiffs are correct that the Air Force's actions with respect to Roe, Voe, and the other HIV-positive servicemembers identified by OutServe seem "not in alignment with DoDI 1332.45." Pls.' Memo. 20.

Defendants concede that "[t]he Air Force did not apply DoDI 1332.45." Defs.' Memo. &

Opp'n 22. Instead, they claim to have followed DoDI 6485.01, which states that active-duty

servicemembers diagnosed with HIV must be "referred for . . . a medical evaluation for fitness

for continued service in the same manner as a Service member with other chronic or progressive

illnesses." DoDI 6485.01, enclosure 3, § 2(c), at A85. They claim that under this "case by case"

medical evaluation process, A339, Roe and Voe were fairly found to be unfit for duty and

therefore must be discharged.

The process to which Roe and Voe were subjected does not comport with even the

minimal requirements of the APA. Applicable Air Force regulations make clear that "HIV

seropositivity alone is not grounds for medical separation." AFI 44-178, § 2.4.1, at A299; accord

id. § A9.1.1, at A329; see also A341 ("Asymptomatic HIV alone is not unfitting for continued

service."). To be subject to separation, an HIV-positive individual's condition must (i) prevent

him "from reasonably performing the duties of [his] office, grade, rank, or rating";

(ii) "represent[] an obvious medical risk to the health of the member or the health or safety of

other members"; or (iii) "impose[] unreasonable requirements on the military to maintain or

protect the Service member." DoDI 1332.18, enclosure 3, app. 1, § 2(a), at A26. For the reasons

discussed in detail above, the evidence in this record clearly establishes that HIV seropositivity

alone is not inconsistent with ongoing military service, does not seriously jeopardize the health

or safety of the servicemember or his companions in service, and does not impose unreasonable

burdens on the military when compared to similar chronic conditions.[39] Moreover, both named

---

[39] Indeed, the unjustified different treatment given to HIV as compared to other conditions is
itself contrary to the explicit policy demanding that HIV be treated "in the same manner as . . .
other chronic or progressive illnesses," DoDI 6485.01, enclosure 3, § 2(c), at A85.

plaintiffs' commanding officers recommended retention, opining that Roe's and Voe's HIV

status did not interfere with their ability to perform their duties. The SAFPC recognized as much.

See A460 ("[H]e is able to perform all in[-]garrison duties, has passed his most recent fitness

assessment without any component exemptions, and his commander strongly supports his

retention."); A747 (same). The same is true for the four identified active-duty members of

OutServe facing imminent separation. See Pls.' Memo. Exs. C1-C4 [Dkt. Nos. 40-1 to -4].

The same is true for the four identified active-duty members of

Nonetheless, Roe and Voe—along with the four OutServe members—were found unfit

for duty and ordered discharged. The reason given in all six cases was identical: The

servicemember "belongs to a career field with a comparatively high deployment rate/tempo" to

the CENTCOM area, but being HIV positive "precludes him from being able to deploy world-

wide without a waiver and renders him ineligible for deployment to [CENTCOM]." A460;

accord A747; Pls.' Memo. Exs. C1-C4 [Dkt. Nos. 40-1 to -4]; see also Defs.' Memo. & Opp'n

26-27 (stating that Roe and Voe were ordered "discharged for a combination of having HIV and

being in a career field where they would have a high deployment tempo to CENTCOM,

rendering it impossible for them to fully perform their duties").[40]

The Court has already explained why the policy declaring all HIV-positive

servicemembers categorically ineligible for deployment to CENTCOM is irrational and arbitrary.

---

[40] Defendants have identified four servicemembers who were referred into the DES after being diagnosed with HIV but who were ordered returned to duty rather than separated, assertedly because each "had a much lower likelihood of deployment" to CENTCOM. A421. Two observations are in order. First, at least one servicemember ordered returned to service had a 17.1% likelihood of deployment as measured between fiscal year ("FY") 2015 and FY 2017, whereas those who were ordered separated had "at least a 20% likelihood" over that same period. Id. Because it is unclear by how much any of the servicemembers' likelihoods of deployment exceeded 20%, it is impossible to tell whether defendants' distinction is meaningful. Second, that a few HIV-positive servicemembers were spared from separation does not make the decisions in Roe's and Voe's cases any more acceptable.

Defendants' reliance on that policy renders the decisions to discharge Roe and Voe contrary to the APA for two reasons. First, although the SAFPC purported to engage in an individualized determination as to Roe's and Voe's fitness for duty, in fact its decisions were completely dependent on the across-the-board deployability policy. The failure to consider the issues with that policy or to analyze whether Roe and Voe could in fact be deployable to CENTCOM—let alone to any other location beyond the continental United States—despite their condition renders the decisions to discharge them arbitrary and capricious.[41] Moreover, because the categorical deployment limitation is not rationally related to any legitimate interest, that limitation applies to Roe and Voe solely because they have been diagnosed with HIV. By attempting to discharge them because of that limitation, the SAFPC violated agency policy mandating that HIV status alone is not a permissible ground for separation. A decision in direct conflict with the agency's own standards, and one based on a failure to consider key aspects of the problem, cannot stand under the APA.[42]

---

[41] Another aspect of the problem that defendants failed to consider was whether Roe and Voe could be retained in a different capacity. DoDI 1332.18 sets out factors that must be considered in deciding "whether a Service member can reasonably perform his . . . duties," one of which is whether "reclassification or reassignment is feasible." DoDI 1332.18, enclosure 3, app. 2, § 4(a), at A31. Nothing indicates that the SAFPC, or any other Air Force decisionmaker, ever considered that question, even though Roe was hoping to pursue retraining in another field with a lower likelihood of deployment. See Pls.' Opp'n & Reply Ex. A [Dkt. No. 60-1] 2. During oral argument, plaintiffs' counsel stated that Voe also was interested in pursuing retraining.

[42] To show a likelihood of success on their equal protection and APA claims, plaintiffs need only demonstrate that the challenged policies are irrational and arbitrary; they need not endeavor to explain what irrational or unstated forces may be behind those policies. Nonetheless, it bears observing that the history of HIV has largely been one of fear, misinformation, stigma, and moral outrage, see Pls.' Memo. Ex. E [Dkt. No. 40-6] 3-6 (expert declaration of Trevor Hoppe), and the military would hardly be the first American institution to react to HIV in a manner incommensurate with the true nature of the disease and those affected by it.

## B. **Irreparable Harm**

A party seeking a preliminary injunction must make a clear showing of "actual and imminent" irreparable harm in the absence of injunctive relief. <u>Direx Isr., Ltd. v. Breakthrough Med. Corp.</u>, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). "[I]rreparable harm occurs when the threatened injury impairs the court's ability to grant an effective remedy," <u>Int'l Refugee Assistance Project v. Trump</u>, 883 F.3d 233, 270 (4th Cir.), <u>vacated on other grounds</u>, 138 S. Ct. 2710 (2018), typically when monetary damages "are difficult to ascertain or are inadequate," <u>Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.</u>, 193 F. Supp. 3d 556, 574 (E.D. Va. 2016) (citation omitted), <u>aff'd</u>, 700 F. App'x 251 (4th Cir. 2017). The impending harm must be likely, not merely possible. <u>Winter</u>, 555 U.S. at 22.

One point of clarification is necessary at the outset. Defendants argue that <u>Sampson v. Murray</u>, 415 U.S. 61 (1974), as applied to military employees in <u>Guerra v. Scruggs</u>, 942 F.2d 270 (4th Cir. 1991), requires plaintiffs "to make a much stronger showing of irreparable harm than [under] the ordinary standard for injunctive relief." Defs.' Memo. & Opp'n 17. Defendants cite <u>Sampson</u> and <u>Guerra</u> out of context. In <u>Sampson</u>, a federal employee sued to prevent herself from being terminated pending her appeal to the Civil Service Commission. 415 U.S. at 62-63. The district court granted an injunction after finding a mere possibility of harm, <u>see</u> <u>id.</u> at 67, and the court of appeals affirmed on similar grounds, <u>see id.</u> at 84-85. The Supreme Court reversed, holding that the court of appeals erred "in suggesting that . . . the District Court need not have concluded that there was actually irreparable injury." <u>Id.</u> at 88. <u>Sampson</u> is thus a relic of the world before <u>Winter</u>'s unambiguous rejection of the "possibility" standard, <u>see</u> 555 U.S. at 22 (requiring a showing "that irreparable injury is <u>likely</u> in the absence of an injunction" (emphasis in original)). Likewise, when <u>Guerra</u> applied <u>Sampson</u> in 1991, the Fourth Circuit employed a

flexible sliding-scale approach that permitted a preliminary injunction to issue based only on "possible" irreparable harm. See Guerra, 942 F.2d at 273-74; see also Henderson ex rel. NLRB v. Bluefield Hosp. Co., 902 F.3d 432, 438 n.* (4th Cir. 2018) (discussing the Fourth Circuit's former balancing approach and how that approach was abrogated by Winter). The same was true for the sister-circuit cases on which Guerra relied. See, e.g., Hartikka v. United States, 754 F.2d 1516, 1518 (9th Cir. 1985). Since Winter, the "ordinary standard for injunctive relief," Defs.' Memo. & Opp'n 17, has come into line with what the Court described in Sampson. Accordingly, Guerra does not impose a special, heightened requirement on military-employee plaintiffs.[43] There is but one standard for issuing injunctive relief, in military cases "no less"—and no more—"than in other cases." See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 394 (2006).

Plaintiffs have made a clear showing that they likely face irreparable, actual harm. Under normal circumstances, termination of employment does not constitute irreparable injury because of the "possibility that adequate compensatory or other corrective relief will be available at a later date." Sampson, 415 U.S. at 90. This may be true for some servicemembers facing discharge, at least absent "unusual actions relating to the discharge itself." Hartikka, 754 F.2d at 1518 (quoting Sampson, 415 U.S. at 92 n.68). But it is not guaranteed to be true in every case. Roe and Voe, along with other similarly situated HIV-positive servicemembers, face a particularly heinous brand of discharge, one based on an irrational application of outmoded policies related to a disease surrounding which there is widespread fear, hostility, and misinformation. In their cases, the "stigma of being removed from active duty . . . and [being]

---

[43] This is not to suggest that the military context of this litigation is irrelevant. As discussed above, that plaintiffs seek preliminary relief from military discharge orders weighs heavily in the Court's overall analysis of whether relief is appropriate and what form that relief may take.

labeled as unfit for service" is coupled with the indignity suffered because the reason for their

discharges bears no relationship to their "ability to perform [their] job[s]." Elzie v. Aspin, 841 F.

Supp. 439, 443 (D.D.C. 1993).[44] It is further compounded by the stigma and discrimination

facing those living with HIV and the commonsense observation that HIV-positive

servicemembers, if discharged under these circumstances, will likely be forced to reveal their

condition. In that sense, the discharges with which Roe and Voe are faced are doubly damaging:

Not only will they lose the opportunity to "pursue [their] chosen profession," Enyart v. Nat'l

Conf. of Bar Exam'rs, Inc., 630 F.3d 1153, 1166 (9th Cir. 2011), but it is likely that they will

also face genuine stigmatic injury caused by defendants' decisions, see Karnoski v. Trump,

No. 17-cv-1297, 2017 WL 6311305, at *9 (W.D. Wash. Dec. 11, 2017), stay granted, No. 18A625,

2019 WL 271944 (U.S. Jan. 22, 2019).[45] This is precisely the type of harm that back pay or

reinstatement cannot remedy and for which status quo-preserving preliminary relief is designed.

---

[44] Defendants suggest that Guerra forecloses this reasoning. It does not. Guerra involved an
Army private who sought to enjoin his discharge for "cocaine usage and absence from duty due
to alcohol intoxication." 942 F.2d at 271-73. Guerra did not dispute his drug and alcohol use;
rather, he challenged the procedures through which the discharge recommendation was made. Id.
The Fourth Circuit's conclusion that any "damage to [Guerra's] reputation during the interim
between his discharge and the decision of the board reviewing his discharge" did not qualify as
irreparable harm, id. at 274-75, does not require the same conclusion here. Unlike Guerra,
plaintiffs do not simply dispute the procedures used to reach a decision; they also challenge the
basic notion that their HIV status makes them in any way unfit for service. Put another way: It
was Guerra's behavior, not his impending discharge, that would subject him to stigma, whereas
in plaintiffs' case it is the Armed Forces's apparent affirmation that plaintiffs are less valuable by
virtue of their HIV status that will cause immeasurable harm.

[45] Defendants suggest that the Supreme Court's decision to stay the injunction in Karnoski, a
case involving the ban on military service by openly transgender individuals, rebuts the
reasoning in that opinion. Defs. Memo. 19. That argument puts too much weight on the Court's
action. Because no reasons were given for granting the stay request, the most that can be intuited
is "a reasonable probability that four Members of the Court will consider the issue sufficiently
meritorious to grant certiorari." Graves v. Barnes, 405 U.S. 1201, 1203 (Powell, Circuit Justice
1972); cf. Dunn v. Ray, No. 18A815, 2019 WL 488293, at *1 (U.S. Feb. 7, 2019) (vacating a
stay and explaining why, in the Court's view, the injunctive relief had been improperly granted).

## C. **Remaining Equitable Factors**

Finally, to be entitled to the preliminary injunctive relief they seek, plaintiffs must show that the balance of equities tips in their favor and that an injunction is in the public interest. Where, as here, the injunctive relief is sought against the federal government and implicates a matter of great public interest, these two factors overlap and may be considered together. Nken v. Holder, 556 U.S. 418, 436 (2009); Int'l Refugee Assistance Project v. Trump, 857 F.3d 554, 602 (4th Cir.), vacated on other grounds, 138 S. Ct. 353 (2017).

The equities weigh heavily in plaintiffs' favor. Although the impact of defendants' policies on servicemembers like Roe and Voe is potentially immense, defendants can scarcely be said to face any serious consequences stemming from the issuance of appropriately tailored injunctive relief, given that HIV-positive individuals make up such a miniscule percentage of active-duty servicemembers—0.027%, by one calculation. Pls.' Memo. 29. Defendants do not attempt to argue that retaining HIV-positive servicemembers would be prohibitively expensive or burdensome. Instead, they focus on a different sort of institutional harm: that granting relief here will encourage a deluge of cases challenging discharge determinations and undermine the principle of military independence. Defendants' concerns are overstated. Plaintiffs' claims are not of the sort that worried the Fourth Circuit in Guerra—namely, individualized or procedural challenges with little or no general applicability. Nor is the relief sought by plaintiffs likely to entangle the Court in "complex, subtle, and professional decisions" in a way that would cause symbolic or actual harm to the Armed Forces. Plaintiffs ask only that defendants adhere to their stated policies and make nonarbitrary, personalized determinations about each individual's fitness for service. That sort of request does not do violence to the notion of military independence, but rather enforces it.

The public interest also decisively favors granting injunctive relief. The military is a branch of the federal government and ultimately bears a responsibility to the American public at large. The public undoubtedly has an interest in seeing its governmental institutions follow the law and treat their employees in reasonable, nonarbitrary ways. More concretely, the public benefits from the security provided by military departments populated with individuals dedicated to the notion of service. Roe and Voe, along with similarly situated HIV-positive members of the Air Force, have been serving—and want to continue serving—their country. They have carried out their responsibilities in a creditable manner, earning trust on the part of their commanding officers and fellow servicemembers. It is in the public interest to prevent their discharge for apparently arbitrary and indefensible reasons, at least until the Court can definitively decide the merits of plaintiffs' claims.

### D. Scope of Injunctive Relief

Plaintiffs have demonstrated that they are entitled to injunctive relief. The remaining question is what form that relief should take. "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." Trump v. Int'l Refugee Assistance Project, 137 S. Ct. 2080, 2087 (2017) (per curiam). Interim equitable relief serves "not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." Id. (citation omitted). In forging such relief, a court must exercise great care to "mold its decree to meet the exigencies of the particular case." Id. (citation omitted); see also North Carolina v. Covington, 137 S. Ct. 1624, 1625 (2017) (per curiam) ("A district court therefore must undertake an equitable weighing process to select a fitting remedy for the legal violations it has identified,

taking account of what is necessary, what is fair, and what is workable." (internal quotation marks and citations omitted)).

First, any relief granted must be "limited to the inadequacy that produced the injury in fact that the plaintiff has established." Lewis v. Casey, 518 U.S. 343, 357 (1996); see Missouri v. Jenkins, 515 U.S. 70, 88 (1995) ("[T]he nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation." (citation omitted)). That requirement respects the separation of powers and keeps courts from entangling themselves in delicate policy matters. Here, the apparent inadequacy giving rise to imminent, irreparable injury is that servicemembers like Roe and Voe face separation based on the arbitrary policy that they are categorically ineligible for deployment to CENTCOM. The solution, then, is the mirror image of that defect: defendants will be prohibited from making or enforcing discharge determinations based on that policy.[46]

Next, defendants have argued that if injunctive relief of any kind is to be granted, it must be limited to Roe and Voe. Such a limitation would be inappropriate for several reasons. For one, plaintiff OutServe has the right to assert associational standing and seek relief on behalf of its members who face imminent and irreparable injury due to defendants' policies. There are at least four active-duty Air Force members who are members of OutServe and who are identically

---

[46] The order will not address the enlistment of HIV-positive individuals or the reenlistment of HIV-positive servicemembers whose terms of service have expired. Nor will defendants be enjoined at this time "from restricting Roe and Voe and others similarly situated from being promoted, changing duty station, or re-training on the same terms as other service members living with HIV who are not being separated" [Dkt. No. 34-1]. As it currently stands, the preliminary record does not contain information that would allow the Court to evaluate the reasons for, and consequences of, that requested relief. Of course, the Court has "both statutory and equitable authority to modify" an injunctive order, Transp., Inc. v. Mayflower Servs., Inc., 769 F.2d 952, 954 (4th Cir. 1985), and the denial of this aspect of plaintiffs' motion is without prejudice to plaintiffs' ability to seek modification of the order should the need arise.

situated to Roe and Voe. Because of the longstanding stigma and discrimination facing those living with HIV, it may be difficult to identify potential plaintiffs in a case of this nature. Granting relief to all similarly situated servicemembers is thus the only way to ensure uniform, fair, rational treatment of individuals who belong to a vulnerable, and often invisible, class. Moreover, plaintiffs' entitlement to injunctive relief in this civil action is not so much dependent on characteristics peculiar to Roe and Voe; rather, it flows from defendants' reliance on an arbitrary, across-the-board determination that HIV-positive servicemembers must be deemed ineligible to deploy to CENTCOM, regardless of each servicemember's actual physical condition. That determination is flawed, and its uncritical application will be equally flawed no matter whether the servicemember is named Roe or Doe or whether he hails from Portland, Oregon or Portland, Maine. This case deals with national institutions, national policies, and national interests; it is thus unsurprising that the appropriate scope of relief should be national as well. Servicemembers who enlist in the Air Force do so with the expectation that they will fly under one flag and answer to one Department. They serve the country at large, and there are no relevant regional or localized facts that would counsel in favor of limiting the scope of the injunction to the named plaintiffs.[47]

---

[47] So-called universal injunctions are the subject of fierce debate. Compare, e.g., Trump v. Hawaii, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring) (labeling universal injunctions "legally and historically dubious"), with, e.g., Amanda Frost, In Defense of Nationwide Injunctions, 93 N.Y.U. L. Rev. 1065, 1090-1104 (2018) (reviewing practical and doctrinal reasons in favor of universal injunctions), and Spencer E. Amdur & David Hausman, Response, Nationwide Injunctions and Nationwide Harm, 131 Harv. L. Rev. F. 49, 52 (2017) ("[W]hen many people face the same genuinely irreparable injury as the plaintiff, a complete injunction of the illegal policy serves an important purpose."). For now, they remain a viable part of a district court's equitable powers and may be used where appropriate. Indeed, in International Refugee Assistance Project, the Supreme Court rejected portions of a district court's injunctive order as overbroad but left in place relief that applied not just to the plaintiffs but also to "similarly situated" individuals. 137 S. Ct. at 2087 (per curiam). That case suggests that there is no categorical rule prohibiting injunctive relief reaching nonparties; rather, what governs the

Although plaintiffs have at times suggested that they seek relief on behalf of all members of the Armed Forces, the relief granted will be limited to active-duty members of the Air Force. The record reveals that there are meaningful differences in the way each military department has approached the issue of HIV-positive servicemembers, and the Court does not discount the possibility that another department's policies could be supported by a rational basis and applied in a manner consistent with the APA. Similarly uncertain is whether the foregoing analysis would apply to HIV-positive servicemembers who are on restricted duty of one kind or another. Without a firmer basis in evidence, any broader relief would be inappropriate.

## IV. CONCLUSION

The military is an institution like no other in our system of government. It has unique institutional interests and experience. The decisions it makes are thus entitled to deference from the coordinate branches, and particularly from the judicial branch, whose officers are largely shielded from the exigencies of military life. Nonetheless, the military remains a branch of government and so is bound to follow the Constitution and laws of the United States. And the judiciary's responsibility remains to enforce those laws and protect the rights of individuals vulnerable to arbitrary exercises of governmental authority. Courts must examine questions of military policy with care and humility—but examine them they must.

Here, plaintiffs have made a strong preliminary showing that the Air Force's approach to servicemembers living with HIV is irrational, inconsistent, and at variance with modern science. Accordingly, plaintiffs' motion for a preliminary injunction will be granted in part and denied in

issuance of equitable relief is, as always, the need to ensure that the relief is carefully tailored to address only those defects giving rise to the specific irreparable injury as demonstrated in the preliminary injunction record.

part, and defendants' motion to dismiss denied, by an appropriate Order to be issued with this

Memorandum Opinion.

Entered this 15 day of February, 2019.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge