**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

––––––––––––

**No. 19-1410**

––––––––––––

RICHARD ROE; VICTOR VOE; OUTSERVE-SLDN, INC.,

        Plaintiffs - Appellees

   v.

UNITED STATES DEPARTMENT OF DEFENSE; MARK T. ESPER, in his
official capacity as Secretary of Defense; and BARBARA M. BARRETT, in her
official capacity as Secretary of the Air Force,

        Defendants - Appellants.

––––––––––––

HIV MEDICINE ASSOCIATION; AMERICAN ACADEMY OF HIV MEDICINE;
GLMA: HEALTH PROFESSIONALS ADVANCING LGBT EQUALITY;
INFECTIOUS DISEASES SOCIETY OF AMERICA; SECRETARY ERIC K.
FANNING; SECRETARY DEBORAH LEE JAMES; SECRETARY RAY
MABUS; DR. LAWRENCE J. KORB; REAR ADMIRAL ALAN M. STEINMAN;
CAPTAIN THOMAS T. CARPENTER; AIDS UNITED; THE AMERICAN
PUBLIC HEALTH ASSOCIATION; DUKE LAW HEALTH JUSTICE CLINIC;
SOUTHERN AIDS COALITION; THE NATIONAL ALLIANCE OF STATE AND
TERRITORIAL AIDS DIRECTORS; NMAC,

        Amici Supporting Appellees.

––––––––––––

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria. Leonie M. Brinkema, District Judge. (1:18-cv-01565-LMB-IDD)

––––––––––––

Argued: September 18, 2019            Decided: January 10, 2020
            Amended: January 14, 2020

––––––––––––

Before WYNN, DIAZ, and FLOYD, Circuit Judges.

———————————

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge Diaz and Judge Floyd joined.

———————————

**ARGUED:** Lewis Yelin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants.  Geoffrey Paul Eaton, WINSTON & STRAWN LLP, Washington, D.C., for Appellees. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Ryan D. Newman, Deputy General Counsel, Michael J. Fucci, Associate General Counsel, Mark B. Stern, Marleigh D. Dover, James Y. Xi, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; G. Zachary Terwilliger, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellants.  Scott A. Schoettes, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., Chicago, Illinois; Peter Perkowski, OUTSERVE-SLDN, INC., Washington, D.C.; Lauren Gailey, John W.H. Harding, Laura Cooley, WINSTON & STRAWN LLP, Washington, D.C., for Appellees.  Mary H. Schnoor, Chicago, Illinois, Benjamin C. Mizer, Parker A. Rider-Longmaid, JONES DAY, Washington, D.C., for Amici HIV Medicine Association, American Academy of HIV Medicine, GLMA: Health Professionals Advancing LGBTQ Equality, and Infectious Diseases Society of America.  Peter J. Anthony, Laura Seferian, Washington, D.C., Richard D. Salgado, Dallas, Texas, Monica R. Thompson, DENTONS US LLP, Phoenix, Arizona, for Amici Former Military Officials.  Bennett Klein, Chris Erchull, GLBTQ LEGAL ADVOCATES & DEFENDERS, Boston, Massachusetts; Kevin J. Minnick, Adam K. Lloyd, Los Angeles, California, for Amici AIDS United, The American Public Health Association, Duke Law Health Justice Clinic, Southern AIDS Coalition, The National Alliance of State & Territorial AIDS Directors, and NMAC.

———————————

WYNN, Circuit Judge:

Richard Roe and Victor Voe are active-duty members of the Air Force.[1] They were discharged when the Air Force determined that their chronic but managed illness—HIV—makes them unfit for military service. Roe and Voe sought a preliminary injunction to maintain the status quo while they challenged their discharges. The district court concluded Roe and Voe were likely to succeed on their claims that their discharges were arbitrary and capricious, in violation of the Administrative Procedure Act, and irrational, in violation of Roe and Voe's equal protection rights. The Government appeals. For the reasons that follow, we affirm.

I.

A.

In the early 1980s, many young and otherwise healthy people became ill with "a wide array of rare and often deadly infections." J.A. 656. In the United States alone, thousands died. Researchers identified acquired immunodeficiency syndrome (AIDS) as the reason so many otherwise healthy people died from these infections, but they did not understand the cause of AIDS. The people most frequently diagnosed with AIDS belonged to marginalized and stigmatized groups—gay men, intravenous drug users, Haitians, and hemophiliacs—and the disease acquired the colloquial moniker "gay cancer." In 1984, researchers discovered that AIDS was caused by the human immunodeficiency virus (HIV), which could infect any person sufficiently exposed. However, "by that time, many

---

[1] Roe and Voe proceed pseudonymously. Documents containing identifying information have been filed under seal. Redacted versions are part of the public record.

Americans already believed the cause of the disease to be a deviant lifestyle, a stigmatizing belief that . . . AIDS [w]as a punishment from God." J.A. 657. Stigma, fear, and misinformation about HIV persist today.

Unlike some viruses, HIV is not easily transmitted. It cannot be spread by saliva, tears, or sweat, and it is not transmitted through hugging, handshaking, sharing toilets, exercising together, or closed-mouth kissing. HIV may be transmitted when certain infected body fluids—blood, semen, pre-seminal fluid, rectal and vaginal fluids, and breastmilk—encounter damaged tissue, a mucous membrane, or the bloodstream. However, even then, transmission is unlikely. The Centers for Disease Control and Prevention estimate the per-exposure risk of transmitting untreated HIV during the riskiest sexual activity—receptive anal intercourse—to be 1.38%. For other sexual activities, the per-exposure risk of transmitting untreated HIV drops to between 0% and 0.11%. And although the risk of transmitting untreated HIV through blood transfusion is high, people who have been diagnosed with HIV are not permitted to donate blood. Untreated HIV can also be transmitted through other types of exposure, but the risk is low. For needle sharing, the per-exposure risk is 0.63%, and for percutaneous needlestick injuries, the per-exposure risk is 0.23%. For other exposures to untreated HIV—like biting, spitting, and throwing bodily fluids—the CDC found the risk to be "negligible," meaning transmission of untreated HIV is "technically possible but unlikely and not well documented." J.A. 599.

In 1996, antiretroviral therapy for HIV became widely available. Today, there is "an effective treatment regimen for virtually every person living with HIV," and 75% to 80% of people living with HIV are on a one-tablet antiretroviral regimen, which combines the

required medications into a single pill taken daily. J.A. 598. The pills have no special handling or storage requirements and tolerate extreme temperatures well. They have minimal side effects and impose no dietary restrictions. And with adherence to treatment, an HIV-positive person's viral load becomes "suppressed" within several months and the virus reaches "undetectable" levels shortly thereafter, meaning there are less than 50 virus copies per milliliter of blood. J.A. 597, 795. In addition to medication, individuals with HIV receive viral load testing, which is usually conducted quarterly until the patient reaches an undetectable viral load. Then, testing is reduced to three times a year, and finally, once the viral load is undetectable for two years, testing is reduced to a semiannual basis. Testing is routine and can be performed by a general practitioner. Where on-site testing is unavailable, a blood sample can be shipped to a lab.

Antiretroviral therapy is effective for virtually every person living with HIV. Usually, the virus develops resistance to antiretroviral therapy only when individuals fail to adhere to their treatment regimens. But even then, switching to a different regimen returns the individual to viral suppression. And failing to adhere to treatment does not result in immediate adverse health consequences. It "often takes weeks for an individual's viral load to reach a level that would not be considered 'suppressed.'" J.A. 795. If nonadherence continues, the person enters a clinical latency period during which the person may not have any symptoms or negative health outcomes. This clinical latency period "can last for years," and "can be reversed by restarting [treatment]." *Id.*

Antiretroviral therapy has both increased the quality of life of individuals with HIV and decreased the chance of transmission. In contrast to the fraction-of-a-percent exposure

risks for untreated HIV addressed above, according to the CDC, "people who take [antiretroviral medication] daily as prescribed and achieve and maintain an undetectable viral load have effectively no risk of sexually transmitting the virus to an HIV negative partner." J.A. 600. And other than through blood transfusions—again, "HIV infection is among a number of medical conditions that preclude blood donation"—risk of transmission from a person with an undetectable viral load through non-sexual means such as percutaneous needlestick injuries is very low, if such a risk exists at all. J.A. 459. An HIV diagnosis was "[o]nce considered invariably fatal within approximately eight to ten years," but now, HIV is a "chronic, treatable condition." J.A. 794. Those who are timely diagnosed and treated "experience few, if any, noticeable effects on their physical health and enjoy a life expectancy approaching that of those who do not have HIV." *Id.*

### B.

The United States military does not permit HIV-positive individuals to enlist, nor does the military allow a servicemember who acquired HIV after joining to be appointed as an officer. However, servicemembers who are diagnosed with HIV after enlistment may not be discharged solely based on their HIV-positive status. Department of Defense policies address retention of servicemembers with medical conditions generally and HIV-positive servicemembers specifically.

Department of Defense Instruction 6485.01, which applies to all military branches, provides that servicemembers diagnosed with HIV "will be referred for appropriate treatment and a medical evaluation of fitness for continued service." J.A. 134. And servicemembers "determined to be fit for duty will be allowed to serve in a manner that

6

ensures access to appropriate medical care." *Id.* When determining fitness, HIV-positive servicemembers are evaluated "in the same manner as a Service member with other chronic or progressive illnesses." *Id.*

The Air Force has also implemented policies for retaining HIV-positive servicemembers. For example, like the Department of Defense generally, the Air Force requires that "HIV-positive personnel . . . undergo medical evaluation for the purpose of determining status for continued military service." J.A. 350. Air Force Instruction 44-178 provides that HIV-positive status "alone is not grounds for medical separation or retirement." J.A. 351. It further clarifies, "[f]orce-wide, HIV-infected employees are allowed to continue working as long as they are able to maintain acceptable performance and do not pose a safety or health threat to themselves or others." J.A. 352. An attachment to Air Force Instruction 44-178 reiterates that servicemembers "who are able to perform the duties of their office, grade, rank and/or rating, may not be separated solely on the basis of laboratory evidence of HIV infection." J.A. 381.

Accordingly, Department of Defense and Air Force policies permit HIV-positive servicemembers to continue to serve, so long as they are determined to be fit. Department of Defense Instruction 1332.18 governs servicemember fitness determinations under the military's Disability Evaluation System. A member is unfit for service "when the evidence establishes that the member, due to disability, is unable to reasonably perform duties of his or her office, grade, rank, or rating." J.A. 79. Such a finding requires consideration of "all relevant evidence," including whether the servicemember: "can perform the common military tasks required" of the servicemember's position; is medically permitted to take a

7

"required physical fitness test"; can be deployed "individually or as part of a unit, . . . to any vessel or location specified by the Military Department"; and is able to fulfill any "specialized duties" of assignment. J.A. 79–80. In determining servicemember fitness, Department of Defense Instruction 1332.18 requires the relevant decision-maker to "cite objective evidence in the record, as distinguished from personal opinion, speculation, or conjecture, to determine a Service member is unfit because of disability." J.A. 82. The instruction further clarifies, "[d]oubt that cannot be resolved with evidence will be resolved in favor of the Service member's fitness." *Id*.

In making servicemember fitness determinations, the military considers deployability. And Department of Defense Instruction 6490.07 governs deployment-limiting medical conditions. This instruction is intended to ensure personnel are "medically able to accomplish their duties in deployed environments" by creating "minimum medical standard[s] for all deploying and deployed DoD personnel." J.A. 136–37. It provides that servicemembers with "existing medical conditions" may deploy based on a medical assessment and when certain criteria—including that a servicemember's condition is stable and will not require "routine evacuation out of theater" for evaluation and that needed medications can be provided in theater through the Military Health System—are met. J.A. 138.

Department of Defense Instruction 6490.07 also provides a non-comprehensive list of medical conditions that prevent servicemembers from deploying unless they obtain a waiver. The list includes "diagnosis of [HIV] antibody positive with the presence of progressive clinical illness or immunological deficiency." J.A. 146. However, Department

8

of Defense Instruction 6490.07 does not preclude deployment or require a waiver for deployment of HIV-positive servicemembers *without* a progressive clinical illness or immunological deficiency.

Department of Defense Instruction 6490.07 permits "[m]ore stringent . . . Service-specific readiness requirements." J.A. 137. And the Air Force enacted such requirements in Air Force Instruction 44-178, which provides that HIV-positive "personnel must be assigned within the continental United States[,] Alaska, Hawaii, [or] Puerto Rico," absent a waiver. J.A. 351. The waiver process follows the "normal procedures established for chronic diseases." *Id.*

Eighty percent of all Air Force deployments are to Central Command's (CENTCOM) area of responsibility, which includes theater-level military operations spanning North Africa, Central Asia, and the Middle East. CENTCOM's Modification 13 to its Individual Protection and Individual/Unit Deployment Policy (Modification 13) sets policy for personnel deploying to its area of responsibility. Specifically, Modification 13 provides that personnel who are "found to be medically non-deployable . . . will not enter [the Central Command area] . . . until the non-deployable condition is completely resolved or an approved waiver . . . is obtained." J.A. 393. It also lists "disqualifying medical conditions" that preclude deployment without a waiver. J.A. 412. Within that list, Modification 13 states that "[c]onfirmed HIV infection is disqualifying for deployment." J.A. 417.

C.

From a young age, Roe wanted a career in the Air Force. He enlisted in 2012 and currently serves as a Staff Sergeant. During his time in the Air Force, he has received numerous awards and has been entrusted with increasing levels of responsibility. He mentors other airmen, describing that mentorship role as "one of the highlights of [his] military career." J.A. 588. In October 2017, Roe was diagnosed with HIV. He immediately began antiretroviral treatment. And now, he takes one pill per day and has an undetectable viral load. The pills are stored in an ordinary bottle, do not require special storage, and are refilled every 90 days. His doctors have not recommended his daily work be restricted as a result of his diagnosis.

Following his diagnosis, Roe was referred to the Disability Evaluation System for assessment of his fitness for continued military service. Roe's commanding officer described him as "a valued team member" and recommended he be retained. J.A. 589. And Roe's primary care doctor recommended he be returned to duty. Nevertheless, the Air Force's Informal Physical Evaluation Board recommended Roe be discharged. Roe appealed to the Air Force's Formal Physical Evaluation Board. On appeal, Roe provided additional letters from his commanding officers and colleagues supporting his retention. Additionally, Roe submitted a letter from Lt. Col. Jason Okulicz, Director of the HIV Medical Evaluation Unit at the San Antonio Military Medical Center. In that letter, Lt. Col. Okulicz stated that there was no "medical reason to explain why [Roe] would not be returned to duty." J.A. 590. Nonetheless, the Formal Physical Evaluation Board also recommended Roe be discharged.

Upon review, the Secretary of the Air Force Personnel Council affirmed the decision. In its memorandum, the Council acknowledged that Roe was "compliant with all treatment," "currently asymptomatic," and had an undetectable viral load. J.A. 545. And the Council noted that Roe was "able to perform all in garrison duties" and that his "commander strongly support[ed] his retention." *Id*. But the Council concluded Roe's HIV status "precludes him from being able to deploy world-wide without a waiver and renders him ineligible for deployment to the Central Command (CENTCOM) Area of Responsibility (AOR) where the majority of Air Force members are expected to deploy." *Id*. Because "[d]eployability is a key factor in determining fitness for duty . . . and [Roe] belongs to a career field with a comparatively high deployment rate[,] . . . the Board determined he is unfit for continued military service." *Id*. Accordingly, Roe's discharge date was set for March 28, 2019.

Voe experienced a nearly identical process. Voe enlisted in 2011 and has deployed twice in his time in the Air Force. In March 2017, Voe was diagnosed with HIV. He began antiretroviral treatment within two weeks, and his viral load reached undetectable levels in August 2017. He takes two pills a day. The pills are stored in an ordinary bottle, do not require special storage, and are refilled every 90 days. Voe takes his medication as prescribed and continues to have an undetectable viral load. His doctors have not recommended restricting his daily work as a result of his diagnosis. Voe would like to continue to serve and is "willing to go anywhere in the world to fulfill [his] duties." J.A. 579.

After Voe's diagnosis, he was referred to the Disability Evaluation System for evaluation of his fitness for continued military service. Both the Informal Physical Evaluation Board and the Formal Physical Evaluation Board recommended that Voe be discharged. Upon review, the Secretary of the Air Force Personnel Council affirmed the decision and issued a memorandum almost identical to Roe's. The Council acknowledged that Voe was "compliant with all treatment," "currently asymptomatic," and had an undetectable viral load. J.A. 553. The Council observed Voe was "able to perform all in garrison duties" and that his "commander strongly support[ed] his retention." *Id*. But the Council concluded Voe's HIV status "precludes him from being able to deploy world-wide without a waiver and renders him ineligible for deployment to the Central Command (CENTCOM) Area of Responsibility (AOR) where the majority of Air Force members are expected to deploy." *Id*. Because "[d]eployability is a key factor in determining fitness for duty . . . and [Voe] belongs to a career field with a comparatively high deployment rate[,] . . . the Board determined he is unfit for continued military service." *Id*. Voe's discharge date was set for February 25, 2019.

Roe and Voe were not alone in receiving this disposition. OutServe-SLDN (OutServe), an organization that works on behalf of the LGBTQ+ and HIV-positive military community, identified four other HIV-positive Air Force servicemembers found unfit for duty and ordered discharged based upon identical reasoning.

### D.

In December 2018, Plaintiffs filed suit against the Government in the United States District Court for the Eastern District of Virginia. Plaintiffs contended the Air Force's

discharge decisions and the military's deployment policies violated the Administrative Procedure Act and the equal protection component of the Fifth Amendment's Due Process Clause. Plaintiffs sought declaratory and injunctive relief prohibiting the Air Force from discharging them and prohibiting the Air Force and the Department of Defense from enforcing their policies in a manner that limits the deployability of servicemembers diagnosed with HIV. Plaintiffs moved for a preliminary injunction, and the Government moved to dismiss the case.

In an opinion dated February 15, 2019, the district court granted in part and denied in part Plaintiffs' motion and denied the Government's motion. *See Roe v. Shanahan*, 359 F. Supp. 3d 382 (E.D. Va. 2019). The district court entered an injunction prohibiting the Air Force from "separating or discharging from military service Richard Roe, Victor Voe, and any other similarly situated active-duty member of the Air Force because they are classified as ineligible for worldwide deployment or deployment to the [CENTCOM] area due to their HIV-positive status." Dkt. No. 73. The district court later modified the injunction to allow the separation or discharge of Air Force servicemembers who did not wish to be retained during the litigation. The Government appeals the district court's opinion and order denying the Government's motion to dismiss and granting in part Plaintiffs' motion for a preliminary injunction.

## II.

As a preliminary matter, the Government contends the district court erred in denying its motion to dismiss because this case presents a nonjusticiable military controversy. To determine whether a case involving a military decision is justiciable, courts in this circuit

13

apply the framework articulated in *Mindes v. Seaman*, 453 F.2d 197, 201–02 (5th Cir. 1971). *See Guerra v. Scruggs*, 942 F.2d 270, 276 (4th Cir. 1991); *Williams v. Wilson*, 762 F.2d 357, 359–60 (4th Cir. 1985). In *Aikens v. Ingram*, a panel of this Court declined to "pass[ ] on the continued viability of the *Mindes* test in this circuit" and observed that three circuits have rejected the test. 811 F.3d 643, 648 & n.5 (4th Cir.), *as amended* (Feb. 1, 2016). However, this circuit's adoption of the *Mindes* test has not been "overruled by a subsequent en banc opinion of this court or a superseding contrary decision of the Supreme Court" and is therefore binding here. *United States v. Collins*, 415 F.3d 304, 311 (4th Cir. 2005). Accordingly, we consider de novo the threshold legal question of justiciability under *Mindes*. *See Aikens*, 811 F.3d at 647.

Under *Mindes*, a justiciable case challenging a military action must allege "the deprivation of a constitutional right, or . . . that the military has acted in violation of applicable statutes or its own regulations." *Guerra*, 942 F.2d at 276 (quoting *Mindes*, 453 F.2d at 201). Next, "the plaintiff must have exhausted the 'available intraservice corrective measures.'" *Id.* (quoting *Mindes*, 453 F.2d at 201). Where those threshold requirements are met, the court balances the following four factors:

1. The nature and strength of the plaintiff's challenge to the military determination. . . .
2. The potential injury to the plaintiff if review is refused.
3. The type and degree of anticipated interference with the military function. Interference per se is insufficient since there will always be some interference when review is granted, but if the interference would be such as to seriously impede the military in the performance of vital duties, it militates strongly against relief.
4. The extent to which the exercise of military expertise or discretion is involved.

14

*Id.* (quoting *Mindes*, 453 F.2d at 201–02 (omission in original)).

The Government recognizes the *Mindes* framework "parallels the application of the preliminary injunction factors." Gov't Br. at 19. And other courts have recognized this parallel. *See, e.g.*, *Aikens*, 811 F.3d at 648 n.5. Because this opinion addresses the relevant factors in detail in reviewing the preliminary injunction, only a brief discussion is necessary here.

Plaintiffs' claims present a justiciable military controversy. *Mindes*'s two threshold requirements are satisfied. First, Plaintiffs allege their discharges violate statutory, regulatory, and constitutional rights. Second, the district court determined—and on appeal the Government does not dispute—that Plaintiffs sufficiently exhausted available intraservice corrective measures and that any further intraservice remedies would be futile. *See Roe*, 359 F. Supp. 3d at 401–04.

Further, each of the four *Mindes* factors supports judicial review. First, as explained below, Plaintiffs are likely to succeed on at least one claim—either that the ordered discharges of Roe, Voe, and the similarly situated members of OutServe violated the APA, or that the challenged deployment policies violate the APA. Second, absent review, Plaintiffs will suffer irreparable harm: discharge without an individualized assessment of their fitness for continued service and for reasons unrelated to their ability to serve, coupled with the prospect of being forced to disclose their HIV status to explain the change in their intended careers. Third, review creates minimal interference with the military's function because, as discussed below, at the core of Plaintiffs' claims is an allegation that the Air Force failed to follow its own stated policies and make nonarbitrary, individualized

determinations about each servicemember's fitness for service. Requiring the military to follow its own policies does not interfere with its functions. Fourth, by declining to make individualized determinations regarding servicemembers' fitness for service, the military failed to apply its expertise to the evidence before it. And the military cannot claim that a failure to follow its own written policies is discretionary. Review thus presents a minimal risk of interference with military expertise and discretion. On balance under the *Mindes* factors, this case presents a justiciable controversy.

The Government identifies no other basis for reversing the district court's denial of the Government's motion to dismiss. *See United States v. Washington*, 743 F.3d 938, 941 n.1 (4th Cir. 2017) ("Issues that [the appellant] failed to raise in his opening brief are waived."); *see also* 4th Cir. R. 34(b) (limiting review to issues raised in the appellant's opening brief). We therefore affirm the district court's denial of the Government's motion to dismiss.

### III.

"We 'review the decision to grant or deny a preliminary injunction for an abuse of discretion.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 213 (4th Cir. 2019) (quoting *Safety-Kleen, Inc. v. Wyche*, 274 F.3d 846, 859 (4th Cir. 2001)). "[A]buse of discretion is a deferential standard," and we may not reverse "so long as 'the district court's account of the evidence is plausible in light of the record viewed in its entirety.'" *Id.* (quoting *Walton v. Johnson*, 440 F.3d 160, 173 (4th Cir. 2006) (en banc)). "A clear error in factual findings or a mistake of law is grounds for reversal." *Id.*

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)). A party "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Although Plaintiffs "need not establish a 'certainty of success,'" they must "make a clear showing that [they are] likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)).

"This case involves 'complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force.'" *Winter*, 555 U.S. at 24 (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)). Accordingly, "[w]e 'give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.'" *Id.* (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)). Still, we are mindful that "military interests do not always trump other considerations." *Id.* at 26.

IV.

The district court did not err in concluding that Plaintiffs are likely to succeed on the merits of at least one claim. Here, two agency actions are at issue: the Government's policies regarding deployment of HIV-positive servicemembers, and the Air Force's decisions to discharge Roe, Voe, and the four OutServe members, decisions which

17

themselves looked to the deployment policies. At this preliminary stage, Plaintiffs have shown they are likely to succeed on their claim that the Government violated the APA by acting arbitrarily or capriciously. First, if the deployment policies permit servicemembers to seek a waiver to deploy to CENTCOM's area of responsibility, the Air Force violated the APA because it discharged the servicemembers without an individualized assessment of each servicemember's fitness, instead predicting they could not deploy as a result of their HIV status. Second, even if the Air Force was correct that CENTCOM's policies render the servicemembers categorically ineligible to deploy to its area of responsibility, Plaintiffs have shown they are likely to succeed on their claim that the deployment policies at issue violate the APA because the Government has not—and cannot—reconcile these policies with current medical evidence.

A.

The APA commands courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). But "[o]ur scope of review is 'narrow': we determine only whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Nonetheless, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). Indeed, the APA "embodies the basic presumption of judicial review to one

18

'suffering legal wrong because of agency action.'" *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967) (quoting 5 U.S.C. § 702), *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99 (1977). And "[a]lthough we accord substantial deference to an agency's final action and presume it valid, 'the arbitrary-and-capricious standard does not reduce judicial review to a rubber stamp of agency action.'" *Ergon-W. Va., Inc. v. EPA*, 896 F.3d 600, 609 (4th Cir. 2018) (quoting *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012)).

To comply with the APA, the "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *State Farm*, 463 U.S. at 43). Agency action is arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *State Farm*, 463 U.S. at 43).

In reviewing an agency action, we "may not supply a reasoned basis for the agency's action that the agency itself has not given," although "we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974). We "consider the record made before the agency at the time the agency acted," so "post-hoc rationalizations . . . have 'traditionally been found to be an inadequate basis for review.'" *Dow*

*AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 467–68 (4th Cir. 2013) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419 (1971)). Courts may consider "affidavits not contained in the agency record . . . where 'there was such failure to explain administrative action as to frustrate effective judicial review.'" *Dow AgroSciences*, 707 F.3d at 468 (quoting *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)). However, such post-hoc materials must only provide "background information or evidence of whether all relevant factors were examined by an agency," or be "merely explanatory of the original record and . . . contain no new rationalizations." *AT&T Info. Sys., Inc. v. Gen. Servs. Admin.*, 810 F.2d 1233, 1236 (D.C. Cir. 1987) (internal quotation marks omitted).

As an initial matter, the Government has taken inconsistent positions on whether HIV-positive servicemembers may deploy to CENTCOM's area of responsibility. Three policies bear on deployment of HIV-positive Air Force servicemembers: Department of Defense Instruction 6490.07, which requires HIV-positive servicemembers who also have a "progressive clinical illness or immunological deficiency" to obtain a waiver before deploying; Air Force Instruction 44-178, which requires all HIV-positive Air Force servicemembers to obtain a waiver before deploying outside the continental United States, Alaska, Hawaii, or Puerto Rico; and Modification 13, which governs deployment of HIV-positive servicemembers to CENTCOM's area of responsibility. Before this Court, the parties focus on CENTCOM's policy under Modification 13.

Modification 13 lists conditions that require a servicemember to obtain a waiver before deploying to CENTCOM's area of responsibility. That list includes the following item: "Confirmed HIV infection is disqualifying for deployment, [in accordance with

20

Department of Defense Instructions 6485.01 and 6490.07], service specific policies, and agreements with host nations. Note that some nations within the CENTCOM [area of responsibility] have legal prohibitions against entering their [countries] with this diagnosis." J.A. 417.

Previously, the Government has treated Modification 13 as a categorical ban. For example, in a 2018 report to Congress, which the Government cites as an explanation for its policies, the Department of Defense described a categorical ban, reporting "current Service policies do not permit HIV-infected Service members to deploy to combat theaters of operation or in support of other contingency operations." J.A. 462. Similarly, in the memoranda discharging Roe, Voe, and the four OutServe servicemembers, the Air Force described HIV as "render[ing the servicemembers] ineligible for deployment to the Central Command" area of responsibility. For all other deployments, the Air Force simply noted the servicemembers were precluded "from being able to deploy world-wide without a waiver." J.A. 545. Moreover, declarations offered by the Government in litigation describe issuing a waiver for an HIV-positive servicemember as "extremely unlikely" and acknowledge that CENTCOM's current waiver-authorizing official has never granted a waiver for an HIV-positive servicemember. J.A. 474.

Now, however, the Government changes its position, suggesting CENTCOM "requires HIV-positive airmen to obtain a waiver to deploy to its area of responsibility." Gov't Br. at 6. That argument is supported by CENTCOM's Modification 13 which itself provides, "[m]edical clearance to deploy with any of the following documented medical conditions may be granted, except where otherwise noted," and then lists HIV as a non-

deployable condition. J.A. 414. Additionally, the Government's declarations assert that in reviewing previous waiver requests, CENTCOM officials "conduct[ed] a thorough risk assessment for each waiver request and consult[ed] with the CENTCOM Surgeon and Component Surgeons." J.A 481.

At this preliminary stage, the limited record does not conclusively show whether CENTCOM's deployment policies act as a categorical ban on deploying HIV-positive servicemembers to CENTCOM's area of responsibility—a view the Air Force took in discharging Plaintiffs—or whether CENTCOM provides an individual assessment to each HIV-positive servicemember who seeks a waiver. Nonetheless, Plaintiffs have shown a likelihood of success in either instance. If Modification 13 is not a categorical ban, the Air Force acted arbitrarily by treating them as categorically ineligible to deploy to CENTCOM's area of responsibility and denying Plaintiffs the required individualized assessment of their fitness for continued service. If Modification 13 is a categorical ban, the Government failed to satisfy the APA's requirements in promulgating the policy.

## B.

To the extent Modification 13 does not operate as a categorical ban, the district court rightly found that Plaintiffs are likely to succeed on their claim that the Air Force's discharge decisions were arbitrary and capricious, in violation of the APA. Department of Defense regulations require individualized determinations based on objective evidence to determine a servicemember's fitness for duty or separation under the Disability Evaluation System. Specifically, Department of Defense Instruction 1332.18 designates a servicemember as unfit "when the evidence establishes that the member, due to disability,

is unable to reasonably perform duties of his or her office, grade, rank, or rating." J.A. 79; *see also* 10 U.S.C. § 1203 (providing for separation of a servicemember "[u]pon a determination by the Secretary concerned that a member . . . is unfit to perform the duties of the member's office, grade, rank or rating because of physical disability"); *id.* § 1214 ("No member of the armed forces may be retired or separated for physical disability without a full and fair hearing if he demands it.").

Additionally, Department of Defense Instruction 1332.18 requires consideration of whether the servicemember "can perform the common military tasks required, " as well as whether the servicemember is permitted to take "the respective Service's required physical fitness test." J.A. 80. It also requires consideration of whether the servicemember "is deployable individually or as part of a unit, with or without prior notification, to any vessel or location specified by the Military Department" and, for servicemembers "whose medical condition disqualifies them for specialized duties, whether the specialized duties constitute the member's current duty assignment." *Id.* Moreover, Department of Defense Instruction 1332.18 requires "objective evidence in the record, as distinguished from personal opinion, speculation, or conjecture, to determine a Service member is unfit because of disability." J.A. 82. In sum, a determination through the Disability Evaluation System that a servicemember is unfit for duty must be based on objective evidence in the record and must consider the individual servicemember's physical abilities, fitness, and deployability.

Here, the record shows the Air Force did not perform such an individualized determination. Specifically, the Air Force discharge memoranda contain identical language briefly stating that each servicemember's HIV-positive status "renders him ineligible for

deployment to the Central Command (CENTCOM) Area of Responsibility (AOR), where the majority of Air Force members are expected to deploy." J.A. 545, 553, 563–70. The conclusion that HIV renders a servicemember ineligible for deployment is inconsistent with Modification 13, which allows HIV-positive servicemembers to seek a waiver to deploy to CENTCOM's area of responsibility.

Seeking to rectify this inconsistency, the Government offers a declaration from Martha P. Soper, whose "office is located within the Deputy Assistant Secretary's office" and whose "specific duties deal with health policy, which includes oversight of the" Air Force's Disability Evaluation System. J.A. 469. To address the Air Force's conclusion that Plaintiffs cannot deploy to CENTCOM's area of responsibility, Soper states, "While CENTCOM's current guidance allows for the theoretical possibility of a waiver for an individual with asymptomatic HIV to deploy [to CENTCOM's area of responsibility], the considerations noted in CENTCOM's policy make it extremely unlikely that such a waiver would ever be granted." J.A. 474. We consider this declaration necessary to facilitate judicial review but merely explanatory of the Air Force's discharge memoranda. *See Dow AgroSciences*, 707 F.3d at 467–68; *AT&T Info. Sys.*, 810 F.2d at 1236.

Although the Air Force concluded that Plaintiffs cannot deploy to CENTCOM's area of responsibility, Modification 13 provides that CENTCOM, not the Air Force, determines servicemembers' eligibility to deploy to its area of responsibility. And Modification 13 specifies a waiver process: "Medical clearance to deploy with any of the following documented medical conditions," which includes confirmed HIV infection, "may be granted, except where otherwise noted." J.A. 414. Thus, Modification 13 does

24

not, on its face, preclude waivers for HIV-positive servicemembers. Further, the Government asserts—in its briefing to this Court and in litigation declarations in the record—that Modification 13 allows an HIV-positive servicemember to request a waiver for authorization to deploy to the area. And Modification 13 requires that the "medical evaluator . . . carefully consider whether the climate, altitude, nature of available food and housing, availability of medical, behavioral health, dental, surgical, and laboratory services, or whether other environmental and operational factors may be hazardous to the deploying person's health." *Id*. It also sets forth the waiver-granting authority and an appeals process.

To explain the waiver process, the Government offers the declaration of Preventive Medicine Officer and primary Waiver Action Officer for CENTCOM, Kevin Cron. Again, we consider this affidavit—which was not in the record before the agency—only to provide background and explanation of that record. *See Dow AgroSciences*, 707 F.3d at 467–68. Cron states he has "reviewed waiver requests from HIV-positive service members" seeking deployment to CENTCOM but has "not granted a deployment waiver for a HIV-positive Service member." J.A 481. He further states that in reviewing those waiver requests, he "conduct[ed] a thorough risk assessment for each waiver request and consult[ed] with the CENTCOM Surgeon and Component Surgeons" and ultimately "determined in each case that the risks of deploying a HIV-positive Service member were too great to justify waiver approval." J.A 481–82.

CENTCOM's waiver process, as the Government has represented it to this Court, includes an individualized determination. In particular, in assessing each servicemember's

waiver request, CENTCOM considers the risks of deploying each servicemember in light of that servicemember's medical condition, taking into account the expertise of medically trained officials. The APA requires such reasoned decision-making in this circumstance.[2] But the Air Force's discharge memoranda do not entertain the possibility of such an individualized waiver determination, and the record is entirely lacking in an explanation reflecting an individualized determination for each servicemember. The Soper and Cron declarations purport to provide such an explanation, but even if credited, the Government's post-hoc attempt to explain its decisions still fails to provide any individualized assessment of the servicemembers ordered discharged. According to the declarations, CENTCOM's primary Waiver Action Officer repeatedly denied waivers for HIV-positive servicemembers, and the Air Force viewed such a waiver as a "theoretical possibility" that was "extremely unlikely" to be granted. J.A. 474. In light of this explanation, in stating that each servicemember's HIV-positive status "renders him ineligible" to deploy to CENTCOM, the Air Force merely *predicted* that HIV-positive servicemembers would not receive a waiver from CENTCOM under Modification 13.

By predicting all HIV-positive servicemembers would be denied a waiver instead of allowing Roe, Voe, and the OutServe members to seek a waiver and obtain CENTCOM's waiver determination, the Air Force cut short the individualized

---

[2] The Government has not argued the APA's requirements of reasoned decision-making and satisfactory explanation on the record do not apply here. And indeed, Congress could have excepted this military action from this requirement, but chose not to. *See* 5 U.S.C. § 701(b)(1) (excluding "courts martial and military commissions" and "military authority exercised in the field in time of war or in occupied territory" from the APA's definition of "agency").

determinations required by Department of Defense policy and never gave CENTCOM—or any military entity—the opportunity to examine the objective evidence of each servicemember's physical condition, symptoms, treatment requirements, and transmission risks. Instead, the Air Force discharged Roe, Voe, and the four OutServe members based on speculation that HIV-positive servicemembers could not deploy to CENTCOM's area of responsibility. Such a categorial predictive assessment is not "a satisfactory explanation" for discharging each servicemember, and in using this predictive assessment to discharge these servicemembers, the Air Force violated Department of Defense regulations, failed to consider important aspects of the criteria for discharge, and explained its decision in a manner contrary to the evidence before it. *See State Farm*, 463 U.S. at 43; c*f. Delta Air Lines, Inc. v. Exp.-Imp. Bank of the U.S.*, 718 F.3d 974, 978 (D.C. Cir. 2013) (per curiam) (concluding an agency's unexplained categorical conclusion violated the APA); *Arrington v. Daniels*, 516 F.3d 1106, 1113–14 (9th Cir. 2008) (concluding a categorical rule promulgated by the Bureau of Prisons violated the APA because one offered rationale was absent from the agency record and the agency did not explain in the record how the second rationale supported the rule). The Air Force's discharge orders were arbitrary and capricious.

Accordingly, based on the limited record at this preliminary stage, Plaintiffs have shown a likelihood of success on the merits of their claim that the Air Force violated the APA in its discharge decisions. *See League of Women Voters v. North Carolina*, 769 F.3d 224, 237–38 (4th Cir. 2014) (granting a preliminary injunction where the plaintiffs were likely to succeed on one claim).

C.

As discussed above, the record is ambiguous as to whether the deployment policies allow HIV-positive servicemembers to seek a waiver to deploy to CENTCOM's area of responsibility or whether the policies operate as a categorical ban. And assuming HIV-positive servicemembers may seek a waiver, the Air Force acted arbitrarily in denying Plaintiffs the opportunity to do so. Alternatively, to the extent Modification 13 operates as a categorical ban, the district court rightly concluded that Plaintiffs are likely to succeed on their claim that the policy violates the APA. *See* 5 U.S.C. § 706(2)(A).[3] Plaintiffs are likely to succeed on the merits of this claim because the Government, by failing to offer an explanation that is reconcilable with the scientific and medical evidence available to it, did not comply with the APA in promulgating this policy.

Other than the text of Modification 13 itself and the Cron declaration, which is a post-hoc explanation of the policy, the Department of Defense has offered no rationale for its policy of non-deployment for HIV-positive servicemembers, nor has it identified the evidence it considered in formulating the policy. And the Department of Defense's statements in a 2018 report to Congress that the policies "accurately reflect current medical literature and expert opinion (consensus standards) regarding transmission and treatment of HIV" cannot substitute for the judicial review provided for by the APA. J.A. 459. Upon

---

[3] Plaintiffs also challenge this policy under the equal protection component of the Fifth Amendment's Due Process Clause. *See* U.S. Const. amend. V. Because we conclude Plaintiffs are likely to succeed on the merits of their APA claim, we need not address their equal protection claim. *See, e.g.*, *Pashby v. Delia*, 709 F.3d 307, 328 (4th Cir. 2013) (concluding a preliminary injunction was appropriate when the plaintiffs had demonstrated a likelihood of success on some, but not all, of their claims).

review, each explanation offered by the Government for the policy is unsupported by the record or contradicted by scientific evidence, leading us to conclude Plaintiffs have adequately shown that the Government failed to consider the relevant evidence and offers explanations so contrary to that evidence as to be arbitrary.

The Government relies primarily on the text of Modification 13 to explain its policy. Modification 13's text suggests three explanations for the policy: the requirements of Department of Defense Instructions 6485.01 and 6490.07; service-specific policies; and "agreements with host nations." J.A. 417. But Department of Defense Instructions 6485.01 and 6490.07 do not prevent HIV-positive servicemembers from deploying to CENTCOM. In fact, Department of Defense Instruction 6490.07 permits HIV-positive servicemembers to deploy even with "the presence of progressive clinical illness or immunological deficiency," provided they obtain a waiver. J.A. 146. Similarly, as to service-specific policies, Air Force Instruction 44-178 permits HIV-positive servicemembers to deploy outside the continental United States, Hawaii, Alaska, and Puerto Rico if they obtain waivers "using normal procedures established for chronic diseases." J.A. 351. Finally, Modification 13 alludes to agreements with host nations and the laws of "some nations" within CENTCOM's area of responsibility. J.A. 417. But the text of Modification 13 does not explain how such laws and agreements bear on deploying HIV-positive U.S. servicemembers. For example, Modification 13 applies to both military servicemembers and civilians, but does not specify whether host nations' restrictions similarly apply to both, and whether the inability to enter one nation would preclude deployment to the entire area. Modification 13 thus fails to "articulate a satisfactory explanation" for the policy and fails

29

to provide "a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Indeed, with respect to host nation requirements, the Government has not even articulated the facts found.

Beyond the contradictory or incomplete explanations implied by Modification 13's text, the record contains no other justification for a categorical ban on deploying HIV-positive servicemembers to CENTCOM's area of responsibility. Because the agency so failed to explain its policy "as to frustrate effective judicial review," we consider the Cron declaration in reviewing the Government's basis for a categorical ban. *See Camp*, 411 U.S. at 142–43. Cron's declaration purports to provide additional justifications and detail for CENTCOM's policy. First, "[t]reatment medications are highly specialized, and require constant, diligent compliance to be effective," because without treatment, a "resurgent infection may go unnoticed[.]" J.A. 482. Second, "austere conditions may place Service members with mandatory medication or treatment regimens at risk because these regimens may be disrupted." J.A. 480–81. Finally, the "remaining force" could be "expos[ed] to [HIV-infected] blood from treating, or being treated for, battlefield trauma, or for those individuals requiring battlefield blood transfusions." J.A. 481.

These proffered justifications fail to account for current medical literature and expert opinion about current HIV treatment and transmission risks. By failing to address the current state of HIV treatment and transmission, CENTCOM did not "consider an important aspect of the problem" and now explains its decision in a manner "that runs

counter to the evidence before" it. *Sierra Club*, 899 F.3d at 293 (quoting *State Farm*, 463 U.S. at 43).

To begin, the Government's assertion that HIV requires "highly specialized" treatment is contrary to evidence in the record. Around three-quarters of HIV-positive individuals take a single daily pill, which does not require special storage or handling. These medications generally tolerate extreme conditions well. And treatment produces minimal side effects and imposes no dietary restrictions. While HIV-positive individuals need viral load testing, the testing is routine and can readily be conducted by a general practitioner, either on-site or by shipping a sample to a lab. The record is inconsistent about the frequency of such testing. Plaintiffs offer declarations of two physicians with extensive experience in the field of HIV who state that a patient with an undetectable viral load for at least two years typically receives viral load testing twice a year. However, Air Force Instruction 44-178 requires "an initial evaluation . . . followed by a visit at 6 months, then yearly thereafter." J.A. 350. Whether testing is needed once or twice every year, the treatment is not "highly specialized."

This simple treatment also undermines the Government's assertion that "austere conditions" would "disrupt[ ] it." J.A. 480–81. Because the medications have no special storage requirements, servicemembers with HIV can be prescribed several months' worth of their medication at a time, just as the military does for servicemembers deploying with other chronic but managed conditions. And for patients with undetectable viral levels— like Roe, Voe, and the OutServe servicemembers—the required treatment is no different in time or effort than other treatments prescribed to servicemembers deployed overseas,

including to CENTCOM's area of responsibility. Even if treatment were disrupted, HIV-positive servicemembers would "not immediately suffer negative health outcomes." J.A. 795. "It often takes weeks for an individual's viral load to reach a level that would not be considered 'suppressed.'" *Id.* Even then, the virus enters a period of clinical latency that can last years, often with no symptoms or negative health outcomes. And, when an individual resumes treatment, even supposing the virus developed a resistance to the previous treatment regimen, a switch to a different regimen will return that patient to viral suppression.

Finally, through the Cron declaration, the Government also explains its deployment policy by pointing to the risk of HIV transmission through battlefield blood exposure and blood transfusions. Again, the Government has failed to reconcile these concerns with the record evidence on HIV transmission. The record does not support the Government's arguments about the risk of transmission through transfusions. Servicemembers who test positive for HIV are ordered not to donate blood. Therefore, any risk of HIV transmission through transfusion is by servicemembers who are unaware of their HIV-positive status. That is, of course, not the case here. Roe, Voe, and the four OutServe members are all aware of their HIV-positive status.[4]

---

[4] Even in the case of a servicemember unaware of his or her status, the risk of HIV transmission through blood transfusion is low because of rigorous transfusion procedures. Specifically, to reduce transmission risks, the FDA screens the military blood supply for various diseases, including HIV. *See* Amicus Br. of Former Military Officials at 16 (citing T. Ballard et al., *Transfusion-Transmissible Infections Among U.S. Military Recipients of Emergently Transfused Blood Products, June 2006-December 2012*, Medical Surveillance Monthly Reports, Vol. 21, No. 11, at 2 (Nov. 2014)). Where FDA-screened blood is

Likewise, the risk of battlefield transmission is unsupported by the record. For example, the CDC has determined that the chance of transmitting untreated HIV by needlestick is 0.23% per needlestick exposure, and the chance of transmitting untreated HIV by throwing bodily fluids is "negligible." J.A. 599. In cases of undetectable viral loads—like those of Roe, Voe, and the OutServe servicemembers—medical experts consider transmission risks to be even lower.

Moreover, the military's own research undermines the Government's purported concern. Specifically, a military study of 1.13 million Army servicemembers who deployed to Afghanistan or Iraq between 2001 and 2007 found 131 servicemembers seroconverted— that is, tested positive for HIV after previously testing negative. This rate was *lower* than the rate among servicemembers who did not deploy to those areas. Moreover, the study identified only one case of a servicemember who was infected with HIV during deployment. In the other studied cases of seroconversion, the servicemembers were infected prior to deployment, after deployment, or during leave for rest and relaxation. And the military did not identify any servicemembers who contracted HIV through non-sexual means. So, among the 1.13 million servicemembers deployed to Afghanistan or Iraq during

---

unavailable, the military turns first to a "walking blood bank," a volunteer servicemember who is pre-screened to donate blood. *Id.* at 17. If no such servicemember is available, the military turns to volunteers who have donated recently. Finally, the military turns to other volunteers. From 2006 to 2012, only 2% of all units of blood transfused to servicemembers were non-screened units. *See id.* at 16 n.18. Again, HIV-positive members have been ordered not to donate blood and so do not contribute to the supply of non-screened blood. The Government has not identified any case of HIV transmission through blood transfusion under its screening procedures. *See* Ballard et al., *supra*, at 4 (noting that the Defense Medical Surveillance System identified "no cases of HIV" transmission from 2006 to 2012).

the six-year study period, the military found *no* instances of transmission through trauma care, blood splash, transfusion, or other battlefield circumstances.

The Government's justifications for a categorical ban, offered through the Cron declaration, do not account for the Plaintiffs' persuasive and credible evidence—evidence available to the Government when it enacted this policy—on HIV treatment and transmission risk. And the record and the military's own research support the conclusion of the military-official amici—including former Secretaries of the Army, Air Force, and Navy, a former Assistant Secretary of Defense, and a former Director of Health and Safety for the Coast Guard—that "there is no legitimate reason to deny HIV positive service members the opportunity to deploy." Amicus Br. of Former Military Officials at 7. A ban on deployment may have been justified at a time when HIV treatment was less effective at managing the virus and reducing transmission risks. But any understanding of HIV that could justify this ban is outmoded and at odds with current science. Such obsolete understandings cannot justify a ban, even under a deferential standard of review and even according appropriate deference to the military's professional judgments.

In summary, the Government has failed to meet the APA's requirement to explain a categorical ban on deploying HIV-positive service members. The Government did not articulate a satisfactory explanation at the time the deployment policy was adopted. And even considering the explanations offered in litigation, the policy fails to withstand review under the APA. Modification 13 "evidences a complete failure to reasonably reflect upon the information contained in the record and grapple with contrary evidence—disregarding entirely the need for reasoned decision-making." *Sierra Club*, 899 F.3d at 293 (quoting

*Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017)). Accordingly, Plaintiffs are likely to succeed in demonstrating the Government acted arbitrarily and capriciously—either by cutting short the individualized determination required by regulation or by imposing an unjustified deployment policy at odds with modern science.

V.

In addition to a likelihood of success on the merits, for a preliminary injunction to issue, Plaintiffs must show they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough." *Di Biase*, 872 F.3d at 230 (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

To argue that Plaintiffs have not sufficiently demonstrated irreparable harm, the Government principally relies on *Guerra v. Scruggs*. *See* 942 F.2d at 273–75. In *Guerra*, a servicemember sought to enjoin his discharge resulting from his admitted "cocaine usage and absence from duty due to alcohol intoxication." *Id.* at 271. We concluded a "higher requirement of irreparable injury should be applied in the military context given the federal courts' traditional reluctance to interfere with military matters," and Guerra could not meet that heightened requirement. *Id.* at 274. Because Guerra could appeal to the Army Board for Correction of Military Records if his general discharge was improper, "the only harm [he] could suffer [was] the damage to his reputation during the interim between his discharge and the decision of the board reviewing his discharge." *Id.* at 274–75. Accordingly, we explained "the prospect of a general discharge under honorable conditions

35

is not an injury of sufficient magnitude to warrant an injunction." *Id.* at 274. (quoting *Chilcott v. Orr*, 747 F.2d 29, 34 (1st Cir. 1984)).

*Guerra*'s heightened requirement of irreparable harm does not prevent a preliminary injunction here. At the time we decided *Guerra*, courts were required to "balance the irreparable harm to the respective parties, requiring only that the harm to the plaintiff outweigh the harm to the defendant." *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009) (emphasis omitted), *vacated on other grounds*, 559 U.S. 1089, *aff'd*, 607 F.3d 355 (4th Cir. 2010). And "upon a strong showing on the probability of success, the moving party [could obtain a preliminary injunction by] demonstrat[ing] only a possibility of irreparable injury." *Id.*; *see also Hartikka v. United States*, 754 F.2d 1516, 1518 (9th Cir. 1985). But the Supreme Court has since rejected this approach, requiring plaintiffs to "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Importantly, *Winter*, a case of general applicability, involved a challenge to "mission-critical" military action that constituted a "top war-fighting priority"—integrated training of a strike group of surface ships, submarines, and aircraft— suggesting no special standard applies in the military context. *Id.* at 12, 14.

Furthermore, although a general discharge was insufficient to demonstrate irreparable injury in *Guerra*, the Supreme Court has recognized that "circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Sampson*, 415 U.S. at 92 n.68; *see also Guerra*, 942 F.2d at 274–75. Here, the district court found that two circumstances surrounding these discharges would create irreparable harm.

First, Plaintiffs "face a particularly heinous brand of discharge" based on "outmoded policies related to" HIV that "bears no relationship to their 'ability to perform [their] job[s].'" *Roe*, 359 F. Supp. 3d at 419–20 (quoting *Elzie v. Aspin*, 841 F. Supp. 439, 443 (D.D.C. 1993) (alterations in original)). Second, this injury is "further compounded by the stigma facing those living with HIV and the commonsense observation that HIV-positive servicemembers, if discharged under these circumstances, will likely be forced to reveal their condition." *Id.* at 420. Notably, unlike Guerra, Roe, Voe, and the OutServe servicemembers cannot address these harms through post-discharge intraservice procedures. *See Guerra*, 942 F.2d at 274.

The Government challenges the factual basis for both findings supporting the district court's conclusion about irreparable harm. First, it argues that there was "no basis to infer animus" from the Air Force's discharge of HIV-positive service members. Gov't Br. at 38. Second, it argues there is "no foundation for the district court's speculation that Plaintiffs will be forced to 'reveal their condition.'" *Id.* We conclude the district court did not clearly err in either respect.

First, the district court did not find—nor suggest—that animus led to Plaintiffs' discharge. Instead, it concluded that Plaintiffs were discharged based upon "outmoded policies" unrelated to their "ability to perform their jobs." *Roe*, 359 F. Supp. 3d at 419–20. As explained above, the weight of scientific evidence supports this finding. This is different from the situation in *Guerra*, where the commanding officer of Guerra's company sought the discharge because of Guerra's admitted drug use. *See Guerra*, 942 F.2d at 275, 280 (declining to issue an injunction requiring the Army to "retain[ ] admitted drug users"

37

because such an injunction would be "a disruptive force as to [military] affairs" (quoting *Orloff v. Willoughby*, 345 U.S. 83, 95 (1953))).

Second, the district court did not clearly err by finding it "commonsense" that Plaintiffs' discharge would require them to "reveal their condition." *Roe*, 359 F. Supp. 3d at 420. Plaintiffs had intended to continue to serve in the Air Force but now face discharge earlier than expected. And the district court rightly acknowledged that Plaintiffs would have to address questions from others as to why they were not continuing in their intended careers. Accordingly, the court did not clearly err in its findings that the discharges would cause irreparable harm to Plaintiffs.

## VI.

The district court also did not err in concluding the balance of the equities and the public interest both favor an injunction. *See Winter*, 555 U.S. at 20; *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) (observing that assessing harm to the opposing party and weighing the public interest "merge" when the government is the party opposing a stay).

The Government contends the district court, in balancing the equities, inadequately accounted for the harm to servicemembers who must "compensate for their unavailable team members by deploying more frequently." Gov't Br. at 37. But the district court recognized this harm and "appropriately tailored" its relief to minimize it. *Roe*, 359 F. Supp. 3d at 420. Specifically, the court examined the evidence and concluded that HIV-positive servicemembers constitute a "miniscule percentage of active-duty servicemembers—0.027% by one calculation." *Id.* at 421. And any harm resulting from

the retention of this small number of servicemembers is outweighed by the "potentially immense" harm to HIV-positive servicemembers. *Id*. at 420.

Next, the Government contends the district court created "institutional harm" through "judicial second-guessing" of "affairs peculiarly within the jurisdiction of the military authorities." Gov't Br. at 36–37. To be sure, "there will always be some interference when [courts] review" military decisions. *Guerra*, 942 F.2d at 276 (quoting *Mindes*, 453 F.2d at 201). But military decisions are not categorically immune from judicial review, and here, Congress has provided for review through the APA. *See* 5 U.S.C. § 701(b)(1); *see also Gilligan*, 413 U.S. at 10 (describing "professional military judgments" as "subject *always* to civilian control of the Legislative and Executive Branches"). Moreover, the district court gave deference to the military regarding its personnel decisions. Still, it concluded that the relief requested, "that defendants adhere to their stated policies and make nonarbitrary, personalized determinations about each individual's fitness for service[,] . . . . d[id] not do violence to the notion of military independence." *Roe*, 359 F. Supp. 3d at 421. The district court did not clearly err in this determination, and the Government has not shown what institutional harm arises from relief that merely requires it to comply with its own policies.

As to the public interest, the district court observed the public "undoubtedly has an interest in seeing its governmental institutions follow the law and treat their employees in reasonable, nonarbitrary ways." *Id.* But the district court also noted another important public interest: "the public benefits from the security provided by military departments populated with individuals dedicated to the notion of service." *Id*. Roe, Voe, and the four

members of OutServe have served their country, collectively earning accolades, promotions, the trust of their commanding officers, and the respect of their fellow servicemembers. And the public interest in their continued service is underscored by the statements of the former-military-official amici: "It is more damaging to military readiness to deny those service members the opportunity to deploy where they are needed." Amicus Br. of Former Military Officials at 7. As the district court correctly noted, "It is in the public interest to prevent their discharge for apparently arbitrary and indefensible reasons, at least until the Court can definitively decide the merits of plaintiffs' claims." *Roe*, 359 F. Supp. 3d at 421.

Accordingly, the district court correctly determined the balance of equities and the public interest favored a preliminary injunction to maintain the status quo during litigation.

## VII.

We review the scope of a district court's injunction for abuse of discretion. *See Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 392 (4th Cir. 2001), *abrogated on other grounds by FEC v. Wis. Right to Life*, 551 U.S. 449 (2007). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (citing *Winter*, 555 U.S. at 20, 24). And "[i]t is well established . . . that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case." *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992). Still, a court should "mold its decree to meet the exigencies of the particular case." *Int'l Refugee Assistance Project*, 137 S. Ct. at 2087

(quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2947 (3d ed. 2013)). And a court must ensure a preliminary injunction is "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr, Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Importantly, in the context of a preliminary injunction, "[t]he purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Int'l Refugee Assistance Project*, 137 S. Ct. at 2087 (internal citation omitted). Therefore, a court should "[take] account of the equities in fashioning interim relief, focusing specifically on the concrete burdens that would fall" on the party seeking the injunction. *Id.* Additionally, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

Plaintiffs sought to enjoin the Air Force from discharging Roe, Voe, and other similarly situated servicemembers, and from "restricting [them] from being promoted, changing duty station, or re-training on the same terms as other service members living with HIV who are not being separated." Dkt. No. 34-1. The district court granted the motion in part and denied it in part, enjoining the Air Force from discharging active-duty servicemembers because they are classified as ineligible to deploy to CENTCOM's area of responsibility due to their HIV status. And after review of the district court's order and the

record before us, we conclude the district court did not abuse its discretion in crafting this preliminary injunction.

A.

The Government argues "the district court had no authority to enter a nationwide injunction barring the Air Force from discharging service members based on" Modification 13. Gov't Br. at 40–41. Specifically, the Government contends the injunction "exceeds a court's authority under both Article III and fundamental principles of equity." Gov't Reply at 20. The Government does not contest that Roe, Voe, and OutServe (representing four members of the Air Force facing discharge) have demonstrated standing to challenge their discharges. Certainly, this is not a case where a plaintiff has sought to vindicate a public right without showing some specific injury to him- or herself. *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2428 (2018) (Thomas, J., concurring).

On the legal question of whether an injunction extending relief to those who are similarly situated to the litigants is categorically beyond the equitable power of district courts, binding precedent requires this Court to reject the Government's argument. The Supreme Court recently affirmed the equitable power of district courts, in appropriate cases, to issue nationwide injunctions extending relief to those who are similarly situated to the litigants. *See Int'l Refugee Assistance Project*, 137 S. Ct. at 2087. There, the Government asked the Court to stay preliminary injunctions extending to "respondents and those similarly situated." *Id.* The Court declined to do so and left that portion of the injunction in place. *Id.* And it is the Supreme Court's "prerogative alone to overrule one of

its precedents." *United States v. Hatter*, 532 U.S. 557, 567 (2001) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997)).

### B.

Here, the district court took care to "mold its decree to meet the exigencies of the particular case." *See Int'l Refugee Assistance Project*, 137 S. Ct. at 2087. The district court carefully considered the equities, "focusing specifically on the concrete burdens that would fall" on the parties and on the public consequences of an injunction. *Id.*; *see also Winter*, 555 U.S. at 24. Because the district court tailored the injunction to the issues presented in the case, imposed a narrow injunction focused on the Air Force's challenged actions, and articulated its reasons for imposing the injunction, the district court did not abuse its discretion in fashioning relief.

First, Plaintiffs challenged the Air Force's failure to provide an individualized determination of their fitness to continue to serve. As explained above, the Government used an unexplained categorical policy, which effectively operated as a ban, in determining Roe, Voe, and the four OutServe members could not deploy to CENTCOM's area of responsibility and therefore should be discharged. The categorical polices relied upon by the Government call for categorical relief. And just as the Government identified no facts particular to any one servicemember to justify discharge, here, no facts require different relief for servicemembers subjected to the same categorical determination.

This Court has expressed concern that preliminary injunctions risk "thwart[ing] the development of important questions of law." *See Va. Soc'y for Human Life*, 263 F.3d at 393 (quoting *United States v. Mendoza*, 464 U.S. 154, 160 (1984)). But here, the

43

Government, by failing to meet its obligation to provide individualized determinations, has already limited this Court's ability to consider this question in a variety of circumstances. And as the district court noted:

> [P]laintiffs' entitlement to injunctive relief in this civil action is not so much dependent on characteristics peculiar to Roe and Voe; rather, it flows from defendants' reliance on an arbitrary, across-the-board determination that HIV-positive servicemembers must be deemed ineligible to deploy to CENTCOM, regardless of each servicemember's actual physical condition.

*Roe*, 359 F. Supp. 3d at 422.

Second, and relatedly, the preliminary injunction is in fact quite narrow. It does not enjoin enforcement of CENTCOM's policy, but only discharges relying on a categorical reading of that policy. Nor does the preliminary injunction prevent the Air Force from discharging servicemembers for reasons unrelated to their HIV status and the Air Force's application of Modification 13. And, as the district court has clarified, the injunction does not prevent HIV-positive servicemembers who wish to separate from the Air Force from doing so. As a result, the district court avoided imposing undesired consequences on similarly-situated Air Force servicemembers.

Additionally, the preliminary injunction entered by the district court is narrower than what Plaintiffs sought. In particular, the district court explicitly noted that the Government was not enjoined "from restricting Roe and Voe and others similarly situated from being promoted, changing duty statutes, or re-training on the same terms as other service members living with HIV who are not being separated," as Plaintiffs had requested. *Roe*, 359 F. Supp. 3d at 422 n.46. And the district court denied OutServe's motion to amend the preliminary injunction to remove the word "active-duty" so that, according to

OutServe, the preliminary injunction would cover members of the Air National Guard. *See* Dkt. Nos. 74, 78.

Moreover, the preliminary injunction applies to a limited number of servicemembers. As the district court noted in addressing the balance of equities, "HIV-positive individuals make up such a miniscule percentage of active-duty servicemembers—0.027%, by one calculation." *Roe*, 359 F. Supp. 3d at 421. Thus, there is a limited number of servicemembers, identifiable by the Air Force, to whom the injunction would apply. *Cf. Int'l Refugee Assistance Project,* 137 S. Ct. at 2088 (leaving in place a preliminary injunction as to an unknown number of "foreign nationals who have a credible claim of a bona fide relationship with a person or entity in the United States").

And as the district court properly noted, the unique characteristics and history of HIV may pose a challenge for other similarly situated servicemembers to bring suits on their own behalf:

> Because of the longstanding stigma and discrimination facing those living with HIV, it may be difficult to identify potential plaintiffs in a case of this nature. Granting relief to all similarly situated servicemembers is thus the only way to ensure uniform, fair, rational treatment of individuals who belong to a vulnerable, and often invisible, class.

*Roe*, 359 F. Supp. 3d at 422.

The district court thus did not abuse its discretion in defining the scope of the preliminary injunction.

## VIII.

Roe, Voe, and the four identified members of OutServe wish to continue to serve their country. Their doctors and their commanding officers support their retention. But the

Air Force, without individually considering each servicemember's condition, fitness, and deployability, assumed the servicemembers could not deploy to CENTCOM's area of responsibility because they are HIV-positive. The Government's explanations for why it has imposed an effective ban on deploying HIV-positive servicemembers to CENTCOM's area of responsibility are at odds with modern science. These servicemembers, like other HIV-positive individuals with undetectable viral loads, have no symptoms of HIV. They take daily medication—usually one pill, for some people two—and need a regular, but routine blood test. They cannot transmit the virus through normal daily activities, and their risk of transmitting the virus through battlefield exposure, if the virus can be transmitted at all, is extremely low. Although transmission through blood transfusion is possible, these servicemembers have been ordered not to donate blood. But the Government did not consider these realities when discharging these servicemembers, instead relying on assumptions and categorical determinations. As a result, the Air Force denied these servicemembers an individualized determination of their fitness for military service.

Plaintiffs have demonstrated a likelihood of success of the merits of at least one claim and have made a clear showing of irreparable harm in the absence of a preliminary injunction. The equities and public interest weigh in the Plaintiffs' favor, and the district court did not abuse its discretion in crafting the preliminary injunction. Accordingly, we affirm the order of the district court.

*AFFIRMED*

46