IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| NICHOLAS HARRISON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:18-cv-641 (LMB/IDD) |
| | ) | |
| RICHARD V. SPENCER, Acting Secretary of Defense, et al., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| RICHARD ROE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:18-cv-1565 (LMB/IDD) |
| | ) | |
| RICHARD V. SPENCER, Acting Secretary of Defense, et al., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

Harrison v. Spencer, Case No. 1:18-cv-641, and Roe v. Spencer, Case No. 1:18-cv-1565,

are two related civil actions challenging the military's accession and retention policies regarding

servicemembers living with the human immunodeficiency virus ("HIV"). Although each action

involves different named parties and a different branch of the United States Armed Forces, both

actions include the same institutional plaintiff, The Modern Military Association of America

("MMAA"), a non-profit organization primarily dedicated to promoting the interests of current,

former, and future servicemembers who are LGBTQ+ and/or HIV positive.[1] The defendants in

---

[1] The plaintiffs in Harrison are Nicholas Harrison and MMAA; the defendants are Richard
Spencer in his official capacity as the Acting Secretary of Defense, the United States Department
of Defense, and Mark Esper in his official capacity as the Secretary of the Army. The plaintiffs

both actions have filed motions to dismiss MMAA under Federal Rule of Civil Procedure

12(b)(1), arguing that its predecessor, Outserve-SLDN, Inc. ("Outserve"), lacked standing to

sue.[2] Given the nearly identical factual and legal issues raised in each motion, the parties agreed

to joint briefing. For the reasons that follow, the defendants' motions to dismiss will be denied.[3]

## I. BACKGROUND

The factual and procedural histories of these actions have been thoroughly recounted in

previous opinions, including most recently in a decision issued by the United States Court of

Appeals for the Fourth Circuit. See Roe v. Dep't of Defense, 947 F.3d 207 (4th Cir. 2020); see

also Roe v. Shanahan, 359 F. Supp. 3d 382 (E.D. Va. 2019); Harrison v. Shanahan, 2019 WL

2216474 (E.D. Va. May 22, 2019). Therefore, they need not be reproduced in full here. This

Memorandum Opinion will focus on the histories of these actions only as they relate to Outserve

and the defendants' motions to dismiss. Because the procedural history provides context for

understanding the factual history, the procedural history will be addressed first.

---

in Roe are Richard Roe, Victor Voe, and MMAA; the defendants are Richard Spencer in his official capacity as the Acting Secretary of Defense, the United States Department of Defense, and Matthew Donovan in his official capacity as the Acting Secretary of the Air Force.

[2] Outserve was the institutional plaintiff involved in both actions when they were filed. [Harrison, Dkt. 1; Roe, Dkt. 1]. On August 6, 2019, Outserve and The American Military Partner Association completed a merger transaction which resulted in the formation of MMAA. [Harrison, Dkt. 247; Roe, Dkt. 258]. MMAA was subsequently substituted for Outserve in both actions. [Harrison, Dkt. 248; Roe, Dkt. 259]. Despite this substitution, "[w]hether a plaintiff has standing is determined by considering the relevant facts as they existed at the time the action was commenced;" therefore, the defendants' motions to dismiss concern Outserve, not MMAA. Rep. Bank & Trust Co. v. Kucan, 245 F. App'x 308, 310 (4th Cir. 2007); see also Lebron v. Rumsfeld, 670 F.3d 540, 561 (4th Cir. 2012). Like MMAA, Outserve was also dedicated to promoting the interests of current, former, and future servicemembers who are LGBTQ+ and/or HIV positive.

[3] Although the parties' briefs and exhibits contained some personal identifying information which was redacted, good cause does not exist to redact any portion of this Memorandum Opinion because it does not identify any individuals other than the plaintiffs.

On May 13, 2018 and December 19, 2018, respectively, the complaints in Harrison and Roe were filed. [Harrison, Dkt. 1; Roe, Dkt. 1]. On May 3, 2019, the defendants filed their motions to dismiss, arguing that Outserve lacked standing to sue. [Harrison, Dkt. 154; Roe, Dkt. 118]. Shortly thereafter, discovery concluded. [Harrison, Dkt. 106; Roe, Dkt. 32]. On May 31, 2019, after the parties had briefed the issue and oral argument had been held, the motions were held in abeyance to allow the parties one month to conduct additional discovery and file supplemental briefs with respect to whether Outserve had standing to sue. [Harrison, Dkt. 183; Roe, Dkt. 147]. On August 1, 2019, following supplemental briefing but before the motions could be resolved, all proceedings were stayed pending the outcome of the defendants' interlocutory appeal of a preliminary injunction issued in Roe. [Harrison, Dkt. 241; Roe, Dkt. 244]. On March 3, 2020, after the preliminary injunction was affirmed, the formal mandate was returned. [Roe, Dkt. 253]. On March 5, 2020, during a telephone conference with attorneys for all parties present, the parties confirmed that the defendants' motions to dismiss were ripe for resolution and that no further discovery or briefing was necessary. [Harrison, Dkt. 249; Roe, Dkt. 260].

Outserve first began HIV-related work in September 2015. Plaintiffs' Supplemental Brief ("Pl. Br."), Ex. A, at 2; Defendants' Supplemental Brief ("Def. Br."), Ex. Y, at 152–53. At that time, Outserve focused on advocacy initiatives related both to service members' "inconsistent access to pre-exposure prophylaxis, . . . a biomedical intervention that prevents the spread of HIV through daily medication taken by people who do not have HIV," and to the military's "accession[] standards, which operate[d] as a categorical bar to people living with HIV enlisting or commissioning into service." Pl. Br., Ex. A, at 2–3; see also Def. Br., Ex. Y, at 153–54. The

latter initiative arose after an HIV-positive individual who was interested in joining the military had approached Outserve seeking legal assistance. Def. Br., Ex. Y, at 153–54.

Over the next two years, the number of HIV-positive individuals seeking Outserve's legal assistance regarding the military's accession standards, as well as HIV-related issues more generally, steadily increased. In 2016, three HIV-positive individuals who were interested in joining or re-joining the military sought legal assistance regarding the accession standards; Outserve provided assistance to two of them. Pl. Br., Ex. A, at 3, 6; Def. Br., Ex. Y, at 189–92. In 2017, three more HIV-positive individuals who were interested in joining or re-joining the military sought assistance regarding the accession standards; Outserve again provided assistance to two of them, one of whom was plaintiff Nicholas Harrison.[4] Pl. Br., Ex. A, at 6; Def. Br., Ex. Y, at 194. Additionally, three other HIV-positive individuals who were current or former servicemembers sought assistance regarding discipline and discrimination they faced due to their HIV-positive status. Pl. Br., Ex. A, at 6; Def. Br., Ex. Y, at 195. During these years, Outserve did not advertise that it had begun providing HIV-related legal assistance. Def. Br., Ex. Y, at 193, 196.

Throughout 2018, these numbers dramatically increased. For example, fifteen individuals "had issues related to deployment and retention because of HIV," particularly following the military's announcement of its "Deploy or Get Out" policy in February 2018. Pl. Br., Ex. A, at 7. In addition, two individuals "had issues with duty restrictions they experienced because of their HIV status." Id. Another two individuals "faced discipline—either court martial or involuntary

---

[4] The defendants point out that various documents in the record call into question whether it was two or three individuals who sought legal assistance from Outserve regarding the accession standards in 2016 and 2017. For the purposes of the defendants' motions to dismiss, this is a distinction without difference.

separation—because of their HIV status." Id. Lastly, five individuals "faced barriers to enlisting or commissioning because of their HIV status," i.e., sought legal assistance regarding the accession standard. Id. Responding to these inquires required personnel to provide extensive legal and non-legal support, including "providing non-litigation support and information (such as scientific and medical information), counseling on strategies, giving legal advice and consultation, and even providing emotional and social support." Id. at 8. For instance, Outserve's attorney spent approximately 405 hours on HIV-related issues in 2018, including at least 100 hours on work regarding the military's accession and retention policies.[5] Id. at 11.

Outserve had always been a small organization with limited human and financial resources. Pl. Br., Ex. A, at 4. For example, between 2016 and 2018, the Outserve attorney referenced above was Outserve's only employee who was a member of a state bar. Outserve also employed approximately 16 individuals in its entire legal and policy department, most of whom were part-time, unpaid interns. Id. at 4–5. Accordingly, Outserve had difficulties accommodating the increase in HIV-related work without sacrificing its work on other projects, including those geared toward the LGBTQ+ military community. Pl. Br., Ex. A, at 8; Def. Br., Ex. Y, at 250. To deal with these difficulties, Outserve utilized a "triage system" whereby it "focus[ed] on tasks that ha[d] the highest impact—i.e., that [would] help the largest number of people or result in the most significant systemic changes—or that . . . help[ed] the individuals in the direst need." Pl. Br., Ex. A, at 8; see also Def. Br., Ex. Y, at 252. Individuals facing separation or discharge from

---

[5] In terms of percentages of total hours worked, Outserve's attorney dedicated approximately 4.3% of his work to HIV-related matters in 2016, and approximately 40% of his work to HIV-related matters in 2017. Id. at 11–12. It is unclear from the record how much of this work focused on the military's accession and retention policies. In 2018, Outserve's attorney dedicated approximately 44% of his work to HIV-related matters, with at least 11% spent specifically on the military's accession and retention policies. Id.

military service because of their HIV-positive status were considered to be in particularly dire situations because their careers were "on the chopping block." Def. Br., Ex. Y, at 253–56; Pl. Br., Ex. A, at 8.

Ultimately, various advocative, educational, and legal projects were delayed or curtailed throughout the end of 2017 and all of 2018. Pl. Br., Ex. A, at 9; Def. Br., Ex. Y, at 252. For example, with regard to Outserve's advocacy efforts, (1) advocacy on the reform of military sexual trauma policy was delayed for more than a year, from the first quarter of 2018 to the second quarter of 2019, and (2) advocacy on LGBTQ+ access to veterans' benefits was delayed from the fourth quarter of 2018 to the second quarter of 2019. Pl. Br., Ex. A, at 10; Def. Br., Ex. Y, at 280–83. With regard to Outserve's education efforts, (1) publication of Outserve's online magazine for the LGBTQ+ military community was delayed for a year, from the third quarter of 2018 to the third quarter of 2019, (2) publication of several supplements to Outserve's informational guide about LGBTQ+ and HIV-positive military service was delayed from various quarters in 2018 to the third quarter of 2019, or in some instances indefinitely, and (3) the launch of an online resource tool for regional directors and volunteers was delayed a year, from the second quarter of 2018 to the second quarter of 2019.[6] Pl. Br., Ex. A, at 9–10; Def. Br., Ex. Y, at 251, 269, 272–73. Lastly, with regard to Outserve's legal efforts, (1) a legal services program to file clemency petitions on behalf of LGBTQ+ veterans who were court martialed or discharged because of military policies regarding sexual activity was delayed indefinitely from "[f]all 2017," (2) a legal services program to file test cases on behalf of LGBTQ+ veterans who were

---

[6] The defendants point out that various documents in the record call into question whether the launch of the online resource tool for regional directors was scheduled to occur in the second or third quarter of 2018. For the purposes of the defendants' motions to dismiss, this is a distinction without difference.

discharged under the military's "Don't Ask Don't Tell" policy before they could qualify for certain veterans' benefits was delayed indefinitely from "early 2018," (3) a Judge Advocate Training program on issues relating to LGBTQ+ and HIV cultural competence was delayed indefinitely from "October 2018," and (4) legal services to at least three clients were delayed for various periods of time between May 13, 2018 and December 31, 2018.[7] Pl. Br., Ex. A, at 12–13; see also Def. Br., Ex. Y, at 186–89, 281–83.

## II. DISCUSSION

In their motions to dismiss, the defendants argue that Outserve lacked standing to sue. Specifically, the defendants argue that Outserve itself suffered no injury—or at least no injury caused by the military's accession and retention policies—and that Outserve was not the type of institutional plaintiff that can sue based on injuries suffered by its members. In response, the plaintiffs argue both that Outserve suffered an injury caused by the military's accession and retention policies—specifically, frustration of its mission combined with a drain on its resources—and that Outserve was the type of institutional plaintiff that can sue based on injuries suffered by its members.

### A. **Standard of Review**

"Federal Rule of Civil Procedure 12(b)(1) governs the dismissal of an action where the Court lacks subject matter jurisdiction." Zargarpur v. Townsend, 18 F. Supp. 3d 734, 736 (E.D. Va. 2013). Under Rule 12(b)(1), "[d]efendants may attack subject matter jurisdiction in one of

---

[7] The plaintiffs identified several other Outserve efforts that were delayed, such as advocacy on the reform of military spousal tax policy, an HIV 101 educational program, and legal services to two specifically identified clients; however, these delays either occurred after both actions were filed, or it is unclear from the record when they occurred. Because, as previously discussed, "[w]hether a plaintiff has standing is determined by considering the relevant facts as they existed at the time the action was commenced," these delays will not be considered. Rep. Bank, 245 F. App'x at 310; see also Lebron, 670 F.3d at 561.

two ways." Id. First, they may argue "that the complaint fails to allege facts upon which subject matter jurisdiction may be based." Id. "In such instances, all facts alleged in the complaint are presumed true." Id. Second, they may argue "that the jurisdictional facts alleged in the complaint are untrue." Id. "In that situation, 'the Court may look beyond the jurisdictional allegations of the complaint and review whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" Id. (quotation omitted). "In either circumstance, the burden of proving subject matter jurisdiction falls on the plaintiff." Id.

Here, the defendants levy the second type of attack on the Court's subject matter jurisdiction over Outserve, asserting that the jurisdictional facts propounded by Outserve are untrue. "Therefore, this Court may weigh the evidence and resolve factual disputes regarding jurisdiction by considering evidence outside the complaint." Pornomo v. United States, 62 F. Supp. 3d 455, 462 (E.D. Va. 2014). "Even though a Rule 12(b)(1) motion to dismiss is not converted into a motion for summary judgment" in these circumstances, "district courts 'should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists.'" Id. (quotation omitted). "Only when 'the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law' should the Court grant the motion." Id. (quotation omitted).

**B. Analysis**

"As the Supreme Court has consistently emphasized, Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" Hutton v. Nat'l Bd. of Examiners in Optometry, Inc., 892 F.3d 613, 619 n.5 (4th Cir. 2018) (quotation omitted). "The requirement that a [p]laintiff possess 'standing to sue' emanates from that constitutional provision." Id. "[I]n order to possess standing to sue under Article III of the Constitution," a

plaintiff must establish three elements: "(1) [he or she] suffered an injury-in-fact that was concrete and particularized and either actual or imminent; (2) there was a causal connection between the injury and the defendant's conduct . . .; and (3) the injury was likely to be redressable by a favorable judicial decision." Id. at 618–19. This law of standing "serves to prevent the judicial process from being used to usurp the powers of the political branches, and confines the federal courts to a properly judicial role." Dreher v. Experian Information Sols., Inc., 856 F.3d 337, 343 (4th Cir. 2017) (quotation omitted). "Indeed, 'no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Id. (quotation omitted).

An institutional plaintiff such as Outserve can have standing "based upon" either of "two distinct theories." Md. Highways Contractors Ass'n, Inc. v. Maryland, 933 F.2d 1246 (4th Cir. 1991); see also Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 182 (4th Cir. 2013). First, it can have standing "in its own right" based on injuries that it has suffered. Southern Walk, 933 F.3d at 182. This is frequently referred to as "direct" or "individual" standing. Second, it can have standing "as a representative of its members" based on injuries that they have suffered. Id. This is often referred to as "representational" or "associational" standing. The plaintiffs assert that Outserve had standing to sue under both theories; the defendants assert that Outserve did not have standing to sue under either theory. For the reasons that follow, the plaintiffs have sufficiently established that Outserve had direct standing, and therefore the Court need not address whether they have sufficiently established that Outserve also had representational standing.[8]

---

[8] This is consistent with the parties supplemental briefs. Although the parties' initial briefs focused much more on whether Outserve had representational standing, after the additional

In evaluating whether an institutional plaintiff has direct standing, "a court conducts the same inquiry as in the case of an individual." Md. Highways, 933 F.2d at 1250. In other words, evaluating whether an institutional plaintiff has direct standing involves a straightforward application of the three familiar elements of standing—injury-in-fact, traceability, and redressability. Southern Walk, 713 F.3d at 182. This evaluation "of course, depends not upon the merits" of the claims asserted, "but on 'whether the plaintiff is the proper party to bring the suit.'" White Tail Park, Inc. v. Stroube, 413 F.3d 451, 460 (4th Cir. 2005) (quotation omitted). "Even though a plaintiff's standing cannot be examined without reference to the 'nature and source of the claim[s] asserted,' [the] ultimate aim is to determine whether [the] plaintiff has a sufficiently 'personal stake' in the lawsuit to justify the invocation of federal court jurisdiction." Id. at 461 (quotation omitted).

Here, the parties' primary arguments are straightforward. The plaintiffs argue that throughout the end of 2017 and all of 2018, Outserve "had a steady increase in HIV-related inquiries, the vast majority of which pertain[ed] to accessions, retention, and deployment." Pl. Br. at 5. "These inquiries [in turn] required personnel" to provide both legal and non-legal support, including "undertak[ing] lengthy phone calls, do[ing] research and investigations, assist[ing] in preparing documents, and even provid[ing] emotional support." Id. As a result, "delays and reprioritizations of other work . . . occurred." Id. In short, the plaintiffs argue that Outserve had direct standing because the military's accession and retention policies "required Outserve to divert resources from other programs and services," all of which lay at the core of its

---

discovery period, their supplemental briefs focused much more on whether Outserve had direct standing.

mission. Id. at 2. In support of this argument, the plaintiffs rely on the Supreme Court's decision in Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982) and its progeny.

The defendants argue that all of "Outserve's purported direct injuries resulted from their own resource allocation decisions," including "internal decisions to prioritize certain initiatives over others, all of which serve the organizational mission." Def. Br. at 22. "Consequently, these alleged harms are merely self-inflicted budgetary choices and not a cognizable legal injury." Id. In support of this argument, the defendants rely on the Fourth Circuit's decision in Lane v. Holder, 703 F.3d 668 (4th Cir. 2012). The plaintiffs have the better argument.

At the outset, the defendants summarily argue that the plaintiffs should not be permitted to assert that Outserve had direct standing to sue because the complaints in both actions only allege representational standing. This argument is unpersuasive. As previously discussed, in evaluating the defendants' motions to dismiss, "the Court may look beyond the jurisdictional allegations of the complaint and review whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." Zargarpur, 18 F. Supp. 3d at 736 (quotation omitted). Moreover, the doctrines of forfeiture and waiver are discretionary and grounded in concerns about fair notice. See Sherrod v. Harkleroad, 791 F. App'x 377, 381 (4th Cir. 2019); see also United States v. Ricco, 52 F.3d 58, 62 (4th Cir. 1995). Here, the defendants themselves served an interrogatory on Outserve asking how it had suffered a direct injury caused by the military's accession and retention policies, and Outserve timely responded that it had been required to divert resources away from numerous projects, all of which lay at the core of its mission. Additionally, the parties were granted one month to conduct additional discovery and file supplemental briefs with respect to whether Outserve had standing to sue, including direct standing. [Roe, Dkt. 147; Harrison, Dkt. 183]. At this point, the defendants cannot persuasively

11

argue that they lacked fair notice that the plaintiffs planned to assert that Outserve had direct

standing to sue in these actions, or an adequate opportunity to respond to that assertion.[9]

Turning to the parties' primary arguments, in Havens Realty, the Supreme Court held that

a non-profit organization dedicated to achieving equal opportunity in housing had sufficiently

alleged direct standing to sue an apartment complex owner on the basis of allegedly unlawful

racial steering practices. 455 U.S. at 379. The organization had alleged that it "ha[d] been

frustrated by [the] racial steering practices in its efforts to assist equal access to housing through

counseling and other referral services," and that it had "devoted significant resources to identify

and counteract the . . . racially discriminatory steering practices." Id. (quotation omitted). The

Supreme Court reasoned that "[i]f, as broadly alleged, [the] steering practices ha[d] perceptibly

impaired [the organization's] ability to provide counseling and referral services for low- and

moderate-income home-seekers, there [could] be no question that [it] had suffered an injury in

fact" because "[s]uch concrete and demonstrable injury to the organization's activities—with the

consequent drain on the organization's resources—constitute[d] far more than simply a setback

to the organization's abstract social interest." Id. Since Havens Realty, courts have frequently

reaffirmed that an institutional plaintiff has direct standing if the challenged policies or practices

both frustrated its purpose and caused a drain on its resources. See, e.g., Southern Walk, 713

F.3d at 183.[10]

---

[9] In any event, Federal Rule of Civil Procedure 15(a)(2) permits amendments to pleadings at any time before trial with leave of court, and states that "[t]he court should freely grant leave when justice so requires." Fed. R. Civ. P. 15(a)(2). For the same reasons that waiver and forfeiture are inapplicable, such an amendment is justified here.

[10] See also League of United Latin Am. Citizens – Richmond Regional Council 4614 v. Pub. Interest Legal Found., 2018 WL 3848404, at *2 n.1 (E.D. Va. Aug. 13, 2018); Heap v. Carter, 112 F. Supp. 3d 402, 417 (E.D. Va. 2015); Lee v. Va. Bd. of Elections, 155 F. Supp. 3d 572, 577–78 (E.D. Va. 2015); Jefferson v. Sch. Bd. of City of Norfolk, 2010 WL 11527350, at *3 (E.D. Va. Nov. 18, 2010); Goldstein v. Costco Wholesale Corp., 278 F. Supp. 2d 766, 770 (E.D.

Subsequently, in Lane, the Fourth Circuit held that a non-profit organization dedicated to promoting the exercise of the right to keep and bear arms did not sufficiently allege standing to sue the Attorney General of the United States on the basis of an allegedly unconstitutional statute restricting interstate transfers of handguns. 703 F.3d at 675. The organization had alleged that "[its] resources [were] taxed by inquiries into the operation and consequences of interstate handgun transfer provisions." Id. (quotation omitted). The court reasoned that "[t]his 'mere expense' to [the organization] [did] not constitute an injury in fact" because "[a]lthough a diversion of resources might harm the organization by reducing the funds available for other purposes, 'it results not from any actions taken by the defendant, but rather from the organization's own budgetary choices.'" Id. (quotation omitted). The court also stated that "[t]o determine that an organization that decides to spend its money on educating members, responding to member inquiries, or undertaking litigation in response to legislation suffers a cognizable injury would be to imply standing for organizations with merely 'abstract concerns with a subject that could be affected by an adjudication,'" which "would not comport with the case or controversy requirement of Article III of the Constitution." Id. (quotation omitted).

Here, it is clear that the plaintiffs in both actions have satisfied the standard set forth in Havens Realty. As previously recounted, between 2015 and 2018, Outserve observed a significant increase in requests for help from individuals seeking legal assistance regarding the military's accession and retention policies, with the most notable increase following the

---

Va. 2003); Moseke v. Miller & Smith, Inc., 202 F. Supp. 2d 492, 499 (E.D. Va. 2002); Charles Alan Wright, et al., Federal Practice and Procedure § 3531.9.5 (3d ed. 2019) ("Injury to an organization's efforts to help others or address social problems has supported standing in a number of cases since the Havens Realty case. The most secure foundation for standing seems to be found in showing that the organization has devoted specific effort and expense to combat the challenged activity.").

military's announcement of its "Deploy or Get Out" policy in February 2018. Outserve faced immediate difficulties accommodating this increase in requests for help, especially given its limited staff and financial resources. Ultimately, Outserve had to delay at least nine specific advocative, educational, and legal projects, all of which lay at the core of its mission, to serve the needs of those who had requested help. On this record, the military's accession and retention policies certainly "perceptibly impaired" Outserve's ability to carry out its mission through frustration of that mission combined with a consequent drain on its resources. Havens Realty, 455 U.S. at 379. "Such concrete and demonstrable injury to the organization's activities . . . constitutes far more than simply a setback to the organization's abstract social interest."[11] Id.; see also Southern Walk, 713 F.3d at 175; Heap, 112 F. Supp. 3d at 417; Moseke, 202 F. Supp. 2d at 499–500.

It is also clear that Lane does not compel a contrary conclusion. First, Lane explicitly reaffirmed the standard set out in Havens Realty, stating that "[a]n organization may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission," such as "in Havens," when the defendant's practices "perceptibly impaired" a "key component" of the

---

[11] The defendants summarily argue that many of the project delays at issue occurred before the complaint in Roe was filed but after the complaint in Harrison was filed, such that Outserve at least lacked standing to sue in Harrison. This argument is unpersuasive because a sufficient number of the project delays occurred before the complaint in Harrison was filed, including advocacy on the reform of military sexual trauma policy, the legal services program to file clemency petitions on behalf of LGBTQ+ veterans who were court martialed or discharged because of military policies regarding sexual activity, and the legal services program to file test cases on behalf of LGBTQ+ veterans who were discharged under the military's "Don't Ask Don't Tell" policy before they could qualify for certain veterans' benefits.

The defendants also summarily argue that the plaintiffs rely largely on answers to interrogatories and deposition testimony, and have not provided specific documentary evidence corroborating either. This argument is unpersuasive because, at this stage of the litigation, the plaintiffs are only required to "set[] forth by affidavit or other evidence specific facts" which "establish[] each element" of standing. Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quotation omitted).

organization's mission. 703 F.3d at 674–75 (quotation omitted). For the reasons already

discussed, the plaintiffs have met that standard here. Moreover, to the extent that any subsequent

statements in Lane conflict with the standard set out in Havens Realty, the latter would obviously

take precedence, particularly given that the three cases cited by the court in Lane are all either

circuit court decisions or Supreme Court decisions that pre-date Havens Realty. See id. at 675.

Second, to the extent that the defendants construe Lane as establishing a categorical ban

on the diversion of resources theory of institutional standing, their argument is undercut by the

Fourth Circuit and several district courts within the Fourth Circuit having reaffirmed since Lane

that an institutional plaintiff has direct standing to sue if the challenged policies or practices both

frustrated its purpose and caused a drain on its resources. See, e.g., Southern Walk, 713 F.3d at

183; League of United Latin Am. Citizens, 2018 WL 3848404, at *2; Heap, 112 F. Supp. 3d at

417; Lee v. Va. Bd. of Elections, 155 F. Supp. 3d at 577–78. Moreover, institutional standing has

frequently been recognized as a fact-intensive inquiry that is rarely susceptible to such

categorical rules. See Wright, et al., § 3531.9.5.

Lastly, in the same vein, there is a stark difference in the thoroughness and specificity of

the plaintiffs' evidence here compared to the institutional plaintiff's allegations in Lane. In Lane,

the only reference to direct standing in the institutional plaintiff's brief was the following

statement: "And as '[the organization's] resources are taxed by inquiries into the operation and

consequences of interstate handgun transfer prohibitions, [the organization] also has

organizational standing." 2011 WL 4533782, at *33 (quotation omitted). Here, by contrast, and

as previously discussed, the plaintiffs have demonstrated that Outserve experienced a significant

increase in requests for help from individuals seeking legal assistance regarding the military's

accession and retention policies, faced immediate difficulties accommodating this increase in

requests, and ultimately delayed at least nine specific advocative, educational, and legal projects,

all of which lay at the core of its mission, to serve the needs of those who had requested help.

Several courts have held that such "discrete programmatic concerns" which were "directly and

adversely affected" are sufficient to establish direct standing, and in doing so have explicitly

analogized Havens Realty and distinguished Lane. See, e.g., Nat'l Federation of the Blind v. U.S.

Dep't of Educ., 407 F. Supp. 3d 524, 531–33 (D. Md. 2019) (explaining that unlike the Second

Amendment organization in Lane, and "[l]ike the fair housing organization in Havens Realty,

[the plaintiffs] ha[d] alleged a need to expend more resources than usual to assist their members

in a specific fashion that [was] core to their mission").[12] Accordingly, as in Havens Realty, there

is "no question" that Outserve had direct standing to sue.[13] 455 U.S. at 379.

### III. CONCLUSION

For the reasons stated above, the defendants' motions to dismiss [Harrison, Dkt. 154;

Roe, Dkt. 118] will be denied by an Order to be issued with this Memorandum Opinion.

Entered this _27_ day of March, 2020.

_/s/_ _____

Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

---

[12] See also Casa de Md. v. Trump, 414 F. Supp. 3d 760, 773 (D. Md. 2019) (explaining that "like [the organization] in Havens Realty" and "unlike the organization in Lane, [the plaintiff] allege[d] that the diversion of its resources frustrated its mission by preventing it from continuing an affirmative advocacy posture, including, for example, advocating on public health issues at the state and local level in Maryland").

[13] The defendants briefly argue that even if the plaintiffs have demonstrated an injury-in-fact in the manner discussed above, they cannot demonstrate that such an injury was caused by increased work regarding the military's accession and retention policies specifically, rather than increased HIV-related work generally, increased legal services work generally, or Outserve's purportedly strained finances. This argument is unpersuasive because the causation element of standing only requires that the challenged policies be "in part responsible" for the plaintiff's injury. Sierra Club v. U.S. Dep't of the Interior, 899 F.3d 260, 283 (4th Cir. 2018). "[T]he causation element of standing does not require the challenged [policies] to be the sole or even immediate cause of the injuries." Id. at 284; see also Libertarian Party, 718 F.3d at 316.