**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| RICHARD ROE, ET AL.,<br><br>          PLAINTIFFS,<br>     v.<br><br>MARK T. ESPER, ET AL.,<br>          DEFENDANTS. | CIVIL ACTION NO. 1:18-cv-01565 |
| NICHOLAS HARRISON, ET AL.,<br><br>          PLAINTIFFS,<br>     V.<br><br>MARK T. ESPER, ET AL.,<br>          DEFENDANTS. | CIVIL ACTION NO. 1:18-CV-00641 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTIONS FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF UNDISPUTED FACTS ...................................................... 5

      The Parties .......................................................................................................... 5

      The Progression of HIV Medicine.................................................................... 11

      HIV Policy in the Military ............................................................................... 13

      Health Care for Service Members with HIV .................................................... 22

      Medication Access............................................................................................ 23

      Periodic Medical Evaluations While Deployed................................................ 25

      Capabilities of People Living With HIV .......................................................... 28

      Neurocognitive Impairments ........................................................................... 30

      Live Vaccines.................................................................................................... 30

      Privacy and Confidentiality .............................................................................. 31

      HIV Transmission ............................................................................................. 31

      Blood Donation and HIV .................................................................................. 33

      Host Nation Requirements ................................................................................ 37

II.   PROCEDURAL HISTORY................................................................................ 37

III.  LEGAL STANDARDS ..................................................................................... 39

IV.   ARGUMENT ..................................................................................................... 43

      A.    The Categorical Bar to the Deployment of Service Members Living with
            HIV Is Unconstitutional and Violates the APA.................................... 44

            1.    None of Defendants' purported justifications for the deployment
                  bar stand up to scrutiny. .............................................................. 45

                  a.    Purported Effects on the Health of Service Members with
                        HIV Do Not Rationally Relate to the Refusal to Deploy
                        Them. ................................................................................ 45

                  b.    The Purported Risk of Transmission to Others in a
                        Deployed Environment Does Not Provide a Rational Basis
                        for Refusing to Deploy Service Members with HIV. .................. 51

                  c.    The Risk of HIV Transmission Through a Battlefield
                        Transfusion is Vanishingly Small.................................... 55

                  d.    Host Nation Requirements Do Not Support a Deployment
                        Bar...................................................................................... 57

B.     Plaintiffs Roe, Voe and MMAA also Prevail on Their APA Claims, Because the Air Force's Decisions to Separate Roe and Voe Were Arbitrary and Capricious and Otherwise Contrary to Law. .................................. 58

     2.     The Air Force's Decisions to Separate Roe, Voe and Others Similarly-Situated Are Arbitrary and Capricious Because the Air Force Previously Reached the Opposite Conclusion on the Exact Same Facts (for Voe) and Essentially the Same Facts (for Roe and Others) .......................................................................................... 59

     3.     The Air Force's Decisions to Separate Airmen Living with HIV Based on a Determination They Are Not Worldwide Deployable Are Contrary to the Air Force's Own Regulations. .................................. 62

     4.     The Air Force's Decisions to Separate Airmen Living with HIV Based on a "Prediction" That They Cannot Deploy Are Contrary to Policies That Require an Individualized Assessment of Fitness for Duty ...................................................................................................... 64

C.     Plaintiffs Are Entitled to Broad Relief to Remedy Defendants' Constitutional and Statutory Violations. .............................................................. 67

V.     CONCLUSION ............................................................................................................ 70

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Bioscience, Inc. v. Thompson,*
    269 F.3d 1077 (D.C. Cir. 2001) ..........................................................................43

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ..........................................................................................39

*Arrington v. Daniels,*
    516 F.3d 1106 (9th Cir. 2008) ..........................................................................67

*Ballinger v. N.C. Agric. Extension Serv.,*
    815 F.2d 1001 (4th Cir. 1987) ..........................................................................39

*Bankers Life & Cas. Co. v. Crenshaw,*
    486 U.S. 71 (1988) ............................................................................................41

*Bragdon v. Abbott,*
    524 U.S. 624 (1998) ............................................................................................4

*Brandon v. Nat'l Credit Union Ass'n,*
    2015 WL 13021804 (E.D. Va. Mar. 13, 2015) ................................................43

*Califano v. Westcott,*
    443 U.S. 76 (1979) ............................................................................................67

*Casa de Maryland, Inc. v. Trump,*
    414 F. Supp. 3d 760 (D. Md. 2019) ................................................................68

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ..........................................................................................39

*City of Cleburne v. Cleburne Living Ctr., Inc.,*
    473 U.S. 432 (1985) ..........................................................................................41

*City of Dania Beach v. FAA,*
    628 F.3d 581 (D.C. Cir. 2010) ..........................................................................43

*Cruz-Casado v. United States,*
    553 F.2d 672 (Fed. Cl. 1977) ..........................................................................64

*Delta Air Lines Inc. v. Exp-Imp. Bank of the U.S.,*
    718 F.3d 974 (D.C. Cir. 2013) (per curiam) ....................................................67

*Doe v. University of Maryland Medical System Corp.*,
　　50 F.3d 1261 (4th Cir. 1995) ........................................................................42, 43

*Drewitt v. Pratt*,
　　999 F.2d 774 (4th Cir. 1993) ................................................................................40

*Emmett v. Johnson*,
　　532 F.3d 291 (4th Cir. 2008) ................................................................................40

*Etelson v. Office of Pers. Mgmt.*,
　　684 F.2d 918 (D.C. Cir. 1982) ..............................................................................61

*Gen. Elec. Co. v. Joiner*,
　　522 U.S. 136 (1997) ..............................................................................................49

*Gilligan v. Morgan*,
　　413 U.S. 1 (1973) ..................................................................................................40

*Goldman v. Weinberger*,
　　475 U.S. 503 (1986) ..............................................................................................40

*Hyatt v. U.S. Patent & Trademark Office*,
　　146 F. Supp. 3d 771 (E.D. Va. 2015) ...................................................................43

*Int'l Refugee Assistance Project v. Trump*,
　　857 F.3d 554 (4th Cir. 2017) (en banc), *vacated on other grounds*, 138 S. Ct.
　　353 (2017) .............................................................................................................68

*Kreis v. Sec'y of Air Force*,
　　406 F.3d 684 (D.C. Cir. 2005) ..............................................................41, 59, 61

*Lindsay v. United States*,
　　295 F.3d 1252 (Fed. Cir. 2002) ............................................................................40

*LivinRite, Inc. v. Azar*,
　　386 F. Supp. 3d 644 (E.D. Va. 2019) ...................................................................43

*Mathews v. Lucas*,
　　427 U.S. 495 (1976) ..............................................................................................40

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
　　475 U.S. 574 (1986) ..............................................................................................39

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
　　463 U.S. 29 (1983) ............................................................................................41, 67

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
　　145 F.3d 1399 (D.C. Cir. 1998) ............................................................................68

*Ostergren v. Cuccinelli*,
    615 F.3d 263 (4th Cir. 2010) .................................................................67

*Palmore v. Sidoti*,
    466 U.S. 429 (1984)............................................................................51

*Perez v. Cissna*,
    914 F.3d 846 (4th Cir. 2019) .................................................................59

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
    908 F.3d 476 (9th Cir. 2018) ............................................................67, 68

*Richmond Tenants Org., Inc. v. Kemp*,
    956 F.2d 1300 (4th Cir. 1992) ..........................................................67, 68

*Roe v. Dep't of Def.*,
    947 F.3d 207 (4th Cir. 2020) ........................................................ *passim*

*Roe v. Shanahan*,
    359 F. Supp. 3d 382 (E.D. Va. 2019) ........................................... *passim*

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ....................................................68

*J.E.C.M. ex rel. Saravia v. Lloyd*,
    352 F. Supp. 3d 559 (E.D. Va. 2018) .....................................................62

*Service v. Dulles*,
    354 U.S. 363 (1957)............................................................................63

*Sierra Club v. Mainella*,
    459 F. Supp. 2d 76 (D.D.C. 2006) .........................................................43

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504 (1994)............................................................................62

*Trans-Pac. Freight Conf. of Japan/Korea v. Fed. Mar. Comm'n*,
    650 F.2d 1235 (D.C. Cir. 1980) ............................................................59

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973)............................................................................40

*United States v. Carolene Prods. Co.*,
    304 U.S. 144 (1938)............................................................................42

*United States v. Heffner*,
    420 F.2d 809 (4th Cir. 1969) .................................................................63

*Ursack, Inc. v. Sierra Interagency Black Bear Grp.*,
    639 F.3d 949 (9th Cir. 2011) ................................................................41

*Windsor v. United States*,
    699 F.3d 169 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013) ........................42

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).................................................................................40

**Statutes**

5 U.S.C. § 706 ...................................................................................... *passim*

10 U.S.C. § 1203 ........................................................................................64

**Other Authorities**

Fed. R. Civ. P. 56 .......................................................................................39

U.S. Const. ............................................................................................ *passim*

## I.     INTRODUCTION

This memorandum is being filed in support of motions for summary judgment in two related cases: *Harrison v. Esper* and *Roe v. Esper*. In these lawsuits, Plaintiffs Nicholas Harrison, Richard Roe, Victor Voe and the Modern Military Association of America ("MMAA") (collectively, "Plaintiffs") are challenging decisions made under policies of the Department of Defense ("DoD"), Army and Air Force that prevent the commissioning and contingency deployment[1] of service members living with HIV. Plaintiff Harrison, a sergeant in the Army National Guard, was denied a commission based solely on his HIV status. The lawsuit he filed along with MMAA (formerly "OutServe-SLDN") challenges this decision and the policies underlying it on the ground that they violate the equal protection components of the U.S. Constitution. Pseudonymous Plaintiffs Roe and Voe were scheduled for discharge from the Air Force in early 2019 after being diagnosed with HIV in 2017. Joined by MMAA, Roe and Voe challenged their discharge decisions and the HIV-related personnel policies on which they were based. Their complaint alleges an equal protection claim, as Harrison and MMAA did, and also alleges that the decisions and policies violate the Administrative Procedure Act ("APA"), because they are arbitrary and capricious, an abuse of discretion and otherwise contrary to law.

HIV medicine has undergone drastic advances since the disease first came to the public's attention in the 1980s. *Roe v. Shanahan*, 359 F. Supp. 3d 382, 397 (E.D. Va. 2019). In contrast, Defendants' categorical bar to the deployment and commissioning of service members living with HIV has remained essentially unchanged. SUF ¶ 34. The policies creating this categorical bar violate both the APA and the U.S. Constitution's guarantee of equal protection, because "the

---

[1] A contingency deployment is a "deployment that is limited to outside the continental United States, over 30 days in duration, and in a location with medical support from only non-fixed (temporary) military medical treatment facilities." SUF ¶ 41, *infra*. Defendants sometimes refer to "combat deployments"; those are a subset of contingency deployments according to Defendants' regulations. SUF ¶ 41.

1

Government has not—and cannot—reconcile these policies with current medical evidence." *Roe v. Dep't of Def.*, 947 F.3d 207, 220 (4th Cir. 2020) (opining on the deployment policies of the Air Force and Department of Defense). Because discovery in these cases has failed to create a genuine issue of material fact regarding the validity of the deployment bar, Plaintiffs are entitled to summary judgment on their claims that it is not rational and therefore violates the law.

Furthermore, plaintiffs in *Roe* are entitled to summary judgment on their claims that the decisions to discharge Roe, Voe, and individuals similarly situated violate the APA, because the decisions are arbitrary and capricious, an abuse of discretion and otherwise contrary to law. In addition to the irrational nature of the deployment bar on which they were based, these decisions violate the APA in three ways: they are inconsistent with prior decisions based on the same or essentially the same facts; they conflict with Air Force regulations prohibiting the discharge of Airmen based solely on their HIV status; and they were based on a *predictive* determination regarding deployment to CENTCOM, denying the Airmen the opportunity to seek an individual waiver as described in the relevant regulations. No genuine issues of material fact exist regarding these claims, and therefore, summary judgment on them is appropriate.

The categorical bar to the deployment of service members living with HIV is at the heart of all of Plaintiffs' claims. Just as the decisions to discharge Airmen Roe and Voe were based on the categorical bar to deployment to the area controlled by Central Command (CENTCOM), the refusal to commission Sergeant Harrison is rooted in his purported inability to deploy worldwide, as required by DoD and Army accession standards. *See* Department of Defense Instruction (DoDI) 6130.03 (stating candidates must be "[m]edically adaptable to the military environment without the necessity of geographical limitations"). Ex. 1, DoDI 6130.03, "Medical Standards for Appointment, Enlistment, or Induction into the Military Services." Discovery in these cases has

merely served to confirm the initial impression of this Court—and the Fourth Circuit—that the policies of the Air Force, Army, and DoD create a categorical bar to the contingency deployment of service members with HIV. *See* Ex. 2, Dep't of Def., *Department of Defense Personnel Policies Regarding Members of the Armed Forces Infected with Human Immunodeficiency Virus: Report to the Committees on the Armed Services of the Senate and House of Representatives* (Aug. 2018) ("2018 Report"), at 2 ("HIV antibody positive status is a deployment-limiting medical condition precluding contingency deployment.")

Though a deployment waiver is ostensibly available, it is undisputed that service members with HIV are not permitted on contingency deployments by DoD and Service-level regulations. Ex. 2, 2018 Report at 14 ("The medical standards in DoDI 6490.07 are mandatory for contingency deployments, and permissible for any other deployment, based on the commander's decision."); *id.* at 25 ("Current Service policies do not permit HIV-infected Service members to deploy to combat theaters of operation or in support of other contingency operations"). Indeed, the CENTCOM waiver authority testified that he rarely even receives a waiver request for HIV, because the Services know it will not be granted. Ex. 3, Cron Dep. 57:16-60:2, 83:5-22, 93:2-16.

Granting summary judgment to Plaintiffs on the deployment policies is appropriate because there is no evidence that there is any significant risk with respect to the deployment of service members living with HIV. Instead, Defendants and their experts assert that any amount of risk—no matter how infinitesimal, undocumented, or unsupported by scientific literature—justifies their policies. SUF ¶ 31. But "zero risk" is unattainable and therefore irrational as a prerequisite for deployment. As the Supreme Court has made clear, "few, if any, activities in life are risk free," and the risk of transmission must be "significant" to justify the discriminatory

3

treatment of people living with HIV or other infectious diseases. *See Bragdon v. Abbott*, 524 U.S. 624, 649 (1998) (defining the appropriate standard for assessing any purported risk to the health or safety of the individual or others in the context of a statutory HIV discrimination claim); *see also* Ex. 4, Murray Dep. 249:22-23 ("[E]very decision in a combat zone is buying risk.") In the context of this case, the Fourth Circuit viewed very low but non-zero risks of transmission as inadequate to provide a rational basis for the deployment bar. *See Roe*, 947 F.3d at 227 (stating that risks of battlefield transmission lower than .23% per exposure did not provide a rational basis). Because Defendants cannot articulate—much less demonstrate—more than a *de minimis* risk in deploying service members with HIV, summary judgment is appropriate on all of Plaintiffs' claims.

In sum, Defendants have not provided a rational basis for the categorical bar to the deployment of service members living with HIV and are unable to articulate anything more than the *de minimis* risks the Fourth Circuit found insufficient to justify these deployment policies. The health of the service member with HIV will not be detrimentally impacted by deployment, because providing health care to an individual living with HIV is no more onerous than providing care to other service members currently permitted to deploy. A service member living with HIV is just as capable of performing the duties of the job as a service member who is not living with HIV. Deployed service members living with HIV present no real risk to the health or safety of others, either through battlefield transmission or battlefield transfusion. And finally, host nation requirements are not a legitimate basis for declaring service members with HIV less than worldwide deployable.

In addition, the discharges of Roe, Voe, and others similarly situated violate the APA because they conflict with Air Force regulations regarding the retention of Airmen living with

HIV, are inconsistent with decisions made on the same or similar facts, and are based on a *predictive* determination regarding deployment, denying the Airmen the opportunity to seek an individual waiver as required by Air Force regulations.

## II.   STATEMENT OF UNDISPUTED FACTS

### The Parties

*Sergeant Nicholas Harrison:*

1.       Originally from Oklahoma, Harrison joined the U.S. Army in 2000. Ex. 5, Harrison Dep. 41:16-20. In 2003, Harrison left active duty and joined the Army Reserves, returning to Oklahoma to become a member of the Oklahoma National Guard. *Id.* at 46:7-19.

2.       In 2005, Harrison received a bachelor's degree from the University of Central Oklahoma and enrolled in law school at Oklahoma City University. *Id.* at 30:20-33:20. Harrison's National Guard unit deployed to Afghanistan for 16 months starting in March 2006 in support of Operation Enduring Freedom. Sergeant Harrison was recognized for his meritorious service with the Army Commendation Medal. *Id.* at 48:16-49:2, 50:9-12. In 2011, Harrison received a JD and MBA from the University of Oklahoma. *Id.* at 37:14-16, 40:3-7. The Army subsidized his educational pursuits through the G.I. bill, tuition assistance and a yearly stipend for participation in Army ROTC. Harrison, ECF No. 26-3, Harrison Decl. of Nicholas Harrison in Supp. of his Mot. for Prelim. Inj. ¶ 3. Harrison was deployed to Kuwait for a second overseas tour of duty from July 2011 to March 2012. Ex. 5, Harrison Dep. 54:7-9.

3.       Harrison was diagnosed with HIV in 2012. Following his diagnosis, he was immediately placed on antiretroviral combination therapy. Within a matter of weeks, he was virally suppressed and has remained so since. *Id.* at 123:18-22, 124:1-13, 129:13-19.

4.       After Harrison passed the Oklahoma bar exam, the Oklahoma National Guard offered him a position as a Judge Advocate General (JAG) officer. *Id.* at 167:16-19, 175:9-11.

When Harrison moved to Washington, D.C., for the Presidential Management Fellow Program, he transferred to the Washington, D.C., National Guard. *Id.* at 43:13-16. In 2013, Harrison applied to be an attorney in the JAG Corps for the Washington, D.C., National Guard, and he was recommended for appointment as a JAG. He began the process of assessment and qualification with the D.C. National Guard recruitment office. *Id.* at 182:3-13, 187:20-188:1.

5.      Harrison received the highest possible PULHES score (the acronym stands for the testing categories: Physical stamina, Upper extremities, Lower extremities, Hearing/ears, Eyes and Psychiatric)—a one out of four—in every category during his medical commissioning exam. *Id.* at 136:10-137:6; Ex. 6, Army Physical Fitness Test Scorecard for Harrison.

6.      Because the accessions standards preclude the commissioning of people living with HIV, Harrison compiled a waiver application, which was submitted through the appropriate channels. Ex. 5, Harrison Dep. 208:2-10, 210:12-15; Ex. 7, Medical Action Detail regarding accession waiver commission for Harrison.

7.      After his request for a waiver was denied, Harrison submitted an exception to policy ("ETP"), which was processed by the Army and ultimately denied. Ex. 5, Harrison Dep. 217:1-218:15, 206:3-13, 214:19-215:2, 216:1-217:15; Ex. 8, Memorandum from Harrison regarding his request for exception to policy (AR 600-110, DoDI 6485.01), with denial. Harrison subsequently submitted an application for review and correction to the Army Board for Correction of Military Records (ABCMR). The ABCMR denied his application on September 7, 2018. Ex. 9, Harrison's application to ABCMR; Ex. 10, Mem. denying Harrison's application.

8.      Harrison was denied a commission to the Washington, D.C., National Guard JAG Corps because he failed to meet medical accession standards due to his HIV status, which prevents him from deploying into combat zones and other contingencies. See Ex. 5, Harrison

Dep., 9 June 2017 Memorandum at 1 ¶ 3 (exhibit 6 to Harrison Dep.); Harrison, ECF No. 43,

Def's Opp'n to Pls' Mot. for a Prelim. Inj. and Mem. In Supp. of Mot. to Dismiss at 27 (hinging

denial of commission on determination regarding the fitness of "those that may be deployed to

combat zones").

*Staff Sergeant Richard Roe:*

9.      Roe enlisted in the Air Force in 2012 at the age of 18 and has been stationed in

two foreign countries during his service. Ex. 11, Roe Dep. 19:4-10, 24:20-25:6, 31:20-32:3.

10.     In October 2017, Roe was diagnosed with HIV while on active duty and

immediately started a course of antiretroviral treatment. By the time he underwent his next

clinical evaluation, he was virally suppressed. *Id.* at 105:10-12. Roe's doctor imposed no work

restrictions as a result of his diagnosis and Roe is medically and physically capable of

performing common military tasks, as described in DoDI 1332.18. Ex. 12, DoDI 1332.18,

"Disability Evaluation System," Encl. 3, App. 2 at 31, § 4(a)(1). After being diagnosed with

HIV, Roe passed the Air Force's required physical fitness tests without any component

exemptions. Ex. 11, Roe Dep. 116:19-117:8, 122:10-20.

11.     Following Roe's HIV diagnosis, he underwent a medical evaluation process to

determine whether he should be retained or separated from the Air Force because of his HIV

status. Roe's commanding officer wrote an evaluation recommending retention on the grounds

that Roe was fit to serve and was ███████████████ Ex. 13, Excerpts from the

administrative records for Roe and Voe, A:557.[2] Many colleagues also wrote character

statements in support of Roe. *Id*. at A:562-566. Roe's primary care doctor also recommended

that he be returned to duty. *Id*. at A:574. Roe's local IPEB recommended that Roe be discharged.

---

[2] All citations to the administrative record will be identified using the format "A:###."

*Id*. at A:549-550.



12.    Roe appealed to the FPEB. ██████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████ The FPEB recommended that
Roe be discharged. *Id*. at A:480-481. Roe appealed to the Secretary of the Air Force. *Id.* at
A:463-466. ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████ Because he was deemed unable to deploy to CENTCOM,
Roe was found unfit for continued military service by the Secretary of the Air Force Personnel
Council and was informed he would be separated. *Id.* at A:460-462, Mem. fr. the SAFPC/AFPB.

*Senior Airman Victor Voe:*

13.    Victor Voe enlisted in the Air Force in 2011 at the age of 19 and has spent almost
all of his adult life in the Air Force. He has been stationed in two foreign countries and deployed
twice to the Middle East. Voe trained to become a munitions systems technician. Ex. 14, Voe
Dep. 20:5-6, 21:17-29:17, 31:20-11. 36:12-16.

14.    Voe was diagnosed with HIV in March 2017 while on active duty. He was
immediately placed on a course of antiretroviral treatment. By August 2017, his viral load was
undetectable and has remained so. *Id.* at 84:12-15, 93:13-22. Voe's doctor imposed no work
restrictions as a result of his diagnosis, and Voe is medically and physically capable of
performing common military tasks, as described in DoDI 1332.18. Ex. 12, Encl. 3, App. 2 at 31,
§ 4(a)(1). After being diagnosed with HIV, Voe passed the Air Force's required physical fitness
tests without any component exemptions. Ex. 14, Voe Dep. 99:22-100:12. Following Voe's HIV

diagnosis, he underwent a medical evaluation process to determine whether he should be retained

or separated from the Air Force because of his HIV status. His commanding officer called Voe a

████████████████████ and recommended that he be retained. Voe's doctors opined that his

medical condition—including HIV status—did not affect his ability to do his job. *Id.* at 110:8-12;

Ex. 13, A:763-764, A:769-771.

      15.     Voe's local IPEB recommended that Voe be discharged. Ex. 14, Voe Dep.

108:21-109:3; Ex. 13, A:757-758. Voe appealed to the FPEB. The FPEB recommended that Voe

be discharged. Ex. 14, Voe Dep. 109:17-19, 112:14-18; Ex. 13, A:755-756. Voe appealed to the

Secretary of the Air Force. *Id.* at A:750-751, A:754, A:934; Ex. 14, Voe Dep. 112:22-113:3.

      16.     The AFPB took two votes on whether to retain Voe in the Air Force. In the first,

█████████████, the AFPB unanimously found that he was fit and returned him to duty. Ex. 15,

Air Force Personnel Vote Sheet ("AFPB Vote Sheet") regarding Victor Voe, unanimously

finding that he is fit, and should be returned to duty. Five months later, █████████████, the

AFPB voted again and unanimously found that he was unfit and should be discharged. Ex. 16,

AFPB Vote Sheet regarding Victor Voe, unanimously finding him unfit and discharging him.

The discussion on both Vote Sheets is the same: ██████████████████████████

████████████████████████████████████████████████████

████████████████████████ No new medical evidence was submitted, nor were

any regulations changed between the first and second votes. Ex. 17, Soper Dep. 287:23-292:9.

*Modern Military Association of America:*

      17.     Plaintiff Modern Military Association of America (formerly OutServe-SLDN,

Inc.) is a nationwide, non-partisan, non-profit, legal services, watchdog, and policy organization

that represents the LGBTQ+ military community—service members, veterans, civilians, and

their spouses and families—worldwide. The organization's mission is to address and end—

through litigation, policy advocacy, and education—all forms of unequal or unfair treatment against members of its community on the basis of sexual orientation, gender identity, or HIV status. Ex. 18, Blevins Dep. 25:25-26:11.

18.     MMAA provides direct legal and advocacy assistance to people with HIV who are subject to Defendants' policies that disqualify them from joining the military, prevent those in the military from deploying, and leads some of them to be involuntarily separated. This includes providing counseling to individuals with HIV, advocating on their behalf—as well as more broadly for changes to these policies—and challenging adverse decisions that affect them. Ex. 19, Pl. OutServe-SLDN's Second Set of Suppl. Resp. to Defs' First Set of Interrogs., at 2-13. Since 2015, as a result of Defendants' HIV-related personnel policies and their decisions pursuant to them, the time MMAA staff has had to devote to this legal and advocacy work has increased. *Id.* MMAA's allocation of resources to addressing Defendants' policies has required it to delay, deprioritize, and divert resources from other programs and services in its mission. *Id.*

A.     Defendants:

*Department of Defense:*

19.     Defendant Mark Esper is the current Secretary of the DoD. He is ultimately responsible for the administration and enforcement of the DoD's service restrictions on people living with HIV. Roe Defs.' Answer to Pls.' Compl. for Declaratory and Injunctive Relief ¶ 28, ECF No. 90 ("Roe Answer").

20.     The DoD is an executive branch department of the U.S. federal government and consists of: the office of the Secretary of Defense, the Joint Chiefs of Staff, the Joint Staff, the Departments of the Army, Navy, and Air Force, the unified and specified combatant commands, and any other offices, agencies, activities, and commands as may be established or designated by the President or by law, and all the offices, agencies activities, and commands under their control

or supervision. Under direction of the Secretary, the DoD is responsible for the administration

and enforcement of the DoD's service restrictions on people living with HIV. Roe Answer ¶ 29.

*Department of the Army:*

21.　　Defendant Ryan D. McCarthy is the current Secretary of the Army. He is the

leader of the Department of the Army and is responsible for its regulations and the actions taken

against Harrison. Harrison Defs.' Answer to Compl. for Decl. and Inj. Relief ¶ 9, ECF No. 62.

*Department of the Air Force:*

22.　　Defendant Barbara M. Barrett is the current Secretary of the U.S. Air Force. She

is the leader of the Department of the Air Force and is responsible for its regulations and the

actions taken against Roe and Voe. Roe Answer ¶ 30.

## The Progression of HIV Medicine

23.　　Acquired Immune Deficiency Syndrome (AIDS) was first identified as a high-

mortality disease in the United States in 1981, and the human immunodeficiency virus ("HIV")

was identified as its cause two to three years later. Ex. 20, Hardy Rep. ¶ 10; Ex. 21, Hoppe Rep.

¶ 12. Since then, significant progress in the treatment and prevention of HIV has occurred,

leading to drastic improvements in the prognosis for people living with HIV. Ex. 20, Hardy Rep.

¶ 10.

24.　　After entering the bloodstream, HIV replicates within the cells of the human

body's immune system and destroys CD4 T-cells, which are critical to the body's ability to fight

infections. *Id.* at ¶¶ 11-12. If left untreated, HIV replicates to levels that allow it to destroy CD4

T-cells faster than they can be replaced. If untreated over a period of years, a person's immune

system can become so compromised that infections and conditions the body is usually able to

fend off can take hold. *Id.* at ¶¶ 12-13.

25.　　Effective antiretroviral medications were first introduced in the mid-1990s. These

medications prevent HIV from replicating, thus protecting the body's CD4 T-cells. *Id.* at ¶ 15. The effectiveness of antiretroviral medications is measured by the reduction in the number of copies of the virus in a milliliter of a person's blood, which is referred to as "viral load." While a person in the acute state of infection could have a viral load of 1 million or more, a person in successful treatment will have a viral load of less than 200, which is considered "virally suppressed," or a viral load of less than 48–50, which is referred to as an "undetectable" viral load. *Id.* at ¶ 16. As an individual's viral load decreases, their CD4 T-cell count rebounds, and overall health improves. *Id.* at ¶ 16.

26.     Researchers and clinicians have been able to refine the use of antiretroviral combination therapy to make treatment adherence easier and health outcomes better. Three or four medications are combined into one tablet that a person takes once a day with no reduction in effectiveness. As medications have been further refined, the severity of side effects has been significantly reduced as well. Ex. 22, Danaher Dep. 17:4-22; Ex. 20, Hardy Rep. ¶ 15. Adherence to an antiretroviral treatment regimen ensures that an individual's viral load remains at undetectable levels. *Id.* at ¶ 17.

27.     The standard practice for the initiation of antiretroviral therapy now calls for individuals to start treatment as soon as possible after diagnosis, leading to better health outcomes. Ex. 22, Danaher Dep. 17:4-18:10; Ex. 20, Hardy Rep. ¶ 10. Today, an individual who is diagnosed with HIV and enters into care has an average life expectancy similar to an individual of the same age who is not living with HIV. Ex. 22, Danaher Dep. 18:1-4; Ex. 20, Hardy Rep. ¶ 10, 20; Ex. 21, Hoppe Rep. ¶ 25; Ex. 4, Murray Dep. 111:13-17.

28.     People living with HIV have suffered for decades through a unique history of misinformation, stigma, ostracism, and discrimination, and continue to do so to this day. *Roe*,

12

947 F.3d at 212, 229, 233-34 (recognizing stigma); Ex. 21, Hoppe Rep. ¶¶ 16, 20, 26-28, 30-31.

A person's HIV status bears no relation to their ability to contribute to society, particularly in

view of dramatic medical advances over the last three decades. Ex. 20, Hardy Rep. ¶¶ 13-20, 23-

26; SUF ¶¶ 25, 26, 27, 77, 78, 89. HIV-positive status is an immutable characteristic: it is not yet

curable, and a person cannot change their HIV status. *Id.* at ¶ 10. People living with HIV are a

discrete and insular group lacking sufficient political power to protect their rights through the

legislative process. "The people most frequently diagnosed with AIDS belonged to marginalized

and stigmatized groups." *Roe*, 947 F.3d at 212. Even today, many people living with HIV still do

not have access to care, and criminal laws continue to unfairly single out and discriminate

against people with HIV. Ex. 21, Hoppe Rep. ¶¶ 20, 28.

### HIV Policy in the Military

29.     Defendants set forth their complete reasoning underlying their policies prohibiting

the commissioning or deployment of persons living with HIV in the 2014 and 2018 Reports to

Congress. Ex. 23, Harrison Defs.' Objs. and Resps. to Pls.' First Set of Interrog. to Defs.' Nos. 1-

23, Interrog. 17 and 18.

30.     In the 2018 Report to Congress, Defendants summed up their purported

justifications for their HIV-related accession and deployment policies: "In the context of the

extraordinary challenges of many aspects of military service, including potential mission needs

under highly stressful combat conditions or in extremely austere and dangerous places

worldwide, even well-managed HIV infection carries risks of complications and comorbidities,

possibly with latent effects, immune system dysregulation, neurocognitive impairments (NCI)

. . . , disrupted medication maintenance and necessary monitoring for potential side-effects,

possible military vaccination adverse effects, and potential communicability, including in

circumstances of buddy-aid to a seriously injured member in combat and emergency whole

13

blood battlefield transfusions." Ex. 2, 2018 Report at 25.

31.     Defendants contend that any non-zero risk involved in deploying a service member with HIV justifies the categorical bar to deployment. Ex. 4, Murray Dep. 153:20-22; Ex. 24, Wiesen Dep. 42:7-12; *id.* at 40:19-22 ("[W]e can't prove a negative. So while we have not seen transmission at levels that are undetectable, it doesn't mean that it's not still possible.") Ex. 25, Blaylock Dep. 44:23-45 ("Again, I don't know what the CDC looked at. I would venture, no, that they looked at the entirety of the medical literature, but that's why they said approximately zero and effectively zero. They never said absolutely zero.")

32.     "HIV infection is a disqualifying medical condition for entry into the military service." Ex. 2, 2018 Report at 2. The accession standard is applied to anyone seeking enlistment or appointment as a commissioned officer in the Military Services. *Id.* at 1, 5.

33.     "The overarching policy is that to maximize the lethality and readiness of the Joint Force, all Service members are expected to be deployable." *Id.* at 4. "HIV antibody positive status is a deployment-limiting medical condition precluding contingency deployment." *Id.* at 3. "All Service policies preclude HIV-positive service members from deploying to combat areas or in support of contingency operations." *Id.*

*Department of Defense Policy:*

34.     Defendants have promulgated policies in the past 30 years concerning medical conditions generally and HIV specifically, and these policies affect service members who are living with HIV. *See, e.g.*, Ex. 26, DoDI 6485.01 (1991 version): "Human Immunodeficiency Virus (HIV) in Military Service Members"; Ex. 27, DoDI 6485.01 (2006 version); Ex. 28, DoDI 6485.01 (current version); Ex. 29, DoDI 6490.07: "Deployment-Limiting Medical Conditions for Service Members and DoD Civilian Employees"; Ex. 1, DoDI 6130.03: "Medical Standards for Appointment, Enlistment, or Induction into the Military Services."

35.    DoDI 6130.03 sets forth the DoD's "physical and medical standards for appointment, enlistment, or induction into the Military," which applies to new enlistees and service members seeking to commission as officers. Ex. 1, DoDI 6130.03 at 1, 9, § 4.1(a). The instruction defines a "physically qualified" service member to be:

(1)  Free of contagious diseases that may endanger the health of other personnel;
(2)  Free of medical conditions or physical defects that may reasonably be expected to require excessive time lost from duty …;
(3)  Medically capable of satisfactorily completing required training and initial period of contracted service;
(4)  Medically adaptable to the military environment without geographical area limitations; [and]
(5)  Medically capable of performing duties without aggravating existing physical defects or medical conditions.

*Id.* at 4, § 1.2(c). An enlisted service member who is seeking a first commission as an officer must meet the military's accession medical standards. *Id.* at 9, § 4.1.

36.    DoDI 6130.03 sets forth a list of conditions "that do not meet the standard," one of which is the "[p]resence of [HIV]." *Id.* at 11, § 5.1; *id.* at 37, § 5.23(b); *see also id.* at 11-46, §§ 5.2-5.30. Defendants contend people with HIV do not meet criteria (1), (2), (4) and (5) (described in ¶ 35, *supra*) while on a contingency deployment. Ex. 24, Wiesen Dep. 62:9-63:17, 92:13-93:10; Ex. 25, Blaylock Dep. 60:6-61:1, 76:19-77:21, 87:11-92:22; Ex. 4, Murray Dep. at 210:17-211:3, 300:4-9.

37.    Applicants who have a presumptively disqualifying condition must seek a medical waiver. Ex. 1, DoDI 6130.03 at 5, § 1(d), 10, § 4.2(c), 47. Final authority to approve a waiver request lies with—but may be delegated by—the secretary of the branch of the Service to which the person is applying or from which the person is seeking a commission. *Id.* at 47-48. A waiver for appointment, enlistment or induction into the military for a person living with HIV has never been granted. Ex. 30, Tumminello Dep. at 91:13-92:8; Ex. 31, Aswell Dep. 59:10-18.

38.     DoDI 6485.01, entitled "Human Immunodeficiency Virus (HIV) in Military Service Members," provides that a service member with HIV "will be referred for appropriate treatment and a medical evaluation for fitness for continued service in the same manner as a Service member with other chronic or progressive illnesses in accordance with DoDI [1332.18]." Ex. 28, DoDI 6485.01 Encl. 3 at 7, § 2(c).

39.     Under DoDI 6485.01, service members who are "determined to be fit for duty will be allowed to serve in a manner that ensures access to appropriate medical care," (*id.*), and "the cognizant Combatant Command surgeon will be consulted in all instances of HIV seropositivity before medical clearance for deployment" in accordance with DoDI 6490.07, which is discussed below. *Id.* at 7 § 2(b); Ex. 29, DoDI 6490.07, Encl. 3 at 11, § e(2). DoDI 6485.01 does not call for service members with HIV to be separated, either because of their HIV status or because of restrictions on their deployment. Ex. 28, DoDI 6485.01 Encl. 3 at 7, § 2(c). To the contrary, the DoD's 2018 Report to Congress makes clear that "[o]nce a Service member completes initial training, the policy is to retain members who acquire HIV and are still capable of performing their duties in the rigorous military environment." Ex. 2, 2018 Report at 9.

40.     DoDI 6490.07, entitled "Deployment-Limiting Conditions for Service Members and Civilian Employees," provides guidance on medical conditions that limit deployment. DoDI 6490.07 provides that service members with existing medical conditions may deploy on a contingency deployment when the following conditions are met:

(1) The condition is not of such a nature or duration that an unexpected worsening or physical trauma is likely to have a grave medical outcome or negative impact on mission execution.

(2) The condition is stable and reasonably anticipated by the pre-deployment medical evaluator not to worsen during the deployment in light of physical, physiological, psychological, and nutritional effects of the duties and location.

(3) Any required, ongoing health care or medications anticipated to be needed for the duration of the deployment are available in theater within the Military Health

16

System. Medication must have no special handling, storage, or other requirements (e.g., refrigeration, cold chain, or electrical power requirements). Medication must be well tolerated within harsh environmental conditions (e.g. heat or cold stress, sunlight) and should not cause significant side effects in the setting of moderate dehydration.

(4) There is no need for routine evacuation out of theater for continuing diagnostics or other evaluations. (All such evaluations should be accomplished before deployment.)

Ex. 29, DoDI 6490.07 at 3, § 4(b).

41.    A contingency deployment is a "deployment that is limited to outside the continental United States, over 30 days in duration, and in a location with medical support from only non-fixed (temporary) military medical treatment facilities. It is a deployment in which the relocation of forces and materiel is to an operational area in which a contingency is or may be occurring." *Id*. at 2, § 3(b).

42.    In addition to the general standard for deployment described above, DoDI 6490.07 contains a list of individual medical conditions "that usually prevent individuals from deploying unless a waiver is granted." *Id*., Encl. 3 at 10. The conditions listed in DoDI 6490.07 include "infectious diseases," which in turn includes HIV. Under this provision, "a diagnosis of HIV antibody positive with the presence of progressive clinical illness or immunological deficiency" generally precludes a contingency deployment. *Id*., Encl. 3 at 11, § e(2); Ex. 32, Kelly Dep. 66:1-71:1. However, the policy also states that the "cognizant Combatant Command surgeon shall be notified in all instances of HIV seropositivity before medical clearance for deployment." Ex. 29, DoDI 6490.07, Encl. 3 at 11, § e(2). HIV is the only condition listed in DoDI 6490.07 that includes this additional notification requirement. DoDI 6490.07, Encl. 3, *passim*. The Combatant Command surgeon is delegated authority by the Combatant Commander to approve medical waivers under DoDI 6490.07. DoDI 6490.07, Encl. 2 at 8, § 3; Ex. 3, Cron Dep. 57:16–60:6. As such, DoDI 6490.07 operates to require the approval of the Combatant

17

Command surgeon (i.e., a waiver) to deploy on a contingency deployment in all instances of HIV seropositivity. Ex. 29, DoDI 6490.07 Encl. 3 at 11, § e(2).

43.     DoDI 1332.18, entitled "Disability Evaluation System," provides that a service member will be referred into the Disability Evaluation System (DES) if they have a "medical condition" that "may . . . prevent the Service member from reasonably performing the duties of their office, grade, rank, or rating"; "represents an obvious medical risk to the health of the member or to the health or safety of other members"; or "imposes unreasonable requirements on the military to maintain or protect the Service member." Ex. 12, DoDI 1332.18, Encl. 1, App. 2 at 26, § 2.

44.     In determining whether a service member can "reasonabl[y] perform[] [their] duties," the Medical Evaluation Board (MEB) and Physical Evaluation Board (PEB) consider the member's ability to perform common military tasks such as firing a weapon, performing field duty, or wearing load-bearing equipment; whether they can take physical fitness tests; and whether they are "deployable individually or as part of a unit, with or without prior notification to any vessel or location." *Id.* Encl. 3, App. 2 at 31. A service member will only be deemed "unfit" if the answer to one of the questions above is "yes." *Id.* Encl. 3, App. 2 at 31.

*Army Policy*:

45.     Along with its own HIV-specific policies, the Army has implemented the requirements of DoDI 6485.01 and DoDI 6490.07 as AR 600-110, which addresses "Identification, Surveillance, and Administration of Personnel Infected with Human Immunodeficiency Virus." Ex. 33, AR 600-110 at i. AR 600-110 applies to the active Army, the Army National Guard and the Army Reserve. Ex. 31, Aswell Dep. 59:19-60:8. Like DoDI 6130.03, AR 600-110 imposes a blanket prohibition barring individuals living with HIV from "accession" (i.e., enlistment, initial appointment as a commissioned officer, or appointment as a

West Point cadet) absent a waiver. Ex. 33, AR 600-110 at 4, § 1-16.a; *id.* at 20, § 5-2.a, 5-3.c. The bar also applies to enlisted service members living with HIV who wish to become commissioned officers; they cannot receive commissions even if they acquired the virus while on active duty. *See id*. Though it grants them for other medical conditions, the Army has never granted an accessions waiver to a person living with HIV. Ex. 31, Aswell Dep. 59:10-18.

46.     AR 600-110 prevents active-duty soldiers who are diagnosed with HIV after joining the Army from being stationed anywhere but the United States and certain territories, unless they are granted a medical waiver. *See* Ex. 33, AR 600-110 at 4, § 1-16.f. Each soldier's condition is monitored regularly, and their HIV health metrics (e.g., viral load and CD4 count) are tracked. *Id*. at 4, § 1-16.d.

47.     The Army designee on exceptions to policy stated that she is aware of two to three service members with HIV, all of whom are in the U.S. Special Forces, who have been granted an exception to policy to engage in a contingency deployment. Ex. 34, Lute Decl. ¶ 4; Ex. 35, Lute Dep. 193:17-196:1, "Update to Sec. to the Army" (exhibit 14 to Lute Dep.), "Exception to AR 600-110" (exhibit 19A to Lute Dep.) There is a special provision in DoDI 6490.07 allowing for the medical clearance of Special Operations Forces by the Commander of US Special Operations Command (USSOCOM). Ex. 29, DoDI 6490.07, Encl. 2 at 8, § 3(b); Ex. 24, Wiesen Dep. 147:6-149:6 (explaining that the waiver application must include any "unique qualifications due to extensive experience" as a potential justification for the waiver).

48.     The Army National Guard refused to grant Plaintiff Harrison a medical waiver to allow him to commission as a JAG officer in the National Guard. A person living with HIV cannot obtain a medical waiver to commission as an officer in the Army National Guard. Ex. 30, Tumminello Dep. 91:13-92:8.

*Air Force Policy:*

49.     Air Force Instruction (AFI) 44-178, "Human Immunodeficiency Virus Program," is the Air Force regulation that implements DoDI 6485.01. Ex. 36, AFI 44-178 at 1. As such, it governs the "identification, surveillance, and administration" of Airmen living with HIV. *Id.* While all "HIV-positive personnel must undergo medical evaluation for the purpose of determining status for continued military service," the regulation also makes clear that "HIV seropositivity alone is not grounds for medical separation or retirement for [active-duty] members." *Id.* at 6 § 2.4.1 ("Outcome of Evaluation for Continued Military Service"). The attached enclosures reiterate that "[m]embers with laboratory evidence of HIV infection who are able to perform the duties of their office, grade, rank, and/or rating may not be separated solely on the basis of laboratory evidence of HIV infection." *Id.* at 36, § A9.1.1.

50.     AFI 44-178 limits airmen living with HIV to assignments "within the continental United States . . . Alaska, Hawaii, [or] Puerto Rico," and they can be deployed outside those areas only with a waiver. *Id.* at 6, § 2.4.2. Deployment waivers are considered using normal procedures for chronic diseases; ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

51.     At least four other Airmen with HIV were notified they would be discharged at about the same time as Roe and Voe. Roe, ECF No. 40. As a result of the preliminary injunction entered on February 15, 2019, eleven discharge orders were rescinded. Roe, ECF No. 105-1.

*CENTCOM Policy:*

52.     ██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ .

Modification 13 to USCENTCOM Individual Protection and Individual Unit Deployment Policy ("MOD-13") applies to all military personnel deployed to CENTCOM. Ex. 37, MOD-13. MOD-13 provides that personnel who are "found to be medically non-deployable . . . will not enter [CENTCOM] . . . until the non-deployable condition is completely resolved or an approved waiver . . . is obtained." Ex. 37, MOD-13 at 4, § 15.C.

53.     Table A to MOD-13 sets forth the applicable fitness standards and lists medical conditions that preclude deployment "without an approved waiver," one of which is "confirmed HIV infection." Ex. 38, "PPG-TAB A: Amplification of the Minimal Standards of Fitness for Deployment to the CENTCOM AOR" (Table A to MOD-13) ("TAB A") at 4, 7. The process for obtaining a CENTCOM waiver requires that disapprovals be made in writing and allows the applicant's unit to appeal the decision. Ex. 37, MOD-13 at 7, § 15.C.3.B.2. During the pendency of this litigation, MOD-13 was superseded by MOD-14, which is identical in all pertinent respects. Ex. 39, USCENTCOM, "MOD FOURTEEN to USCENTCOM Individual Protection and Individual-Unit Deployment Policy" (Nov. 2019) ("MOD-14").

54.     Since 2015, over 30,000 applications for a medical waiver to deploy to CENTCOM have been received. Approximately 70–80% of those waivers have been granted. Ex. 3, Cron Dep. 41:6-10, 70:3-6. However, the Combatant Command Surgeon for CENTCOM has never granted a waiver to a service member living with HIV and is "highly unlikely" to do so. Ex. 40, Cron Decl. ¶ 11; Ex. 3, Cron Dep. 41:11-17.

55.     At the time he signed his declaration on January 25, 2019, in which he stated that it was "highly unlikely" that either Roe or Voe would be granted a waiver to deploy to CENTCOM, Lt. Col. Cron knew only that Roe and Voe were HIV positive. He did not review Roe or Voe's medical records, did not review Roe or Voe's administrative records, and did not

know what jobs they held in the military. Ex. 3, Cron Dep. 133:11-135:1.

56.     The average deployment to CENTCOM is nine months. *Id.* at 192:4-15. The

longest deployment is 15 months. *Id.* at 192:16-18. On average, contingency deployments for Air

Force service members last six months. Ex. 32, Kelly Dep. 48:12-15. An Airman with

asymptomatic HIV does not need special food, housing, medical attention or medical equipment

during deployment. Ex. 22, Danaher Dep. 23:24-24:14. An inability to deploy has a significant

effect on a service member's career progression. Ex. 2, 2018 Report at 17 ("The previous policy

of denying [Navy] deployments has made this subset of personnel less competitive in achieving

career milestones or warrior qualifications.")

### Health Care for Service Members with HIV

57.     All active duty members of the Armed Services are provided with health care. Ex.

41, Brown Dep. 78:4-10. Members of the Armed Services are expected to comply with the

treatment plan of their health care providers. *Id.* at 78:19-79:1.

58.     After an initial evaluation at the San Antonio Military Medical Center (SAMMC),

members of the Air Force newly diagnosed with HIV return to SAMMC for follow-up visits at

six months and annually thereafter. Ex. 36, AFI 44-178 at 5, § 2.4; Ex. 32, Kelly Dep. 38:12-16.

A service member with HIV in the Army is provided with a medical follow-up and evaluation

every six months. Ex. 33, AR 600-110 at 4, § 1.16d.

59.     A person newly diagnosed with HIV is started on antiretroviral treatment,

generally one pill a day or two pills a day. Ex. 32, Kelly Dep. 37:14-41:9; Ex. 20, Hardy Rep. ¶

15-16. After initiating treatment, a person with HIV will reach viral suppression in a matter of

weeks, but could take up to six months. Ex. 32, Kelly Dep. 41:14-19. ART medication adherence

is extremely high among active-duty service members. ████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████

### Medication Access

60.     Defendants currently provide maintenance medications to deployed service members with a wide variety of conditions. *See* Ex. 42, Okulicz Dep. 114:1-2; Ex. 25, Blaylock Dep. 98:19-103:21. Deployed service members who take daily medications for chronic medical conditions are ordered to deploy with a 180-day supply (or appropriate amount for shorter deployments), with provisions made to obtain refill prescriptions through the Armed Forces' Deployment Prescription Program. Ex. 24, Wiesen Dep. 182:2-11; Ex. 3, Cron Dep. 194:16-195:12; Ex. 32, Kelly Dep at 99:17-101:25; Ex. 36, MOD 13 at 8 § 15.D.1; Ex. 25, Blaylock Dep. 100-1:23-101:20 (deployed soldiers are provided with sufficient medication to span the length of deployment).

61.     People who need daily medication are permitted to join the military, commission as officers and/or to deploy without obtaining a waiver. Ex. 3, Cron Dep. 111:14-16 ("It's challenging to find an individual these days who's not on some kind of medication for something[.]") Persons with dyslipidemia are required to take a cholesterol-lowering medication once a day, but are not prohibited from joining the military. Ex. 1, DoDI 6130.03 at 39, § 5.24(n); 4.1(a); Ex. 25, Blaylock Dep. 176:16-177:14. If their dyslipidemia is well controlled with a once daily statin regimen, they are allowed to deploy without obtaining a waiver. Ex. 25, Blaylock Dep. 178:11-180:21. Accession and contingency deployment of individuals with well-controlled hypothyroidism are permitted. Ex. 1, DoDI 6130.03 at 39, § 5.24(k); Ex. 25, Blaylock Dep. 182:11-14. Individuals who use hormone replacement for dysmenorrhea or birth control are allowed to join the military, to commission and to deploy without obtaining a waiver. Ex. 1, DoDI 6130.03 at 23, § 5.13(d). People who require glasses to correct their vision (to a particular level) are permitted to join the military, to commission and to deploy without obtaining a waiver.

Ex. 1, DoDI 6130.03 at 13, § 5.4. People with mild forms of asthma who use an inhaler to control it are also permitted to deploy without a waiver. Wiesen Dep. 236:14-239:9

62.     Current HIV medications are highly effective and well tolerated. Ex. 4, Murray Dep. 328:17-329:3 ("Antiretroviral therapies are outstanding in the way they treat a person's viral load."); *see also* Ex. 24, Wiesen Dep. 99:24-100:1 ("The medications today are better than the medications even ten years ago and they are generally well tolerated."). ART medications have no special handling, storage or other requirements. Ex. 25, Blaylock Dep. 107:20-108:23; Ex. 43, Hendrix Rep. ¶ 52. These medications are not highly specialized, and do not require constant diligent compliance to be effective. *Id.* at ¶ 59; Ex. 44, Hendrix Dep. 129:14-132:6 (explaining that 85% adherence maintains full viral suppression).

63.     Treatment interruption does not have any immediate or significant long-term adverse consequences. Resistance to ART medications is unlikely to develop if all ART medications are stopped at the same time. Ex. 45, Hendrix Rbtl. ¶ 8; Ex. 25, Blaylock Dep at 203:16-205:15. If ART medications are stopped, a person living with HIV would continue to have a suppressed viral load for 4–12 weeks. Ex. 42, Okulicz Dep. 131:5-133:10; Ex. 24, Wiesen Dep. 95:13-20 ("If the assumption you're making is that they were completely suppressed and that their immune system was relatively normal, on an individual basis, it could be as short as perhaps a month or two to as long as—it could be much longer than that. It's an individualized response, but [you] don't develop immunocompromise immediately once you interrupt medication."); Ex. 20, Hardy Rep. ¶ 18; Ex. 45, Hendrix Rbtl. ¶ 7. The person would not experience symptoms of HIV for several months or years after discontinuing medication. Ex. 42, Okulicz Dep. 133:11-134:11; Ex. 24, Wiesen Dep. 157:1-11 ("So for them to manifest outward signs and symptoms of a progression of HIV, the likelihood of them needing to be without meds

for that to occur would be, at a minimum, I would say, at least a month, but could be much longer than that. The average time would probably be much longer than that, six or longer months."); Ex. 45, Hendrix Rbtl. ¶ 7. In addition, negative effects of a treatment interruption of less than a year would likely be reversed after the person is put back on ART medications, avoiding any significant long-term consequences of such a treatment interruption. *Id*. at ¶ 7.

64.     Under DoDI 6490.07 and Service-specific policies, Defendants allow those who control their moderate asthma with an inhaler, those who wear eyeglasses to correct their vision, and those who take medication to control a thyroid condition to deploy without a waiver. Ex. 29, DoDI 6490.07, Encl. 3 at 11, para. (d) (pulmonary disorders), Encl. 3 at 12, para. f (2) (vision loss), Encl. 3, *passim* (omitting thyroid conditions from the list). If an inhaler is lost or destroyed, it could affect the service member's ability to engage in strenuous activity. Ex. 24, Wiesen Dep. 238:18-239:9. The loss or destruction of eyeglasses would immediately affect a service member's ability to perform their duties. Ex. 25, Blaylock Dep. 193:9-14; Ex. 24, Wiesen Dep. 249:16-250:2. Interruption of thyroid medication can cause lethargy and fatigue. Ex. 4, Murray Dep. 278:23-279:13.

### Periodic Medical Evaluations While Deployed

65.     The primary purpose of monitoring follow-up appointments is to conduct viral load testing to ensure continued adherence to an ART regimen. Ex. 43, Hendrix Rep. ¶ 58. A person who has continued taking their antiretroviral medications is extremely unlikely to experience a rise in their viral load. Ex. 45, Hendrix Rbtl. ¶ 5. 99.8% of active duty service members have achieved viral suppression, indicating tremendous medication adherence within this group. Ex. 4, Murray Dep. 120:15-121:7; Ex. 43, Hendrix Rep. ¶ 58.

66.     The secondary purpose of monitoring follow-up visits is to monitor the side effects, if any, on the functioning of the person's organs and other bodily systems. Ex. 43,

25

Hendrix Rep. at ¶ 58. Such side effects are latent and slow-moving and would be unlikely to change substantially after a person has stabilized on an ART regimen. *See* Ex. 43, Hendrix Rep. ¶ 58; Ex. 45, Hendrix Rbtl. at ¶ 3; Ex. 4, Murray Dep. 58:14-59:10 ("Most toxicities occur early on.") Rarely does a person who has achieved viral suppression on a particular ART regimen need to change regimens because of the side effects the medication is having on the functioning of other organs or bodily systems. Ex. 43, Hendrix Rep. ¶ 58.

67.    The World Health Organization (WHO) recommends that routine viral load monitoring occur every 12 months if the person is stable on ART therapy. Ex. 46, WHO, *Consolidated Guidelines on the use of antiretroviral drugs for treating and preventing HIV infection* (2016). A person with well-controlled HIV who has durable viral suppression could be monitored not more often than once a year. Ex. 22, Danaher Dep. 16:10-17:3.

68.    After viral achieving durable viral suppression, a service member living with HIV requires clinical visits at most every six months. Ex. 43, Hendrix Rep. ¶ 55, Ex. 22, Danaher Dep. 16:10-16; Ex. 42, Okulicz Dep. 113:10-22. For individuals with well-controlled HIV, the Department of Health and Human Services treatment guidelines ("DHHS Guidelines") recommend medical monitoring visits once every 6 months. Ex. 20, Hardy Rep. ¶ 17; Ex. 43, Hendrix Rep. ¶ 56; Ex. 44, Hendrix Dep., "Dep't Health and Human Serv. Panel on Antiretroviral Guidelines for Adults and Adolescents, *Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents with HIV*" ("DHHS Guidelines") (exhibit 12 to Hendrix Dep.); Ex. 22, Danaher Dep. 16:10-16; Ex. 42, Okulicz Dep. 113:10-22; Ex. 43, Hendrix Rep. ¶ 55. Increasingly, it is becoming common for physicians to see a well-suppressed, adherent patient once a year. Ex. 22, Danaher Dep. 16:10-17:3; Ex. 20, Hardy Rep. ¶ 17.

69.    DoD deployment standards state that a service member with an unresolved

"chronic condition that requires frequent clinical visits, fails to respond to adequate conservative treatment, or necessitates significant limitation of physical activity" is inappropriate for a contingency deployment. Ex. 29, DoDI 6490.07, Encl. 3 at 10 § (b)(1). Table A to MOD 13, which sets forth the minimal standards of fitness for deployment to CENTCOM, provides that waivers will be considered if "the condition does not require frequent clinical visits more than quarterly." Ex. 38, TAB A at 1, § 1.D.3.

70.     The type of monitoring care conducted in a deployed environment does not require an infectious disease specialist. Ex. 43, Hendrix Rep. ¶¶ 59-60; *Roe*, 947 F.3d at 226.

71.     A "Role 1" medical facility provides a minimal level of care and is located very near combat operations. Ex. 25, Blaylock Dep. 64:14-25. A "Role 2" medical facility is run by a medical company with 30–100 personnel providing acute surgical care fairly close to the front line and would hold a patient for 24–48 hours. *Id.* at 66:16-67:3. A "Role 3" medical facility is a combat support hospital with typical hospital assets, usually at major hubs of military bases in the deployed setting. *Id.* at 67:19-68:6.

72.     "Role 3" medical facilities have the capability to spin down a blood sample in a centrifuge, as is required for viral load testing, and to put it in a cold chain for shipping to a lab capable of doing the testing required. *Id.* at 64:4-68:15 (describing the various levels of medical facilities and the ability of a Role 3 medical facility to collect, process and ship a specimen for testing); Ex. 4, Murray Dep. 198:7-199:5 (stating Role 3 facilities have the capability to spin and freeze blood samples); Ex. 47, Peel Dep. 132:11-133:12 (acknowledging that the tubes for blood collection, centrifuge for processing, and wet and dry ice for shipping are not unique to HIV viral load testing and are available in theater); *Id.* at 117:4-118:8 (wet ice could keep a specimen sufficiently cold until it reached a nearby location at which it could be spun down and frozen).

27

73.     Dr. Peel, Defendants' expert with respect to the feasibility of doing viral load testing on deployed service members, admits that it would likely not be a problem to collect a blood specimen at a Role 2 medical facility and transport it on a helicopter to a Role 3 medical facility for processing. *Id.* at 140:2-141:6, 176:7-17. There is no urgency in transporting a frozen blood specimen to a lab for testing. Ex. 43, Hendrix Rep. ¶ 56 (discussing the flexibility in the timing of the monitoring tests for people with chronic HIV).

74.     A blood specimen does not necessarily need to be shipped to the HIV Diagnostics and Reference Laboratory (HDRL) in Silver Spring, Maryland, for a viral load test to be conducted, as is the current practice. Ex. 47, Peel Dep. 8:1-2; 12:7-12; 53:8-16; 203:19-205:18 (admitting that high-quality viral load testing is conducted by labs across the globe and that she knows of nothing that would prevent the military from contracting with such labs).

75.     The time it takes to transport a service member to a location capable of providing monitoring tests within theater would not be considered "excessive time lost" from one's regular duties, which is the standard under which medical conditions are evaluated under Ex. 1, DoDI 6130.03 at 4, § 1.2(c); Ex. 24, Wiesen Dep. 82:15-20 ("An individual without complications who is not—who is routinely being monitored and does not need multiple revisits for any exigencies for complications of their treatment would not meet the standard of excessive time.").

76.     Defendants regularly offer R&R leave to those on longer deployments. Ex. 3, Cron Dep. at 193:24-194:14; Ex. 4, Murray Dep. at 102:19-104:1. The risk involved with transporting people for medical care are similar to those when transporting people for R&R. Ex. 4, Murray Dep. 229:25-230:13.

## Capabilities of People Living With HIV

77.     HIV seropositivity is not inconsistent with the demands of military service. Ex. 43, Hendrix Rep. ¶¶16, 20, 61-64 (citing Office of the Assistant Secretary of Defense, Health

Affairs Mem. (Policy Memorandum—Human Immunodeficiency Virus Interval Testing) (Mar. 29, 2004). Assuming their HIV is well controlled and otherwise asymptomatic, soldiers with HIV are medically capable of completing required training. Ex. 25, Blaylock Dep. 86:4-11; Ex. 22, Danaher Dep. 18:22-19:7 (term of service).

78.   Ex. 48,

A. De, et al., *Physical Fitness Characteristics of Active Duty Air Force Members with HIV Infection*, 95 Medicine 44 (2016); Ex. 43, Hendrix Rep. ¶ 62.

79.     According to at least one Air Force doctor, service members with asymptomatic HIV are fit to deploy to austere environments from a medical standpoint and the blanket prohibition on deploying service members living with asymptomatic HIV to CENTCOM cannot be medically justified. Ex. 22, Danaher Dep. 16:4-7, 25:2-6; Ex. 43, Hendrix Rep. ¶¶ 64, 72. There is no evidence that service members with HIV would be any more affected by the stressors of the deployed environment than others. Ex. 4, Murray Dep. 114:13-115:15, 201:9-206:6 (admitting that everyone is affected by stressors in a deployed environment and providing no basis for immune system modulation other than those caused by missed medications); Ex. 24, Wiesen Dep. 100:4-15, 138:14-141:3 ("I don't have any scientific basis to say [the stressors] would or would not [result in a worsening of the person's HIV]"); *see also id.* at 92:13-93:24 (acknowledging that a service member with HIV who remained on treatment would be able to perform their duties without exacerbating their HIV) Ex. 25, Blaylock Dep. 93:23-94:12; Ex. 43,

Hendrix Rep. ¶¶ 64, 66.

### Neurocognitive Impairments

80.    Published guidelines on the management of persons living with HIV do not recommend periodic testing for neurocognitive impairments. Ex. 32, Kelly Dep. 187:5-12; Ex. 20, Hardy Rep. ¶ 28; Ex. 44, Hendrix Dep., "DHHS Guidelines." The Air Force does not routinely evaluate HIV-infected Airmen for neurocognitive impairments, because it does not have a clinical perception that HIV impacts neurocognition to the point that it affects their day-to-day life or their job doing their duties. Ex. 42, Okulicz Dep. 59:17-60:13, 118:3-12.

81.    The DoD reported to Congress in 2018 that the impact of potential neurocognitive impairments on a service member's readiness, resilience, and/or retention is currently unknown. Ex. 2, 2018 Report at 21. The accessions standards include a section on neurocognitive conditions, which is applied to all service members. Ex. 1, DoDI 6130.03 at 41, § 5-26.

82.    According to a DoD Infectious Disease Clinical Research Program cross-sectional study of 200 HIV-infected and 50 HIV-uninfected military beneficiaries, including active duty members, retirees, or dependents, HIV-positive patients diagnosed and managed early during the course of HIV infection had a low prevalence of neurocognitive impairments. The DoD reported to Congress that this is comparable to matched HIV-uninfected persons. *Id*. at 20; Ex. 20, Hardy Rep. ¶ 28.

### Live Vaccines

83.    Live vaccines are not absolutely contraindicated for persons living with HIV who have a suppressed viral load and normal immune function; although some witnesses for Defendants believe that the smallpox vaccine cannot be administered to people living with HIV. Ex. 43, Hendrix Rep. ¶ 54. In any event, service members who cannot be administered a live vaccine are not prevented from deploying. For example, persons with a history of eczema cannot

receive the smallpox vaccine but are not prevented from deploying. Ex. 24, Wiesen Dep. 141:4-145:4; Ex. 43, Hendrix Rep. ¶ 54.

### **Privacy and Confidentiality**

84.    Current military polices require disclosure of HIV status only on a "need-to-know" basis. *See, e.g.*, Ex. 28, DoDI 6485.01, Encl. 3 at 7, §5; Ex. 33, AR 600-110 at 21, §5.4; Ex. 36, AFI 44-178.

### **HIV Transmission**

85.    The risk of HIV transmission through wound-to-wound contact is negligible or zero. Ex. 43, Hendrix Rep. ¶ 46; Ex. 25, Blaylock Dep. 52:17-21. There is no known case of HIV transmission from providing "buddy aid." Ex. 42, Okulicz Dep. 29:2-3; Ex. 3, Cron Dep. 199:23-200:1 (no documented case through wound-to-wound contact); Ex. 25, Blaylock Dep. 122:13-15 (testifying that he is not aware of any documented cases of battlefield transmission of HIV); Ex. 35, Lute Dep. 51:3-8 (same); Ex. 43, Hendrix Rep. ¶ 48. There has also never been documented HIV transmission through what may be considered analogous circumstances, such as blood splash, automobile accidents involving a person living with HIV, or through boxing or other sporting activities. Ex. 43, Hendrix Rep. ¶ 48; Ex. 24, Wiesen Dep. 37:5-9 (testifying that he is not aware of a documented case of transmission of HIV via blood splash); Ex. 25, Blaylock Dep. 37:7-21; 124:25-125:2 ("My personal opinion is there's negligible risk to a service member with HIV engaging in combatives.") Whatever de minimis risk may exist would be further reduced by an undetectable viral load in the person with HIV. Ex. 43, Hendrix Rep. ¶¶ 49-50.

86.    The risk of HIV transmission through catastrophic injury to the person with HIV is negligible or zero. There has never been a documented case of HIV transmission through catastrophic injury. Ex. 49, Hendrix Suppl. Rep. ¶ 7. While it is theoretically possible, no one has established that any risk of transmission in this manner in fact exists. The likelihood that a bone

31

shard penetrates the skin of a bystander after catastrophic injury is low. *Id*. at ¶ 5. The risk of transmission from any exposure is a function of the quantity or volume of the bodily fluid to which a mucous membrane or the blood stream is exposed, as well as the amount of virus in the bodily fluid in question. In terms of volume, the blood on a bone shard that entered another's body would be significantly less than one might expect as a result of a needle-stick—which itself is quantified as a very low risk of transmission (.23%). *Id*. at ¶ 6. Whatever *de minimis* baseline risk may exist would be made even smaller by an undetectable viral load in the person with HIV. *Id*. at ¶ 8; *see also Roe*, 947 F.3d 227.

87.     The risk of HIV transmission through occupational exposure of a health care worker is extremely low if the person with HIV is untreated, and it is negligible or zero if the person with HIV has a suppressed or undetectable viral load. The CDC has established that the baseline risk in the context of a needle-stick with a hollow-bore needle containing the blood of an HIV-positive person is approximately .23%. *See* Ex. 50, CDC, HIV Risk Behaviors: Estimated Per-Act Probability of Acquiring HIV from an Infected Source, by Exposure Act (Dec. 2015); Ex. 4, Murray Dep. "U.S. Public Health Serv. Guidelines for the Management of Occupational Exposures to HIV" (exhibit 5 to Murray Dep.), at 6 (estimating risk as .3% for all parenteral occupational exposures); Ex. 49, Hendrix Suppl. Rep. ¶ 6, n.3. The actual risk from such an exposure would be reduced by an undetectable viral load in the person with HIV. Ex. 4, Murray Dep. "U.S. Public Health Serv. Guidelines for the Management of Occupational Exposures to HIV" (exhibit 5 to Murray Dep.), at 10-11; Ex. 49, Hendrix Suppl. Rep. ¶ 8. The reduced risk could be mitigated further if the health care worker took post-exposure prophylaxis (PEP), which is a 30-day regimen of once-daily medication. Ex. 43, Hendrix Rep. at ¶ 51.

88.     The DoD's designee on deployment restrictions stated that at least a 1% (annual)

chance of transmission would be required for a medical condition to fail the accessions criterion regarding contagious diseases that may endanger the health of other personnel. Ex. 24, Wiesen Dep. 61:6-10.

89.     A person living with HIV who adheres to an antiretroviral treatment regimen and has an undetectable viral load has effectively no risk of transmitting the disease through sexual activity. Ex. 32, Kelly Dep. 42:23-43:3; Ex. 20, Hardy Rep. ¶ 24; Ex. 51, CDC, HIV Treatment as Prevention; Ex. 52, CDC, Dear Colleague: Information from CDC's Division of HIV/AIDS Prevention; Ex. 43, Hendrix Rep. ¶ 49; Ex. 50, CDC, HIV Risk Behaviors, Estimated Per-Act Probability of Acquiring HIV from an Infected Source, by Exposure Act.

90.     The risk of battlefield transmission is negligible. Ex. 25, Blaylock Dep. 120:9-121:5. There is no known case of HIV transmission on the battlefield. Ex. 42, Okulicz Dep. 28:21-23; Ex. 25, Blaylock Dep. 122:13-15; Ex. 43, Hendrix Rep. ¶ 48. The risk of transmitting HIV from a blood splash is negligible, and there is no documented case of transmission of HIV via blood splash. Ex. 25, Blaylock Dep. 37:7-21; Ex. 20, Hardy Rep. ¶ 26 ("extremely low and possibly only theoretical"); Ex. 43, Hendrix Rep. ¶¶ 48, 50.

91.     In the unlikely event that a battlefield exposure was to occur, post-exposure prophylaxis (PEP) could be provided to the person exposed, further decreasing the risk of transmission. Ex. 43, Hendrix Rep. ¶ 51; Ex. 49, Hendrix Suppl. Rep. ¶ 9.

### Blood Donation and HIV

92.     Service members selected receive regular screening for HIV at least every two years. Ex. 28, 6485.01, Encl. 3 at 6, § 1(c)(1); Ex. 33, AR 600-110 at 21, § 1, ¶ 6-2; AFI 44-178 at 5, § 2.2.2. They also receive a battery of medical tests, including an HIV test, to receive medical clearance for deployment. *See, e.g.*, Ex. 39, MOD-14, § 15.C.1.

93.     In the event of an HIV diagnosis, service members are counseled by their

commanding officer regarding what actions the service member is expected to take following the diagnosis. Ex. 36, AFI 44-178 Section III, I-16(m). This counseling includes an order not to donate blood, which is signed by the service member. *See* Ex. 36, AFI 44-178, Attach. 13 at 43-44; Ex. 33, AR 600-110 at 15, § 3, ¶ 4-9; Ex. 4, Murray Dep. 93:24-94:7, 97:7-24; Ex. 4, Murray Dep., "HIV Update" at 5 (exhibit 4 to Murray Dep.). Dr. Murray stated "[service members] are expected to sign [the counseling statement], and they are actually expected to follow it." *Id*.; Ex. 32, Kelly Dep. 60:25-61:22; Ex. 25, Blaylock Dep. 109:2-5, 119:21-120:3; Ex. 43, Hendrix Rep. ¶ 67; Ex. 45, Hendrix Rbtl. ¶ 11. Active duty and reserve members who do not comply with this order are subject to administrative and disciplinary action, which may include separation. Ex. 2, 2018 Report at 4; Ex. 36, AFI 44-178, Attach. 9 at 36, § A9.2; Ex. 33, AR 600-110 at 27, § 3, ¶ 6-13; Ex. 32, Kelly Dep. 60:5-61:22; Ex. 45, Hendrix Rbtl. ¶ 11.

94.     The Armed Services Blood Program (ASBP) is a joint operation between the Navy, Army and Air Force that collects, processes and transports blood and blood products worldwide in support of the U.S. military's mission. Ex. 53, Armed Services Blood Program educational campaign factsheet at 3. The ASBP is governed by "strict Food and Drug Administration guidelines to maintain safety and quality of blood and blood products." *Id*.

95.     Where FDA-compliant blood from the ASBP is not available, the next source of blood is the "walking blood bank"—prescreened donors, preferably with low-titer type O blood, who have been screened within the last 90 days. Ex. 54, Taylor Dep. 65:8-20, 68:10-69:1 and 86:18-88:10. As part of the pre-screening process, the service members who would like to be donors to the walking blood bank have blood samples drawn and shipped back to the U.S. for testing for transfusion-transmitted diseases (including HIV) before they are designated as eligible to donate as part of the walking blood bank. *Id.* at 51:6-52:13. In addition, if possible, the pre-

screened donor's blood is tested again upon donation using rapid testing. *Id.* at 52:14-19.

96.     From 2006 to 2012, only 2% of the blood products transfused to service members were non-FDA compliant, non-screened units. *See* Ex. 55, T. Ballard, P. Rohrbeck, M. Kania & L. Johnson, Transfusion-Transmissible Infections Among U.S. Military Recipients of Emergently Transfused Blood Products, June 2006-December 2012, Medical Surveillance Monthly Reports, Vol. 21, No. 11 (Nov. 2014)). Out of these units, no cases of transfusion-transmitted HIV were identified. *Id.*

97.     Participation in the "walking blood bank" is voluntary; no service member is required to donate blood. Ex. 25, Blaylock Dep. 112:23-25. The military's screening questions prior to blood donation ask the prospective donor if he/she has tested positive for HIV or engaged in behaviors that increase the risk of HIV. Ex. 54, Taylor Dep., "Active Duty Deployment TDY Rate for Fiscal Year 2018" (exhibit 3 to Taylor Dep.). If emergency whole blood collection is required, potential donors who have a permanent deferment are not asked to donate blood. Ex. 54, Taylor Dep. 88:6-89:6.

98.     An inability to donate blood is not, in and of itself, disqualifying for deployment. Ex. 3, Cron Dep. 108:6-109:14. The Armed Services Blood Program Medical Conditions List prohibits persons with many medical conditions from donating blood. Ex. 56, "Armed Services Blood Program Medical Condition List" (listing medical conditions that render a person ineligible to donate blood). According to the ASBP, an astonishing 30% of military members are not eligible to donate blood at any given time and are considered "deferred" donors. Ex. 57, ASBP, "Is My Blood Donation Safe?" at 2. These deferrals can be due to transfusion-transmitted diseases like West Nile virus or Zika. Ex. 54, Taylor Dep. 42:3-8. They can also be due to temporary circumstances, like recent travel or iron levels on the day of donation. Ex. 57, "Is My

Blood Donation Safe?" at 2.

99.    The DoD does not require people who are ineligible to donate blood for other reasons to obtain a waiver before a contingency deployment. Ex. 3, Cron Dep. 198:10-199:4 (comparing Armed Services Blood Program Medical Conditions List (Ex. 56, Armed Services Blood Program Medical Condition List, listing medical conditions that render a person ineligible to donate blood) with DoDI 6490.07). Service members with tattoos do not require a waiver to deploy, although, depending on when and where they received the tattoo, they may not be able to donate blood. *Compare* Ex. 56, Armed Services Blood Program Medical Condition List, listing medical conditions that render a person ineligible to donate blood, *with* Ex. 3, Cron Dep. 184:6-17; Ex. 43, Hendrix Rep. ¶ 69. Men who have had sex with another man in the past three months (12 months at the time of the decisions at issue here) are ineligible to donate blood. Ex. 25, Blaylock Dep.115:14-116:1; Ex. 54, Taylor Dep. 106:12-107:1.

100.    An individual with blood type AB+ can only donate blood to another individual with AB+ blood. However, individuals with AB+ blood constitute only 3% of the population in the U.S. Ex. 58, ASBP, "The A-B-Os of Blood Type" at 2. Individuals with type AB+ blood are not prevented from deploying because their blood type can only be donated to 3% of the population.

101.    The military has in place screening mechanisms to protect the blood supply. These efforts have been successful. For example, one study of HIV among U.S. soldiers found that of service members who seroconverted while deployed in Afghanistan or Iraq over the period 2001–2007, "[n]one were emergency blood transfusion donors or recipients." Ex. 43, Hendrix Rep. ¶ 68; Ex. 59, Scott, et al., Short Communication: Investigation of Incident HIV Infections Among U.S. Army Soldiers Deployed to Afghanistan and Iraq, 2001-2007.

102.    There is no known case of transfusion-transmitted HIV in the military. Ex. 54, Taylor Dep. 124:18-23.

## Host Nation Requirements

103.    Dr. Donald Shell, the principal author of the 2018 Report, did not investigate host nation requirements until after the submission of the 2018 Report to Congress. Ex. 60, Shell Dep. 96:10-97:3, 97:24-102:5, 258:5-259:17. His investigation consisted of a review of a website called "The Global Database on HIV-Specific Travel and Residence Restrictions" (hivtravel.org) cross-checked against a publicly available State Department website listing foreign nations' restrictions on persons living with HIV who are seeking residency or a work visa in those countries, considerations that are not relevant to service members. Ex. 60, Shell Dep. 259:4-17, 272:17-273:21, "Table X: HIV restrictions in foreign nations" (exhibit 14 to Shell Dep.). His investigation revealed that most countries have no restrictions on persons with HIV. Ex. 60, Shell Dep. "Table X: HIV restrictions in foreign nations" (exhibit 14 to Shell Dep.). Other countries specifically exempt diplomats and service members from their restrictions. Ex. 60, Shell Dep. 14. Dr. Shell did not know whether the restrictions listed in his chart apply to service members. Ex. 60, Shell Dep. 275:7-24, 279:6-17.

104.    Host nation restrictions have never been the basis for denying an HIV-positive individual a waiver to deploy to CENTCOM. Ex. 3, Cron Dep. 203:3-6. No information was identified that indicates an active-duty service member has ever been deported from a foreign country due to a change in HIV status. Ex. 60, Shell Dep. "HIV Country Restrictions, Summary of Findings" (exhibit 15 to Shell Dep.).

## II.    PROCEDURAL HISTORY

On May 30, 2018, Harrison and MMAA filed a suit alleging that the DoD and Army denied Harrison a commission under regulations that do not permit the accession of service

members living with HIV in violation of the equal protection components of the Constitution. Harrison, ECF No. 1. Shortly thereafter, Harrison and MMAA sought a preliminary injunction preventing the Army from discharging Harrison under a new policy requiring the discharge of service members ineligible to deploy for 12 consecutive months. Harrison, ECF No. 25. The DoD and Army moved to dismiss, arguing the case was non-justiciable and that the decisions and policies satisfied rational-basis review. Harrison, ECF Nos. 41, 42. After receiving assurances the Army did not intend to discharge Harrison, this Court denied the motion for a preliminary injunction as well as the motion to dismiss. Harrison, ECF No. 60. The parties proceeded into discovery.

In the fall of 2018, MMAA heard from two Airmen (and later several others) being discharged from the Air Force because they had been diagnosed with HIV, even though they both were fit to perform their duties. Along with MMAA, these Airmen, proceeding under the pseudonyms "Roe" and "Voe," filed a lawsuit in the Eastern District of Virginia in December 2018. Roe, ECF No. 1. The lawsuit alleged that the decisions to discharge them under policies that prevent the deployment of service members with HIV violated equal protection and were arbitrary and capricious, an abuse of discretion, and/or otherwise contrary to law in violation of the APA. Id. ¶¶ 93, 125, 135, 141, 146. Roe, Voe and MMAA sought a preliminary injunction to prevent the impending discharges of Roe, Voe and others. Roe, ECF No. 33. The DoD and the Air Force moved to dismiss the case on various grounds, including non-justiciability. Roe, ECF Nos. 48, 49. On February 15, 2019, this Court denied the motion to dismiss and granted the preliminary injunction, finding that the plaintiffs had a likelihood of success on their claims that the deployment policies were irrational based on the current science and/or that the discharge decisions were arbitrary and capricious, an abuse of discretion and otherwise contrary to law.

Roe, ECF No. 73.

The DoD appealed the Court's order to the Fourth Circuit. Roe Appeal (No. 19-1410), ECF No. 1. This Court stayed the case to allow for resolution of the interlocutory appeal. Roe, Order, ECF No. 244. On January 10, 2020, the three-judge panel unanimously affirmed the preliminary injunction. Roe Appeal, ECF No. 67. The Fourth Circuit agreed with this Court, holding that the plaintiffs had a likelihood of success on their claims that the deployment policies for service members with HIV are not grounded in the current science of HIV and therefore not rational. *Roe*, 947 F.3d 220, 228. It also held that the plaintiffs had a likelihood of success on at least one of the other APA claims that the discharge decisions were arbitrary and capricious, an abuse of discretion, and/or otherwise contrary to law. *Roe*, 947 F.3d at 224. Shortly after receiving the mandate from the Fourth Circuit, this Court lifted the stay and set a briefing schedule for cross-motions for summary judgment. Roe, ECF No. 260.

### III.   LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The Court must view the facts and the inferences drawn therefrom in the light most favorable to the non-moving party. *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1004 (4th Cir. 1987). While viewing the facts in such a manner, courts look to the affidavits or other specific facts to determine whether a triable issue exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 -48 (1986).

To overcome a motion for summary judgment, the non-moving party must establish that a genuine issue of material fact actually exists. Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 586 n.11 (1986). "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed

39

evidence indicates that the other party should win as a matter of law." *Emmett v. Johnson*, 532

F.3d 291, 297 (4th Cir. 2008). "Where no genuine issue of material fact exists," it is the

"affirmative obligation of the trial judge to prevent factually unsupported claims and defenses

from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal

quotation marks omitted).

      The military is afforded discretion to manage military affairs, but it is not afforded

discretion to violate federal regulations. *See, e.g.*, *Lindsay v. United States*, 295 F.3d 1252, 1257

(Fed. Cir. 2002) (holding that claims that the military violated its own regulations are justiciable,

because "the military no less than any other organ of the government is bound by statute, and …

must abide by its own procedural regulations should it choose to promulgate them"). When a

"case involves 'complex, subtle, and professional decisions as to the composition, training,

equipping, and control of a military force[,]'" a court gives "'great deference to the professional

judgment of military authorities concerning the relative importance of a particular military

interest.'" *Winter*, 555 U.S. at 24 (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) and

*Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)). But it must nonetheless be mindful that

"military interests do not always trump other considerations." *Id.* at 26.

      Under even the lowest level of review, a law must bear a rational relationship to a

legitimate government interest to withstand an equal protection challenge. *See, e.g.*, *U.S. Dep't of

Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see also Mathews v. Lucas*, 427 U.S. 495, 510

(1976) (rational basis standard is "not a toothless one"). Plaintiffs do not contest that military

readiness and effectiveness are legitimate goals, but the relationship between these goals and the

classification Defendants purport to use to achieve it—HIV status—may not be "so attenuated as

to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr., Inc.*,

473 U.S. 432, 446 (1985). "[A]rbitrary and irrational discrimination violates the Equal Protection

Clause" even under a rational-basis standard. *See Bankers Life & Cas. Co. v. Crenshaw*, 486

U.S. 71, 83 (1988).

"The question is the same for . . . [the] APA claims: 'whether the defendants' treatment

of [plaintiffs] was rational (*i.e.*, not arbitrary and capricious).'" Roe, ECF No. 72 at 34 (citing

*Ursack, Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 955 (9th Cir. 2011)).

Additionally, under the APA, an agency "must treat similar cases in a similar manner unless it

can provide a legitimate reason for failing to do so." *Kreis v. Sec'y of Air Force*, 406 F.3d 684,

687 (D.C. Cir. 2005) (citations omitted). Because both ultimately require a rational reason for the

government action in question, the legal standards for Plaintiffs' equal protection and APA

claims "substantially overlap." Roe, ECF No. 72 at 34.

To defeat these claims, Defendants must provide "a rational connection between the

facts" concerning HIV and "the choice made" to categorically bar deployment of service

members with HIV. *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983). Here, they have not done so. The "obsolete understandings" of HIV

medicine that Defendants have put forward are "outmoded and at odds with current science" and

"cannot justify a ban, even under a deferential standard of review." *Roe*, 947 F.3d at 228.

Nevertheless, to be clear and to preserve the issue for appeal, Plaintiffs maintain that

heightened scrutiny is warranted here because the classification Defendants draw—treating

service members living with HIV differently, and worse, than those who are not—is suspect.

People living with HIV meet the traditional standards applicable to applying heightened scrutiny:

they (1) have been "historically subjected to discrimination," (2) have a defining characteristic

that bears no "relation to ability to perform or contribute to society," (3) have "obvious,

41

immutable, or distinguishing characteristics," and (4) lack relative political power. *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013).

First, people living with HIV have suffered for decades through a unique history of misinformation, stigma, ostracism, and discrimination, and continue to do so to this day. SUF ¶ 28. Second, a person's HIV status bears no relation to their ability to contribute to society, particularly in view of dramatic medical advances over the last three decades. SUF ¶¶ 25, 26, 27, 28, 77, 78, 89. Antiretroviral medications prevent the virus from replicating, and these therapies have radically improved health outcomes for people living with HIV, who now enjoy about the same life expectancy as those of a similar age in the general population. SUF ¶ 27. Third, despite these medical advances, HIV status remains an immutable characteristic: it is not yet curable, and one cannot change his/her HIV status to obtain equal treatment. SUF ¶ 28. Fourth, people living with HIV are a discrete and insular group lacking sufficient political power to protect their rights through the legislative process. *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938) (ostracism gives rise to "insular[ity]," which "curtail[s] the operation of those political processes ordinarily to be relied upon to protect minorities"); SUF ¶ 28. Even today, many people living with HIV still do not have access to care, and criminal laws continue to unfairly single out and discriminate against people with HIV. SUF 28.

*Doe v. University of Maryland Medical System Corp.*, 50 F.3d 1261 (4th Cir. 1995), does not foreclose heightened scrutiny. That case largely turned on whether HIV was a disability (as defined under since-amended applicable statutory law) and whether the plaintiff physician's HIV presented a significant risk to the health and safety of his co-workers; prevailing views at the time that have since been undermined by scientific advances. *Id*. at 1262; SUF ¶¶ 25, 26, 27. As the Fourth Circuit recently recognized, "[a]n HIV diagnosis was '[o]nce considered invariably

fatal' but now . . . is a 'chronic, treatable condition'" and "[a]ntiretroviral therapy is effective for virtually every person living with HIV." *Compare Roe*, 947 F.3d at 213-14 (quoting current CDC report) *with Doe*, 50 F.3d at 1265.

For the APA claims challenging the individual decisions, "[s]ummary judgment 'serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA.'" *Hyatt v. U.S. Patent & Trademark Office*, 146 F. Supp. 3d 771, 780 (E.D. Va. 2015) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). "[I]n a review of agency action under the APA, the entire case on review is a question of law." *LivinRite, Inc. v. Azar*, 386 F. Supp. 3d 644, 650 (E.D. Va. 2019) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). Accordingly, judicial review of the decision is generally confined "to the administrative record of proceedings before the agency." *Id.* But the Court may look beyond the administrative record "(1) if the agency deliberately or negligently excluded documents that may have been adverse to its decision, (2) if background information was needed to determine whether the agency considered all the relevant factors, or (3) if the agency failed to explain administrative action so as to frustrate judicial review." *Brandon v. Nat'l Credit Union Ass'n*, 2015 WL 13021804, at *1 (E.D. Va. Mar. 13, 2015) (quoting *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010)).

## IV.   ARGUMENT

Analytically, these cases can be examined in two parts. Part One considers Defendants' categorical bar to the contingency deployment of service members living with HIV, which lies at the center of all the challenged policies and decisions in both cases. Since the deployment bar lacks even any rational basis under equal protection principles of the Constitution, and additionally is arbitrary and capricious under the APA, Plaintiffs are entitled to judgment as a

matter of law on each of their constitutional and APA claims.

Part Two considers Defendants' decisions to discharge Roe, Voe and other service members with HIV. There are no disputed material facts here, either: those decisions are inconsistent with previous decisions made on essentially the same facts and run contrary to Defendants' own regulations precluding the separation of service members based solely on HIV status and requiring individualized determinations regarding deployment waivers. Those discharges therefore violate the APA, and Plaintiffs are entitled to judgment as a matter of law on the *Roe* APA claims as well.

### A. The Categorical Bar to the Deployment of Service Members Living with HIV Is Unconstitutional and Violates the APA.

The categorical bar to contingency deployment of people living with HIV is at the crux of all the challenged decisions here. Yet that bar cannot withstand scrutiny under either the Constitution or the APA.

Harrison alleges that denying him a commission based on his HIV status violates the equal protection components of the Constitution. Harrison Compl. ¶¶ 71-78 (Count 1). In denying Harrison a commission, the Defendants rely entirely upon their bar to accession for service members with HIV, which in turn hinges entirely upon the purported inability of a service member with HIV to engage in a contingency deployment. *See* SUF ¶¶ 32, 33, 35-37, 40-42. The accession standards require that a person be "free from contagious diseases that may endanger the health of other personnel"[;] "free of medical conditions or physical defects that may reasonably be expected to require excessive time lost from duty"[;] "medically adaptable to the military environment without geographical area limitations"[;] and "medically capable of performing duties without aggravating existing physical defects or medical conditions." SUF ¶ 35. Defendants contend that people living with HIV are unable to meet each of these criteria if

they are on a contingency deployment. SUF ¶ 36. They do not contend that a service member

living with HIV who is stationed stateside does not meet these criteria. SUF ¶ 46.

Similarly, Roe and Voe allege they are being denied equal protection because the

categorical bar treats them differently based on their HIV-positive status (*Roe* Count 1), but they

also allege that the categorical bar to contingency deployment is arbitrary and capricious under

the APA (*Roe* Counts 4 and 5). Roe Compl. ¶¶ 92-100, 136-146. In both cases, these claims turn

on the validity of Defendants' categorical refusal to allow service members with HIV to engage

in a contingency deployment.

### 1. None of Defendants' purported justifications for the deployment bar stand up to scrutiny.

Regardless of the level of scrutiny applied, the deployment bar fails to pass muster.

Defendants offer purported justifications in four categories: the health of service members with

HIV; protecting the health of other service members against the risk of transmission; protecting

the supply of blood available for transfusion in deployed environments; and ensuring our troops

are able to maintain the appropriate presence and operations in host nations with purported

restrictions on foreigners with HIV. SUF ¶ 30. Accepting each of these as a legitimate

government purpose, the undisputed facts show that the deployment bar is not even rationally

related to these goals and therefore violates equal protection principles and the APA.

### a. Purported Effects on the Health of Service Members with HIV Do Not Rationally Relate to the Refusal to Deploy Them.

As the Fourth Circuit acknowledged, medical care and treatment for HIV has come a

long way in the past 25 years, now involves one pill taken once a day for the majority of people

living with HIV, and has transformed HIV from a fatal diagnosis to a chronic but manageable

condition with no effects on physical capabilities and little effect on life expectancy. *Roe*, 947

F.3d at 212-15; SUF ¶¶ 25-27. Based on this accurate accounting of the facts, the Fourth Circuit

45

concluded—contrary to the Government's contentions—that treatment medications are not "highly specialized," and do not require constant diligent compliance to be effective. *Id.* at 226; SUF ¶ 62.

Nothing the Government has asserted through its witnesses or produced in discovery undermines the Fourth Circuit's conclusion that the care needed by deployed service members with HIV is no more onerous than the care provided to other service members whom the Defendants permit to deploy without a waiver. In fact, Defendants' witnesses support the facts upon which the Fourth Circuit relied in reaching this conclusion. Defendants' primary medical expert, Colonel Clinton Murray, M.D., admits that the current "[a]ntiretroviral therapies are outstanding in the way they treat a person's viral load." Ex. 4, Murray Dep. 328:17-329:3; SUF ¶ 62. Defendants currently provide maintenance medications to deployed service members with a wide variety of conditions. SUF ¶¶ 60, 61.

In the event that medications of a deployed service member with HIV were lost or destroyed *and* could not be resupplied in a timely fashion, the health consequences for that individual would be minimal and easily reversed upon resumption of treatment. SUF ¶ 63; *see also Roe*, 947 F. 3d at 213. Other defense 30(b)(6) witnesses admitted the very slow-moving and incremental nature of the negative effects of treatment interruption. SUF ¶ 63. Treatment interruption for service members with HIV does not have any immediate or significant long-term adverse consequences. SUF ¶ 63.

This is in contrast to medications and devices that service members with other conditions use and with which they are permitted to deploy without a waiver. Several of these medications or devices could have more immediate consequences on the service member's ability to perform their duties, in addition to any effects on their health. For instance, if asthma is not too severe,

46

Defendants allow those who control it with an inhaler to deploy without a waiver. SUF ¶ 61. If that inhaler was lost or destroyed, it could immediately affect the service member's ability to engage in any strenuous activity. SUF ¶ 64. Similarly, regulations permit the deployment of those who wear glasses to correct their vision (within certain parameters), yet the loss or destruction of those glasses would immediately affect their ability to perform their duties. SUF ¶ 64. And service members who take medication to control a thyroid condition are allowed to deploy, even though interruption of that medication can result in fatigue and lethargy. SUF ¶ 64. By contrast, a person with a durably suppressed HIV viral load who stops taking their HIV medication, even for months, is very unlikely to experience any physical manifestations of the treatment interruption and should suffer no long-term health consequences, provided they are placed back on those medications within six months to a year. SUF ¶ 63.

Moreover, monitoring care and testing is not required to maintain the health of a service member living with HIV on deployments as long as 15 months. Ex. 45, Hendrix Rbtl. ¶ 5. The Army engages in monitoring appointments every six months; Air Force policy requires that Airmen with HIV return to its medical facility in San Antonio only once a year for such appointments. SUF ¶ 58. The Air Force policy is consistent with the World Health Organization recommendation that people with HIV who are virally suppressed in countries with more-limited resources receive follow-up monitoring care once a year. SUF ¶ 67. At one year, the frequency for follow-up HIV monitoring care is *longer* than the average deployment, which is approximately 9 months. SUF ¶ 56. Even service members on the longest deployments (i.e., 15 months) do not require a monitoring appointment while deployed. SUF ¶¶ 67, 68; Ex. 45, Hendrix Rbtl. ¶ 5 (explaining that follow-up at 14–15 months is not a significant deviation from the standard of care).

The viral load test conducted at a monitoring appointment is primarily to confirm continued viral suppression through medication adherence. SUF ¶ 65. A person who has continued taking their antiretroviral medications will not experience a rise in their viral load. SUF ¶ 65. Approximately 99.8% of active duty service members with HIV have achieved viral suppression—a figure that demonstrates tremendous medication adherence within this group. SUF ¶ 65. The other metrics monitored at a follow-up appointment are to detect latent and slow-moving medication side effects, which would be very unlikely to change substantially after a person has stabilized on a particular regimen. SUF ¶ 66. A delay in discovery of such incremental change is relatively inconsequential. Ex. 43, Hendrix Rep. ¶ 58; Ex. 45, Hendrix Rbtl. ¶ 5. Although a follow-up appointment every six months for this population while deployed may be ideal, it is far from necessary.

Further, monitoring care is generally available in theater within the Military Health System, as required by the deployment standards, and would not require routine evacuation out of theater. Ex. 29, DoDI 6490.07 at 3, §§ 4(b)(3), 4(b)(4)). This type of monitoring care does not require an infectious disease specialist. Ex. 43, Hendrix Rep. ¶¶ 59-60; *see also Roe*, 947 F.3d at 213 (noting that a general practitioner is capable of providing follow-up testing). For the majority of deployments, at least some medical facilities within theater are capable of providing necessary testing and care, including specimen shipping, if necessary. Ex. 4, Murray Dep. 198:7-199:5; Ex. 25, Blaylock Dep. 67:17-68:15; Ex. 47, Peel Dep. 176:7-17 (describing a method of getting a blood sample to Germany, from which she receives samples for processing in Maryland almost three times a week). "Role 3" medical facilities have the capability to "spin down" a blood sample in a centrifuge, as is required for viral load testing, and to put it in a cold chain for shipping to a lab capable of doing the testing required. SUF ¶ 72.

According to Defendants, the alternative to bringing the testing capability to the service member is to bring the service member to the testing capability. Ex. 47, Peel Dep. 117:18-21, 125:16-18, 134:3-5. The time it would take to transport a service member to a location capable of providing such care within theater would not be considered "excessive time lost" from one's regular duties, which is the standard under which medical conditions are evaluated for accessions under DoDI 6130.03; SUF ¶ 75. To the extent the Defendants consider monitoring care for deployed service members with HIV essential, it could be coordinated with the R&R leave regularly offered to those on longer deployments. SUF ¶ 76. Because the monitoring testing may be performed on a very flexible schedule—extending from six months to a year or longer—it could be scheduled only when it was safest to do so, presumably the protocol followed for those being offered R&R. Ex. 43, Hendrix Rep. ¶ 56 (on frequency and flexibility of testing required); Ex. 4, Murray Dep. 229:25-230:13 (admitting that the risks involved with transporting people for medical care are similar to those when transporting people for R&R); SUF ¶ 76.

Service members living with HIV are just as capable of performing their duties in a deployed environment as their HIV-negative counterparts. SUF ¶ 77-79. In fact, a recent study of HIV-positive Airmen found that they were in better physical shape than the HIV-negative Airmen in the study. SUF ¶ 78. With that in mind, Defendants' remaining justifications about protecting service members with HIV, as set forth in the 2018 Report to Congress, are vague and unsubstantiated. These justifications, without basis, are mere *ipse dixit* and cannot create a genuine issue of material fact. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.")

First, Defendants' vague and paternalistic concerns about how the stressors in a deployed

environment may affect the mental and immunological health of service members with HIV are wholly unsupported. There is no evidence that service members with HIV would be more affected by the stressors of the deployed environment than others. SUF ¶ 79.

Second, Defendants' concern regarding the potential for a greater incidence of neurocognitive impairment among people with HIV is not just unsupported, it is contradicted by their own scientific evidence. Defendants admit that any potential impacts on fitness are currently unknown. SUF ¶ 81. Tellingly, a DoD study showed no difference in the incidence of neurocognitive impairment between HIV-positive service members who were diagnosed and managed early and HIV-negative service members. SUF ¶ 82. The physician in charge of the Air Force HIV Medical Evaluation Unit does not conduct neurocognitive testing on his patients because he does "not have a clinical perception that HIV affects either their day-to-day lives or their job doing their . . . duties." SUF ¶ 80. To the extent neurocognitive impairments are an issue for some service members living with HIV, they can be addressed individually by using the standards applicable to all service members and not by excluding an entire class of people. Ex. 1, DoDI 6130.03 at 41, § 5.26, Disqualifying Conditions: Neurologic Conditions; SUF ¶ 81; Ex. 20, Hardy Rep. ¶ 29; Ex. 43, Hendrix Rep. ¶ 65.

Third, perhaps with the exception of the smallpox vaccine, service members living with HIV who have a suppressed viral load and a normal CD4 count are just as capable of receiving live vaccines as service members who do not have HIV. SUF ¶ 83. To the extent the smallpox vaccine or other live vaccines or prophylactic medications cannot be administered to service members with HIV, Defendants admit that others are permitted to deploy even when they cannot be administered some vaccines or prophylactic medications. SUF ¶ 83.

Finally, Defendants' concerns about a decreased level of privacy and confidentiality with

respect to HIV status do not provide a rational basis for the deployment bar. Defendants' own policies currently permit the disclosure of a person's HIV status on a "need to know" basis. SUF ¶ 84; Ex. 28, DoDI 6485.01, Encl. 3 at 7, § 5; Ex. 33, AR 600-110 at 21 § 5-4. Though more personnel may "need to know" a service member's HIV status while on a deployment, that alone does not justify restricting the service member; rather, Defendants merely need to follow their own regulations by maintaining the "need to know" policy for those who are deployed. To the extent these concerns are based on the possibility of HIV stigma and discrimination from other service members, the answer is education and a zero-tolerance policy. As it currently stands, the Defendants' outdated policies are only perpetuating the stigma and discrimination that people living with HIV face. Anticipated acts of discrimination from others cannot justify discriminatory policies. *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.")

       **b.**    **The Purported Risk of Transmission to Others in a Deployed Environment Does Not Provide a Rational Basis for Refusing to Deploy Service Members with HIV.**

Setting aside blood transfusion (addressed fully below), the risk of non-sexual HIV transmission in a deployed environment is either extremely low or essentially zero. Ex. 43, Hendrix Rep.; SUF ¶¶ 85-87, 90. Whatever low baseline risk exists in these contexts is further reduced by an undetectable viral load. Ex. 43, Hendrix Rep. ¶¶ 49, 50 (citing CDC). This very low level of risk does not provide even a rational basis for a categorical bar to the deployment of service members with HIV. *See Roe*, 947 F.3d at 213, 226-227 (holding that risk of transmission of .23% per exposure or lower (in the context of a needle-stick injury) does not provide a rational basis for refusing to deploy service members with HIV); *see also* SUF ¶ 87.

Nothing that Defendants have presented in discovery undermines the Fourth Circuit's

holding on this issue. Rather than presenting any evidence that the risks of transmission are greater than described by Plaintiffs' experts, Defendants merely argue that *any* non-zero risk is sufficient to justify their bar to the deployment of service members with HIV. SUF ¶ 31; Ex. 4, Murray Dep. 153:20-22 ("We are continuing to decrease the risk of transmission lower and lower. We have not yet hit the zero mark yet."); Ex. 24, Wiesen Dep. 42:7-12 ("[A]ny level of viral copies in blood, that viable virus in blood theoretically can transmit the disease. There is no level that would be considered to be absolutely safe."); *id.* at 40:19-22; Ex. 25, Blaylock Dep. 44:23-45. Because the Fourth Circuit has already made clear that a "zero-risk" standard is not rational, Defendants' argument fails and there is no genuine issue of material fact on this issue preventing summary judgment in Plaintiffs' favor.

Even so, Defendants posit scenarios—nothing more than hypotheticals—that could in theory result in the transmission of HIV. Defendants do not (and cannot) substantiate or quantify these theoretical "risks," and so each of them fails rational basis review.

First, Defendants contend that the risk of transmission through wound-to-wound contact in the context of the provision of "buddy aid" justifies their refusal to deploy service members with HIV. Ex. 2, 2018 Report at 9. But there is no evidence this is even a method of HIV transmission—much less that any risk from such exposure rises to a level that would provide a rational basis for the deployment bar. Furthermore, any attempt to do so would fail: there has never been a documented HIV transmission through wound-to-wound contact in the military. SUF ¶ 85. While theoretically possible, without documentation of an actual transmission, it cannot be established that any risk exists. Similarly, there has never been documented HIV transmission through what may be considered analogous circumstances, such as blood splash in the health care or first-responder (police and fire) context, automobile accidents involving a

person living with HIV, or through boxing or other sporting activities. SUF ¶ 85. Whatever *de minimis* baseline risk may exist would be made even smaller—and closer to, if not actually, zero—by an undetectable viral load in the person with HIV. SUF ¶ 91. Ex. 43, Hendrix Rep. ¶¶ 49-50; *see also Roe*, 947 F. 3d at 227. The purported risk of HIV transmission while one service member is providing buddy-aid to another on the battlefield is so miniscule, it is not rational to base decisions about the deployment of service members with HIV on it. *Roe*, 947 F.3d 227.

Second, the risk of transmission from exposure to the bodily fluids of a service member with HIV who is experiencing a catastrophic injury (e.g., as a result of an improvised explosive device) does not provide a rational basis for the refusal to deploy service members with HIV. SUF ¶ 86. There has never been a documented case of HIV transmission through catastrophic injury. SUF ¶ 86. While transmission is theoretically possible in this manner, no one has established that any risk of transmission in fact exists. The likelihood that a bone shard penetrates the skin of a bystander after catastrophic injury is low. SUF ¶ 86. The risk of transmission from any exposure is a function of the quantity or volume of the bodily fluid to which a mucous membrane or the blood stream is exposed, as well as the amount of virus in the bodily fluid in question. SUF ¶ 86. In terms of volume, the blood on a bone shard that entered another's body would be significantly less than one might expect as a result of a needle-stick— which itself is quantified as a very low risk of transmission (.23%). SUF ¶ 86. Whatever *de minimis* baseline risk may exist would be made even smaller—and closer to, if not actually, zero—by an undetectable viral load in the person with HIV. SUF ¶ 86; *see also Roe*, 947 F.3d 227. As with wound-to-wound contact, it is not rational to refuse to deploy service members with HIV based on a merely theoretical risk of transmission.

Finally, the risk of transmission to health care workers providing care to service members

with HIV also does not provide a rational basis for the deployment bar, because the Fourth

Circuit has already deemed such risks too low to justify the policy at issue. *Roe*, 947 F.3d at 227.

The CDC has established that the baseline risk in the context of a needle-stick with a hollow-

bore needle containing the blood of an HIV-positive person is approximately .23%. SUF ¶ 87.

The CDC also states—and the parties do not dispute—that the actual risk from such an exposure

would be reduced by an undetectable viral load in the person with HIV. SUF ¶ 87. And finally,

the already-reduced risk could be mitigated even further if the health care worker took post-

exposure prophylaxis (PEP), a 30-day regimen of once-daily medication. SUF ¶ 87. The actual

risk of transmission in providing health care to a service member with HIV is still extremely low,

and too low to justify a categorical ban.

      Notably, health care workers in the civilian workforce place themselves at similar risk in

providing care to people living with HIV, and those risks may be even greater because

approximately half of the people living with HIV in the United States do not have an

undetectable viral load. Ex. 61, CDC, "Understanding the HIV Care Continuum," at 2 (graphic

showing viral suppression at 53% in the U.S. in 2016). While true that the practice of medicine

in a combat zone does not always lend itself to ideal procedures in terms of universal precautions

or mitigation measures after an exposure, the needle-sticks and other exposures that civilian

healthcare workers experience have, by definition, defeated any universal precautions being

utilized. The desire to remove people living with HIV from the deployed patient population

stands in stark contrast to the circumstances in which civilian doctors in the U.S. work every day.

      Even by pointing to the occupational risks in providing health care to service members

with HIV—the deployed environment risk that is highest (but still extremely low)—Defendants

cannot justify their bar on the deployment of service members with HIV.

c.     **The Risk of HIV Transmission Through a Battlefield Transfusion is Vanishingly Small.**

Service members living with HIV would not endanger the "walking blood bank." Defendants' concerns about transfusion risk are irrational.

First, as this Court has recognized, Defendants are "compar[ing] apples to oranges" by conflating the risk posed by service members with HIV who are aware of their status with service members with HIV who are unaware of their status. *See Roe*, 359 F. Supp. 3d 415. Service members receive regular screening for HIV at least every two years and also receive a battery of medical tests, including an HIV test, to receive medical clearance for deployment. SUF ¶ 92. In the event of an HIV diagnosis, service members are counseled by their commanding officer regarding what actions the service member is expected to take following the diagnosis. SUF ¶ 93. This counseling includes an order not to donate blood, which is signed by the service member. SUF ¶ 93. As Dr. Murray stated "[service members] are expected to sign [the counseling statement], and they are actually expected to follow it." SUF ¶ 93. Accordingly, "any risk of HIV transmission through transfusion is by servicemembers who are unaware of their HIV-positive status." *See Roe*, 947 F.3d 227.

Second, the rigorous screening measures for military blood donations minimize the risk of transmission through blood transfusions. SUF ¶¶ 94-97. The Armed Services Blood Program (ASBP) is a joint operation between the Navy, Army and Air Force that collects, processes and transports blood and blood products worldwide in support of the U.S. military's mission. SUF ¶ 94. The ASBP is governed by "strict Food and Drug Administration guidelines to maintain safety and quality of blood and blood products." SUF ¶ 94.

Where FDA-compliant blood from the ASBP is not available, the next source of blood is the "walking blood bank"—prescreened donors, preferably with low-titer type O blood, who

55

have been screened within the last 90 days. SUF ¶ 95. As part of the pre-screening process, the service members that volunteer to be donors to the walking blood bank have blood samples drawn and shipped back to the U.S. for testing for transfusion-transmitted diseases (including HIV) before they are designated as eligible to donate as part of the walking blood bank. SUF ¶ 95. In addition, where possible, the pre-screened donor's blood will be tested again on the date of donation using rapid testing. SUF ¶ 95.

From 2006 to 2012, only 2% of the blood products transfused to service members were non-FDA compliant, non-screened units. SUF ¶ 96. Out of these units, no cases of transfusion-transmitted HIV were identified. SUF ¶ 96. An entire series of unfortunate and unlikely events, including the decision to donate in direct violation of an order, would need to coalesce for there to be a transmission through the walking blood bank from a service member aware of their HIV-positive status. Ex. 43, Hendrix Rep. ¶¶ 67-68. The chances of that occurring are vanishingly small. *Id.*

Finally, the inability to donate blood should not bar service members living with HIV, as other conditions that prevent service members from donating blood are not considered disqualifying. *See Roe*, 359 F. Supp. 3d 415. There are many factors that prevent individuals from being eligible to donate blood. According to the ASBP, 30% of military members are not eligible to donate blood at any given time and are considered "deferred" donors. SUF ¶ 98. These deferrals can be due to transfusion-transmitted diseases like West Nile virus or Zika. SUF ¶ 98. They can also be due to temporary circumstances, like recent travel or iron levels on the day of donation. SUF ¶ 98. And men who have sex with men are not permitted to donate. SUF ¶ 99.

As this Court has stated, "Defendants have not argued that every deployed servicemember must be able to donate blood [n]or could they. . ." *See Roe*, 359 F. Supp. 3d 415.

For example, an individual with blood type AB+ can only donate blood to another individual with AB+ blood. However, individuals with AB+ blood constitute only 3% of the population in the U.S. SUF ¶ 100. Individuals with type AB+ blood are not prevented from deploying because their blood type can only be donated to only 3% of the population—"all these service members are routinely allowed to deploy into a combat theater as part of small teams without waiver or restriction." Amici Curiae Br. of Former Military Officials in Supp. of Appellees and for Affirmance of the District Court Below, *Roe v. Dep't of Defense*, 947 F.3d 207 (4th Cir. 2020) (No. 19-1410), 2019 WL 3409758; SUF ¶ 100.

### d.    Host-Nation Requirements Do Not Support a Deployment Bar

As noted, the Defendants set forth their "complete reasoning" underlying the policies prohibiting the accession, commissioning, or deployment of persons living with HIV in the 2014 and 2018 Reports to Congress. SUF ¶ 29. The 2018 Report to Congress contains barely a sentence about host-nation requirements, and the 2014 Report to Congress contains even less. The 2018 Report states that "DoDI 6485.01 instructs compliance with host-nation requirements for screening and related matters for Service members." Ex. 2, 2018 Report at 15. DoDI 6485.01, in turn, assigns responsibility for compliance with host-nation requirements for screening and related matters for service members and for coordinating host-nation screening with the Department of State, (Ex. 28, DoDI 6485.01), but sets forth no policies or procedures related to host nations.

Dr. Donald Shell, the principal author of the DoD's 2018 Report to Congress, did not investigate host-nation requirements until after the submission of the 2018 Report to Congress. SUF ¶ 104. His investigation consisted of a review of a State Department website listing foreign nations' restrictions on persons living with HIV who are seeking residency or a work visa in

those countries, considerations that are not relevant to Service members. SUF ¶ 104. His

investigation revealed that many countries have no restrictions on persons with HIV. SUF ¶ 104.

Other countries exempt diplomats and service members from their requirements. SUF ¶ 104. Dr.

Shell did not know whether the restrictions listed in the chart apply to service members. SUF ¶

104.

Although Dr. Shell testified that host-nation requirements are one of the factors that

combatant commanders utilize to determine where service members living with HIV are able to

deploy (Ex. 60, Shell Dep. 261:6-1), Lt. Col. Cron, the CENTCOM waiver action officer,

testified that host-nation restrictions have never been the basis for denying an HIV-positive

individual a waiver to deploy to CENTCOM. SUF ¶ 105. Nor has any active-duty service

member ever been deported from a foreign country due to a change in HIV status. SUF ¶ 105.

In sum, none of Defendants' purported justifications for the categorical deployment bar

withstands scrutiny. In fact, the purported justifications are belied by the special exceptions

Defendants have made to deploy a few members of the Special Forces. SUF ¶ 47. Members of

the Special Forces, who generally work in smaller teams all across the globe, with HIV would

face the same purported risks and alleged barriers to which Defendants point in this litigation. If

those risks were of any real significance, Defendants would not be able to justify the deployment

of anyone living with HIV. Because those risk are in fact negligible, the categorical deployment

bar fails even rational-basis review and is therefore unconstitutional and a violation of the APA.

**B.** **Plaintiffs Roe, Voe and MMAA Also Prevail on Their APA Claims, Because the Air Force's Decisions to Separate Roe and Voe Were Arbitrary and Capricious and Otherwise Contrary to Law.**

Additionally, plaintiffs in *Roe* are entitled to summary judgment on their claims that the

decisions to discharge Roe, Voe, and other individuals similarly situated violate the APA. These

decisions violate the APA for three additional reasons: 1) they are inconsistent with prior

decisions based on the same or essentially the same facts; 2) they conflict with Air Force regulations prohibiting the discharge of Airmen based solely on their HIV status; and 3) they were based on a *predictive* determination regarding deployment to CENTCOM, denying the Airmen the opportunity to seek an individual waiver as described in the relevant regulations.

To uphold an agency's action under the APA, the Court must determine whether the agency committed "a clear error of judgment." *Perez v. Cissna*, 914 F.3d 846, 852 (4th Cir. 2019) (internal quotation marks and citations omitted). The agency's rationale must be "both discernible and defensible." *Trans-Pac. Freight Conf. v. Fed. Mar. Comm'n,* 650 F.2d 1235, 1251 (D.C. Cir. 1980). An agency's action is neither discernible nor defensible where the agency fails to "treat similar cases in a similar manner" without "providing a legitimate reason for failing to do so." *Kreis v. Sec'y of the Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005) (internal citation omitted).

### 2. The Air Force's Decisions to Separate Roe, Voe and Others Similarly Situated Are Arbitrary and Capricious Because the Air Force Previously Reached the Opposite Conclusion on the Exact Same Facts (for Voe) and Essentially the Same Facts (for Roe and Others)

Roe's and Voe's discharge decisions, along with those of several other Airmen with HIV issued around the same time, mark a sea change in the Air Force's approach to fitness for duty determinations for Airmen with HIV. SUF ¶ 49. The Air Force's decisions—based on the exact same information that would have resulted in retention less than six months earlier under the exact same regulations—resulted in discharge orders ▮▮▮▮▮▮▮▮▮. SUF ¶¶ 12, 16. These decisions were quintessentially "arbitrary and capricious," as well as contrary to law.

Voe's discharge offers a particularly glaring example of the arbitrary and capricious nature of Air Force decision-making on the continued service of Airmen living with HIV. ▮▮▮ ▮▮▮▮▮▮, the five-member Air Force Personnel Board unanimously voted to return Voe to

duty, noting on that Voe ███████████████████████████ █ ██████████████████

██████████████████████████████████████████████████████

████████████████████████████. Accordingly, in a memorandum dated

█████████, the SAFPC directed that Voe be returned to duty. SUF ¶ 16. ██████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████. █████████████

██████████████████████████████████████████████████████

██████████████████████████

This memorandum never reached Voe. SUF ¶ 16. Instead, █████████████, a second AFPB

panel—composed of different members from those who voted to retain Voe █████████took a

second vote. SUF ¶ 16. The second panel heard no new evidence, and the substantive

information on the vote sheet was identical to the information on the █████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████The only difference ████████████████████████

██████████████, besides the composition of the panel, was the result: despite the

acknowledgement that Voe was fit and that his HIV did not disqualify him from service, each

panel member voted he was not fit for continued service and to discharge him with 10%

disability pay. SUF ¶ 16.

In a ████████████████ memorandum, the SAFPC acknowledged—in keeping with the

first memorandum from the AFPB—that Voe was asymptomatic, ██████████████████████

---

[3] Voe actually had an "undetectable" viral load at this time, as current tests are not sensitive enough to
establish a viral load of "zero."



██████████████████████████████████████████████

███████████ SUF ¶16. The SAFPC, however, now concluded that ██████████████

███████████████████████████████████ Neither the facts of Voe's case nor

the Air Force's regulations upon which the decision rested had changed between the first

decision and the second. Yet, the opposite result was reached.

Roe's discharge followed a similar course. Like Voe, he was virally suppressed, passed

his physical fitness tests, and had the support of his doctors and commander. SUF ¶¶ 10-12. His

case came before the AFPB on ███████████, approximately two weeks before Voe's first

AFPB panel vote. SUF ¶ 12. However, the AFPB did not take any action for approximately six

months; ████████████████, it issued a memorandum and decision mirroring the one sent to

Voe after the second vote in his case. █████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

These internally inconsistent decisions were contrary to the APA. If "[i]t is axiomatic that

an agency must treat similar cases in a similar manner unless it can provide a legitimate reason

for failing to do so," *Kreis*, 406 F.3d at 687, and "[g]overnment is at its most arbitrary when it

treats similarly situated people differently," then a fortiori treating *the same person* differently is

beyond the bounds of arbitrariness. *See Etelson v. Office of Pers. Mgmt.*, 684 F.2d 918, 926

(D.C. Cir. 1982). The administrative record reveals no legitimate reason for reaching one

decision about asymptomatic Airmen living with HIV in the spring of 2018 and reaching the

opposite decision on the same facts in the fall of 2018. Nor is there any legitimate reason to

reach such conflicting results based on the relevant AFIs and DoDIs—none of which changed

during that time period.

### 3. The Air Force's Decisions to Separate Airmen Living with HIV Based on a Determination They Are Not Worldwide Deployable Are Contrary to the Air Force's Own Regulations.

An agency's action is contrary to law where it is "inconsistent with [an agency] regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal citation omitted). The agency's decision must "comport with governing statutes or regulations"; otherwise it "is 'not in accordance with law' and must be set aside." *J.E.C.M. ex rel. Saravia v. Lloyd*, 352 F. Supp. 3d 559, 583 (E.D. Va. 2018). The Air Force's decisions to separate Airmen living with HIV were premised on a new (and baseless) interpretation of existing policies, are inconsistent with those existing policies, and are thus contrary to law.

AFI 44-178 is unequivocal: "HIV seropositivity alone is not grounds for medical separation or retirement for ADAF members." SUF ¶ 49 (Ex. 36, AFI 44-178 at 6, § 2.4.1). The Air Force seeks to evade its own rule by purporting to separate asymptomatic, virally suppressed HIV-positive Airmen because they cannot deploy worldwide—including to CENTCOM— without a waiver. *See, e.g.*, SUF ¶¶ 12, 50. Because the only reason Airmen with HIV purportedly cannot meet the deployment criteria is because they have HIV, they are being discharged solely because of HIV.

For years, the Air Force and the other military services followed the same practice as to members with asymptomatic HIV: returning them to duty. SUF ¶ 49. ██████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████



Once in the DES, the Air Force makes a determination as to whether the Airmen are fit for duty; if, at the end of the DES process, they are not deemed fit for duty, they are retired or separated from service. SUF ¶¶ 43, 44.

Critically, the Air Force's new fitness determinations for service members with HIV do not hinge on any concerns around *medical* fitness.

AFI 44-178 precludes this interpretation, and "[a]n agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down." *United States v. Heffner*, 420 F.2d 809, 811 (4th Cir. 1969). *See Serv. v. Dulles*, 354 U.S. 363, 365-72 (1957) (declaring the discharge of a Foreign Service Officer by the Secretary of State void because the Secretary failed to follow State Department regulations in discharging the officer); *see also Cruz-Casado v. United States*, 553 F.2d 672, 675 (Fed. Cl. 1977) (explaining in discharge case against the Army that "[i]t is elementary that an agency must follow its own regulations, and that a discharge

brought about in violation of those regulations is invalid and cannot stand").

> **4. The Air Force's Decisions to Separate Airmen Living with HIV Based on a "Prediction" That They Cannot Deploy Are Contrary to Policies That Require an Individualized Assessment of Fitness for Duty.**

Finally, as the Fourth Circuit recognized, by deciding to separate Roe and Voe based on a prediction they would not be allowed to deploy to CENTCOM, the Air Force denied Plaintiffs the required individualized assessment of their fitness for continued service. *Roe*, 947 F.3d 224. DoD regulations require individualized determinations based on objective evidence to determine a service member's fitness for duty or separation under the DES. Specifically, DoDI 1332.18 designates a service member as unfit "when the evidence establishes that the member, due to disability, is unable to perform duties of his or her office, grade, rank, or rating." Ex. 12, DoDI 1332.18 Encl. 3, App. 2 at 30, § 2(a); *see also* 10 U.S.C. § 1203 (providing for separation of a service member "[u]pon a determination by the Secretary concerned that a member . . . is unfit to perform the duties of the member's office, grade, rank or rating because of physical disability") *id.* § 1214 ("No member of the armed forces may be retired or separated for physical disability without a full and fair hearing if he demands it.").

Additionally, DoDI 1332.18 requires consideration of whether the service member "can perform the common military tasks required," as well as whether the service member is permitted to take "the respective Service's required physical fitness test." Ex. 12, DoDI 1332.18 Encl. 3, App. 2 at 31, § 4(a)(2). It also requires consideration of whether the service member "is deployable individually or as part of a unit, with or without prior notification, to *any vessel or location* specified by the Military Department" and, for service members "whose medical condition disqualifies them for specialized duties, whether the specialized duties constitute the member's current duty assignment." *Id*. (emphasis added) Moreover, DoDI 1332.18 requires "objective evidence in the record, as distinguished from personal opinion, speculation, or

conjecture, to determine a Service member is unfit because of disability." Ex. 12, DoDI 1332.18 Encl. 3, App. 2 at 33, § 6(a)(1). In sum, a determination through the DES that a service member is unfit for duty must be based on objective evidence in the record and must consider the individual service member's physical abilities, fitness and worldwide deployability. *Roe*, 947 F.3d at 222.

Here, the Air Force did not perform such an individualized determination. Specifically, the Air Force discharge memoranda for Roe and Voe contain identical language ███████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████. The conclusion that HIV renders a service member ineligible for deployment is inconsistent with MOD-13, which allows HIV-positive service members to seek a waiver to deploy to CENTCOM's area of responsibility (though as described above, how meaningful that opportunity is for service members with HIV is questionable). MOD-14 does not rectify this inconsistency. SUF ¶ 53.

MOD-13 does not, at least on its face, preclude waivers for HIV-positive service members. MOD-13 requires that the "medical evaluator . . . carefully consider whether the climate, altitude, nature of available food and housing, availability of medical, behavioral health, dental surgical and laboratory services or whether other environmental and operational factors may be hazardous to the deploying person's health." *Id*. It also sets forth the waiver-granting authority and an appeals process.

As noted by the Fourth Circuit, the Air Force's discharge memoranda do not entertain the possibility of such an individualized waiver determination, and the record is entirely lacking in explanation reflecting an individualized determination for each service member. *Roe*, 947 F.3d at

224. CENTCOM's primary waiver action officer testified that he repeatedly denied waivers for HIV-positive service members. SUF ¶¶ 54, 55; Ex. 40, Cron Decl. ¶ 11; Ex. 3, Cron Dep. 41:6-17 (of over 30,000 waiver applications to CENTCOM since 2015, a waiver for HIV has never been granted), and ███████████████████████████████████████████ ████████████████████████████████████████ In light of this explanation, in stating that each service member's HIV-positive status renders him "ineligible" to deploy to CENTCOM, the Air Force merely predicted that HIV-positive service members would not receive a waiver from CENTCOM under MOD-13.

By predicting all HIV-positive service members would be denied a waiver, instead of allowing Roe, Voe and the MMAA members to seek a waiver and obtain CENTCOM's waiver determination, the Air Force cut short the individualized determinations required by DoD policy and never gave CENTCOM—or any military entity—the opportunity to examine the objective evidence of each service member's HIV health, physical condition, and any special risks particular to that member's deployment to a specific location. Instead, the Air Force discharged Roe, Voe and the MMAA members based on speculation that they would not be permitted to deploy to CENTCOM. Such a categorical predictive assessment is not "a satisfactory explanation" for discharging each service member, and in using this predictive assessment to discharge these service members, the Air Force violated regulations, failed to consider important aspects of the criteria for discharge, and explained its decision in a manner contrary to the evidence before it. *See Roe*, 947 F.3d at 224 (*citing State Farm*, 463 U.S. at 43; cf. *Delta Air Lines Inc. v. Exp-Imp. Bank of the U.S.*, 718 F.3d 974, 978 (D.C. Cir. 2013) (per curiam) (concluding an agency's unexplained categorical conclusion violated the APA); *Arrington v. Daniels*, 516 F.3d 1106, 1113-14 (9th Cir. 2008) (concluding a categorical rule promulgated by

the Bureau of Prisons violated the APA because one offered rationale was absent from the

agency record and the agency did not explain in the record how the second rationale supported

the rule). The Air Force's discharge orders were arbitrary and capricious, an abuse of discretion

and otherwise contrary to law.

C.     **Plaintiffs Are Entitled to Broad Relief to Remedy Defendants' Constitutional and Statutory Violations.**

A nationwide injunction covering all of those similarly situated to the individual

Plaintiffs is appropriate here, regardless of the cause(s) of action on which that remedy is based.

"[D]istrict courts have broad discretion when fashioning injunctive relief." *Ostergren v.*

*Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010). The district courts' authority to issue nationwide

injunctions in appropriate circumstances is well established. *See, e.g.*, *Richmond Tenants Org.,*

*Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992) (explaining in affirming nationwide scope of

permanent injunction that "[i]t is well established … that a federal district court has wide

discretion to fashion appropriate injunctive relief in a particular case" (citations omitted)). A

customary remedy for an equal protection violation is to enjoin enforcement of the

discriminatory aspects of a statute, regulation or policy. *See, e.g.*, *Califano v. Westcott*, 443 U.S.

76, 90-93 (1979) (affirming district court order eliminating discriminatory aspects of Social

Security benefits rules through extension rather than invalidation).

Moreover, a violation of the APA is a paradigmatic circumstance for enjoining a

regulation nationwide. *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476,

511-12 (9th Cir. 2018) (nationwide injunctive "relief is commonplace in APA cases"). "In this

context, '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary

result is that the rules are vacated—not that their application to the individual petitioners is

proscribed." *Id.* at 511 (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d

1399, 1409 (D.C. Cir. 1998)); *see also Int'l Refugee Assistance Project v. Trump,* 857 F.3d 554, 604-05 (4th Cir. 2017) (en banc), *vacated on other grounds*, 138 S. Ct. 353 (2017) (nationwide injunction appropriate if "carefully addressed to the circumstances of the case" and "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs").

Because MMAA has organizational standing in this case, the remedy for the causes of action challenging the individual discharge decisions is also a nationwide injunction covering all individuals similarly situated to Roe and Voe. *See Richmond Tenants,* 956 F.2d at 1308-09. This Court has already determined that the reallocation of MMAA's limited resources to address the adverse determinations for Roe, Voe and others similarly situated is sufficient injury to sustain MMAA's standing. Roe, ECF No. 261 at 13-14. Because MMAA would continue to be injured if Defendants were permitted to render and enforce such adverse personnel decisions against those similarly situated, a nationwide injunction to address this injury is appropriate. *See, e.g.*, *Casa de Maryland, Inc. v. Trump*, 414 F. Supp. 3d 760 (D. Md. 2019) (granting preliminary injunction to nonprofit whose mission was to improve quality of life in low-income immigrant communities, because it would suffer irreparable harm if new rule went into effect."); *Saget v. Trump*, 375 F. Supp. 3d 280, 379 (E.D.N.Y. 2019) (granting a nationwide injunction to protect Haitian nationals residing in U.S. with Temporary Protected Status and nonprofit organization with direct standing that serves similarly-situated individuals because "[l]imiting a preliminary injunction to the parties would not adequately protect the interests of all stakeholders."). In addition, MMAA continues to assert its organizational standing to represent the interests of its members, which would also justify a nationwide injunction.

As a remedy to the equal protection violations under Count 1 in *Harrison* and Count 1 in *Roe*, Plaintiffs are entitled to a declaration that Defendants' policies and procedures prohibiting

Harrison, Roe, and Voe from contingency deployments based on their HIV status are unconstitutional. MMAA is entitled to a declaration that the policies and procedures prohibiting contingency deployments for similarly situated service members are unconstitutional. As a further remedy to the equal protection violations under Count 1 in *Harrison* and Count 1 in *Roe*, Plaintiffs are entitled to an order enjoining Defendants, and anyone acting on their behalf or at their direction or under their authority, from enforcing the HIV-focused provisions of their policies and procedures prohibiting the contingency deployment of Harrison, Roe, Voe or any similarly situated service member with HIV.

As a remedy to the APA violation under Counts 4 and 5 in *Roe*, Plaintiffs Roe and Voe are entitled to a declaration that Defendants' policies and practices prohibiting Roe and Voe from contingency deployments based on their HIV status are arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. MMAA is entitled to a declaration that the policies and procedures prohibiting contingency deployments for similarly situated service members are arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

As a remedy to the equal protection violation under Count 1 in *Harrison,* Plaintiff Harrison is entitled to a declaration that Defendants' policies and practices prohibiting him from commissioning as an officer based on his HIV status are unconstitutional. MMAA is entitled to a declaration that the policies and practices prohibiting the commissioning of similarly situated service members are unconstitutional. As a further remedy under Count 1 in *Harrison*, Plaintiff Harrison is entitled to an order directing the Secretary of the Army to vacate the decision denying his commission. Further, the Court should order the Secretary of the Army to re-evaluate this decision without applying any of the regulations and policies enjoined above.

As a remedy to the APA violation under Counts 2 and 3 in *Roe*, Plaintiffs Roe and Voe

are entitled to a declaration that the decisions to discharge them were arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Similarly, MMAA is entitled to a declaration that the decisions to discharge Roe, Voe, and others similarly situated are arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. As a further remedy to the APA violations under Counts 2 and 3 in *Roe*, Roe, Voe, and MMAA are entitled to an order enjoining Defendant the Secretary of the Air Force, and anyone acting on her behalf or at her direction or under her authority, from separating any Airman with HIV, including Roe, Voe and any member of MMAA, based on their purported inability to engage in contingency deployments under Defendants' current policies and practices.

In the alternative to the remedy directly above, as a remedy to the APA violations under Counts 2 and 3 in *Roe*, Roe, Voe, and MMAA are entitled to an order enjoining Defendant the Secretary of the Air Force, and anyone acting on her behalf or at her direction or under her authority, from separating any Airman with HIV, including Roe, Voe and any member of MMAA, based on a predictive decision as to their ability to engage in a contingency deployment under Defendants' current policies and practices.

As a further remedy for the Constitutional and/or APA violations under Counts 1, 2, 3, 4, and 5 in *Roe*, Roe and Voe are entitled to an order directing the Secretary of the Air Force to vacate her decisions separating them. MMAA is entitled to the same order directing the Secretary of the Air Force to vacate similar decisions that were made as to its members with HIV and that have been held pending the outcome of this matter. Further, the Court should order the Secretary of the Air Force to re-evaluate such decisions without regard to any of the policies and practices enjoined above.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs' motions for summary judgment should be granted.

Dated: May 4, 2020

Respectfully submitted,

/s/ *John W. H. Harding*

Scott A. Schoettes*
SSchoettes@lambdalegal.org
Kara Ingelhart*
KIngelhart@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
105 W. Adams St., Suite 2600
Chicago, IL 60603
T: (312) 663-4413

Peter E. Perkowski*
PeterP@modernmilitary.org
MODERN MILITARY
ASSOCIATION OF AMERICA,
INC.
P.O. Box 65301
Washington, DC 20035-5301
T: (800) 538-7418

*pro hac vice*

John W. H. Harding
Virginia State Bar No. 87602
JWHarding@winston.com
Lauren Gailey*
LGailey@winston.com
Alexandra J. Hemmings*
AHemmings@winston.com
WINSTON & STRAWN LLP
1901 L St., NW
Washington, DC 20036
T: (202) 282-5000

Julie A. Bauer*
JBauer@winston.com
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
T: (312) 558-560

Andrew R. Sommer
Virginia State Bar No. 70304
Sommera@gtlaw.com
GREENBERG TRAURIG, LLP
1750 Tysons Boulevard
Suite 1000
McLean, VA 22102
T: (703) 749-1370

**CERTIFICATE OF SERVICE**

I certify that, on the 4th day of May, 2020, I caused this document to be filed electronically through the Court's CM/ECF system, which automatically sent a notice of electronic filing to all counsel of record.

Dated: May 4, 2020                                    Respectfully submitted,

                                                      /s/ *John W. H. Harding*

                                                      John W. H. Harding