**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| NICHOLAS HARRISON, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>MARK ESPER, Secretary of Defense, *et al.*,<br><br>    Defendants. | No. 1:18-cv-641 (LMB/IDD) |
| RICHARD ROE, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>MARK ESPER, Secretary of Defense, *et al.*,<br><br>    Defendants. | No. 1:18-cv-1565 (LMB/IDD) |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTIONS**
**FOR SUMMARY JUDGMENT AND IN OPPOSITION TO**
**PLANTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF UNDISPUTED FACTS ..........................................................................3

I.      Accessions Policy ......................................................................................................3

     A.   DoD and Army Policies ...................................................................................3

     B.   Development Of Accessions Medical Standards...............................................4

     C.   DoD Policies For Contingency Deployments ...................................................6

     D.   U.S. Central Command (CENTCOM) Policy...................................................6

     E.   Foreign Relations Considerations ....................................................................8

II.     The Disability Evaluation System (DES) ...................................................................9

III.    Plaintiffs ...................................................................................................................10

     A.   Sergeant Nicholas Harrison ...........................................................................10

     B.   Airmen Richard Roe, Victor Voe, And Those Like Them .............................11

     C.   There Is No Evidence Of Animus Toward Any Plaintiff................................13

IV.     HIV Medical Care .....................................................................................................13

     A.   Adherence To Antiretroviral Therapy (ART) ................................................13

     B.   Side Effects And Comorbidities......................................................................15

     C.   Costs Of Treatment .......................................................................................16

V.      HIV Transmission......................................................................................................17

     A.   Overview........................................................................................................17

     B.   Risks Of Transmissions Through The Walking Blood Bank...........................18

     C.   Risks Of Transmission In Combat .................................................................20

VI.     Medical Care And Logistics During Contingency Deployments ................................22

     A.   Transportation Logistics And Risks................................................................22

     B.   Medical Caregiver Training ............................................................................24

VII.    HIV Management And Prevention In Contingency Deployments ...............................24

     A.   Clinical and Viral Load Monitoring ...............................................................24

     B.   Availability Of PEP During Contingency Deployments .................................26

RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS................................27

LEGAL STANDARD ......................................................................................................40

ARGUMENT....................................................................................................................40

I.     Threshold Defenses ...................................................................................................41

     A.     The Deployment Policies Are Committed To Agency Discretion By Law................42

     B.     APA Review Is Also Unavailable Under the APA's "Military Authority" Exception...................................................................................................43

II.     The Accessions Policy In *Harrison* Does Not Violate the Equal Protection...........................44

     A.     The Military's Medical Standards for Accessions. ........................................44

     B.     Equal Protection Standard Of Review ...................................................46

     C.     Plaintiffs Failed To Demonstrate They Have an Equal Protection Claim...................48

     D.     The Accessions Policy Has a Rational Basis...........................................50

III.     The Deployment Limitations Of HIV-Positive Service Members Are Lawful .....................55

     A.     Standard Of Review ...................................................................55

     B.     Defendants Deployment Policies are Rational...........................................56

           1.     A Deployed HIV-Positive Service Member Could Experience Viral Rebound...................................................................57

               a.     *Lost Or Destroyed Medication* ...............................................58

               b.     *Insufficient Adherence To Medication* ......................................59

           2.     HIV Could Be Transmitted By Deployed Service Members. .........................60

               a.     *Blood Transfusions*...........................................................61

               b.     *Transmission During Medical Care*............................................63

           3.     The Military's Ability To Mitigate These Risks Is Limited. .............................67

           4.     Foreign Relations .....................................................................71

IV.     The Air Force Correctly Followed Its Own Regulations In Its Discharge Decisions.............71

     A.     Administrative Procedure Act ...........................................................72

     B.     Roe And Voe's Separation Decisions Were Proper .......................................72

     C.     Roe And Voe Received An Appropriately "Individualized" Determination .............73

     D.     Roe And Voe's Separation Decisions Are Correct Under AFI 44-178......................76

     E.     The DES Treated All Airmen Before It Correctly. .......................................77

V.     Even If the Court Enters Judgment For Plaintiffs, the Remedies Should Be Limited...........78

CONCLUSION ...............................................................................................80

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Al Odah v. United States,*
  321 F.3d 1134 (D.C. Cir. 2003), *rev'd on other grounds*, *Rasul v. Bush*, 542 U.S. 466 (2004) .................43

*Ange v. Bush,*
  752 F. Supp. 509 (D.D.C. 1990) ............................................................................................... 42, 43

*Angelex Ltd. v. United States,*
  723 F.3d 500 (4th Cir. 2013) ...........................................................................................................42

*Bluth v. Laird,*
  at 1071, 435 F.2d 1065 (4th Cir. 1970) .........................................................................................43

*Brandon v. Carmichael,*
  Civ. No. 15-CV-2814, 2016 WL 8731115 (S.D. Cal. Oct. 28, 2016),
  *report and recommendation adopted*, Civ. No. 15-cv-2814, 2016 WL 7030365
  (S.D. Cal. Dec. 2, 2016).....................................................................................................................48

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ...........................................................................................................................78

*City of Cleburne. v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) ...........................................................................................................................47

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197 (1938) ...........................................................................................................................72

*Constantine v. Rectors & Visitors of George Mason Univ.,*
  411 F.3d 474 (4th Cir. 2005) ...........................................................................................................47

*Cooper Hosp./Univ. Med. Ctr. v. Burwell,*
  179 F. Supp. 3d 31 (D.D.C. 2016), *aff'd per curiam*, 688 F. App'x 11 (D.C. Cir. 2017).......................55

*Curran v. Laird,*
  420 F.2d 122 (D.C. Cir. 1969)..........................................................................................................54

*Dash v. Mayweather,*
  731 F.3d 303 (4th Cir. 2013) ...........................................................................................................40

*Dodson v. Army,*
  988 F.2d 1199 (Fed. Cir. 1993) .......................................................................................................46

*Doe v. Sullivan,*
  938 F.2d 1370 (D.C. Cir. 1991).......................................................................................................43

*Doe v. Univ. of Md. Med. Sys. Corp.*,
   50 F.3d 1261 (4th Cir. 1995) ................................................................................ 46, 47

*Doe2 v. Shanahan*,
   917 F.3d 694 (D.C. Cir. 2019) ................................................................................ 44

*FCC v. Beach Commc'ns, Inc.*,
   508 U.S. 307 (1993) ................................................................................ 47, 51

*Fox v. Poole*,
   Civ. No. 06-CV-148, 2008 WL 1867939 (W.D.N.Y. Apr. 24, 2008) .................... 47

*Gates v. Rowland*,
   39 F.3d 1439 (9th Cir. 1994) ................................................................................ 48

*Giarratano v. Johnson*,
   521 F.3d 298 (4th Cir. 2008) ................................................................................ 46, 51

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ................................................................................ 78

*Gilligan v. Morgan*,
   413 U.S. 1 (1973) ................................................................................ 42, 50, 51

*Goldman v. Weinberger*,
   475 U.S. 503 (1986) ................................................................................ 47, 61, 64

*Guerra v. Scruggs*,
   942 F.2d 270 (4th Cir. 1991) ................................................................................ 40

*Haig v. Agee*,
   453 U.S. 280 (1981) ................................................................................ 42

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................................ 42

*Heller v. Doe*,
   509 U.S. 312 (1993) ................................................................................ 46, 47, 50

*Jacobs v. N.C. Admin. Off. Of the Courts*,
   780 F.3d 562 (4th Cir. 2015) ................................................................................ 40

*Johnson v. Brewer*,
   Civ. No. 10-CV-28-A-S, 2012 WL 3580678 (N.D. Miss. Aug. 17, 2012) .......... 47

*Johnson v. N.C. Dep't of Pub. Safety*,
   Civ. No. 1:16-cv-267-FDW, 2018 WL 443002 (W.D.N.C. Jan. 16, 2018) .......... 49

*Kolbe v. Hogan,*
  813 F.3d 160 (4th Cir. 2016), *aff'd by rehearing en banc*, 849 F.3d 114 (4th Cir. 2017) ..........................49

*Lewis v. Casey,*
  518 U.S. 343 (1996) ..........................................................................................................................78

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ..........................................................................................................................43

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ..........................................................................................................................41

*Mathews v. Diaz,*
  426 U.S. 67 (1976) ............................................................................................................................70

*Middendorf v. Henry,*
  425 U.S. 25 (1976) ............................................................................................................................53

*Mofield v. Bell,*
  3 F. App'x 441 (6th Cir. 2001) ......................................................................................................47

*Moore v. Ozmint,*
  Civ. No. 3:10-3041-RBH-JRM, 2012 WL 762460 (D.S.D. Feb. 16, 2012) ..........................49

*Morrison v. Garraghty,*
  239 F.3d 648 (4th Cir. 2001) ...........................................................................................46, 48, 56

*Nolley v. County of Erie,*
  776 F. Supp. 715 (W.D.N.Y. 1991) ...............................................................................................49

*Nordlinger v. Hahn,*
  505 U.S. 1 (1992) ..............................................................................................................................48

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,*
  556 F.3d 177 (4th Cir. 2009) ..........................................................................................................72

*Orloff v. Willoughby,*
  345 U.S. 83 (1953) ............................................................................................................................79

*Ornato v. Hoffman,*
  546 F.2d 10 (2d Cir. 1976) ..............................................................................................................42

*Parker v. Levy,*
  417 U.S. 733 (1974) ..........................................................................................................................48

*Personnel Admin. of Mass. v. Feeney,*
  442 U.S. 256 (1979) ..........................................................................................................................49

*Platone v. Dep't of Labor,*
548 F.3d 322 (4th Cir. 2008) ...........................................................................72

*Pulte Home Corp. v. Montgomery Cty.,*
909 F.3d 685 (4th Cir. 2018) .......................................................................46, 47

*Randall v. United States,*
95 F.3d 339 (4th Cir. 1996) ........................................................................42, 79

*Roe v. Shanahan,*
359 F. Supp. 3d 382 (E.D. Va. 2019).............................................................40, 55

*Roe v. Dep't of Def.,*
947 F.3d 207 (4th Cir. 2020) .................................................................... *passim*

*Rostker v. Goldberg,*
453 U.S. 57 (1981) ...............................................................................43, 47, 66

*Sandlands C&D LLC v. Cnty. Of Horry,*
737 F.3d 45 (4th Cir. 2013) ...........................................................................48

*Solorio v. United States,*
483 U.S. 435 (1987) ....................................................................................47

*Speed Mining, Inc. v. Fed. Mine Safety & Health Review Comm'n,*
528 F.3d 310 (4th Cir. 2008) ..........................................................................42

*Sylvia Dev. Corp. v. Calvert Cty.,*
48 F.3d 810 (4th Cir. 1995) ...........................................................................49

*Thomasson v. Perry,*
80 F.3d 915 (4th Cir. 1996) .......................................................................47, 48

*Town of Chester v. Laroe Estates, Inc.,*
137 S. Ct. 1645 (2017) ..................................................................................79

*Trump v. Hawaii,*
138 S. Ct. 2392(2018),
*remanded, Hawaii v. Trump,* 898 F.3d 1266 (9th Cir. 2018) .................................47, 61

*U.S. Dep't of Agric. v. Moreno,*
413 U.S. 528 (1973) ....................................................................................55

*U.S. R.R. Ret. Bd. v. Fritz,*
449 U.S. 166 (1980) .................................................................................51, 56

*United States ex rel. Schonbrun v. Commanding Officer, Armed Forces,*
403 F.2d 371 (2d Cir. 1968)............................................................................42

*United States v. Olvis*,
   97 F.3d 739 (4th Cir. 1996) ................................................................................49

*Ursack, Inc. v. Sierra Interagency Black Bear Grp.*,
   639 F.3d 949 (9th Cir.2011) ...............................................................................55

*Webster v. Doe*,
   486 U.S. 592 (1988) ............................................................................................41

*Weiss v. United States*,
   510 U.S. 163 (1994) ............................................................................................47

*Wilkins v. Gaddy*,
   734 F.3d 344 (4th Cir. 2013) ..............................................................................51

*Wilson v. Lynch*,
   835 F.3d 1083 (9th Cir. 2016) ............................................................................48

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................... 1, 63, 67

## STATUTES

5 U.S.C. § 701 ........................................................................................... 42, 43

5 U.S.C. § 706 ........................................................................................... 71, 79

28 U.S.C. §§ 12101-213 (1990) .................................................................48

## RULES

Fed. R. Civ. P. 56 .........................................................................................40

## REGULATIONS

28 C.F.R. § 35.108 ......................................................................................48

## UNITED STATES CONSTITUTION

U.S. Const. art. II .................................................................................. 42, 80

## OTHER AUTHORITIES

CDC, *HIV Transmission*,
   https://www.cdc.gov/hiv/basics/transmission.html ........................................17

CDC, *HIV Treatment*,
   https://www.cdc.gov/hiv/basics/livingwithhiv/treatment.html .......................14

CDC, *HIV Treatment and Care*,
  https://www.cdc.gov/hiv/clinicians/treatment/treatment-clinicians.html......................................24

*Expeditionary Force*, DOD Dictionary of Military and Associated Terms (2020),
  https://www.jcs.mil/Portals/36/Documents/ Doctrine/pubs/dictionary.pdf................................1

U.S. Dep't of Vet. Affairs, *VA education and training benefits*,
  https://www.va.gov/education...............................................................................................................27

**INTRODUCTION**

Plaintiffs seek to substitute their own risk assessment for the professional military judgment of the Department of Defense (DoD) and the Military Services regarding medical qualifications for service – in this case as they pertain to persons with HIV. In *Harrison v. Esper*, Plaintiffs bring an equal protection claim based on the military's medical standard for commissioning as an officer. In *Roe v. Esper*, Plaintiffs bring equal protection and Administrative Procedure Act (APA) claims based on the Air Force's decision to discharge two airmen who cannot fully deploy due to their medical condition. Decisions regarding medical qualifications for service are the quintessential "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force" that are "essentially professional military judgments." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Yet, Plaintiffs ask that the Court scrutinize and reject the military's judgment regarding risk to its operations related to HIV.[1]

Defendants agree that the advancement in HIV treatment is a medical success story. But HIV remains incurable, infectious, and, if not continuously treated, progressive and possibly fatal. At least as pertains to military service, there is no reasonably comparable medical condition. Although the military is guided by medical science, it must also rely on its professional understanding of battlefield capabilities and needs. Straightforward medical care—such as refilling medicine, transfusing blood, or providing regular clinical monitoring of a chronic disease—becomes far more complicated and risky for an expeditionary force.[2]

---

[1] At various points, Plaintiffs' complaints challenge the military's classification of individuals based on "HIV status." *See, e.g.*, Compl. ¶ 72, *Harrison* ECF 1; Compl. ¶ 94, *Roe* ECF 1. All of Plaintiffs' arguments appear to apply only to individuals living with HIV who (i) meet the military's other fitness standards, (ii) are durably virally suppressed, (iii) have a history of medication adherence over time, (iv) have an undetectable viral load, (v) are on a 1-2 pill a day antiretroviral therapy (ART) regimen, and (vi) are asymptomatic with no known comorbidities or side effects, or other issues unrelated to HIV-infection, which would independently preclude service. Defendants understand that Plaintiffs are only requesting relief for such individuals. If an individual living with HIV does not meet these criteria, then the need for the challenged military policies would be strengthened, and additional rationales would apply with respect to accessions, deployment, and/or retention.

[2] An expeditionary force is "an armed force organized to achieve a specific objective in a foreign country." *Expeditionary Force*, DoD Dictionary of Military and Associated Terms (2020), https://www.jcs.mil/Portals/36/Documents/Doctrine/pubs/dictionary.pdf

The military has considered the interrelated risks that it would have to accept if it accessed or deployed an HIV-positive service member: risks to the service member's health, risks of transmission to others, and the accompanying burdens on the Service. Plaintiffs largely ignore these risks and military-exclusive considerations, demanding that the military accept heavy burdens to mitigate, though not eliminate, the risks of accessing or deploying an HIV-positive service member. The military's decision to reject these risks is rational, and supported by medical evidence and the unique competence of the military to understand its needs and capabilities in determining the composition of its force and during combat operations.

Defendants maintain that Plaintiffs' claims are nonjusticiable military controversies, that challenges to Defendants' deployment policies are not subject to APA review, and that Plaintiffs have not met their burden to negate the bases for Defendants' policies under the rational basis standard of review. The Fourth Circuit's decision on the preliminary injunction in *Roe* was based primarily on a purported lack of adequate reasoning in the limited record, and in denying Defendants' motions to dismiss without prejudice, this Court also left open consideration of additional evidence. Defendants now lay out in detail their considered reasons and evidence in support of the policies in question.[3] Defendants also fully establish that the decision to discharge Roe and Voe complied with the DoD's own regulations. For these reasons, set forth below, the Court should grant summary judgment in Defendants' favor in both *Harrison* and *Roe* and deny Plaintiffs' motions.

---

[3] Defendants maintain their position that it is improper to inquire into the military deliberative process given the applicable standard of review in this case. *See* Defs. Opp'n to Pls. Mot. to Compel Production of Documents, *Harrison* ECF 78; Defs. Opp'n to Pls. Mot. to Compel Produc. of Interrog. Resps., *Harrison* ECF 93; Defs. Opp'n to Pls. Mot. to Compel Docs. & Info. Withheld on the Basis of Deliberative Process, *Harrison* ECF 111; Mem. in Supp. Objs. to Magistrate Judge's Ruling or Recommendation re Order on Mot. to Compel, *Harrison* ECF 138; Defs. Opp'n to Pls. Mot. to Compel Docs. & Info. Withheld on the Basis of Deliberative Process, *Roe* ECF 98; Defs. Opp'n to Pls. Mot. to Compel Docs. & Info. Withheld on the Basis of Deliberative Process, *Roe* ECF 200. Nonetheless, the Court has permitted broad discovery into the military's reasoning for the challenged policies. Accordingly, Defendants preserve their objection to the extent of discovery permitted, but will use the information developed from the discovery to add depth and explanation to the reasons for the policies already set out in the 2014 and 2018 Reports to Congress. *See* Ex. 13, 2014 Report; Ex. 14, 2018 Report.

## STATEMENT OF UNDISPUTED FACTS

### I. Accessions Policy

#### A. DoD and Army Policies

*1.* DoDI 6130.03 specifies the medical standards for appointment, enlistment, or induction (collectively, "accessions") of personnel into the Military Services. *See* Ex. 1, DoD Instruction 6130.03, (2018) ("DoDI 6130.03"); *see also* Pls. Br., *Roe* ECF 270, Statement of Undisputed Facts ("PSUF") ¶¶ 35-45; Defs. Resp. to Pls. SUF (RSUF) ¶ 35-36. The list contains hundreds of disqualifying medical conditions, including HIV seropositivity. *See* DoDI 6130.03 § 5. It contains a waiver process, in which the particular Service may generally waive the listed disqualifying medical conditions in certain mitigating circumstances. *See* Ex. 12, Aswell Decl. ¶ 11; PSUF ¶ 37.

*2.* DoDI 6485.01 is the Department of Defense instruction regarding "HIV in Military Service Members." *See* Ex. 2, DoD Instruction 6485.01;[4] PSUF ¶ 38. It specifically states that it is DoD policy to deny accessions eligibility to persons with an HIV infection. DoDI 6485.01 3.a. DoDI 6485.01 contains no waiver mechanism. *Id.* When there are two policies which cover the same subject matter, the more specific policy controls. Ex. 15, Frazier Decl. ¶ 10.

*3.* AR 40-501 is the Army's "Standards for Medical Fitness" for "induction, enlistment, appointment, retention, and related policies and procedures," implementing the requirements of DoDI 6130.03, and adding any additional requirements for Army service. *See* Ex. 3, AR 40-501, ch. 2;[5] Ex. 15, Frazier Decl. ¶ 9. AR 40-501 lists hundreds of disqualifying medical conditions, including HIV seropositivity. *Id.* As permitted by DoDI 6130.03, AR 40-501 provides a process for certain individuals who do not meet accessions standards to receive a waiver if they meet retention standards. *Id.* at 2-3, §§ 1-6. Granting a waiver is discretionary, subject to "current

---

[4] DoDI 6485.01 was updated on April 28, 2020. The updates were principally administrative, updating cross references and language regarding the expiration of the policy. *See* DoD Instruction 6485.01, Human Immunodeficiency Virus (HIV) in Military Service Members (2020).

[5] AR 40-501 was updated in June 2019 with no relevant, substantive changes to the policies regarding HIV. *See* Army Regulation 40-501, Standards for Medical Fitness (2019).

directives," "interpretation of the medical standards," and the "appropriateness" of the waiver. *Id.* HIV is subject to a separate Army Regulation, SUF ¶ 4, and this regulation specifically excludes HIV from its waiver process. *Id.* at 4, § 2-2(b).

*4.*  AR 600-110 is the Army's regulation on "Identification, Surveillance, and Administration of Personnel Infected with [HIV]." *See* Ex. 4, AR 600-110; *see also* PSUF ¶ 45. There is no waiver mechanism in this policy. *See* AR 600-110. The Army Deputy Chief of Staff ("Army DCS G-1") is the authority for any exception to policy requests for the requirements of AR 600-110. *Id.* at i; *see also* Ex. 15, Frazier Decl. ¶ 12.

*5.*  Military accessions medical standards are restrictive because an accession represents a long-term resource commitment to train and maintain the candidate in their military career field, including necessary medical treatment. *See* Ex. 14, Dep't of Def., Personnel Policies Regarding Members of the Armed Forces Infected with Human Immunodeficiency Virus: Report to the Committees on the Armed Services of the Senate and House of Representatives (Aug. 2018) ("2018 Report"), at 5. Retention standards are less restrictive than accession standards because the military has already invested in a person's training. *Id.* Pursuant to long-standing policy, an enlisted service member seeking appointment as an officer (*i.e.*, commissioning) must meet the same medical standards as a new entrant. *Id.;* PSUF ¶ 35; Ex. 16, Brown Dep. 33:7-20; Ex. 19, Ciminera Decl. ¶¶ 48-52. The DoD explains that applying the accessions standards is appropriate because "it is a new position, involving a whole new set of duties and responsibilities and new training and mentorship." 2018 Report 5.

### B.  Development of Accessions Medical Standards

*6.*  The Accessions Medical Standards Working Group (AMSWG) makes recommendations to DoD leadership regarding the disqualifying medical conditions listed in DoDI 6130.03. Ex. 12, Aswell Dep. 67:1-16; Ex. 16, Brown Dep. 33:7-36:7. The AMSWG is composed of personnel policymakers and medical providers who analyze medical conditions under these standards. Ex.

16, Brown Dep. 16:3-9, 47:19-48:14; Ex. 18, Ciminera Dep. 180:20-181:4, 184:19-185:15; Ex. 19, Ciminera Decl. ¶¶ 13-15; Ex. 14, 2018 Report 9.

*7.*   When considering medical conditions, the AMSWG considers the five listed policy criteria in DoDI 6130.03 in the aggregate. Ex. 16, Brown Dep. 75:16-76:3, 83:19-84:5; Ex. 19, Ciminera Decl. ¶ 27;*see also* PSUF ¶ 35. The policy criteria specifically states DoD's objective to bar accessions of candidates carrying contagious diseases. Ex. 19, Ciminera Decl. ¶ 29-39. If a medical condition violates any one of these criteria individually, or in some combination, it is potentially disqualifying for accession. Brown Dep. 83:19-84:5. For example, the AMSWG determines whether a medical condition makes an individual "medically adaptable to the military environment without geographical area limitations" based on medical providers' assessments of the availability of necessary care, equipment, and supplies required in all operational environments. Ex. 16, Brown Dep. 81:8-82:16; *see also* Brown Dep. 54:12-57:20, 67:9-70:9.

*8.*   The military applies these criteria based on both an applicant's condition at the time of accession and possible progression over the lifetime of service. Ex. 14, 2018 Report 5; Ex. 12, Aswell Decl. ¶ 7; Ex. 19, Ciminera Decl. ¶¶ 24-36. The AMSWG evaluates chronic conditions by comparing long-term military capabilities of individuals with and without the condition. Ex. 20, Wiesen Dep. 102:25-103:16. Evaluation of long-term prognosis includes consideration of adherence to necessary treatment, possible side effects, and comorbidities. Ex. 18, Ciminera Dep. 101:25-102:16, 103:1-6; Ex. 19, Ciminera Decl. ¶ 24.

*9.*   When considering the possible progression and management of care for a candidate with well-managed HIV, that candidate, at least in part, fails to meet each of the five policy criteria in 6130.03. Ex. 16, Brown Dep. 46:15-22, 75:16-76:16,79:25-81:2l, 83:19-84:5; Ex. 18, Ciminera Dep. 66:7-15, 78:17-79:18, 101:10--102:16, 103:1-6, 110:15-111:19; Ex. 19, Ciminera Decl. ¶28.

### C.  DoD Policies for Contingency Deployments

*10.*   A "contingency deployment" is a deployment "in a location with medical support from only non-fixed (temporary) military medical treatment facilities," and to a location where a

"contingency" "is or may be occurring." *See* Ex. 5, DoD Instruction 6490.07, Deployment-Limiting Medical Conditions for Service Members and DoD Civilian Employees (2010) ("DoDI 6490.07") § 3(b); PSUF ¶ 41. A "contingency" is "[a] situation requiring military operations in response to natural disasters, terrorists, subversives, or as otherwise directed . . . ." Ex. 6490.07 § 3(a). The military considers all deployments to Central Command to be contingency deployments. Ex. 21, Cron. Dep. 79:1-12; PSUF ¶ 52.

**11.**  Under DoDI 6490.07, "[i]ndividuals with the conditions in Enclosure 3 . . . shall not deploy unless a waiver can be granted." Ex. 5, DoDI 6490.07 § 4(c). Enclosure 3 includes "known blood-borne diseases that may be transmitted to others in a deployed environment," *Id.* § e(1), and specifically requires that "[t]he cognizant Combatant Command surgeon *shall be consulted* in all instances of HIV seropositivity before medical clearance for deployment," *Id.* § e(2) (italics added).

**12.**  All Combatant Commands prohibit service members with a bloodborne pathogen, such as HIV, Hepatitis B, or Hepatitis C, from deploying to their area of operations without a waiver. Ex. 14, 2018 Report 15; Ex. 5, DoDI 6490.07 at 10. Unlike HIV, there is a Hepatitis-B vaccine and Hepatitis-C is normally curable. Ex. 22, Murray Dep. 140:1-12.

**13.**  Having unit members who cannot deploy without a waiver impacts overall unit readiness. Ex. 23, Frazier Dep. 52:20-55:15; *see also* Ex. 15, Frazier Decl. ¶ 6.

**14.**  Military policy and logistical planning for contingency deployments requires consideration of unplanned operations in both current and future battlefields. Ex. 24, Murray Decl. ¶¶ 19; Ex. 19, Ciminera Decl. ¶ 25. Future battlefields may be characterized by increased hostilities in current or new theaters of operations or conflicts with "near peer" adversaries in which the U.S. may not possess military superiority. Ex. 24, Murray Decl. ¶¶ 18.

**15.**  Entry operations (early days of combat in a new theater), lack of fixed medical infrastructure, kinetic events such as gunfire, explosions, mass casualties, and loss of air superiority heighten the risk of battlefield injuries and disrupt military logistics. Ex. 24, Murray Decl. ¶¶ 30-31.

### D. U.S. Central Command (CENTCOM) Policy

*16.* Modification 13 to CENTCOM's deployment policy confirms that service members with a "confirmed HIV infection" "will not deploy without an approved waiver." Mod. 13 to USCENTCOM Individual Protection and Individual Unit Deployment Policy (2017)("MOD-13"), Tab A, § 7(c)(2).[6]

*17.* CENTCOM has been the destination of over 80% of Air Force deployments over the past twenty years. Ex. 25, Soper Decl. ¶ 20. Thus, the Air Force gives particular weight to airmen's ability to deploy to CENTCOM in its adjudication of Disability Evaluation System (DES) cases. *Id.* The Air Force does not have the staffing resources to retain non-deployable airmen serving in positions that require frequent deployment. *Id.* ¶ 17-19.

*18.* CENTCOM has never approved a deployment waiver for an HIV-positive service member. Ex. 25, Soper Decl. ¶ 21; Ex. 26, Cron Decl. ¶ 33. Thus the Air Force considers it unlikely that HIV-positive personnel would be granted waivers, and that consideration weighs against retention of airmen in positions that require frequent deployment to CENTCOM. *Id.*

*19.* Individuals do not have a right to unilaterally submit waiver requests; they must have command approval. Ex. 25, Soper Decl. ¶ 23; Ex. 5, DoDI 6490.07, Encl. 2 § 3. CENTCOM will accept waiver requests from individuals, but the requests should confirm commander approval. Ex. 26, Cron Decl. ¶ 15. Waiver authorities must know the "position to be placed in, any known specific hazards of the position, anticipated availability and need for care while deployed, the benefit expected to accrue from the waiver, [and] the recommendation of the commander or supervisor." Soper Decl. ¶ 24; DoDI 6490.07, Encl. 2 § 3(a); Cron Decl. ¶ 17-19. Thus, CENTCOM can only make a waiver determination once a service member has been assigned to a specific deployment, and CENTCOM generally will not consider waiver requests more than six weeks in advance of deployment because conditions of the patient, theater, or deployment may change. Cron Decl. ¶¶ 15, 18. An individual with HIV would be granted a waiver only in

---

[6] MOD 13 was superseded by MOD 14, which was superseded by MOD 15 in April 2020. None of the updates substantively effects the deployment policy regarding HIV. Ex. 26, Cron Decl. 12 n.2.

extraordinary circumstances, such as when the individual had irreplaceable skills that outweighed the risk of the deployment. *Id.* ¶ 34.

**20.** There is no existing process for CENTCOM to consider hypothetical deployment waivers for individuals in the DES process. Ex. 25, Soper Decl. ¶ 22-26; *see* Ex. 26, Cron Decl. ¶ 15, 18. Such a hypothetical waiver request would not permit a Command Surgeon to assess whether the benefit of approving the waiver outweighs the risk posed by a specific deployment, undermining the purpose of the waiver process. Ex. 25, Soper Decl. ¶ 24; *see* Ex. 26, Cron Decl. ¶ 15-18. Even if such hypothetical waivers could be considered, requiring waiver authorities to consider thousands of hypothetical waiver requests every year would overburden CENTCOM's medical personnel, who should be focused on medical challenges arising in theater. Soper Decl. ¶ 25. Instead, the Air Force must make predictive judgments about whether particular conditions are likely to be waived should an individual airman deploy. *Id.* ¶¶ 22-26.

### E. Foreign Relations Considerations

**21.** The DoD has an interest in maintaining good relationships with nations that host deployed forces. *See* Ex. 6, DoDI 6485.01 Enc. 2, §§ 1(b), 3(c). Respecting host nation laws is one way it maintains that relationship, and respecting those laws is required by some Status of Forces Agreements. Ex. 27, Shell Dep. at Ex. 15 (HIV [C]ountry [R]estrictions, [S]ummary of [F]indings); *see also* Ex. 26, Cron Decl. ¶ 32. MOD 13 reflects this policy, that deploying individuals must consider host nation infectious disease restrictions. Ex. 6, MOD-13 § 15(A)(3).

**22.** Many host nations in CENTCOM, including Bahrain, Egypt, Jordan, Kuwait, Qatar, Saudi Arabia, United Arab Emirates and (likely) Syria will generally deport or expel foreigners with HIV. Ex. 27, Shell Dep., at Ex. 14 at 2, 7, 9, 10, 14, 18; *see also* RSUF ¶ 103.

**23.** DoD plans for contingency deployment scenarios that may require using host nation or allied medical facilities. Ex. 24, Ex. 26, Cron Decl. ¶ 32. There is an ethical obligation to notify a local medical facility if a service member is HIV-positive. Ex. 21, Cron Dep. 27:11-22. CENTCOM was

informed that some nation's medical facilities could refuse care to HIV-positive patients. Cron Decl. ¶ 32.

## II. The Disability Evaluation System (DES)

*24.* DoDI 1332.18 describes the DES. *See* PSUF ¶ 43. "A Service member will be considered unfit when the evidence establishes that the member, due to disability, is unable to reasonably perform duties of his or her office, grade, rank, or rating. . . ." Ex. 8, DoDI 1332.18, Encl. 3 App. 2 § 2(a). A determination of unfitness to continue service must "cite objective evidence in the record, as distinguished from personal opinion, speculation, or conjecture. . . ." *Id.* Encl. 2 § 6(a)(1)

*25.* Under DoDI 6485.01, service members "with laboratory evidence of HIV infection will be referred for appropriate treatment and a medical evaluation of fitness for continued service in the same manner as a service member with other chronic or progressive illnesses in accordance with DoDI 1332.18 (Reference (k))." Ex. 2, DoDI 6485.01 Encl. 3, § 2(c).Those "who are determined to be unfit for further duty will be separated or retired pursuant to Reference (k)." *Id* § 2(e).

*26.* For purposes of the DES "[d]etermining whether a Service member can reasonably perform his or her duties includes consideration of: . . . (3) Deployability. Whether the Service member is deployable individually or as part of a unit, with or without prior notification, to any vessel or location specified by the Military Department." Ex. 8, DoDI 1332.18 App. 2 Encl. 3 § 4(a). The Air Force is permitted to specify locations where airmen are able to deploy in assessing their fitness. *Id.*; Ex. 25, Soper Decl. ¶ 14, 20.

*27.* Air Force Instruction (AFI) 44-178, "Human Immunodeficiency Virus Program" imposes a stricter requirement than DoDI 6485.01, requiring that all "HIV-positive personnel must undergo medical evaluation for the purpose of determining status for continued military service." Ex. 9, AFI 44-178 § 2.4. While "HIV seropositivity alone is not grounds for medical separation or retirement . . . Members shall be retained or separated as outlined in Attachment 9." *Id.* § 2.4.1. HIV-positive service members "*who are able to perform the duties* of their office, grade, rank and/or rating, may not be separated solely on the basis of laboratory evidence of HIV infection." *Id.*

9

Attach. 9 § A9.1.1. For service members "who are determined to be unfit for further duty," AFI

36-3212 "provides guidance for separation or retirement." *Id.* § A9.2.1. The standards and criteria

for making an unfitness determination are contained in DoDI 1332.18, Ex. 10, AFI 36-3212,

Physical Evaluation for Retention, Retirement, and Separation § 3.16.

*28.* In 2017, the Air Force determined that its practice of automatically returning service members

with asymptomatic HIV infection to service conflicted with the plain requirements of DoDI

6485.01. Ex. 25, Soper Decl. ¶¶ 27-31. Airmen with other chronic or progressive diseases that limit

deployability are routinely referred to the DES. *Id.* ¶ 29. The Air Force issued three policy

memoranda addressing this issue. *Id.* ¶¶ 30-32.

*29.* The Secretary of the Air Force Personnel Council (SAFPC) is the final appeal for an airman

before retirement or separation. During the 2017 policy discussions concerning the standardizing

of processing of airmen with asymptomatic HIV, the SAFPC learned that CENTCOM was

unlikely to grant waivers for HIV. Ex. 25, Soper Decl. ¶ 31. All SAFPC decisions are non-final and

subject to potential reconsideration until delivered to the respondent airman. *Id.* ¶ 41.

### III. Plaintiffs

#### A. Sergeant Nicholas Harrison

*30.* In November 2013, Harrison was pre-selected for an open billet[7] as a Judge Advocate with the

D.C. National Guard. Ex. 28, Harrison Dep. 182:3-184-21; Ex. 15, Frazier Decl. ¶ 18.

*31.* Under both DoD and Army policy, Harrison's HIV-status was medically disqualifying for

accession and thus, he could not complete the application process. Ex. 15, Frazier Decl. ¶ 19.

*32.* On ██████████████, the National Guard Bureau (NGB) denied Harrison's request to

waive the HIV accession standard, because that requirement cannot be waived under AR 40-501.

Ex. 15, Frazier Decl. ¶ 19.

---

[7] A billet is a position in a particular military unit that is filled by a service member with a particular
rank and occupational specialty. Ex. 15, Frazier Decl. ¶ 13 n.5.

*33.* On ███████████ Harrison requested an exception to the HIV accession policies in AR 600-110 and DoDI 6485.01. Ex. 15, Frazier Decl. ¶ 20. The request was considered by the Army decision authority, the Army DCS G-1. Frazier Decl. ¶¶ 19, 21-22.

*34.* On ███████████, the Office of the Surgeon General Infectious Disease Consultant ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████." Ex. 15, Frazier Decl. ¶ 21, Ex. D at US2004. On ████████████, ████████████████████████████████████████ █████████████████████████████████ Ex. 15, Frazier Decl. ¶ 21 (citing Ex. D at US2005).

*35.* ████████████████████████████████████████ ██████ ██████████████████ Ex. 15, Frazier Decl. ¶¶ 20, 22. The Army cannot consider an exception to AR 600-110 until relieved of the minimum requirements of DoDI 6485.01. *Id.*

*36.* If a pre-selected candidate is medically cleared, the National Guard accessions board will then consider the full application package if all qualifications for appointment, including an age waiver if necessary, are met. Ex. 15, Frazier Decl. ¶ 13. For a JAG application, the package is also certified by The Judge Advocate General of the United States (TJAG). Ex. 15, Frazier Decl. ¶ 14. Only after approval from these additional reviews may an applicant be accessed as a JAG. *Id.*

*37.* ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ [8] *Id.* ¶ 24.

*38.* █████████████████████████████████ ████████████████████████████████████████ ████████████████████ *Id.*

---

[8] ████████████████████████████████████████

### B. Airmen Richard Roe, Victor Voe, and Similar Individuals

*39.* Roe joined the Air Force in 2012 and was diagnosed with HIV while on active duty in 2017. *See* PSUF ¶ 9-10. Voe joined the Air Force in 2011 and was diagnosed with HIV while on active duty in 2017. *See* PSUF ¶ 13-14. In 2018, Roe, a Staff Sergeant ████████ ████████ was evaluated for medical fitness in the DES and found unfit for continued military service and recommended discharged. *See* Ex. 29, Excerpts from the Administrative Records for Roe and Voe (Admin. Record). A460-63.[9] In 2017-18, Voe, a Senior Airman ████████ ████████, was evaluated for medical fitness in the DES; after the SAFPC initially voted to retain Voe, they held the decision pending a policy review, received further policy guidance, and then found him unfit and recommended discharge. *See id.* A756-58; Ex. 25, Soper Decl. ¶ 39-42.

*40.* Roe's and Voe's discharge decisions were based on their HIV infections as well as their career fields and levels, the likelihood of deployment by those career fields to CENTCOM, and SAFPC's knowledge that CENTCOM was unlikely to grant a waiver to an HIV-positive service member. Ex. 25, Soper Decl. ¶18, 21, 31, 35-42. Because Roe and Voe are in career fields with many individuals and do not have unique skills, CENTCOM would deploy someone in their stead rather than granting them waivers. *See* Ex. 26, Cron Decl. ¶¶ 17, 34-35. Neither Roe nor Voe was discharged due to an inability to complete common military duties or to take the physical fitness test. Ex. 29, Admin. Record A460, A468, A747, A756; *see also* Ex. 8, 1332.18 Encl. 3, App. 2, § 4(a). Neither Roe nor Voe has special qualifications or specialized duties. *See id.*

*41.* Since new policy guidance was issued in September 2018, sixteen airmen, including Roe and Voe, have received final fitness determinations. Ex. 25, Soper Decl. ¶ 33. Another seven have not yet received a final fitness determination and their cases remain pending. *Id.* ¶ 34. Of the sixteen who have reached a final determination, five were returned to duty in the DES process and eleven received discharge determinations. *Id.* ¶ 33. The Air Force was preliminarily enjoined from enforcing discharges by the Court's order of February 15, 2019. *Roe* ECF 73. That order was later

---

[9] The full administrative record for Roe and Voe has been previously filed with the Court, *see Roe* ECF 55-58. Administrative record excerpts are cited as "A---" and attached as Exhibit 29.

amended, *Roe* ECF 111, to allow five HIV-positive airmen who preferred to accept discharge to be separated. Soper Decl. ¶ 33. Two of the remaining six airmen who were found unfit have been separated: one for medical retirement, and one because of unrelated misconduct. *Id.* ¶ 33. The other four airmen who were found unfit have been retained under the Court's preliminary injunction. *Id.* The discharged airmen were more likely to deploy compared to the retained airmen. *Id.* ¶ 32. If the Court grants this motion, the DES will continue processing HIV-positive airmen.

### C.  There is no evidence of animus toward any Plaintiff

*42.* It is Army policy that: "Individuals who are confirmed to be HIV infected will be treated with dignity and understanding" and "[e]very effort will be made to ensure that, except for their assignment limitations, HIV infected personnel are treated no differently than other Soldiers." Ex. 4, AR-600-110 § 6(1)(b, c).

*43.* Plaintiffs Harrison, Roe, and Voe did not personally experience any instances of animus or intentional discrimination based on their HIV-status in the course of their military service. Ex. 28, Harrison Dep. 142:15-143:7; Ex. 30, Roe Dep. 121:20-122:6; Ex. 31, Voe Dep. 45:1-3. Plaintiffs' military leadership and medical providers were considerate and supportive when they learned of Plaintiffs' HIV status. *See* Harrison Dep. 141:15-21.

## IV. HIV Medical Care

### A.  Adherence to Antiretroviral Therapy (ART)

*44.* To maintain viral suppression, HIV-positive individuals must strictly adhere to their ART regimens. *See, e.g.,* Ex. 32, Hendrix Dep. 146:18-147:4; Blaylock Decl. ¶ 30-31. If they stop taking their medication, they will experience viral rebound, meaning that their viral loads will eventually increase to detectable levels and then continue to rise. *See* Ex. 24, Murray Decl. ¶ 50; Ex. 33, Hendrix Dep. 149:4-151:11; 270:15-271:22; Ex. 34, Okulicz Dep. 131:5-17.

*45.* Not every person on ART properly adheres to their medication. Ex. 33, Hendrix Dep. 86:16-89:4; Ex. 18, Ciminera Dep. 233:4-15. Even with adherence, ART does not produce durable viral suppression in all patients. Ex. 24, Murray Decl. ¶ 44; *see* Ex. 36, Blaylock Decl. ¶ 13, 15.

*46.* If an ART regimen is interrupted for more than two weeks, the patient should be given a viral load test within 4-8 weeks. . Ex. 24, Murray Decl. ¶¶ 45, 47-49.

*47.* The precise timing of viral load rebound following treatment interruption varies by individual and type of treatment. *See* Ex. 33, Hendrix Dep. 159:14-161:19. Studies and experts in this case have estimated that viral rebound can be expected as soon as three days to as many as eight weeks after treatment interruption. *See* Ex. 24, Murray Decl. ¶ 50 (2-3 days); Ex. 37, Chun Article at 2 (nine days); Hardy Dep. 133:10-134:4 ( "within as quick as two to four weeks and sometimes as long as eight to no resumption"), 140:8-24; Ex. 32, Hendrix Dep. 159:14-163:22 (citing Ex. 9) "usually occurs within two to three weeks"), Ex. 10; *see also* Ex. 34, Okulicz Dep. 131:18-132:17; Ex. 24, Murray Decl. ¶ 50.

*48.* Insufficient adherence to an ART regimen can lead to resistance to various ART regimens. *See* Ex. 38, Kelly Dep. 74:15-75:3; 132:25-133:19; Ex. 20, Wiesen Dep. 92:21-93:2; Ex. 32, Hendrix Dep. 258:1-6; Ex. 24, Murray Decl. ¶ 48.

*49.* The minimum level of adherence required to maintain viral suppression is uncertain, particularly for newer ART regimes. Ex. 24, Murray Decl. ¶ 50; *Cf.* Hendrix Dep. 131:16-132:2; 147:5-148:6 (estimating that at approximately 85% adherence is required, roughly equivalent to missing one dose per week.).

*50.* Experts recommend that ART be taken the same time every day as part of a regular schedule to make it easier to remember. *See, e.g.*, Ex. 24, Murray Decl. ¶¶ 47-48; CDC, *HIV Treatment.*[10] Contingency deployments present increased risks to non-adherence to strict ART regimes compared to domestic environments. Ex. 22, Murray Dep. 169:10-171:5; Ex. 20, Wiesen Dep. 93:25-95:1-6; Ex. 24, Murray Decl. ¶¶ 31, 47-50; CDC, *HIV Treatment.* Deployment conditions are highly variable, potentially involving constant movement, lack of sleep, high stress, irregular schedules, working at night, operations away from base in which service members might not carry

---

[10] https://www.cdc.gov/hiv/basics/livingwithhiv/treatment.html (last visited June 1, 2020).

extra pills, and other factors that increases the risk of non-adherence. Murray Dep. 262:19-263:13, 264:22-265:18; Murray Decl. ¶¶ 31, 47-50.

*51.* Deployment presents increased risks of medicine being lost or destroyed. *See, e.g.*, Ex. 21, Cron Dep. 136:14-17, 141:15-142:1; Ex. 24, Murray Decl. ¶ 31. Like all other supplies, medication can be destroyed in combat, and service members lose medication for several reasons, including the unique stresses of austere environments and battlefield conditions. Ex. 24, Murray Decl. ¶ 27. If that happens, it is unlikely that the individual's specific medication regimen will be readily available from military medical supplies. *See* Ex. 38, Kelly Dep. 81:9-11; Ex. 21, Cron Dep. 136:1-17; Ex. 35, Blaylock Dep. 103:2-10, 105:10-105:25; Murray Decl. ¶ 31, Ex. 36, Blaylock Decl. ¶ 28. It might take months after medication is lost before it is possible to check for viral load rebound. *See, e.g.*, Blaylock Dep. 73:17-74:17.

### B. Side Effects and Comorbidities

*52.* Even virally suppressed HIV-positive patients can experience side effects and comorbidities from either ART treatment or their underlying HIV infection. Ex. 35, Blaylock Dep. 149:22-163:8; Ex. 24, Murray Decl. ¶ 26; Ex. 36, Blaylock Decl. ¶¶ 10-11. These can present years after HIV treatment begins and can develop and change over time. Ex. 32, Hendrix Dep. 248:12-250:2; 380:5-381:8; Ex. 19, Ciminera Decl. ¶ 40.

*53.* All ART regimens have some side effects; the type and severity of side effect varies based on the treatment regime and the individual. Ex. 33, Hendrix Dep. 143:19-147:18. Common ART side effects are: nausea, vomiting, diarrhea, difficulty sleeping, dry mouth, headache, rash, dizziness, fatigue, and pain. *See* CDC, *HIV Treatment*. Newer ART regimes "have not been around long enough" to reach conclusions regarding long term side effects. Ex. 35, Blaylock Dep. 154:19-155:2.

*54.* Conditions that may pertain during training or operations in austere military environments, including dehydration, lack of sleep, lack of regular meals, and disruptions in medications, can

aggravate side effects. Ex. 22, Murray Dep. 222:20-223:14; Ex. 18, Ciminera Dep. 112:12-113:4; Ex. 24, Murray Decl. ¶ 47; Ex. 18, Ciminera Decl. ¶ 41.

**55.** The following are known long-term comorbidities present, at different levels of severity, in some individuals with well-managed HIV: cardiovascular abnormalities, renal disease, liver disease, inflammation-related diseases, neurocognitive impairment, and signs of "premature aging" such as cardiovascular disease and osteoporosis. Ex. 35, Blaylock Dep. 102:17-103:6; Ex. 33, Hendrix Dep. 157:11-159:14; Ex. 32, Hendrix Dep. 252:10-254:2; Ex. 38, Kelly Dep. 33:18-37:8. These long-term comorbidities can be present even in individuals with undetectable viral loads and on ART. Ex. 22, Murray Dep. 211:4-211:24; 221:15; Ex. 18, Ciminera Dep. 102:9-102:16.

**56.** The 2018 Report noted that neurocognitive symptoms in HIV patients include "changes in memory, concentration, attention, and motor skills" that "present challenges for accurate diagnoses and assessment of functional capacity, and often require prolonged observation or reporting" and that the course of impairment may "fluctuat[e] . . . over time." 2018 Report at 20.

**57.** Neurocognitive impairment is a poorly understood comorbidity in patients with HIV; modern studies demonstrate that it persists even on modern ART treatment and tends to develop long term. 2018 Report; Ex. 38, Kelly Dep. 34:14-37:8; Ex. 35, Blaylock Dep. 152:10-153:4; Ex. 32, Hendrix Dep. 294:7-10; Ex. 36, Blaylock Decl. ¶¶ 9, 11; *see generally* Ex. 39, Crum-Cianflone Art.; Ex. 40, Sacktor Art.; Ex. 41, Price Art.; Ex. 42, De Souza Art.; Ex. 43, Grant Art.

**58.** Identifying neurocognitive impairment requires specialized testing and diagnosis. Ex. 35, Blaylock Dep. 158:4-162:16; Ex. 36, Blaylock Decl. ¶¶ 11.

### C.  Costs of Treatment

**59.** The expenditure of resources to ensure a service member continues to be able to perform their duties and to prevent lost duty time is part of the consideration of whether a medical condition meets the five policy criteria for medical disqualification in DoDI 6130.03. Ex. 18, Ciminera Dep. 148:11-149:13; Ex. 19, Ciminera Decl. ¶¶ 23, 43.

**60.** ART costs between $10,000 and $25,000 annually. *See* Ex. 44, Information Paper; Ex. 32, Hendrix Dep. 205:18-206:2; Ex. 19, Ciminera Decl. ¶¶ 23, 40 (explaining other costs of caring for HIV-positive service members). Supporting 1,800 service members with HIV could exceed $45 million annually just for ART treatment, Ex. 32, Hendrix Dep. 207:2-15.

## V.  HIV Transmission

### A.  Overview

**61.** HIV is a chronic contagious disease which can be managed through effective ART treatment. Pls. Ex. 20, Hardy Exp. Rep. ¶¶ 10, 17, 21-22; Ex. 18, Ciminera Dep. 57:16-25, 66:7-15; Ex. 24, Murray Decl. ¶¶ 23-26, 57, 61; Ex. 36, Blaylock Decl. ¶¶ 31, 34; Ex. 19, Ciminera Decl. ¶ 29-39. HIV can be transmitted through sexual contact, blood to blood contact, blood transfusion, from mother to infant, sharing drug needles, or through being stuck with a contaminated needle or sharp object. CDC, *HIV Transmission*;[11] *see e.g.*, Ex. 33, Hendrix Dep. 159:24-160:17; Ex. 32, Hendrix Dep.138:11-140:16; Ex. 35, Blaylock Dep. 29:7-30:1.

**62.** The CDC has concluded that someone with an undetectable viral load has effectively no risk of transmitting HIV *sexually*. *See* CDC, *HIV Transmission*. The CDC has not made the same finding for other transmission routes such as blood, and such a proposition is not supported by current research indicating that non-sexual transmission may be possible even with an undetectable viral load. *See, e.g.*, Ex. 33, Hendrix Dep. 174:6-10, 174:19-175:17; Ex. 32, Hendrix Dep. 138:11-139:6, 322:15-20, 366:17-22; Ex. 45, Lute Dep. 49:3-19.

**63.** As viral load increases, the likelihood of transmitting the virus also increases. *See, e.g.*, Ex. 24, Murray Decl. ¶ 61; Ex. 36, Blaylock Decl. ¶¶ 31, 34; Ex. 32, Hendrix Dep. 146:20-147:2, 150:11-151:11, 161:20-162:9.

**64.** An individual with a detectable viral load may transmit HIV sexually. Ex. 33, Hendrix Dep. 142:17-144:15, 156:21-157:3. Sexual activity occurs during deployments, even though it may be prohibited. Ex. 24, Murray Decl. ¶ 61.

---

[11] https://www.cdc.gov/hiv/basics/transmission.html (last visited June 2, 2020).

**B. Risks of Transmissions through the Walking Blood Bank**

*65.* The military relies on the "walking blood bank" to provide fresh whole blood for medical transfusions. Ex. 46, Taylor Dep. 57:19-60:22; Ex. 21, Cron Dep. 27:23-28:10; Ex. 23, Frazier Dep. 55:16-56:19; Ex. 38, Kelly Dep.119:20-120:7; Ex. 22, Murray Dep. 86:8-89:18; Ex. 20, Wiesen Dep. 76:14-77:10. In certain circumstances, there is no opportunity (or only limited opportunity) to screen for bloodborne pathogens prior to transfusion. *Id.*; Taylor Dep. 50:1-50:9; Murray Decl. ¶¶ 54-55. The walking blood bank is a "military-unique" operation, and presents a risk of HIV transmission that is only present in the military setting. Ex. 18, Ciminera Dep. 62:12-23; Ex. 47, Chandler Art.

*66.* The military relies on the walking blood bank capability in planning for unknown contingency operations. Ex. 20, Wiesen Dep. 72:20-73:1; Ex. 47, Chandler Art. The walking blood bank may be activated to support care for mass casualties or "kinetic injuries, meaning gunfire or other explosive devices." Wiesen. Dep. 74:25-77:1; Ex. 21, Cron Dep. 27:23-28:14, Ex. 46, Taylor Dep. 60:7-22. Between 2001 and 2008, 77% of the 35,630 military casualties in Iraq and Afghanistan resulted from mass-casualty events. Ex. 49, CDC Mass Casualty Rep.

*67.* HIV can be transmitted through blood transfusion. Ex. 33, Hendrix Dep. 311:1-10; Ex. 20, Wiesen Dep. 34:16-19. There is more than a 90% risk of HIV transmission from a blood transfusion donated by an HIV-positive individual without a suppressed viral load. Ex. 22, Murray Dep. 301:4-302:4. There is a risk that a donation to the walking blood bank might be provided by a service member in viral rebound with a detectable viral load, because of the possibility of undetected or unreported non-adherence to medication during deployment. *Id.*; Ex. 35, Blaylock Dep. 54:22-55:18; Ex. 24, Murray Decl. ¶ 54-56.

*68.* It is also possible for a person with an undetectable viral load to transmit the virus through whole blood donation. Ex. 35, Blaylock Dep. 56:5-13; 206:7-207:9; Ex. 21, Cron Dep. 28:3-14; Ex. 23, Frazier Dep. 56:21-57-8; Ex. 36, Blaylock Decl. ¶¶ 36, 38. Although no studies have quantified

the risk, CDC guidance requires that HIV-positive individuals with undetectable viral loads refrain from donating blood. Blaylock 218:24-219:7.

**69.** "The safety of the blood supply is an important factor when considering who is able to deploy." Ex. 38, Kelly Dep. 72:24-73:24. In particular, deployments to austere environments, without fixed medical infrastructures and FDA-compliant blood, require consideration of blood supply. Ex. 50, Tumminello Dep. 68:13-69:7.

**70.** There have been documented cases of transmission of Hepatitis C and HTLV, both bloodborne pathogens, through use of unscreened donor blood in the walking blood bank. Ex. 22, Murray Dep. 130:1-131:9 Ex. 46, Taylor Dep. 125:3-13; Ex. 51, Hakre Art.

**71.** Inability to donate blood is a "potentially" disqualifying concern for deployment to CENTCOM. Ex. 21, Cron Dep. 108:6-19; Ex. 21, Cron Dep. 108:6-19. In small units, any individuals' inability to donate blood increases risk to the entire unit. Ex. 24, Murray Decl. ¶ 54.

**72.** Blood donation is voluntary. *See* PSUF ¶ 97; RSUF ¶ 97. But "you can imagine how that's perceived by the unit in a setting of a MASCAL [mass casualty] if a soldier declines to give blood for a fellow service member." Ex. 35, Blaylock Dep. 112:23-113:9; *see also* Ex. 23, Frazier Dep. 58:3-59:4 ("in combat environments, that are in extreme circumstances that service members are placed under, they are often times asked to make difficult choices.")

**73.** An order not to give blood, the HIV counseling statement, and the threat of military discipline are not sufficient to protect the blood supply. Ex. 24, Murray Decl. ¶ 56. A service member in a battlefield situation is subject to stressors and pressure from other service members that increase the chances that they might not follow that order, including forgetting or misunderstanding the order. *Id.*; Blaylock 109:6-110:133; 113:6-9, Ex. 23, Frazier Dep. 58:12-59:5. Murray Decl. ¶ 56; Ex. 20, Wiesen Dep. 70:3-19; Ex. 36, Blaylock Decl. ¶ 38; Ex. 19, Ciminera Decl. ¶ 73. Further, in conflict situations, a service member might make a value judgment that the immediate need for a blood donation outweighs the risk. *Id.*

19

*74.* Confidentiality concerns might compel an HIV-positive service member to donate blood contrary to orders to avoid disclosing status. Ex. 35, Blaylock Dep. 108:25-110:1; Ex. 36, Blaylock Decl. ¶ 38; Ex. 19, Ciminera Decl. ¶ 73. In emergency circumstances, normal screening procedures, such as confidential checklists indicating blood should not be used for transfusion, may not be feasible. Ex. 35, Blaylock Dep. 113:10-114:20.

*75.* There is at least one known case in which an HIV-positive service member donated blood even though he was aware that he was HIV-positive, had been ordered not to give blood, and received counseling that he should not give blood. Ex. 45, Lute Dep. 48:10-20; Ex. 35, Blaylock Dep. 113:14-20; *see also* Ex. 32, Hendrix Dep. 319:17-21 (calling this is a "believable" situation).

*76.* HIV rapid tests for blood transfusion are not available at all deployed locations. Ex. 38, Kelly Dep. 172:11-21. These tests are not FDA-approved, Ex. 46, Taylor Dep. 55:6-16; Ex. 52, Peel Dep. 203:11-14; Ex. 53, Peel Decl. ¶¶ 81-85.

*77.* Because the walking blood bank is used on an emergent basis, transfusions must sometimes occur before rapid tests, which take 20 minutes, can provide results. Ex. 35, Blaylock Dep. 111:24-112:12; Ex. 46, Taylor Dep. 92:1-11; 130:23-131:21, 133:18-25, 136:5-138:1. Rapid tests sometimes result in false negatives in HIV-patients with undetectable viral loads. Ex. 22, Murray Dep. 88:12-89:23; Ex. 53, Peel Decl. ¶ 85.

### C.  Risks of Transmission in Combat

*78.* In combat, medical care can be provided by combat surgeons, physician assistants, medics, or another Service member applying "buddy-aid." *See* Ex. 24, Murray Decl. ¶ 36.

*79.* The nature of combat medical care presents an increased risk of transmission of HIV compared to civilian care. *See* Ex. 21, Cron Dep. 29:12-30:18; Ex. 18, Ciminera Dep. 58:2-13; Ex. 24, Murray Decl. ¶¶ 51-53. Transmission can occur from an HIV-positive patient to a caregiver, or from an HIV-positive caregiver to a patient. *See* Ex. 18, Ciminera Dep. 58:2-13. The military determined that there is a meaningful risk of HIV transmission even when the infected person has

an undetectable viral load for the reasons described below. *See Id.* 67:11-17; Ex. 21, Cron Dep. 28:11-31:8; Ex. 45, Lute Dep. 49:8-19.

*80.*   In combat medical care, both the patient and caregiver may have open wounds, be covered with abrasions, or otherwise have nonintact skin that provides a blood-to-blood transmission route. *See, e.g.*, Ex. 22, Murray Dep. 140:1-12; Ex. 21, Cron Dep. 28:15-31:8, 154:4-15; Ex. 18, Ciminera Dep. 70:21-71:5; Ex. 24, Murray Decl. ¶¶ 51-52. HIV transmission risk is higher in combat medical care in part because combat injuries often involve mutilating wounds with substantially larger volumes of blood than typical injuries in civilian medical care. *See, e.g.*, Cron Dep. 29:12-30:17; *see* Ex. 54, 2018 PEP Guidelines at 10.

*81.*   Combat medical care presents a greater risk of a medical caregiver exposing themselves to a patient's blood either through a needlestick or because a patient's wounds may be embedded with shrapnel, sharp bones, or other objects that could cut the caregiver while they are touching the patient's blood. *See, e.g.,* Ex. 21, Cron Dep. 28:11-29:2, 154:4-23; Ex. 24, Murray Decl. ¶¶ 51, 57-58. Needlesticks and similar injuries are not rare, and are more common in combat medical care than in civilian care. *See, e.g.*, Ex. 22, Murray Dep. 140:25-141:16.

*82.*   Often during combat medical care, caregivers are unable to employ universal precautions, such as using sterile gloves, and often lack means to try to remedy blood-to-blood contact, such as hand sanitizers, soap, and running water, that would otherwise be available in civilian medical care environments. *See, e.g.*, Ex. 22, Murray Dep. 71:21-72:2, 348:6-14; Ex. 24, Murray Decl. ¶ 58.

*83.*   Combat medical caregivers, in particular combat surgeons, are at the greatest risk of exposure. Ex. 24, Murray Decl. ¶ 67. Following a known exposure, they would likely have to be removed from the field temporarily for viral load monitoring after Post Exposure Prophylaxis (PEP) treatment. *Id.* In many deployed locations, these caregivers are "one deep" and removing them from the field would deprive the remainder of their unit of medical care. *Id.*

*84.*   In a combat environment, a medical caregiver may not have access to a service member's medical record to determine their HIV status. Ex. 18, Ciminera Dep. 64:2-19; *see, e.g.*, Ex. 22,

Murray Dep. 349:9-18, 354:15-355:2; Ex. 24, Murray Decl. ¶ 59. Therefore, the medical caregiver might be unaware of exposure to HIV and the need to seek access to PEP or testing. *Id.*

**85.** The military screens individuals for HIV and bars them from combat deployments; it also evacuates individuals who acquire HIV during deployment to the U.S. for treatment. *See, e.g.*, Ex. 18, Ciminera Dep. 72:14-73:1; Ex. 26, Cron Decl. ¶ 22. Accordingly, there are very few, if any, individuals with HIV in combat to inform a meaningful study about the likelihood of battlefield transmission. *See, e.g.*, Ciminera Dep. 72:14-73:1; Murray Decl. ¶ 52.

**VI. Medical Care and Logistics During Contingency Deployments**

**86.** When the military considers the requirements for the composition of its force, it considers "highly unlikely events," "full mobilization," and "full contingency operations." Ex. 20, Wiesen Dep. 73-21-75:2. "What might occur during full contingency operations are much different than the experience that we have day to day." *Id.* 74:25-75:2. It must consider "possible low-frequency but high severity" events. Ex. 19, Ciminera Decl. ¶ 39.

**87.** The purpose of the military medical system is to deal with emergent situations and to maintain the health and readiness of deployed forces, not to maintain and mitigate pre-existing medical conditions. Ex. 21, Cron Dep. 114:2-16. Deployment restrictions and the waiver system are necessary to maintain operational readiness. *See id.*

**88.** Once someone is placed in theater, they may be ordered to go to other parts of the theater, including to areas with fewer medical resources. *See, e.g.*, Ex. 22, Murray Dep. 247:19-248:11; *see also* Ex. 50, Tumminello Dep. 158:18-159:19; Ex. 24, Murray Decl. ¶ 28.

**A.  Transportation Logistics and Risks**

**89.** If HIV-positive Service members were deployed, particularly to forward locations (in or in close proximity to combat), the military would likely need to transport them to a medical facility for care or testing, transport blood samples to testing sites or logistics hubs, and/or transport medical supplies to the Service member. Ex. 24, Murray Decl. ¶¶ 66-67. If ART is lost or destroyed, a new supply of drugs would need to be ordered and shipped to a regional mail or

medical post, and then would need to be shipped directly to the HIV-positive service member, who may be anywhere in theater. *See, e.g.*, Ex. 35, Blaylock Dep. 103:2-107:3. If a service member is transported away from the operational location, that member and any accompanying support are no longer available to support the unit's mission. Murray Decl. ¶¶ 66-67.

**90.** Military transportation is inherently risky, unpredictable, and often dangerous. Ex. 24, Murray Decl. ¶ 60. Mail and shipping in the deployed environment may be extremely unreliable due to factors such as combat conditions, weather, geography, or the need to prioritize ammunition, food, or medical supplies that are more immediately life-saving than ART. *See, e.g.*, Ex. 38, Kelly Dep. 100:10-101:11; Ex. 22, Murray Dep. 172:20-174:21; 191:21-192:1; 226:2-25; 248:23-250:4; 340:6-341:18; Ex. 21, Cron Dep. 124:9-125:4; Murray Decl. ¶¶ 28-31; Ex. 53, Peel Decl. ¶¶ 66-69. Air or ground transportation may have to transit through enemy territory. *See, e.g.*, Ex. 21, Cron Dep. 148:15-22; Kelly Dep. 161:7-162:1.

**91.** For mail delivery, delays of a month or more are common and longer delays or destruction of the delivery are possible. *See, e.g.*, Ex. 35, Blaylock Dep. 103:2-21, 106:4-107:3; Ex. 21, Cron Dep. 26:24-27:5; Ex. 50, Tumminello Dep. 150:21-151:5; Ex. 38, Kelly Dep. 105:8-16; Ex. 22, Murray Dep. 193:5-196:4, 249:1-6, 346:19-347:18; Blaylock Decl. ¶¶ 28, 29.

**92.** The military must also plan for re-supply of medications in varied current and future combat situations, which may present different and more challenging logistical considerations than encountered recently in CENTCOM. For example, near peer fights or entry operations present much more challenging logistics then relatively developed theaters like Iraq and Afghanistan. *See, e.g.*, Ex. 22, Murray Dep. 76:3-10; 174:4-11, 194:20-196:4, 289:5-20, 291:21-292:4,. 349:4-8; Ex. 24, Murray Decl. ¶ 30-31. Another concern is the "tyranny of distance," in some locations, like Africa, where distances between service members and medical facilities may be extreme. *See, e.g.*, Murray Dep. 174:22-175:13, 338:17-23.

### B.  Medical Caregiver Training

*93.* Personnel providing medical services in the field, even when they are medical doctors, are unlikely to be trained to manage HIV. Ex. 36, Blaylock Decl. ¶ 27; Ex. 24, Murray Decl. ¶¶ 36-39. Because of the number of people and the diversity of conditions likely to arise, it is difficult to ensure that all personnel are trained to treat infrequently arising conditions. Murray Decl. ¶¶ 36-39.

*94.* Deployed medical assets generally are not familiar with PEP or viral load testing. Ex. 22, Murray Dep. 216:4-217:6; Ex. 24, Murray Decl. ¶¶ 36, 46; Ex. 36, Blaylock Decl. ¶ 27. Viral load monitoring by non-specialist doctors may be insufficient; they may also be unfamiliar with common medical issues in the context of changing HIV condition. Ex. 35, Blaylock Dep. 77:17-78:13. Medical care givers in the field, who may be paramedics or combat medics, do not have training in HIV care necessary to identify side effects of treatment, symptoms associated with viral load rebound, or when PEP is indicated. Murray Dep. 216; 342-45; 350. Medics receive limited training, and to add additional HIV training would compromise other training areas. Murray Dep. 221:1-14; Murray Decl. ¶¶ 36-37.

*95.* Every battalion aid station and combat support kit has the same basic medical packet, limited by space and weight. Ex. 22, Murray Dep. 75:11-76:10; Ex. 24, Murray Decl. ¶¶ 33, 60, 65. Kits generally do not contain any of the 15 common ART regimes or PEP. *Id.*

## VII.  HIV Management and Prevention in Contingency Deployments

### A.  Clinical and Viral Load Monitoring

*96.* Stable HIV patients on ART are monitored every three to four months, and once they achieve durable viral suppression after two years, every six months. CDC, *HIV Treatment and Care*.[12] Military doctors rely in part on guidance promulgated by the U.S. Public Health Service and the CDC in making decisions regarding HIV treatment, and follow this standard of care. *See, e.g.*, Ex. 22, Murray Dep. 145:23-146:21; RSUF ¶¶ 67-68.

---

[12] Available at https://www.cdc.gov/hiv/clinicians/treatment/treatment-clinicians.html (last visited June 1, 2020).

*97.* The military medical system is not currently equipped to monitor HIV-infection during a contingency deployment. Monitoring is either unavailable or extremely resource-intensive and potentially disruptive to military operations in a deployed setting. Ex. 52, Peel Dep. 104:1-105:3; 125:9-126:7; 136:18-22; 174:21-175:12.

*98.* Viral load testing is a complex and precise operation for which the necessary equipment and knowledge does not and cannot reasonably exist at forward deployed locations. Ex. 52, Peel Dep. 57:10-59:7; 103:6-22, 114:8-115:11; 131:17-132:10; Ex. 53, Peel Decl. ¶¶ 33-57. The furthest forward medical facilities (Role One) have no ability to process blood drawn for testing and may not even have the ability to properly draw blood for testing. Ex. 35, Blaylock Dep. 63:5-64:8; 64:14-65:12; 65:15-24. More developed forward facilities (Role Two) may or may not have necessary processing equipment such as a centrifuge and wet or dry ice for transport depending on the needs of the deployment. Peel Dep. 107:15-18; 133:9-13; 186:10-20; Ex. 35, Blaylock Dep. 67:4-16; Peel Decl. ¶ 60. Blood samples must be processed within hours and tested within days to produce reliable results. Peel Dep. 116:22-117:3; 124:5-10. A cold chain must be maintained on the samples to prevent dangerous false negative results. Peel Dep. 116:19-117:3; 165:9-166:7; 177:10-16; Peel Decl. ¶¶ 35, 47. Even if a service member or the service member's blood is able to reach a more mature, fixed medical facility (Role Three) a sample must still be transported further to a location that can conduct a viral load test. Ex. 36, Blaylock Decl. ¶¶ 25-27. Viral load testing is performed by large, complex, expensive equipment that cannot easily be placed in a deployed environment. Peel Dep. 191-193; 196:16-197:2; 201:8-14, 207:21-208:17; Peel Decl. ¶¶ 50-52.

*99.* There are two Role Three facilities in Afghanistan. *See, e.g.*, Ex. 35, Blaylock Dep. 67:19-25. In many theaters of operation, there are no Role Three facilities available. *See, e.g.*, Ex. 22, Murray Dep. 210:5-211:3.

*100.* In many circumstances, operations are minimally staffed to necessary roles, and removing someone from duty for medical purposes will degrade mission capabilities. Ex. 38, Kelly Dep. 161:7-162:1; Ex. 22, Murray Dep. 172:23-173:4, 210:24-211:3. Examples of such "one-deep" units

include combat surgical teams, explosive ordnance disposal teams, sniper teams, and others. Ex. 22, Murray Dep. 224:25-225:19; Ex. 18, Ciminera Dep. 88:21-89:9, 91:17-93:10; Murray Decl. ¶ 67.

**B. Availability of PEP during Contingency Deployments**

*101.* The military relies on the most recent published guidelines from the CDC for use of PEP in response to exposures to HIV. *See* Ex. 54, 2018 PEP Guidelines; *see* Ex. 24, Murray Decl. ¶ 17, n.2. PEP is recommended after "a percutaneous injury (e.g., a needlestick or cut with a sharp object) or contact of mucous membrane or nonintact skin (e.g., exposed skin that is chapped, abraded, or afflicted with dermatitis) with blood . . . that [is] potentially infectious." 2018 PEP Guidelines at 9.

*102.* "PEP should be initiated as soon as possible, preferably within hours of exposure," *id.* at 21, and should generally not be used more than 72 hours after exposure. Ex. 35, Blaylock Dep. 39:21-40:10; Ex. 34, Okulicz Dep. 105:3-9 Ex. 36, Blaylock Decl. ¶ 21. While PEP is available at some facilities within the military system, it is not commonly used and not needed nearly as often as other drugs. Ex. 22, Murray Dep. 148:22-149:11; Murray Decl. ¶¶ 11.b, 60. For deployed units with limited storage, sometimes to what they can physically carry, a course of PEP is not a good use of limited space. Ex. 32, Hendrix Dep. 175:11-176:5; 177:2-11; Murray Decl. ¶¶ 33, 35, 60.

*103.* Although the risk of transmission "is thought to be very low," blood "[e]xposure to a source patient with an undetectable serum viral load does not eliminate the possibility of HIV transmission or the need for PEP and follow-up testing," and "PEP should still be offered." 2018 PEP Guidelines at 10-11; *see also* Murray Decl. ¶ 60. By contrast, PEP should not be offered when an exposure poses a "negligible" transmission risk. *Id.* at 23. "Occupational exposures to HIV should be considered urgent medical concerns and treated immediately." *Id.* at 21; *see also* Ex. 22, Murray Dep. 141:19-142:20. There is an increased risk of HIV infection when there is an "exposure to a larger quantity" of blood or a "deep injury." 2018 PEP Guidelines at 10.

*104.* After a needlestick or other blood-to-blood exposure with potentially HIV-infected blood, the exposed individual should seek medical testing to monitor for possible seroconversion. 2018 PEP Guidelines at 27. Baseline testing should be done immediately followed by testing at "6

26

weeks, 12 weeks, and 6 months." *Id.* Follow-up should include viral load testing, treatment regarding potential side effects or adverse drug interactions, discussions about the potential for secondary transmission, and other topics. *Id.* at 26-28, 37; Ex. 35, Blaylock Dep. 39:21-40:10; Ex. 22, Murray Dep. 250:12-251:25. If a service member is exposed to infected blood, they may need to be removed from the theater for these follow-up visits, and critically needed combat surgeons are most likely to be exposed. Murray Dep. 250:20-251:25; Ex. 24, Murray Decl. ¶ 66; 2018 PEP Guidelines at 26-29.

## RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Civil Rule 56(B), Defendants provide the following response to Plaintiffs' Statement of Undisputed Facts. Defendants first identify those facts stated by Plaintiffs that are unsupported by the record. In addition, Defendants further dispute any facts supported by evidence that should be excluded from this civil action, as explained it its contemporaneously filed motion. *See* Defs.' Mot. to Excl. Beyond that motion, Defendants dispute the incorrect characterizations and inferences that Plaintiffs draw from certain facts and address those *infra*. Plaintiffs have also set forth many statements of fact that constitute legal assertions or are not material, but that nonetheless require correction or clarification to ensure an accurate understanding of the facts and issues in this case and to comply with Defendants' obligations under the Local Rules. Thus, by addressing statements of fact below, Defendants do not suggest that these disputes preclude summary judgment because the facts are either immaterial or Defendants' position is clearly correct on the face of the record.

*2.*



---

[13] U.S. Dep't of Vet. Affairs, *VA education and training benefits*, https://www.va.gov/education (last visited May 27, 2020)

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

***4.*** Plaintiffs' description is inaccurate. Harrison was pre-selected for an open position as a JAG in both Guard units as the first step in the application process. *See* SUF ¶¶ 30-31; 36-38.[14]

***8.*** Plaintiffs' statement that Harrison was "denied a commission" is incorrect and their statement that deployment restrictions caused him to fail medical accessions standards is incomplete. Medical clearance is only one step in commissioning. *See* SUF ¶¶ 36-37. ████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████

***11.*** Plaintiffs mischaracterize the statement of Roe's commander, ██████████████████████████

████████████████████████████████ Ex. 29, A468.

***12.*** Plaintiffs mischaracterize Roe's SAFPC decision. His discharge was premised on inability to deploy worldwide and the relatively high deployment rate of his career field. SUF ¶¶ 39-40.

***16.*** Plaintiffs mischaracterize Voe's SAFPC appeal process. Although there was no change to the regulations between the two retention votes, the Air Force corrected its interpretation of the regulations during that time. SUF ¶ 28.

***18.*** Plaintiffs set forth legal conclusions regarding MMAA's standing that rely only on self-serving and conclusory interrogatory responses unsupported by any record evidence and are contradicted by evidence in the record. Defendants' objection to Plaintiffs' reliance on this evidence is set forth in their briefing in their Renewed Motions to Dismiss OutServe ("MTD"). *See* MTD Br., *Roe* ECF 119; MTD Reply, *Roe* ECF 137; Defs. Supp. Br., *Roe* ECF 239; Defs. Supp. Resp., *Roe* ECF 242.[15]

***25.*** Plaintiffs are incorrect that the terms "virally suppressed" and "undetectable" are always defined in the manner they set forth. In scientific literature, these terms are used inconsistently. *See* Ex. 32,

---

[14] All cross references to Defendants' Statement of Undisputed Facts incorporate by reference the factual statement itself and the record evidence cited in support of that statement.

[15] For any docket entry that was filed on both the *Harrison* and *Roe* dockets, citations are provided to just the *Roe* docket for simplicity.

Hendrix Dep. 151:15-153:5 (a "detectable viral load" is considered 200, 50, 40, or 20 copies of the virus); Ex. 53, Peel Decl. ¶ 25; Ex. 35, Blaylock Dep. 198:6-18. The terms "virally suppressed" and "undetectable" are also used inconsistently, imprecisely, or with qualifications in the deposition testimony. *See, e.g.*, Ex. 33, Hendrix Dep. 144:5-9, 152:21-153:5:Ex. 30, Roe Dep. 110:16-111:7; Ex. 18, Ciminera Dep. 216:9-19.

**26.** Plaintiffs' statement regarding "further refined" medications requires qualifications. Assuming that Plaintiffs refer to medications introduced in the last few years, not all HIV-positive individuals (including service members) have been transitioned to these regimens. Ex. 33, Hendrix Dep. 64:18-65:8; Ex. 22, Murray Dep. 270:4-270:19. Plaintiffs do not allege nor does the evidence support that these regimens have no side effects or that the severity of the side effects is the same for all patients. Hardy Dep. 143:19-147:11; *see* SUF ¶ 53.

**27.** Plaintiffs' statement regarding the life expectancy of an individual with HIV should be qualified because the conclusion is based on average outcomes for individuals with an early diagnosis and lifetime management on ART. *See* Ex. 24, Murray Decl. ¶ 26; Ex. 18, Ciminera Dep. 131:15-132:3. Drug resistance, comorbidities, and other factors can reduce life expectancy. Murray Decl. ¶ 26; Ex. 18, Ciminera Dep. 131:15-132:3.

**28.** The generalizations in this paragraph do not support Plaintiffs as a marginalized group requiring a heightened standard of review. Plaintiffs are neither marginalized nor lacking in power to protect their rights as alleged. MMAA, which claims to represent a broad interest group including HIV-positive service members, is a lobbying group with tens of thousands of supporters, in-house counsel, and access to outside legal advice. Harrison Compl. ¶ 69; Roe Comp. ¶ 25; PSUF ¶ 17; Ex. 60, Pls.' Resp. to Defs' Second Rogs Nos. 9, 13. The individual plaintiffs have benefited, so far, by a donation of $4.5 million dollars in legal services from two large law firms and a well-funded legal advocacy group. Ex. 58, Blevins Dep. 163:25, 164:1-6. Further, they have full access to medical care through the military medical system while on active duty and the Veterans Affairs system following their discharge. *See, e.g.*, Ex. 28, Harrison Dep. 124:4-8; Ex. 30, Roe Dep. 106:5-11; Ex. 31, Voe Dep.

29

85:1-86:8. Lastly, this paragraph is unsupported by record evidence because the Court should exclude consideration of evidence from Dr. Hoppe as explained in Defendants' Motion to Exclude.

**29.** The 2014 and 2018 Reports to Congress summarize the "rationale" for the enlisted and officer medical accessions policies and contingency deployment policies with respect to individuals with laboratory evidence of HIV. *See* Pls. Ex. 23 at 33-37. [16] Defendants have further explained the basis for the rationale set forth in these Reports, including by providing testimony from 20 military officials, who more fully and completely explained the reasoning behind these policies on behalf of the organizational defendants.

**30.** Defendants dispute that the justification quoted by Plaintiffs expressly applies to the deployment policy, as it was written in the context of the accessions policy. Ex. 14, 2018 Report 9. The quote is also incomplete, the justification also states that "the DoDI 6130.03 disqualification for accession for HIV infection does not reflect disagreement with the medical consensus that modern medication management of HIV infection produces very positive results." *Id.*

**31.** Plaintiffs statement of the military's analysis and conclusion in weighing a combination of multiple, interrelated risks against the possible benefit of deploying an HIV-positive service member to contingency operations is incomplete and inaccurate. *See* SUF ¶¶ 44-104. Further, Plaintiffs' statement is unsupported by all the cited testimony. *See* PSUF 31 (citing depositions.)

**32.** The DoD policies specifying HIV as a medically disqualifying condition for accession into the military are DoDI 6130.03 and DoDI 6485.01. *See* Exs. 1-2. The Army Regulations that implement these policies are AR 40-501 and AR 600-110. *See* Exs. 3-4. The 2018 Report is an explanation of these policies provided to Congress, not the policies themselves. Ex. 14, 2018 Report.

**33.** Though the quotations in this statement are correct, this paragraph does not include *all* the reasons that the military adopted its accessions policy. *See, e.g.,* SUF ¶¶ 5, 7-9, 59-60.

**35.** DoDI 6130.03, does not contain the phrase "physically qualified." *See* Ex. 1.

**36.** Plaintiffs misrepresent Defendants' position regarding the application of the five listed policy

---

[16] The responses to these interrogatories were caveated by numerous objections. Defendants hereby renew their objections.

criteria in DoDI 6130.03 to accessions candidates with HIV. In defining accessions medical standards, all five criteria are considered. *See* SUF ¶¶ 6-8. A medical condition that fails to meet any one of these five criteria, or multiple criteria when considered together, may be a reason to deny accession. *Id.*

**37.** Plaintiffs' statement requires a qualification; DoD and the Army National Guard are not aware of any time an HIV-positive individual has received a waiver for accession to the Military services, but cannot confirm that it has "never" happened. Ex. 50, Tumminello Dep. 91:13-92:8; Ex. 12, Aswell Dep. 59:10-18.

**39.** Plaintiffs mischaracterize the applicable policies. DoDI 6485.01 does not require that HIV-positive service members be separated because of their seropositivity or limited ability to deploy. But DoD policy does require that they be referred for an evaluation of fitness to continue service when their condition impacts their fitness, such as by restricting deployability. *See* SUF ¶¶ 24-26 (citing Ex. 8, DoDI 1332.18, App'x 2, Encl. 3, § 2(a), 4(a)(3)).

**42.** Plaintiffs mischaracterize DoDI 6490.07 as requiring a "special notification" of the Combatant Command Surgeon. Numerous medical conditions require approval of the Command Surgeon before deployment may be approved. *See* DODI 6490.07 Encl. 2; Encl. 3.

**44.** Plaintiffs misquote the regulation. A service member must be deployable to any vessel or location *specified by the Military Department.* DODI 1332.18 Encl. 3 Appx. 2 § 4(a)(3).

**45.** Plaintiffs' explanation of the Army's waiver process is incomplete and misleading. *See* SUF ¶¶ 4, 33-35.

**47.** Plaintiffs' statement is unsupported because it relies only on the testimony of a witness who is not authorized to provide the Army's position regarding the circumstances of deployments of service members with HIV in the U.S. Special Forces. Ex. 45, Lute Dep. 193:14-21.

**48.** Plaintiffs mischaracterize the waiver and commissioning process. A medical waiver would not "allow" Harrison to commission. SUF ¶¶ 36-37. The Army National Guard lacks authority to grant an exception to policy for AR 600-110 or DoD policy. *See* SUF ¶ 33

*50*. Plaintiffs' description of the regulation is incomplete. AFI 44-178 § 2.4.2 limits the duty assignments of HIV-positive airmen who have already been returned to service through the DES. The Air Force's designee also testified that she was unaware of any HIV accessions waivers, not deployment waivers. Ex. 59, Soper Dep. 57:12-14.

*51*. In addition to being a legal assertion, Plaintiffs mischaracterize the effect of the Court's preliminary injunction. The Court's order did not rescind the discharge orders, it just enjoined the orders from taking effect. *Roe* ECF 73. Additionally upon modification of the injunction, *Roe* ECF 111, six of the affected airmen were discharged at their request. Ex. 25, Soper Decl. ¶ 33.

*52*. Plaintiffs' quotation is incomplete. Medically non-deployable individuals cannot enter CENTCOM until their condition is resolved or they receive a waiver from the CENTCOM waiver authority. SUF ¶¶ 11-12, 16.

*53*. Plaintiffs' description of the CENTCOM medical waiver process is incomplete; the entire process is set out by MOD-13 § 15.C.3. *See* Ex. 6.

*55*. Plaintiffs' statement requires a clarification; the CENTCOM Command Surgeon stated it was "highly unlikely" he would grant a waiver for Roe, Voe, or similarly situated service members because the risks were likely "too great to justify waiver approval." Ex. 48, 1st Cron Decl. ¶ 11 (filed Jan. 25, 2019).

*56*. Plaintiffs claim that the longest deployment to CENTCOM is 15 months is incorrect. In response to a vague question, Dr. Cron testified that CENTCOM "still see[s] 15-month deployments" but the ultimate length of a contingency deployment is driven by operational needs and can exceed 15 months. Ex. 21, Cron Dep. 192:16-24; Ex. 24, Murray Decl. ¶ 27. Plaintiffs are also incorrect that an airman with asymptomatic HIV will not need medical attention or medical equipment during deployment. Even assuming no problematic side effects or development of resistance to medication, the airman will still need, at a minimum, both viral load monitoring and medical resupply. *See* SUF ¶ 89. Plaintiffs' assertion also is unsupported because it relies on testimony that should be excluded. *See* Mot. to Excl.

*57*. Plaintiffs' statement is unsupported because it relies only on the testimony of a witness who is not authorized to provide the DoD's position on this subject. *See* Ex. 16, Brown Dep. 78:4-79:1

*59*. Plaintiffs' statements are incorrect. The Department of Defense study showed that 75% of newly diagnosed service members achieve viral suppression within six months of ART initiation; and 90% of service members achieve viral suppression in the first year, with statistical error bounds of up to 5%. Ex. 22, Murray Dep. 120:15-121:21, 124:4-125:5 (describing Ex. 4).

*60*. Plaintiffs are incorrect that there are always "provisions made to obtain refill prescriptions" during a contingency deployment. Timely refill may be impossible due to operational conditions of deployment. Ex. 20, Wiesen Dep. 181:24-186:3; Ex. 24, Murray Decl. ¶¶ 30, 31; *see* SUF ¶¶ 89-91.

*61*. Plaintiffs' statement that "people who need daily medication are permitted to join the military" is overbroad and lacks support given that there are hundreds of medically disqualifying conditions, some of which require daily medication. *See* Ex. 1, DoDI 6130.03, Enc. 5. Plaintiffs' statement regarding dyslipidemia, hypothyroidism, dysmenorrhea, and asthma is unsupported because it relies only on the testimony of a witness who is not authorized to provide DoD's position on accessions policy, *see* Ex. 35, Blaylock Dep. 176:10-183:5, and is incomplete because in some instances each of these conditions is medically disqualifying for accessions and/or requires a deployment waiver. Ex. 18, Ciminera Dep. 218:5-219:10 (dyslipidemia); Ex. 27, Shell Dep. 193:3-193:24 (dyslipidemia); Ciminera Dep. 224:17-226:10 (hypothyroidism); Ex. 38, Kelly Dep. 140:7-141:9 (hypothyroidism); Ex. 12, Aswell Dep. 119:11-121:17 (dysmenorrhea); Ex. 21, Cron Dep. 177:11-179:19 (asthma).

*62*. Plaintiffs' statement regarding the effectiveness and tolerance of modern medications is a generalization that does not apply to all patients. It only concerns recently introduced one-to-two pill per day regimens in cases where HIV is detected early and the patient adheres to the regimen. *See* Ex. 22, Murray Dep. 328:17-329:3; Ex. 20, Wiesen Dep. 99:24-100:1. In addition, current pill-based ART medicines do have a maximum storage temperature on their package. Ex. 35, Blaylock Dep. 107:22-108:23. Plaintiffs' statement regarding stowage and handling does not apply to injectable medicines that are still in use or are under development. Plaintiffs' statement regarding "diligent

compliance" and "effective" is subject to interpretation based on the definition of the terms, because non-compliance results in temporary viral load rebound. *See* SUF ¶¶ 44, 47.

*63*. Plaintiffs' statement is partially incorrect. Resistance to ART is "less" likely to develop from treatment interruption than intermittent cessation. Ex. 35, Blaylock Dep. 203:16-205:15; Ex. 36, Blaylock Decl. ¶ 31. Treatment interruption can result in viral load rebound to detectable levels in under two weeks, and the long-term adverse consequences, including development of resistance, development of HIV symptoms, or other negative effects is dependent on a variety of individualized factors. *See* SUF ¶¶ 47-48. Plaintiffs' supposition that symptoms may not appear for "years" after stopping treatment is contrary to the cited evidence that symptoms may appear in "months." PSUF ¶ 63.

*64.* Plaintiffs' statement is incorrect and misleading. Not all patients with asthma or thyroid conditions are permitted to deploy, nor are the conditions comparable to an asymptomatic infectious disease. Ex. 21, Cron Dep. 177:11-179:19; Ex. 18, Ciminera Dep. 224:17-226:10 (hypothyroidism); Ex. 38, Kelly Dep. 140:7-141:9, Murray 278:12-279:13 (not comparable). As for glasses, the need is common and the military devotes substantial resources, including deploying optometry labs and lens resupplies. Ex. 20, Wiesen Dep. 248:11-249:4; Ex. 38, Kelly Dep. 26:10-28:11.

*65*. Plaintiffs' statement is incorrect in part. The primary and secondary purposes of clinical monitoring vary by individual and depend on factors including the medicine regimen, viral load, and immune profile. Ex. 24, Murray Decl. ¶¶ 42-44. Further, Plaintiffs' conclusion about the likelihood of medication adherence fails to consider the risk of non-adherence associated with military deployments. *See* SUF ¶¶ 50-51. Last, because statistics on adherence in the military do not include deployed service members, the data should not be used to extrapolate a conclusion regarding adherence during contingency deployment. *See id.*

*66.* Plaintiffs' statement regarding the purpose of clinical monitoring is incomplete and requires clarification. *See* RSUF ¶ 65. Plaintiffs' statement about side effects is unsupported by Dr. Murray's

34

testimony, which is quoted out of context and contains an explanation of the ways in which side effects develop over time. Ex. 22, Murray Dep. 58:14-59:19; SUF ¶¶ 52-53.

*67.* Plaintiffs' statement conflicts with the military standard of care, based on HHS guidelines, to monitor viral load every six months. SUF ¶ 96; PSUF ¶ 68; RSUF ¶ 68.

*68.* Assuming "durable" viral suppression means consistent adherence to treatment and an undetectable viral load after two years of monitoring, Plaintiffs' statement requires clarification. A clinical decision to depart from the guidelines and monitor viral load less frequently than once every 12 months should only be made on an individualized basis and not applied generally to the military population as a whole. Ex. 24, Murray Decl. ¶ 43.

*69.* Tab A to MOD 13 lists *nine* criteria that all underlying medical conditions must meet to receive a waiver consideration, and not requiring "frequent clinical visits" is only one of the criteria. Ex. 7, Mod 13, Tab A at 1, § 1.D.1-9.

*70.* This statement is misleading and incorrect. Deployed medical care providers do not necessarily have the training to provide the required care to patients with HIV. SUF ¶¶ 93-94.

*71.* This statement is an incomplete description of the type of care available at Role 1, Role 2, and Role 3 medical facilities. *See* SUF ¶ 98.

*72.* This statement is incorrect, shipping blood samples may be impossible, or a lower priority given shipment capacity, or unacceptably risky. Ex. 53, Peel Decl. ¶¶ 62, 66.

*73.* Plaintiffs improperly paraphrase Dr. Peel's testimony, which she qualified with considerations that transportation of a sample from a Role 2 to Role 3 medical facility is "logistically challenging, financially costly," and may endanger the safety of service members. Ex. 53, Peel Decl. ¶¶ 63-64.

*74.* Plaintiffs' statement requires clarification. The military has considered using other laboratories for viral load testing, but the benefits and efficiencies of a centralized laboratory outweigh any flexibility gained from utilizing commercial laboratories. Ex. 53, Peel Decl. ¶¶ 71-80.

*75.* Whether transporting a patient out of a location to provide tests is "excessive time lost" depends on the deployment location, the difficulty of transporting the service member, and whether the

service member is "one deep," filling a critical role in the unit with no replacement. Ex. 24, Murray Decl. ¶ 67.

*76*. R&R is not always available during a deployment. Availability depends on the needs of the military, the location of the deployment, and the risk of transportation and is permitted only when circumstances allow. Ex. 24, Murray Decl. ¶ 68. Because of these limitations, military planning does not assume that required medical care can be provided during R&R leave. *Id*.; 2018 Report to Congress 15.

*77*. Plaintiffs' statement is generally true, but military service demands that candidates for accessions and service members in many positions be qualified for worldwide deployments without limitation. Ex. 1, DoDI 6130.03; SUF ¶¶ 7, 9. HIV-positive individuals cannot fulfill this requirement. SUF¶¶ 11, 18.

*79*. Dr. Danaher, a former Air Force doctor's, opinion does not represent the considered position of the military and fails to consider all the factors relevant to a contingency deployment. *See* Mot. to Excl. Further, Plaintiffs' statement that deployment stressors do not affect HIV-positive individuals any differently than others is incorrect and based on testimony about the combination of stressors taken out of context. Ex. 20, Wiesen Dep. 138:14-139:10. For instance, deployment stressors could cause non-adherence to ART or a battlefield scenario could cause an HIV-positive service member to donate blood. SUF ¶¶ 50-51, 72-74.

*80*. Plaintiffs' statement regarding the Air Force's position on testing for neurocognitive impairment is incomplete. Because this is a developing area of HIV-science, the medical response required may change over time. SUF ¶ 57.

*81*. Plaintiffs failed to include the necessary context to the conclusion offered by the 2018 Report on neurocognitive impairment. The conclusion was based on medical studies suggesting that some virally suppressed patients will experience symptomatic neurological impairment. *See* Ex., 2018 Report. The DoD concluded that the ultimate "impact . . . on a Service member's readiness, resilience, and/or retention" is unknown because the research is still developing. 2018 Report 20-21.

The military cannot rely on accession medical screening to determine the likelihood of future neurocognitive impairment. SUF ¶¶ 56-57.

**82.** The study referenced in this paragraph did not conclude that HIV does not cause neurological impairment. It concluded that neurological impairment could be "limit[ed]" by early recognition and management of HIV infections. Ex. 14, 2018 Report 20 (citing Ex. 39 Crum-Cianflone study); *see also* Ex. 18, Ciminera Dep. 131:15-132:3.

**83.** Plaintiffs' statement requires qualification; in some instances live vaccines are contraindicated for service members with HIV. Ex. 21, Cron Dep. 155:23-18; Ex. 20, Wiesen Dep. 144:17-145:1. There are some deployment scenarios in which a waiver would be rejected for any service member with medical conditions that bar them from receiving a particular vaccine. Ex. 20, Wiesen Dep. 144:17-145:1.

**85.** Plaintiffs' description is misleading. The risk of HIV transmission through wound-to-wound contact is low but not non-zero. The precise risk is unknown. *See* SUF ¶¶ 80, 85.

**86.** Plaintiffs' description is misleading. The risk of HIV transmission through catastrophic injury is low but non-zero. The precise risk is unknown and may be increased by the severity and type of wound. *See* SUF ¶¶ 80, 103. Further, Plaintiffs have no basis to support their conclusion that the volume of blood from a combat wound such as a bone shard would be less than that from a needle stick.

**87.** Plaintiffs' description is misleading and mischaracterizes the risk of occupational exposure as "extremely low." There is no evidence to support the conclusion that an undetectable viral load eliminates entirely the risk of transmission through occupational exposure. *See* SUF ¶¶ 79-81. The CDC considers an occupational exposure to be an "urgent concern" of transmission. *See* SUF ¶ 103. The frequency of occupational exposures may be higher in a combat environment, rendering statistics from civilian exposures inapplicable. *See* SUF ¶ 81.

**88.** Plaintiffs' statement is incorrect. The actual testimony is that a "perhaps" 1% chance of transmission was the minimum threshold regarding contagious disease that could endanger the

health of other personnel but "[i]t's difficult to pin down." Ex. 20, Wiesen Dep. 61:6-10. DoD

policy barring accessions of individuals with contagious disease contains no minimum criteria for

transmission. *See* Ex. 1, DoDI 6130.03.

**90.** Plaintiffs' description is misleading. The risk of HIV battlefield transmission is low but non-zero.

The precise risk is unknown. *See* SUF ¶ 85; Ex. 36, Blaylock Decl. ¶ 37. Additionally, Plaintiffs'

reliance on Dr. Blaylock's testimony that the risk from blood splash is negligible is flawed because

the statement "assum[ed] an intact mucosal surface" (i.e., no skin wounds). Ex. 35, Blaylock Dep.

37:7-21.

**91.** Plaintiffs' description is misleading. There are numerous reasons why the provision of PEP

cannot be regularly relied upon in a circumstance of battlefield exposure. *See* SUF ¶¶ 94, 102.

**93.** Plaintiffs' description of an order not to donate blood and the counseling statement is

misleading regarding their effectiveness. *See* SUF ¶ 73. The Court should exclude (or at least

discount) testimony from Dr. Hendrix, on this subject. *See* Mot. to Excl.

**95.** Plaintiffs' description of the walking blood bank is incomplete. There are scenarios in which pre-

screened donors are not available and there is no time for rapid testing prior to transfusion. SUF ¶¶

69, 76-77.

**96.** Plaintiffs' reliance on the statistic that in a six year period, "only 2% of the blood products" were

non-FDA compliant, non-screened units is misleading because the military plans for scenarios which

require greater reliance on unscreened blood from the walking blood bank, such as in small units or

mass casualty situations. SUF ¶ 66; Ex. 24, Murray Decl. ¶ 54. That there are "no cases of

transfusion-transmitted HIV" in combat is evidence that the military's decision to bar HIV-positive

members from deployments has so far been successful in mitigating this risk.

**97.** Participation in the walking blood bank is voluntary, but there are circumstances in contingency

operations in which a service member might be under pressure to donate blood. SUF ¶¶ 72-74.

**98.** Plaintiffs' statement requires qualification: being unable to donate blood is "potentially"

disqualifying because certain contingency operations might require all deployed service members be

38

available to donate blood. SUF ¶ 71. The military bars all individuals with contagious diseases,
including those with bloodborne pathogens such as HIV, Hepatitis B, Hepatitis C, and HTLV, from
contingency deployment. Ex. 26, Cron Decl. ¶ 20; *see* DoDI 6490.07 Encl. 3 § e.

*99.* This statement is partially incorrect and is unsupported because it relies only on the testimony of
a witness who is not authorized to provide testimony on behalf of the military regarding the Armed
Services Blood Program. Ex. 21, Cron Dep. 184:10-18; 198:10-199:4; *see* RSUF ¶ 98. The military
mitigates the risk of donation from people who might have a bloodborne  pathogen by pre-
screening service members for infectious diseases before deployment. *See* Ex. 6, MOD 13 § 15.C.1.

*100.* Plaintiffs' statement requires clarification. AB blood is a universal plasma donor. Service
members with this blood type are very useful source of blood plasma for individuals of all blood
types at facilities with regular blood banks in deployed locations. Pls.' Ex. 58 at 2.

*101.* To the extent that Plaintiffs characterize screening efforts as "successful" at protecting the
blood supply, Plaintiffs fail to include the basis for that success, which includes a policy to prevent
deployment of individuals carrying bloodborne pathogens and evacuating people from theater when
diagnosed. SUF ¶ 85; Ex. 26, Cron Decl. ¶¶ 20, 22.

*102.* Plaintiffs' statement is unsupported. Colonel Taylor testified that she did not know of any cases
in the last ten years, and did not know the answer about whether there were cases in the time period
beyond that. Ex. 46, Taylor Dep. 124:18-23.

*103.* Plaintiffs mischaracterize Dr. Shell's testimony. Dr. Shell was not the only contributor to the
2018 Report. Ex. 27, Shell Dep. 97:24-99:2, 98:11-2; Ex. 14, 2018 Report 1 ("Service-level
information was obtained from each of the Military Departments"). The 2018 Report correctly
references DoDI 6485.01, *see, e.g.,* Ex. 14, 2018 Report 9, which designates Under Secretary of
Defense for Personnel and Readiness as responsible for policy implementation and guidance "for
compliance with host-nation requirements for screening and related matters for Service members."
Ex. 2, DoDI 6485.01 Enc. 2. Plaintiffs' description of the contents of "Table X: HIV Restrictions in
[F]oreign [N]ations" is misleading. Ex. 27, Shell Dep. at Ex. 14. Though "most countries" on the list

do not have restrictions on persons living with HIV, that generalization is not true in the CENTCOM Area of Operations. SUF 22.

**104**. Because CENTCOM has other considerations in rejecting waivers to HIV-positive service members for deployment into its area of operations, it has not had to consider host nation laws. But policy requires it do so when necessary. *See* PSUF ¶ 21.

## LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Jacobs v. N.C. Admin. Off. Of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (citations omitted). The court "must view the evidence in the light most favorable to the nonmoving party" and "therefore cannot weigh the evidence or make credibility determinations." *Id.* (citations omitted). If the non-movant's evidence is "unduly speculative, merely colorable, or not significantly probative, summary judgment can be granted" to the moving party. *Dash v. Mayweather*, 731 F.3d 303, 327-28 (4th Cir. 2013) (citation omitted).

## ARGUMENT

All of Plaintiffs' claims should be dismissed as nonjusticiable, and *Roe* Counts 4 and 5 should be independently dismissed as not subject to judicial review under the APA. On the merits, both the accessions and deployment policies are rational and supported by substantial evidence.[17] The Court should reject Plaintiffs' attempts to invert the standard of review by requiring the military to prove a risk exists, rather than Plaintiffs negating the reasoned basis for the policy. In addition, the military correctly followed its own procedures in determining that Roe and Voe should be discharged.

---

[17] Rational basis review is the correct standard for these claims because the deployment policies are not subject to APA review. *See infra*. However, should the Court determine that rational basis review would not apply, Defendants' policies would also pass arbitrary and capricious review, or even heightened constitutional scrutiny for the reasons set forth below.

## I.   Threshold Defenses

Because Plaintiffs ask this Court to second-guess military policies that lie at the core of military discretion, both *Harrison* and *Roe* should be dismissed in their entirety as nonjusticiable military controversies. *See Guerra v. Scruggs*, 942 F.2d 270, 276 (4th Cir. 1991); *see also Harrison* ECF 43 at 10-14 (raising Guerra argument); *Roe* ECF 47 at 9-13 (same*). Although the Court has already held that these cases are justiciable under *Guerra*, Defendants respectfully preserve their previous argument for further review. *See Roe*, 359 F. Supp. 3d 282; *Harrison* Hrg. Tr. (Sept. 14, 2018) at 16-17 (denying the motion to dismiss without prejudice and stating that the Court "will take another look at it probably in the summary judgment context").

In addition, Defendants also moved to dismiss on grounds that Plaintiff Harrison and Plaintiff MMAA lack of standing. *See Harrison* ECF 43; *Roe* ECF 119. The Court denied Defendants' motions to dismiss and declined to address MMAA's associational standing and holding that MMAA has standing based on its unpled theory of direct injury. Mem. Op. at 9, *Roe* ECF 261. Nonetheless, Plaintiffs must support their standing "with the manner and degree of evidence required at the successive stages of the litigation," including at summary judgment. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Defendants thus renew their motions to dismiss for lack of standing, incorporate by reference all arguments made in support, and hereby convert them to a motion for summary judgment. Plaintiffs Harrison and MMAA must submit "affidavits and other evidence, showing, through specific facts" that they have standing at this stage of the litigation. *Id.* at 563.

Further, *Roe* Counts 4 and 5 must be independently rejected for threshold reasons. Unlike *Roe* Counts 2 and 3, which challenge how Air Force *procedures* were applied to Roe and Voe, Counts 4 and 5 raise APA challenges to the underlying, *substantive* deployment policies of the military.[18] Because APA review does not apply to the types of polices at issue here, the Government is entitled to summary judgment on those counts. The Government recognizes that the Fourth Circuit applied

---

[18] *Roe* Count 3 includes paragraph 133, which might be read to include a challenge to the military's substantive deployment policy, rather than the military's discharge procedures. *See Roe* Compl. ¶ 133. To the extent *Roe* Count 3 raises such an APA challenge, it too should be dismissed.

APA review in its opinion on the preliminary injunction, *Roe*, 947 F.3d at 225, but it did so only after noting that the Government had not raised an argument regarding the APA's inapplicability and noting that the military was not uniformly exempt from the APA, *id.* at 224 n.2. Here, the Government explains why APA arbitrary and capricious review of these policies is unavailable, and accordingly Roe and Voe may challenge them only through their equal protection claim under rational basis (*Roe* Count 1). *See Webster v. Doe*, 486 U.S. 592, 601–02 (1988) (precluding review of an employment action brought under the APA when the decision was "committed to agency discretion" but holding that constitutional claims were not also precluded).

### A.   The Deployment Policies Are Committed to Agency Discretion By Law.

The APA provides a partial waiver of the government's sovereign immunity. *Randall v. United States*, 95 F.3d 339, 345 (4th Cir. 1996). But that waiver does not apply "to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Heckler v. Chaney*, 470 U.S. 821, 828 (1985) ("[B]efore any [APA] review at all may be had, a party must first clear the hurdle of § 701(a)."). Courts lack subject matter jurisdiction to consider APA challenges to such decisions. *See Angelex Ltd. v. United States*, 723 F.3d 500, 509 (4th Cir. 2013).

Agency action is "committed to agency discretion by law" when there are "no judicially manageable standards . . . for judging how and when an agency should exercise its discretion." *Speed Mining, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 528 F.3d 310, 317 (4th Cir. 2008) (quoting *Heckler*, 470 U.S. at 830). This exception is particularly relevant in the area of military affairs. *Cf. Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.").

Just as a court is ill-positioned to second-guess military decisions like the training and arming of a military force, *see Gilligan v. Morgan*, 413 U.S. 1, 6-8 (1973); U.S. Const., Art. II, § 2, courts also lack manageable standards to oversee military decisions regarding who to deploy. *See, e.g., Ornato v. Hoffman*, 546 F.2d 10, 14-15 (2d Cir. 1976) (decision to grant deferment or exemption from active duty because of personal hardship not reviewable under APA); *United States ex rel. Schonbrun v.*

*Commanding Officer, Armed Forces*, 403 F.2d 371, 374-75 (2d Cir. 1968) (same); *Ange v. Bush*, 752 F.

Supp. 509, 518 (D.D.C. 1990) ("[T]his court is not empowered to review the standards used by the

Army to determine the deployability of soldiers[.]"). Whether to deploy an individual with a

particular medical condition requires considerations of myriad military factors, such as combat and

theater conditions, logistics capabilities, and others. Whether the combination of those factors

warrants allowing an individual with a particular medical condition to deploy is a question for which

the courts should defer to the military.[19] *Cf. Rostker v. Goldberg*, 453 U.S. 57, 66 (1981) (noting the

Supreme Court has given "a healthy deference to legislative and executive judgments in the area of

military affairs"); *cf. also Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (§ 701(a)(2) bars review of

"categories of administrative decisions that courts traditionally have regarded as 'committed to

agency discretion'").

### B.  APA Review Is Also Unavailable Under The APA's "Military Authority" Exception.

*Roe* Counts 4 and 5 should also be dismissed under the APA's exemption for review of

"military authority exercised in the field in time of war or in occupied territory." 5 U.S.C.

§ 701(b)(1)(G). The term "in the field" is not restricted to tactical decisions made during active

combat operations. *See Al Odah v. United States*, 321 F.3d 1134, 1150 (D.C. Cir. 2003) (Randolph J.,

concurring), *rev'd on other grounds*, *Rasul v. Bush*, 542 U.S. 466 (2004). Similarly, "time of war" is not

limited to instances in which Congress has declared war. *Id.* As suggested by then-Judge Ruth Bader

Ginsburg, the exception applies to "military commands made in combat zones or in preparation for,

or in the aftermath of, battle." *Doe v. Sullivan*, 938 F.2d 1370, 1380 (D.C. Cir. 1991). CENTCOM's

area of responsibility covers multiple active combat zones with ongoing military operations

involving hostile forces.

Roe's and Voe's APA challenges to the various military deployment policies must be

dismissed because an order to deploy is a "military command" made "in preparation for. . . battle."

---

[19] In some circumstances courts might address whether the military failed to follow their own
procedures. Whereas such procedural questions may be subject to judicial review, courts lack the
power "to decide the *merits* of a matter committed to [the military's] discretion." *Bluth v. Laird* at
1071, 435 F.2d 1065, 1071-72 (4th Cir. 1970).

The military classifies deployments to areas that "requir[e] military operations" because of acute security concerns (among other reasons) as "contingency operations." *See* Ex. 5, DoDI 6490.07, ¶ 3(a), (c). And the Department of Defense considers all deployments to Central Command to be "contingency deployments." SUF ¶ 10. APA review of such quintessential military policies is therefore improper. *Cf., e.g.*, *Ange*, 752 F. Supp. at 51. A challenge to deployment policies puts at issue the basis on which the military makes actual deployment decisions, and those judgments are a military function not subject to APA review.

## II.  The Accessions Policy in *Harrison* does Not Violate the Equal Protection.

The Court should deny Plaintiff Harrison's equal protection challenge to the DoD and Army's policies denying accessions for HIV-positive candidates.

### A. The Military's Medical Standards for Accessions.

The Department of Defense sets medical standards for appointment, enlistment, and induction into the military (generally called "accessions") to ensure a medically fit military force. The accessions medical standards are stricter than the retention standards because "the needs of the Service incline toward selecting members in whom to make the training and mentoring investment who minimize any risk of inability due to medical conditions to complete an initial period of service and potentially a longer military commitment." SUF ¶ 5. Potential officer candidates who are serving as enlisted service members, such as Harrison, are required to meet the accessions medical standards because their commissioning represents a military investment in training the service member for a new career and new sets of duties. *See* PSUF ¶ 35; *see* SUF ¶ 5. Nearly 71% of military-age Americans are presumptively ineligible for service based on "the many demanding selection practices" of the military. *Doe 2 v. Shanahan*, 917 F.3d 694, 721 (D.C. Cir. 2019) (Williams, J. concurring).

The Department of Defense lists hundreds of medically disqualifying conditions for accessions in DoDI 6130.03, including the presence of HIV infection. *See* SUF ¶ 1; PSUF ¶ 36. DoDI 6130.03 explains that the medical standards are based on five policy criteria to ensure that individuals considered for accessions will be likely to stay healthy, deployable, and not risk other

service members for the length of their career. *See* PSUF ¶ 35; RSUF ¶ 35. A working group of military medical providers and personnel policy makers from the Department of Defense and each Service, develops and maintains the list of disqualifying conditions. SUF ¶ 6-7.

      The Army implements the minimum medical standards required by the DoD in Army Regulation 40-501, which includes HIV as a disqualifying condition.[20] *See* SUF ¶ 3. The DoD has an instruction specific to HIV management, DoDI 6485.01, which also identifies HIV infection as a disqualifying condition for accessions. *See* SUF ¶ 2. The Army has an implementing regulation, AR 600-110 which also identifies HIV infection as a disqualifying condition for accession to the Army.[21] SUF ¶ 4. DoDI 6485.01 and AR 600-110 contain no provision for a waiver process, and so the condition cannot be waived. SUF ¶ 2, 4. Thus, an HIV-positive candidate seeking to enter the Army, including an enlisted service member seeking a commission, would have to receive an exception to policy first from the DoD (for DoDI 6485.01) and then from the Army (for AR 600-110). *See* SUF ¶¶ 2, 4, 35.



---

[20] Any service component can choose to implement heightened medical standards above the "floor" prescribed by DoDI 6130.03 if necessary for the particular needs of its service. Frazier Decl. ¶ 9. But, in the case of HIV, the Army has implemented the minimum requirement from the DoD. SUF ¶ 3.

[21] For simplicity, when Defendants refer to the "Accessions Policy" it is collectively referring to these two DoDIs (6130.03 and 6485.01) and two ARs (AR 40-501 and 600-110), as they apply to HIV.



Plaintiffs argue that the medical standards that define HIV seropositivity as a medically disqualifying condition deny Harrison, and those enlisted service members seeking commissions like him, violate the equal protection clause of the Fifth Amendment. Defendants are entitled to summary judgment as a matter of law on this claim.

### B. Equal Protection Standard of Review

"To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny. *Id.*

A "challenged classification need only be rationally related to a legitimate state interest unless it violates a fundamental right or is drawn upon a suspect classification such as race, religion, or gender." *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008). Under the controlling law of this Circuit, individuals diagnosed with HIV are not a suspect class. *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1267 (4th Cir. 1995). It is also undisputed that there is no fundamental right to serve in the United States military. *See, e.g., Dodson v. Army*, 988 F.2d 1199, 1203-04 (Fed. Cir. 1993). Accordingly, rational basis review is the appropriate standard in this case.

Under the rational basis standard, a defendant "'need not actually articulate at any time the purpose or rationale supporting its classification,' and it is not required to produce evidence showing the rationality of its classification." *Pulte Home Corp. v. Montgomery Cty.*, 909 F.3d 685, 693 (4th Cir. 2018) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). Defendants' policies "[are] entitled to 'a strong presumption of validity,' and must be sustained if 'there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Thomasson v. Perry*, 80 F.3d 915, 928 (4th Cir. 1996) (en banc) (quoting *Heller,* 509 U.S. at 318-20). "The burden is on the one attacking the [government's policy] to negative every conceivable basis which might support it." *Heller*, 509 U.S. at 320 (citation omitted). Classifications challenged under rational basis review are "not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Id.* (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). "The test is not a subjective one . . . and [t]he actual motivation for the [government's] actions [is] irrelevant." *Pulte Home Corp. v. Montgomery Cty., Maryland*, 909 F.3d 685, 693 (4th Cir. 2018) (cleaned up).

Beyond the generally deferential rational basis review standard, "[j]udgments concerning military operations and needs" are "unquestionably" entitled to deference. In particular decisions about who should serve in the military "necessarily require[]" deference. *Rostker*, 453 U.S. at 68 (internal citation omitted). Moreover, judicial review of military regulations challenged on constitutional grounds "is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) (first amendment challenge); *Trump v. Hawaii*, 138 S. Ct. 2392, 2421(2018) (courts should defer to the "Executive's predictive judgments" on matters relating to national security); *see also Weiss v. United States*, 510 U.S. 163, 177 (1994); *Solorio v. United States,* 483 U.S. 435, 448 (1987).

Plaintiffs contend that the Court should apply heightened scrutiny to their equal protection claims, *see* Pls. Br. 41-42, despite controlling precedent holding that classifications involving HIV-

positive individuals are subject only to rational basis review. *Doe*, 50 F.3d at 1267.[22] It is well-established that "classifications based on disability are subject to minimal scrutiny." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 486 (4th Cir. 2005); *see also, e.g., City of Cleburne. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985). Plaintiffs also assert that HIV infection should no longer be considered a disability for purposes of legal analysis in light of the developments in HIV treatment. *See* Pls. Br. 42. However, HIV remains defined as a disability under the Americans with Disabilities Act, 28 U.S.C. §§ 12101-213 (1990). *See* 28 C.F.R. § 35.108(a)(1)(i), (b)(2); *see also, e.g., Gates v. Rowland*, 39 F.3d 1439, 1446 (9th Cir. 1994). Moreover, classifications based on diseases and other medical conditions are subject only to rational basis review. *See, e.g., Wilson v. Lynch*, 835 F.3d 1083, 1098 (9th Cir. 2016); *Brandon v. Carmichael*, Civ. No. 15-CV-2814, 2016 WL 8731115, at *4 (S.D. Cal. Oct. 28, 2016), *report and recommendation adopted*, Civ. No. 15-CV-2814, 2016 WL 7030365 (S.D. Cal. Dec. 2, 2016). Finally, Courts are "reluctant to establish new suspect classes" and this concern "has even more force when the intense judicial scrutiny would be applied to the 'specialized society' of the military." *Thomasson*, 80 F.3d at 928 (quoting *Parker v. Levy*, 417 U.S. 733, 743 (1974).[23]

### C. Plaintiffs Failed to Demonstrate They Have an Equal Protection Claim.

Plaintiffs failed to meet either of their two initial burdens to succeed on an equal protection claim: (1) Plaintiffs have not demonstrated that Harrison, and those like him, have been treated differently from others similarly situated, and (2) Plaintiffs have not demonstrated any disparate treatment was the result of intentional discrimination. *See Morrison*, 239 F.3d at 654.

*First*, to even state an equal protection claim, "a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated." *Sandlands C&D LLC v. Cnty. Of Horry*, 737 F.3d 45, 55 (4th Cir. 2013). Plaintiffs' claims fail at this threshold step because

---

[22] *See also Mofield v. Bell*, 3 F. App'x 441, 443 (6th Cir. 2001); *Johnson v. Brewer*, Civ. No. 10-CV-28-A-S, 2012 WL 3580678, at *2 (N.D. Miss. Aug. 17, 2012); *Fox v. Poole*, Civ. No. 06-CV-148, 2008 WL 1867939, at *14-15 (W.D.N.Y. Apr. 24, 2008).

[23] Rational basis review is the correct standard for these equal protection claims. *See supra*. However, should the Court determine that rational basis review would not apply to this claim, Defendants' policies should be sustained as reasonable under review of an APA arbitrary and capricious claim, or even under heightened constitutional scrutiny for the reasons set forth below.

they cannot show that HIV-positive candidates for accessions into the United States Army are similarly situated to any other candidates for accession into the Army. Constitutional guarantees of equal protection only prohibit "governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). "[I]n determining whether persons are similarly situated . . . a court must examine all relevant factors." *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996). A prospective applicant's physical and mental health condition is indisputably a relevant factor for any accession into Army service.

"The 'similarly situated' standard requires a plaintiff to identify persons materially identical to him or her who have received different treatment." *Kolbe v. Hogan*, 813 F.3d 160, 185 (4th Cir. 2016) (emphasis added) (holding that "the evidence must show an extremely high degree of similarity" to provide a relevant comparison). *affirmed by rehearing en banc, Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017). Plaintiffs have not, and cannot, identify any other group or groups of prospective applicants who are similarly situated to HIV-positive applicants for accession to the Army because there are no sufficiently similar conditions that are infectious, bloodborne, incurable, with no vaccine, and require daily medication and periodic blood testing to remain stable. SUF ¶ 61.

Courts have specifically noted that because HIV is a contagious disease, HIV-positive individuals are not similarly situated to other individuals not carrying contagious diseases. *See, e.g., Nolley v. County of Erie*, 776 F. Supp. 715, 739 (W.D.N.Y. 1991); *Moore v. Ozmint*, Civ. No. 3:10-3041-RBH-JRM, 2012 WL 762460 at *10-11 (D.S.D. Feb. 16, 2012) (collecting cases); *see also Johnson v. N.C. Dep't of Pub. Safety*, Civ. No. 1:16-cv-267-FDW, 2018 WL 443002 at *8 (W.D.N.C. Jan. 16, 2018) ("HIV and Hepatitis-C infected inmates suffer from distinct viruses and are not similarly situated.").

*Second*, Plaintiffs' failure to identify any purposeful and intentional discrimination by the DoD or Army also means that their equal protection challenge should be dismissed at this threshold stage of the analysis. "[D]iscriminatory intent 'implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular

course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 819 n.2 (4th Cir. 1995) (quoting *Personnel Admin. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). There is no evidence whatsoever suggesting that the military decisionmakers acted out of animus towards individuals with HIV. *See* SUF ¶¶ 42-43.

Because Plaintiffs failed to meet their threshold burden to support an equal protection claim for two separate reasons, the government is entitled to summary judgment on the equal protection claims. *See Kolbe*, 813 F.3d at 185.

### D. The Accessions Policy Has a Rational Basis.

Even if the Court finds that Plaintiff satisfies the two initial inquiries, the military's decision to bar accessions of HIV-positive individuals is supported by multiple independent rationales, all of which are consistent with DoD's general policy on accessions medical standards. Plaintiffs' focus only on the accessions policy's relationship to CENTCOM's current deployment policy, *see* Pls. Br. 44-45, thus ignoring critical rationales that independently support the accessions policy. *See Heller*, 509 U.S. at 320 (plaintiffs must negative "every conceivable basis" for a policy to prevail on rational basis). Contrary to Plaintiffs' construction, the accessions medical standards are based not just on *current* conditions in one area of operations, but on the military's assessment of the *future* prognosis of the candidate and its own *future* potential operational needs. *See* SUF ¶¶ 5, 8, 14, 92. The military expends substantial resources training service members to prepare them for careers in the relevant service. *See* SUF ¶¶ 5, 8. In evaluating the requirements of service, the military also has a legitimate interest in ensuring that its fighting force is composed of service members who are best equipped for possible (and necessarily hard-to-predict) future conflicts, as well as for current deployment conditions. *Id.* Because accessions medical standards require professional judgment regarding the needs of the military in combat, it is precisely the type of "complex, subtle, and professional decision[] as to the composition, training, equipping, and control of a military force," which are "essentially professional military judgments." *Gilligan*, 413 U.S. at 10.

The DoD's professional military  judgment to medically disqualify HIV-positive candidates for accession is supported by multiple independent bases: (1) the risk of a contagious disease to the fighting force, (2) the long-term prognosis for HIV-positive service members, (3) the financial burden of supporting health care for HIV-positive service members, and (4) limitations on worldwide deployability. Whether considered individually or collectively, these reasons satisfy any rational basis inquiry. *See U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980); *Wilkins v. Gaddy*, 734 F.3d 344, 348 (4th Cir. 2013) ("[T]he fit between the enactment and the public purposes behind it need not be mathematically precise. As long as [DoD] has a reasonable basis for adopting the classification, which can include rational speculation unsupported by evidence or empirical data, the [challenged policy] will pass constitutional muster.") (quoting *FCC*, 508 U.S. at 315). Here, Defendants exceed the standard required by rational basis review by putting forward evidence that supports the basis for its decision to classify HIV as a medically disqualifying condition. When viewed through the lens of its five accessions medical standards policy criteria, *see* PSUF ¶ 35, the military reached a rational conclusion that HIV seropositivity is and should remain a disqualifying medical condition.

*First*, HIV is undisputedly a chronic and contagious disease, even when managed as well as possible under current medical science. SUF ¶ 61; PSUF ¶¶ 25-26. In its very first policy criterion in setting accessions medical standards, the military affirms its legitimate interest in excluding individuals carrying contagious diseases "that may endanger the health of other personnel." *See* PSUF ¶ 35; *see Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008). Plaintiffs effectively ask the Court to grant HIV-positive individuals a special status, not applied to other candidates for accessions carrying contagious diseases, simply because treatment of HIV has substantially reduced the risk of transmission in certain circumstances. But although current science suggests that an undetectable viral load renders HIV effectively untransmittable through *sexual* activity, the disease remains contagious through blood-to-blood transmission paths. *See* SUF ¶ 62. As explained *infra*, the military regularly faces scenarios – uncommon in the civilian world – that involve a heightened

51

likelihood of substantial blood-to-blood contact, for which the impact of decreased viral load on the likelihood of transmission is unknown. SUF ¶¶ 79-81.

Further, the military's risk assessment regarding contagiousness must also consider that some HIV-positive individuals will fail to maintain an undetectable viral load for the duration of their service. *See infra* at 57. If an HIV-positive individual experiences viral rebound to a detectable level—not an uncommon development over the course of a lifetime or a career—the risk of transmission increases for all transmission paths, and HIV becomes sexually transmittable. SUF ¶¶ 63-64. It is rational to account for these realities, and thus to conclude that excluding individuals with an infectious disease will reduce the likelihood of spreading that disease through the military.

*Second*, the military has a legitimate interest in barring conditions that could result in lost duty time or inability to continue service. Some well-managed patients with HIV will experience side effects from their medication or develop comorbidities, both of which could result in lost duty time and prevent or limit continued service. SUF ¶¶ 52, 59. Side effects and comorbidities may develop over time and may not be detectable during accessions medical screening. SUF ¶ 52. The development of side effects and comorbidities and their severity vary by individual, treatment type, and progression of the disease. SUF ¶ 55. Known comorbidities that develop in some people living with HIV include: cardiovascular abnormalities, renal disease, liver disease, inflammation-related diseases, neurocognitive impairment, and signs of "premature aging" such as cardiovascular disease and osteoporosis. SUF ¶ 55. The presence of any of these side effects or comorbidities could result in lost duty time or limit the types of duty that can be performed. In the most extreme cases, especially in combination with other medical conditions, they could result in early separation from service. SUF ¶¶ 9, 27. Conditions of deployed military service, such as dehydration, lack of sleep, and lack of regular meals, which are common in austere military environments, may aggravate these side effects or comorbidities. SUF ¶ 54.

Plaintiffs acknowledge the possibility of only one of these comorbidities – neurocognitive impairment. Although the science on neurocognitive impairment as a comorbidity for HIV is a

developing area, SUF ¶ 57, Plaintiffs acknowledge that the military's consideration of this risk is grounded in evidence that this condition is possible in some patients. *Id.*, *see* PSUF ¶ 80-82. Plaintiffs propose that the military mitigate this risk by expending additional medical resources to monitor HIV patients' neurological condition to make sure it continues to meet medical standards (also resulting in more lost duty time), and discharging or limiting service if a decline in capacity is detected (resulting in an inability to complete a term of service). *See* Pls. Br. 49-50. This proposal ignores the legitimate military interest in an accessions medical policy that avoids the risk of these outcomes, as well as the quintessential military policy judgment that some concerns are better addressed by an across-the-board policy, rather than case-by-case, service member by service member consideration.

This reasoning is equally applicable to all the other side effects and comorbidities that Plaintiffs fail to acknowledge – each possible condition means that an HIV-positive individual is at a greater risk than another service member of lost duty time or not completing a term of service. It is rational for the military to exercise its judgment to exclude individuals with this heightened risk to continued service.

*Third*, the increased burden of caring for an HIV-positive patient also is a rational basis for excluding their accession. Even when the alleged constitutional rights of service members are involved, decisions by the political branches as to whether a benefit "consumes the resources of the military to a degree . . . beyond what is warranted" deserve significant deference. *Middendorf v. Henry*, 425 U.S. 25, 45 (1976). Maintaining a healthy fighting force and keeping service members free of physical defects is plainly more burdensome if persons already being treated for a chronic condition like HIV are allowed access. To begin, ongoing ART treatment and annual clinical monitoring of a well-managed HIV patient represents a significant cost burden. Annually, ART costs between $10,000 and $25,000. SUF ¶ 60. This cost was considered in the development of the accessions medical standards for HIV. SUF ¶ 59. Plaintiffs' propose additional cost burdens, suggesting the military mitigate its other risk concerns by procuring clinical testing from commercial laboratories,

adding neurological monitoring, flying the HIV patients in and out of theater as part of regular clinical monitoring, and adding PEP to medical kits. *See, e.g.*, Pls. Br. 48-50, 54. The military's judgment not to burden itself with these additional costs (financial and otherwise) by denying accessions to HIV-positive individuals is rational.

*Fourth*, the military has a legitimate interest in maintaining a fighting force without any deployment limitations, SUF ¶ 13; PSUF ¶ 35, and can act to further that interest at the accession stage. As discussed, *infra*, CENTCOM has multiple valid reasons to disallow deployment of HIV-positive service members into its current areas of operation. Regardless of how the Court rules on the separate issue of whether service members may be discharged because of the CENTCOM deployment policy, it plainly would be rational for the military to deny accessions to individuals who cannot deploy to CENTCOM. Even if the Army chooses to retain soldiers with HIV, it is still in the military's interest to avoid accessions of a candidate that presumptively has a geographic limit on their service. SUF ¶ 7, 11-12.

It also is rational for the military to consider at the accession stage *future* conflicts that might present circumstances counseling against deployment of HIV-positive service members. SUF ¶ 14. These conflicts may be with an adversary who has similar military power to the United States, may lack fixed medical facilities or a developed logistical supply chain, and have longer deployment lengths. SUF ¶ 92. Such a conflict might present austere and remote living conditions which would tax the already difficult military problem of medical resupply. *Id.* There might be increased risks of kinetic and explosive events. SUF ¶ 15. Deployments could increasingly rely on small units in which every team member is needed for the walking blood bank. SUF ¶ 96. The military exercised its judgment about how to compose its force in preparation for future conflicts, and it was rational to decline to access individuals with a chronic condition that requires complex and costly special care and logistical support in unknown future combat environments. *See Curran v. Laird*, 420 F.2d 122, 129 (D.C. Cir. 1969) (questions of foreign affairs that "involve large elements of prophecy" should be undertaken by experts, not courts).

54

Each of these reasons is a plausible, rational basis that supports the military's legitimate interest in maintaining a healthy fighting force medically capable of performing their duties without geographic limitations. The decisions of who to recruit and access in order to build the healthiest and best possible fighting force is a quintessentially military decision subject to exceptional deference. *See Gilligan*, 413 U.S at 1. It is rational for the military to medically disqualify accessions for individuals with HIV, just as it does for hundreds of other medical conditions. Accordingly, Defendants are entitled to summary judgment on this claim; the Accession Policy does not violate Harrison's equal protection rights.

### III. The Deployment Limitations of HIV-Positive Service Members Are Lawful.

Both the accessions policies at issue in *Harrison* and the retention policies at issue in *Roe* rely in part on the deployability of HIV-positive service members, and in particular their deployability to the CENTCOM region. For the reasons set forth below, the deployment limitations at issue are lawful.

#### A. Standard of Review

As explained above, Plaintiffs' substantive challenges to the deployment policies under the APA, *Roe* Count 4 and 5, must be dismissed, as these policies are only subject to constitutional review, *see supra* at 40. And with respect to their constitutional challenge, the court again need only consider whether the policies are rationally related to a legitimate governmental interest. *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533 (1973) ("Under traditional equal protection analysis, a legislative classification must be sustained if the classification itself is rationally related to a legitimate governmental interest."). If, however, the Court holds that the APA claims may also be reviewed, then they also are subject to a form of rational basis review. "[R]ational-basis [r]eview of an equal protection claim in the context of agency action is similar to that under the APA." *Roe v. Shanahan*, 359 F. Supp. 3d 382, 411 (E.D. Va. 2019) (second alteration in original) (quoting *Cooper Hosp./Univ. Med. Ctr. v. Burwell*, 179 F. Supp. 3d 31, 47 (D.D.C. 2016) *aff'd per curiam*, 688 F. App'x 11 (D.C. Cir. 2017)). "In such a case, the equal-protection argument is 'folded into the APA argument, since no

suspect class is involved and the only question is whether the [defendants' treatment of plaintiff] was rational (*i.e.*, not arbitrary and capricious).'" *Cooper*, 179 F. Supp. 3d at 47 (quoting *Ursack, Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 955 (9th Cir.2011)).

**B. Defendants Deployment Policies are Rational**

Plaintiffs' challenges to various military deployment policies must be rejected because the military's decision to limit the deployability of HIV-positive individuals is rationally related to the military's legitimate interest in reducing risk and logistical burdens in contingency operations. As set forth below, these policies reduce battlefield-related risk in several ways, any one of which is sufficient to uphold the policy under rational basis review, and the military's policies are rational when the sum total of all reduced risk is considered. *See U.S. R.R. Ret. Bd.*, 449 U.S. at 179.

As a threshold matter, prior to considering whether the military has a rational basis for its policy, Plaintiffs again must first demonstrate that they have "been treated differently from others with whom [they are] similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison*, 239 F.3d at 654. As explained, *supra* at 48, Plaintiffs fail to meet this threshold requirement. The Court should reject Plaintiffs' lackluster attempt to compare HIV to other minor chronic conditions that are sometimes eligible for deployment waivers because none of the proffered conditions are simultaneously infectious, incurable, and dependent on strict medical adherence to reduce transmission risk. SUF ¶¶ 44, 61.

In any event, even if Plaintiffs could make that threshold showing, their challenge to the deployment policy would otherwise fail on the merits. In the DoD's Reports to Congress, Defendants laid out their rationale for the deployment policies for HIV-positive service members. *See* Ex. 14, 2018 Report at 20-25. Though not necessary for a rational basis review in which it is Plaintiffs' burden to negate every conceivable basis for a policy, the military has put forth substantial evidence explaining the basis and background for the policy concerns expressed in the Reports to Congress, thereby demonstrating that the military's deployment policies relating to HIV are based on reasoned decisionmaking. *See Roe*, 947 F.3d at 221 (4th Cir. 2020) (describing the standard for

consideration of evidence in APA review). The rationale in the 2018 report to Congress, supported by this explanatory evidence, shows that the military reached a reasoned conclusion that restricting deployment of service members with HIV reduces multiple battlefield risks. In sum, Defendants deployment restrictions are rational because: (1) there are situations that could lead an HIV-positive service member to experience viral rebound while deployed; (2) there remains a meaningful risk that service members could transmit their infection to others; (3) bloodborne transmission paths are especially significant in the context of military deployments; and (4) allowing HIV-positive service members to deploy would tax military resources by redirecting them to mitigate the possible risk of transmission, where such mitigation is even possible.

### 1. A Deployed HIV-Positive Service Member Could Experience Viral Rebound.

Plaintiffs' challenge to the deployment policies largely relies on the unsupported assumption that all service members with HIV will maintain an undetectable viral load throughout their deployments. However, the undisputed facts demonstrate that there is a meaningful likelihood that at least some HIV-positive service members would be unable to maintain an undetectable viral load during deployment, especially given the risks that medicine could be lost or destroyed, or that service members may insufficiently adhere to their treatment. To maintain an undetectable viral load, an HIV-positive individual must strictly adhere to an ART regimen and receive frequent viral load testing (and at times, genetic resistance testing, to ensure that they have not developed resistance to their ART treatment). SUF ¶ 44. Upon interruption of medication, it is undisputed that a patient's viral load will begin to increase, reach a detectable level, and then continue to rise. *Id.* With a detectable viral load, there is a greater risk of transmission of the virus, including the possibility of sexual transmission. SUF ¶¶ 63-64. Service members who fail to adhere to their ART regimen may develop symptoms of viremia or develop resistance to an entire class of drugs and will likely need additional clinical monitoring and viral load testing, which is not available in theater. SUF ¶ 49, 98.

### a. Lost or Destroyed Medication

Deployment presents an increased risk of viral rebound because individuals' medications are at an increased risk of being lost or destroyed, either in combat or because of the unique stressors of austere environments, and there is a decreased ability to timely replace them. SUF ¶ 51. Viral rebound after interruption of ART can occur in as little as 3 days, and many studies show rebound in an average of two weeks after interruption of ART, varying based on individual condition, regimen, and external conditions. SUF ¶ 47. Evidence shows that at four weeks nearly 80% of individuals are no longer virally suppressed . SUF ¶ 47 (citing Ex. 32, Hendrix Dep. at Ex. 10); PSUF ¶ 25. Given the divergent view points, and HHS guidance indicating viral rebound can occur in some cases in as little as three to six days, it is rational for the military to consider the possibility that service members might be at risk of viral rebound after a short period of medication interruption . Even if the Court accepts, for the purposes of summary judgment, Dr. Hendrix's outlying assertion that viral rebound might not occur until eight to twelve weeks, as discussed *supra* at 58, there are valid concerns that medication may not be resupplied for even that long. In any event, the military may rationally rely on the many sources indicating viral rebound occurring well before Dr. Hendrix's outlying assertion.

It is unlikely that medical facilities in deployed locations, particularly those "forward" deployed locations far from mature infrastructure, will have the required medicine to replace an individual's specific regimen. SUF ¶ 51. If medications were lost or destroyed, the service member would need to request a refill of their specific ART regimen from outside of theater and then await shipment through the military logistics system to a location that may be remote and may be in a combat zone. SUF ¶ 89. It is undisputed that the military cannot guarantee timely arrival of shipped medications. SUF ¶¶ 90-91. Given the unpredictable nature of combat, weather, and other factors that influence military logistics, it is impossible to provide a ceiling on how long it could take for the medication to arrive to the service member, but it can take months even in a mature theater. SUF ¶ *Id.* Moreover, space constraints are often severe in military logistics, and ART medications would

58

have to compete with other mission-necessary cargo such as ammunition, food, and immediately life-saving medical supplies. SUF ¶ 90. Under the undisputed facts, therefore, Plaintiffs' baseline presumption of consistent viral suppression in all deployed individuals is unsupported.

Plaintiffs do not meaningfully address these points in their motion for summary judgment, arguing instead that if "medications . . . were lost or destroyed *and* could not be resupplied in a timely fashion, the health consequences *for that individual* would be minimal." Pls. Br. 46 (second emphasis added). But that argument just assumes the conclusion. The consequences to the individual may not be minimal if the medication could not be resupplied – a risk the military reasonably takes into account. And Plaintiffs do not even address the most salient increased risk: the potential infection of *other* service members if HIV medication cannot be adequately resupplied —a serious outcome that would increase all of the costs and burdens described throughout this brief on other otherwise-healthy service members, and could significantly hamper the readiness of the fighting force.

Plaintiffs are ill-equipped to render an opinion regarding the military's ability to resupply medications. *See* Defs.' Mot. to Excl at 3-6. But to the extent that they attempt to do so, they mistakenly rely on evidence for mature theaters, such as Afghanistan and Iraq. *See* Pls.' Br. at 46-48; SUF ¶ 92. The military must also plan for future combat in which current theaters become unstable or combat moves into other regions. In potential "near-peer" combat situations, where the U.S. does not have marked superiority, the military's logistical capabilities would be even more constrained and resupply might be rendered impossible. *Id.* Thus, even if the military somehow could guarantee effective and timely delivery of medications in situations similar to those seen in the current conditions in Iraq and Afghanistan, the same would not necessarily be true of other combat situations the military must prepare for. *See id.*

### b. **Insufficient Adherence to Medication**

Deployment also presents an increased risk that service members will fail to adhere to their medicine. There is no definitive proof of the level of adherence required to avoid adverse health

outcomes. SUF ¶ 49. Insufficient adherence to an ART regimen will likely lead to severe health outcomes, including the development of resistance to ART regimens. SUF ¶ 48. Furthermore, service members who do not maintain their ART adherence may see their viral load increase and become more contagious.

The stress and exigencies of deployment may make it more difficult to maintain such strict adherence, counseling against deployment in the considered opinion of military infectious disease doctors. SUF ¶ 50. Best practices for non-deployed settings, such as taking ART medications alongside a regularly-scheduled daily activity (*e.g.*, immediately after brushing teeth) in order to increase the likelihood of compliance, are not possible in highly variable deployed conditions that potentially involve constant movement, expeditionary operations in which a service member does not carry enough medicine, lack of sleep, high stress, and irregular daily activities. *Id.*

The military is rational in rejecting the risk to its service members, and the increased risk of transmission, resulting from possible non-adherence to medication during deployment.

### 2.   *HIV Could be Transmitted by Deployed Service Members.*

As discussed, there are many reasons why a service member could be experiencing viral rebound while deployed, increasing the risk of transmission. But in any event, even a service member with an undetectable viral load poses an unacceptable risk of transmission. Plaintiffs' challenge to the HIV deployment policy rests heavily on the notion that individuals with an undetectable viral load have a low risk of transmitting HIV in the civilian context. However, the question here is whether the risk of transmission by a person with an undetectable viral load is sufficiently low to require the *military* to permit deployment on that basis. There are a number of military-unique scenarios that increase the risk that a transmission will occur. The Fourth Circuit dismissed this concern at the preliminary injunction stage as "unsupported" by the record, *Roe*, 947 F. Supp. 3d at 207. The Fourth Circuit believed that, based on the record before it, the military had "fail[ed] to account for current medical literature and expert opinion about current HIV treatment and transmission risks." *Id.* at 226. Now at summary judgment, the Government has submitted

additional evidence to demonstrate the rationality of its policies. And that record demonstrates the military used current medical evidence, combined with its knowledge of the circumstances of contingency deployments, to assess the risk of transmission. This evidence was not previously considered by the Fourth Circuit.

### a. Blood Transfusions

The military has a legitimate interest in protecting the blood supply in the walking blood bank by excluding from contingency deployments individuals carrying bloodborne pathogens, such as HIV. The walking blood bank is a military operational capability that relies on fresh whole blood donations from service members, which may be untested or insufficiently tested for pathogens (screening), when FDA-approved blood products are unavailable. SUF ¶¶ 65, 77. Pls. Br. 55-56. The military is particularly reliant on the walking blood bank to provide lifesaving transfusions for expeditionary forces without access to fixed medical infrastructure or in response to unplanned contingency events like mass casualties, explosions, or gunfire. SUF ¶ 66. It is a "military-unique" capability that has no civilian equivalent. SUF ¶ 65.

Transmission of HIV through blood transfusion is extraordinarily likely in cases of unsuppressed viral loads. SUF ¶ 67. As discussed, *supra* at 57, there is the potential for service members to experience viral load rebound from treatment interruptions. SUF ¶¶ 49, 67. But even individuals with undetectable viral loads can transmit HIV via blood transfusion, which is why blood donation guidelines bar donation by individuals even with well-managed HIV. SUF ¶ 68. It is unquestionably a legitimate military interest to protect its blood supply from unscreened donation by an HIV-positive individual. Plaintiffs' arguments merely attempt to supplant the military's assessment of the risk to its blood supply with their own assessment. *See Goldman*, 475 U.S. at 507 (affording "deference to the professional judgment of military authorities concerning the relative importance of a particular military interest").

*First*, Plaintiffs incorrectly dismiss the military's concern regarding unscreened blood altogether, relying on a single historical study as evidence that the walking blood bank is rarely used.

*See* Pls. Br. 56. But this is irrelevant. The military is plainly justified in planning for that reasonably foreseeable contingency. Military conflicts can involve mass casualties, explosive events, or deployment to austere environments in small units, in conflicts with near-peers, all situations in which a pre-screened blood may not be available. SUF ¶¶ 65-66. The reported infrequency of such scenarios during the period of one study does not invalidate the military's judgment that it may heavily rely on the walking blood bank for potential future operational needs. *Trump*, 138 S. Ct. at 2421 (courts should defer to the "Executive's predictive judgments" on matters relating to foreign affairs).

*Second*, Plaintiffs attempt to displace the military's risk assessment by making flawed comparisons to other groups of service members restricted from donating blood. *See* Pls. Br. 56. As one example, Plaintiffs suggest deploying a service member with HIV is the same as deploying a service member with a rare blood type, AB+. But, Plaintiffs ignore the obvious difference: although AB service members may be of limited use to the walking blood bank most of the time (but can prove extraordinarily useful as universal plasma donors to the blood bank), they do not present a harm of spreading an infectious disease like HIV. RSUF ¶ 100, SUF ¶ 68-70.

Plaintiffs next suggest that other individuals who are barred from donating blood – such as those with certain travel or sexual histories – pose the same risk as those with HIV. *See* Pls. Br. 56. Service members with these characteristics possess an increased possibility of carrying a transfusion-transmittable pathogen. But the military mitigates this risk by performing pre-deployment screening for diseases. RSUF ¶ 99. That the military deploys such people, with some minor risk of carrying a pathogen, is not the equivalent to deploying a service member carrying HIV.[24]

*Third*, Plaintiffs argue that the military should simply assume service members with known HIV infection will not donate blood because they receive counseling and generic, standing orders

---

[24] Plaintiffs' examples of iron deficiency, West Nile virus, and Zika are also misdirection. *See* Pls. Br. 56. CENTCOM bars deployment of an individual with a known infectious disease – so if an individual is "deferred" from giving blood because of the presence of West Nile or Zika infection, they would also be prevented from deployment until their condition resolves. *See* Ex. 26, Cron Decl. ¶ 20. Likewise, pre-deployment screening would identify iron deficiency and it would be corrected.

not to donate blood. *See* Pls. Br. 55. The Fourth Circuit found that "the record does not support" the risk of transmission in this scenario, *Roe*, 947 F. Supp. 3d at 227, but whether or not the court's conclusion was correct at the time, it was based only on the limited record available at the preliminary-injunction stage. The full record now before this Court demonstrates that there *is* a risk of transmission in this scenario. Multiple military experts testified that the stress of the battlefield or a mass casualty event, coupled with extraordinary need, could compel an HIV-positive service member to donate blood despite orders and counseling to the contrary. SUF ¶ 72-73. The order could be forgotten, misunderstood, or disobeyed based on a value judgment. *Id.* Moreover, HIV-positive individuals might donate to avoid disclosing their HIV status, a scenario that even Plaintiffs' expert described as "believable." SUF ¶ 74-75.

These are not mere theoretical concerns. There have been actual incidents of service members donating blood despite knowledge that they are carrying a bloodborne pathogen and counseling and orders not give blood. SUF ¶ 70, 75. The Court should defer to the military's judgment based on its understanding of battlefield behavior. *See Winter*, 555 U.S. at 27.

Plaintiffs describe the possibility that the military might use unscreened blood from an HIV-positive donor in violation of an order the result of "[a]n entire series of unfortunate and unlikely events." Pls. Br. 56. Not only are Plaintiffs wrong that some of these events are "unlikely," military contingency planning is *precisely* about preparing for unfortunate and unlikely events. Here, the military has made a professional judgment regarding the risks to its walking blood bank program from a potential donation of blood from an HIV-positive service member. The decision to exclude HIV-positive service members from contingency deployments on this basis is a reasoned judgment to which deference is owed.

**b.  *Transmission During Medical Care***

Next, an HIV-positive service member risks transmitting their HIV infection when receiving or providing combat medical care.[25] The military policies to reduce this risk by ensuring people with known bloodborne pathogens do not deploy, are plainly rational.

Plaintiffs contend that the risk of an individual with an undetectable viral load infecting a medical caregiver is so low that it is irrational to limit deployability on that basis. *See* Pls. Br. 53. Plaintiffs also claim that the Fourth Circuit "has already deemed such risks too low to justify the policy at issue." Pls. Br. 54. That is incorrect. Again, the Fourth Circuit emphasized that its opinion was based on a "limited record" at a "preliminary stage." *Roe*, 947 F.3d at 222, 224. In any event, Plaintiffs' argument primarily depends on analogizing the transmission risks associated with combat medical care to needlesticks in civilian healthcare. *See* PSUF ¶ 87. This argument breaks down in several places.

*First*, it is not Plaintiffs' role to decide what quantity of per-act risk of transmission would constitute an unacceptable risk in a combat deployment. That decision is firmly committed to the military's discretion. *See Goldman*, 475 U.S. at 510 (military policy disagreements over where to "draw[] the line" are not constitutional violations).

*Second*, Plaintiffs' dismissive perspective regarding the risk of occupational exposure, *see* Pls. Br. 54, is at odds with the opinion of the CDC and the U.S. Public Health Service (USPHS).[26] The 2018 PEP Guidelines categorize the risk of transmission from an occupational exposure as non-negligible, demonstrating that the military's policies are in fact consistent with "current medical literature and expert opinion about current HIV treatment and transmission risks." SUF ¶ 103. The

---

[25] Although this section primarily discusses transmission risks to military surgeons, physicians' assistants, combat medics, and similar individuals, the discussion is also applicable to others, including fellow service members who may be called on to give lifesaving aid to wounded comrades. These individuals face many of the same risks that a combat surgeon would.

[26] Plaintiffs' attempt to characterize this as similar to the risk assumed regularly by civilian medical care providers, *see* Pls. Br. 54, is a faulty analogy. In the military, medical care providers are often "one deep," and an occupational exposure might require them to be removed from the field for care, leaving no medical care providers behind to care for a deployed unit.

2018 PEP Guidelines state that PEP should not be used for exposures with negligible risk of HIV transmission but *should* be used when an individual is exposed to HIV-infected blood through a percutaneous injury or exposure to non-intact skin, indicating that the risk from such exposure is not negligible. *Id.* Contrary to Plaintiffs' characterization of such risks as "extremely low" and "too low to justify the policy at issue," Pls. Br. 54, the 2018 PEP Guidelines state that "[o]ccupational exposures to HIV should be considered urgent medical concerns and treated immediately." SUF ¶ 103. The Guidelines are unequivocal that despite the risk of transmission likely being "very low," "[e]xposure to a source patient with an undetectable serum viral load does not eliminate the possibility of HIV transmission or the need for PEP and follow-up testing." *Id.*[27] Thus the military's assessment of the risk is more consistent with current best practices, and accounts for the likelihood, as discussed *infra*, that PEP will be unavailable to military medical care givers.

*Third*, Plaintiffs' reliance on the baseline 0.23% per-act transmission rate for needlesticks in civilian medical settings fails to account for the undisputed fact, as demonstrated by the attached evidence, that healthcare in a civilian hospital is often very different from the dangerous, high-stress, and emergency conditions frequently associated with combat medical care. *See* SUF ¶¶ 80-81. For example, combat medical care often involves mutilating wounds, exposing a much larger volume of blood than is seen in typical blunt force civilian trauma cases. *Id.* The risk of HIV transmission increases with the amount of infected blood exposed, likely resulting in a correspondingly higher risk for military medical care than civilian medicine. *Id.* In combat medical care, the caregiver is also more likely to have possible routes for blood-to-blood exposure because the caregiver might also be wounded, particularly when care is rendered close to the front line, or might become wounded in caring for the patient's wounds, which are often dirty and full of jagged shrapnel or sharp bones. SUF ¶¶ 80-81. Needlesticks are not rare in military combat care. SUF ¶ 81. Moreover, it is unlikely

---

[27] Underscoring the seriousness of this possible transmission route, the 2018 PEP Guidelines stated that "a surgeon who sustains an occupational exposure to HIV while performing a surgical procedure should promptly scrub out of the surgical case, if possible, and seek immediate medical evaluation for the injury and PEP." See Ex. 54, 2018 PEP Guidelines at 21.

that military caregivers in many combat situations will be able to apply universal precautions, such as protective gloves and washing out or sterilizing caregiver cuts or abrasions after exposure to blood, to reduce the risk of transmission.[28] SUF ¶ 82.

Plaintiffs rely heavily on the reduction in risk of transmission created by an undetectable viral load. However, studies to that effect only quantify reduction in the risk of *sexual* transmission. Plaintiffs' experts concede that there are no studies showing that HIV cannot be transmitted via *blood-to-blood* transmission routes from individuals with undetectable viral loads. SUF ¶ 62. In other words, Plaintiffs cannot establish how much an undetectable viral load would decrease the risk of transmission in blood-to-blood contact. But it is Plaintiffs' burden to show that the military's decision to take account of this uncertainty is irrational, which they cannot do.[29] Moreover, to the extent there is a material dispute about the degree of the risk, that dispute largely turns on military-specific issues, such as the type and frequency of various injuries, the conditions of combat medical care, and the military's availability to mitigate potential HIV transmission, and is therefore squarely within the realm of  judgments subject to military deference. *See Rostker*, 453 U.S. at 66.

Plaintiffs also argue that there is a negligible risk of HIV transmission via "catastrophic injury," *i.e.*, infected blood blown directly into the body of another service member as the result of an explosion. Pls. Br. 53. Both the court, *see Roe*, 947 F. Supp. 3d at 227, and Plaintiffs, *see* Pls. Br. 53, emphasize the lack of known cases of battlefield transmissions as a relevant consideration that Defendants must "reconcile." *Roe*, 947 F. Supp. 3d at 226. But there are no documented cases of such a transmission precisely because the military's deployment limitations prevent most people with

---

[28] For all these reasons, Plaintiffs are incorrect to suggest that a doctor in a civilian hospital is at "similar risk" as a medic providing care under combat conditions. Pl. Br. 54. Compared to a civilian doctor, a combat surgeon is much more likely to deal with cases involving extraordinary trauma, substantial volumes of blood, and a greater likelihood of direct blood-to-blood contact. Nor is there merit in the argument that needlesticks are of equal concern in civilian and combat medicine. *Id.* Percutaneous injuries are likely more frequent in combat, involve greater volumes of blood, and mitigation measures are less available. SUF ¶¶ 81-83.

[29] As discussed above, there is also a substantial risk that an individual who had an undetectable viral load prior to deployment would not be able to maintain that status during deployment. *See supra* at 57.

HIV from being in situations where these types of injuries occur. The lack of documented cases of battlefield transmission is evidence of the policy's success, not that the policy is unnecessary. Plaintiffs' argument again inverts the standard of review; they must show that concern with this transmission route is irrational, and they cannot do so. Indeed, no studies show that HIV transmission would be unlikely to occur from the introduction of infected blood into an uninfected body. *See* SUF ¶¶ 62, 68. Moreover, the CDC and U.S. Public Health Service have noted that "deep injuries" such as this are associated with an *increased* risk of HIV transmission. SUF ¶ 103. Finally, there can be no dispute that situations that could prompt a catastrophic injury transmission are far from theoretical: between 2001 and 2008, 77% of the 35,630 military casualties in Iraq and Afghanistan resulted from mass-casualty events. SUF ¶ 66 (add DX315 at 3 to SUF).

### 3.   *The Military's Ability To Mitigate These Risks Is Limited.*

Plaintiffs contend that Defendants' assessment of the risks and costs of deploying HIV-positive service members is irrational because it fails to account for possible mitigation. However, decisions related to the allocation of medical resources and training of medical personnel are quintessential "professional decisions as to the composition, training, equipping, and control of a military force" that are "essentially professional military judgments." *Winter*, 555 U.S. at 24. Certainly, changes to operations are *possible*, but requiring the military to reduce a risk by altering its operations is not appropriate when the military has judged that its best course of action is to avoid a particular risk, rather than alter its operations to minimize the harmful consequences of accepting that risk.

*First*, even if it were appropriate for the Court to reconsider the proper amount of resources the military should devote to reducing the risk of infection, it is clear that Plaintiffs' proposed methods are unworkable. Plaintiffs' suggestions fail to take account of the restrictive conditions of the deployed environment. The military medical apparatus in the deployed setting is designed to address the acute medical needs of the deployed force with a heavy emphasis on trauma care. SUF ¶ 87. The military prioritizes the operational readiness of the deployed force and not management of

chronic conditions, leading to the development of deployment restrictions and the waiver system. *See id.* The military is entitled to make this calculation to accomplish its purpose in a deployed environment.

*Second*, the routine monitoring needed to manage HIV-infection is either unavailable or extremely resource-intensive in a deployed environment and potentially disruptive to military operations. SUF ¶ 97. It is undisputed that regular clinical monitoring and viral load testing is required as part of the standard of care for HIV-positive service members, and accordingly the military is rational in considering its effect on its operations. SUF ¶ 96; RSUF ¶¶ 67-68. Viral load testing is a complicated and precise operation for which the necessary equipment and knowledge does not and cannot reasonably exist at forward deployed locations. SUF ¶ 98. The most forward deployed medical facilities (Role One) may lack the ability to even draw blood. *Id.* Even intermediate medical facilities (Role Two) may not have the necessary equipment for processing drawn blood or keeping the blood cold as required for transport and to prevent incorrect results. *Id.* And even the rare mature medical facilities (Role Three) are unable to test blood and must preserve and transport samples to a higher level facility. *Id.* Transportation of service members or blood samples between these facilities is resource intensive, and often dangerous. SUF ¶¶ 89-90, 98.

Plaintiffs understand that viral load testing itself, which requires large, complex, and expensive equipment, cannot easily be performed in a deployed environment and suggest the military simply outsource the testing to private labs. SUF ¶ 98; RSUF ¶ 74; *see* Pls. Br. 48. Plaintiffs' claim that the military can outsource such tests to private local laboratories near deployed locations is speculative and ignores the reality of military operations and invites increased expenses. RSUF ¶ 74. There is no evidence that equally reliable results could be achieved more quickly outside of the military's existing procedure. Moreover, military assets exist which can perform these functions so contracting with foreign private companies would unnecessarily incur substantial costs and burden. SUF ¶ 98; RSUF ¶ 74. Beyond testing itself, monitoring by non-specialist medical care providers, who may not even be doctors, may also be insufficient; they may be unfamiliar with the interactions

of common medical issues and a patient's changing HIV condition. SUF ¶ 94. Plaintiffs also suggest that service members complete their required monitoring on R&R personal leave, ignoring that the military does not rely on R&R for the provision of medical care because there are many situations in which R&R does not occur. SUF ¶ 76.

*Third*, Plaintiffs' contention that the risk of bloodborne HIV exposures can be reduced by the use of PEP suffers from the same problems. PEP guidelines direct its use only in cases of suspected exposure, and only within 72 hours of possible exposure. SUF ¶ 7. Ongoing hostilities can mean an exposed service member might not be able to seek PEP within the 72-hour window. SUF ¶ 102. PEP is available at some limited facilities within the military system, but is not commonly supplied. *Id.* For forward deployed units that are constrained in the items they can bring, sometimes to what they can physically carry or by volume, there are higher priority medications. *Id.* Similarly, as noted *supra*, transporting medicines in or individuals out of forward deployment positions is resource intensive and potentially dangerous. SUF ¶ 90. Plaintiffs' argument also assumes that the available medical caregivers are trained in HIV prevention in order for them to recommend that an injured service member should take PEP, which is not currently the case. SUF ¶ 94. Consequently, there is no way to ensure that a service member for whom PEP is indicated will be able to timely obtain it. Finally, reliance on PEP under circumstances in which HIV-positive service members are knowingly deployed inherently undermines the confidentiality of the service members' diagnoses.[30] If a service member were instructed to begin PEP after becoming exposed to the blood or bodily fluids of another service member, it would necessarily reveal to the service member being treated and potentially various others that the source service member was HIV-positive.

---

[30] Plaintiffs implausibly suggest that service members living with HIV will have no interest in protecting their confidentiality and that, in any event, this is not an important consideration if there are better education programs regarding HIV and zero tolerance regarding stigma or discrimination toward the disease. Pls. Br. 51. Plaintiffs have no basis to assert, on behalf of all service members living with HIV, that confidentiality is not to be respected if these conditions are met. And, in any event, medical care providers still have an ethical obligation to confidentiality for all medical conditions.

Like PEP, Plaintiffs suggest that HIV rapid tests are a cure all for transmission risks from unscreened blood donations. Pls. Br. 55-56. As discussed, *supra*, blood transfusion even from a virally suppressed individual presents a transmission risk. But HIV rapid tests for whole blood may not be available at all deployed locations. SUF ¶ 76. These tests are not FDA-approved. *Id.* Moreover, rapid tests may provide false negative results for individuals who are virally suppressed on ART. SUF ¶ 77. Even if the HIV quick tests did not suffer from these issues, they may take at least twenty minutes to provide results and in exigent circumstances that require whole blood transfusion there may not be time to test blood products. *Id.*

### 5. *Foreign Relations*

Lastly, both DoD and CENTCOM policy requires consideration of local laws regarding infectious diseases before granting a deployment waiver, SUF ¶ 21, and these counsel against deploying HIV-positive service members. The military's judgment to respect host nation's local laws regarding HIV "implicate[s] our relations with foreign powers." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). Courts lack the competence to second guess these core military decisions. *Id.* Plaintiffs incorrectly assert that there are no host nation requirements that would warrant foreign policy consideration. *See* Pls. Br. 57-58. Bahrain, Egypt, Jordan, Kuwait, Qatar, Saudi Arabia, and the United Arab Emirates – all nations in the CENTCOM region which host a substantial U.S. military presence – are known to expel or deport foreigners with HIV.[31] *See* SUF ¶ 22. Also, the military relies on local hospitals and allied medical facilities to support its medical infrastructure, and in some host nations, local hospitals are known to refuse care to HIV-positive patients or have a different standard of care for this condition. *See* SUF ¶ 23. Plaintiffs' counter argument that no service member with HIV has ever been involuntarily deported is simple misdirection. *See* Pls. Br. 58. If a service member in this region is diagnosed with HIV, they most likely would be medically evacuated

---

[31] Though local laws regarding entry restrictions for HIV-positive foreigners are not as common in other regions of the world, it is DoD policy to consider them in the context of worldwide contingency deployments. *See* Ex. 5, DoDI 6490.07 (requiring consideration of host nation laws before deploying an HIV-positive service member). Notably, both China and Russia bar long term stays of HIV-positive foreigners. *See* Ex. 27, Shell Dep. at Ex. 15.

for care before there would any potential expulsion or deportation. SUF ¶ 85. Also, Plaintiffs' argument, if anything, again indicates the *effectiveness* of current policies, rather than any shortcoming—in this case, success in avoiding unnecessary conflict with allied governments and avoiding placing service members in risky situations in which medical care may be refused.

The fact that CENTCOM's consideration of a deployment waiver has not included foreign relations thus far does not minimize this reasoning. Because CENTCOM does not generally allow service members with HIV to deploy for health and logistics related reasons, they have not had to fully consider whether a waiver should *also* be denied for reasons relating to foreign relations.[32] And although some local laws carve out exceptions for diplomats, *see* Pls. Br. 58, it cannot be assumed that a host nation would have the same tolerance toward a member of a foreign military. Compliance with these local laws is a core policy concern that implicates both foreign relations and service members' access to local health care. The Executive Branch may properly consider the risk to foreign relations before permitting the deployment of an HIV-positive service member to the region.

Because Plaintiffs have failed to negate actual and conceivable reasons for the deployment policy, and Defendants have thoroughly explained how they reconcile medical evidence with combat conditions in determining that the risk of deploying an HIV-positive service member to contingency operations outweigh the benefits, Defendants are entitled to summary judgment in their favor in *Harrison* and in *Roe* Counts 1, 4, and 5.

**IV. The Air Force Correctly Followed Its Own Regulations In Its Discharge Decisions.**

---

[32] Combatant Commands maintain waiver authority for *all* their deployment restrictions because operational need may overcome the risk of the deployment. *See* DoDI 6490.07 Encl. 2 § 3. As Plaintiffs pointed out, at least one witness believes Special Forces have deployed HIV-positive personnel to contingency operations in CENTCOM. PSUF ¶ 47. Conceivably operational need might favor deploying a single highly trained, specialized, and irreplaceable member of a Special Forces unit for a specific mission, despite a potential foreign relations consequences. But such a specific determination does not undercut the sound reasons supporting a policy of not deploying HIV-positive service members to an allied host nation with laws prohibiting entry to HIV-positive foreigners.

Apart from their challenges to the military's substantive deployment policies, Roe and Voe raise three arguments attacking the process they received in the Disability Evaluation System (DES). The Government is entitled to summary judgment on these claims (*Roe* Counts 2 and 3) because the DES properly determined that Roe's and Voe's HIV status made them unfit for military service, and each of Plaintiffs' procedural arguments lack merit.

The DES is a multi-level process that allows the Services to evaluate service members with potentially disqualifying medical conditions for fitness for continued service. SUF ¶¶ 24-25; Ex. 25, Soper Decl. ¶¶ 3-12 (explaining DES process). A service member may be found unfit if a condition prevents him or her from deploying to any location specified by the Military Service. SUF ¶ 26.

## A. Administrative Procedure Act

Under the APA, a court may set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In conducting APA review, a court must examine the applicable record and assess "whether the agency considered the relevant factors and whether a clear error of judgment was made." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). "[W]here the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made," the decision must be sustained. *Id.* (citation omitted). Similarly, the court must also sustain an agency action that is supported by "substantial evidence," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Platone v. Dep't of Labor*, 548 F.3d 322, 326 (4th Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## B. Roe and Voe's Separation Decisions Were Proper.

Military separation decisions based on medical conditions are processed through the DES. SUF ¶¶ 24-25. By regulation, a service member with HIV will be referred to the DES for "a medical evaluation of fitness for continued service in the same manner as a Service member with other chronic or progressive disease." *Id.* A referral to the DES is made for all such diseases which

72

"may . . . prevent the Service member from reasonably performing the duties of their office, grade, rank, or rating." SUF ¶ 24. The DES then determines whether a Service member "due to disability, is unable to reasonably perform the duties of his or her office, grade, rank, or rating." SUF ¶ 24. In making that determination, the DES considers "[w]hether the Service member is deployable . . . to any vessel or location specified by the Military Department." SUF ¶ 26. For the Air Force, the ability to deploy to CENTCOM is particularly important because over 80% of Air Force deployments in the past twenty years have been to that region. SUF ¶ 17.[33]

For both Roe and Voe, the DES correctly determined that they were presumptively ineligible to deploy to CENTCOM because of their HIV status and that it was unlikely they could obtain a deployment waiver. SUF ¶¶ 18, 39-40. Because they were junior airmen in highly deployable career fields, Roe and Voe were likely to be ordered to deploy to CENTCOM, and they would unlikely be able to do so because of their HIV status. *Id.* Accordingly, the DES process correctly resulted in a finding that Roe and Voe could not reasonably perform their military duties and recommended their separation. *Id.* As described below, none of the purported procedural defects identified by Plaintiffs have any merit because the Air Force properly followed its own procedures.

**C.  Roe and Voe Received an Appropriately "Individualized" Determination**

Plaintiffs Roe and Voe claim they were denied an "individualized" assessment in the DES, but that is exactly what they received. Though the Fourth Circuit called into question whether Roe and Voe properly received an individualized determination, it made clear that its opinion was based on an incomplete understanding of the policies at issue. *Roe*, 947 F.3d at 222 (noting "[a]t this preliminary stage, the limited record does not conclusively show" whether CENTCOM's deployment policy acted as a categorical ban on individuals with HIV, or whether it provided for an

---

[33] Plaintiffs' Complaint alleges that Roe and Voe were improperly separated because they are considered "deployable with limitations" under DoDI 1332.45 and therefore not subject to retention determinations. Compl. ¶ 111, *Roe* ECF 1. Plaintiffs have not pursued this argument, but even if they had, Roe and Voe were assessed for retention under the independent general retention standards of DoDI 1332.18 based on a referral required by DoDI 6485.01 and AFI 44-178. Therefore, DoDI 1332.45 simply has no relevance to this case.

73

individual assessment for waiver applications). Now at summary judgment, the record contains a thorough explanation of how the CENTCOM waiver process works in practice, demonstrating that a deployment waiver denial is not a prerequisite for a determination of unfitness to continue service.

To be clear, CENTCOM's deployment policy is not a categorical ban. Although CENTCOM presumptively bars all deployments of HIV-positive individuals, if an individual with HIV were ordered deployed, that person could seek a waiver. SUF ¶ 19. For HIV infection, CENTCOM would grant a waiver only in extraordinary circumstances for an individual with highly specialized skills to complete a mission with an extraordinary need. SUF ¶¶ 18-19. To date, no service member with HIV has possessed these rare characteristics required for a waiver. SUF ¶ 18.

Plaintiffs argue that military regulations do not allow the Air Force to discharge a service member based on deployability until that service member has been denied a deployment waiver. Pls. Br. 64-67. At the preliminary-injunction stage, the Fourth Circuit also found it problematic that the DES "predicted" that Plaintiffs would not receive a waiver, rather than allowing CENTCOM to rule on an application. *Roe*, 947 F.3d at 224. But both Plaintiffs' and the Fourth Circuit's preliminary conclusions are based on fundamental misunderstandings of DES procedures, for which "predictive judgments" are an essential component of the regulatory procedure.

The decisions (1) whether to grant a deployment waiver and (2) whether to discharge an airman based on deployability are different types of decisions, made by different decision-makers at different times. The decision whether to grant a deployment waiver is entrusted to CENTCOM, and is made near the time of deployment. SUF ¶ 19. By regulation, CENTCOM must be informed of the "position [an individual will] be placed in, any known specific hazards of the position, anticipated availability and need for care while deployed, [and] the benefit expected to accrue from the waiver." *Id.*[34] Thus, a waiver request must be tailored to an actual planned deployment. *Id.* Without this information, CENTCOM cannot determine the specific hazards the individual will

_____

[34] Though this is typically performed in an individualized manner in practice, MOD-13 only *requires* individualized waiver consideration for civilians, not military service members. *See* Ex. 6, MOD 13 § 15.C.

face, the medical care likely available, and the benefit expected from the waiver. *Id.* Because conditions in theater and for individuals can change rapidly, CENTCOM generally will not consider waiver requests more than six weeks in advance of deployment. *Id.*

By contrast, the decision whether to discharge an airman is made in the DES process, which can begin at any time, whether or not an airman has been ordered to deploy. SUF ¶ 26 (citing DoDI 1332.18, Enc. 3, App. 2 ¶ 2(a)). Rather than determining (as CENTCOM does) whether current conditions and available medical assets could support a planned deployment, the DES is charged with considering the airman's generalized "deployability." *Id.* Enc. 3, App. 2 § 4(c). That question is more forward-looking and generalized. Thus, the DES process is wholly distinct from CENTCOM's waiver process. The Air Force has no procedural mechanism by which the DES could request a hypothetical deployment waiver from CENTCOM to support its process. SUF ¶ 20.[35]

Under Plaintiffs' theory (requiring waiver requests to be submitted to CENTCOM), if an airman were referred into the DES because there was a concern about their deployability, the DES could not actually proceed with that case until that individual was ordered to deploy. Using the CENTCOM waiver process in this manner would cripple the DES system and Air Force deployment planning. In all cases of potentially disqualifying disabilities, it would prohibit the Air Force from instituting separation proceedings until the most inconvenient time for both the service member and the Service: weeks before a planned deployment. SUF ¶ 19-20. Because of the manner in which Air Force deployments are staffed, the Air Force cannot operationally support individuals occupying deployable positions who cannot deploy. SUF ¶ 17.

Plaintiffs contend that this procedure of requesting hypothetical waivers for DES processing would be required even for conditions like HIV or insulin-dependent diabetes, even though it is uncontested that there is very little chance of a waiver being granted. SUF ¶ 18; PSUF ¶ 54. Such a

---

[35] Plaintiffs' references to the other fitness considerations of DoDI 1332.18 are irrelevant to the determinations made for Roe and Voe. Pls. Br. 64. Neither Roe nor Voe were discharged because they could not perform common military tasks or were unable to take the required physical fitness tests. *See* SUF ¶ 40. The fitness requirements for specialized duties are also irrelevant because Roe and Voe are not in positions that perform any specialized duties. *Id.*

procedure would presumably extend to *any* medical condition limiting deployability, which would unduly overburden both CENTCOM and unit commanders, who must approve waiver requests. The CENTCOM Surgeon's role is to secure the health and military readiness of deployed assets, not to serve as an intermediate step in every DES process. SUF ¶ 20. CENTCOM already processes thousands of waiver requests for specific deployments every year, adding untold numbers of hypothetical waivers, even if possible, would substantially increase the burden on CENTCOM's system. *Id.* In short, Plaintiffs' theory that the DES may not separate Plaintiffs without making a request for a hypothetical waiver rests on a misunderstanding of the deployment waiver process and would be unworkable in practice.

In sum, the Air Force properly followed its existing procedure, which is that an unfitness determination must be based upon "objective evidence in the record, as distinguished from personal opinion, speculation, or conjecture." SUF ¶ 24. The DES process relied on Roe and Voe's individual characteristics: each were HIV seropositive and relatively likely to deploy based on their junior status in career fields that frequently require deployment. SUF ¶ 39-40. None of this is personal opinion, mere speculation, or conjecture. Moreover, the DES appropriately relied on its knowledge that CENTCOM was unlikely to grant a deployment waiver for HIV. SUF ¶ 40. And neither Roe nor Voe has any specialized skills or training that would make him difficult to replace with an airman without a disqualifying condition. Indeed, a number of individuals with comparable medical information to Plaintiffs (i.e., HIV-positive but otherwise healthy) were returned to duty because of the nature of their individual positions as more senior in their career and in career fields that did not deploy frequently. SUF ¶ 41. The court should reject Plaintiffs' attempts to conflate the requirement to receive an individualized determination from the DES – which they received – with an individualized determination from CENTCOM. *See* Pls. Br. 66.

### D.  Roe and Voe's Separation Decisions are Correct Under AFI 44-178.

Pursuant to AFI 44-178, "HIV seropositivity alone is not grounds for medical separation or retirement," however, the regulation goes on to say: "Members with laboratory evidence of HIV

infection *who are able to perform the duties of their office, grade, rank and/or rating*, may not be separated solely on the basis of laboratory evidence of HIV infection." SUF ¶ 27 (emphasis added). The Air Force followed its policy. AFI 44-178 does not prohibit the Air Force from separating airmen whose HIV infection *does* prevent them from performing their military duties. Thus, as long as the Air Force correctly concludes that an airman cannot perform his or her military duties (as is true for Roe and Voe), AFI 44-178 provides no impediment to their separation. Any other reading is inconsistent with the plain text of the policy.

Roe and Voe were not separated because of HIV seropositivity "alone." The Air Force determined that Roe and Voe should be discharged because: (i) they were expected to deploy relatively frequently to Central Command's area of responsibility because of their individual career fields, and tenure within those fields; *and* (ii) they were unlikely to be able to deploy to CENTCOM because of their HIV status. SUF ¶ 40. That determination – which was based on the conjunction of two factors, only one of which took HIV status into account – is not based on HIV status "alone." Airmen with HIV "alone," with positions that are unlikely to require deployment, are being properly returned to duty. SUF ¶¶40-41.

Plaintiffs' passing argument that deployability is an administrative rather than a medical limitation is incorrect. See Pls. Br. 63. DoD's regulation obligates the Air Force to consider deployability when assessing fitness, and the deployability condition is not limited to medical considerations. SUF ¶ 26. Moreover, deployability is explicitly identified as a standalone consideration, which may or may not depend exclusively on medical restrictions, independent of ability to perform common military tasks and ability to take the physical fitness test. *Id.* DoD's regulations clearly make deployability, without limitation, a necessary consideration for fitness to continue service for all service members.

**E.  The DES Treated All Airmen Before It Correctly.**

Plaintiffs also argue that the Air Force's decision to discharge certain HIV-positive service members was arbitrary and capricious because other members were retained on the same or similar

facts.[36] Specifically, Plaintiffs note that the AFPB made an initial vote to return Voe to duty, but before finalizing that decision the DES voted again and found Voe unfit for duty. Plaintiffs claim that these contrasting votes show the decision was arbitrary because no underlying facts or policies had changed between the two decisions, and that the same conclusion applies to Roe. *See* Pls. Br. 59-61. This argument fails for at least two reasons.

*First*, Plaintiffs are incorrect that Voe's discharge was decided two different ways on the same facts. A DES decision is not final until it is delivered to the person subject to the decision, and Voe's initial decision memorandum was never sent to him. SUF ¶ 29; RSUF ¶ 16. Voe thus received only one final decision, and there is nothing improper, or uncommon, about an agency changing its mind during a deliberative process.

*Second*, there *was* a material change in Air Force policy between the two votes. Before 2017, the Air Force generally returned asymptomatic, HIV-positive airmen to duty. SUF ¶ 28. Following a 2017 policy review, the Air Force issued guidance confirming that it had been incorrectly excluding service members with HIV from its regulations which required the referral of all people with chronic diseases that could affect fitness for duty into the DES for consideration of separation. SUF ¶¶ 25-28. Aware of this policy discussion, the AFPB held Voe's initial letter pending further guidance. SUF ¶¶ 28, 39. And shortly after the final memo was published in September 2018, the Board, relying on that policy guidance, voted Voe unfit. SUF ¶ 39. Thus, the different votes on Voe's panels demonstrate the Air Force complying with controlling regulations.

**V.  Even if the Court Enters Judgment for Plaintiffs, the Remedies Should be Limited.**

---

[36] In their complaint, Plaintiffs argued that the DES decisions were inconsistent because Roe and Voe were separated while other asymptomatic, HIV-positive airmen were retained. *Roe* Compl. ¶¶ 128-32. Plaintiffs have abandoned this position at summary judgment. The government has shown that Roe and Voe, relatively junior airmen in career fields likely to deploy frequently to CENTCOM, were not similarly situated to the retained airmen, who had a lower likelihood of deploying to CENTCOM. *See* SUF ¶¶ 40-41. There is thus no genuine dispute about the military's consistent treatment of asymptomatic airmen in this way, and the Government is entitled to summary judgment on *Roe* Count 3.

For the reasons set forth above, summary judgment in favor of Defendants is appropriate on all claims. Should this Court disagree, however, Plaintiffs' requested relief should be denied as overbroad.

First, nationwide injunctions are irreconcilable with the settled constitutional and equitable limitations that a federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1929-30 (2018); *see also Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). By definition, a nationwide injunction extends relief to parties that were not "plaintiff[s] in th[e] lawsuit, and hence were not the proper object of th[e court's] remediation." *Lewis*, 518 U.S. at 358. The fact that Plaintiffs bring claims under the APA does not justify a departure from these principles. Nothing in the APA's directive to "set aside" unlawful "agency action" mandates that "agency action" shall be set aside globally, rather than as applied to the plaintiffs who brought the suit. 5 U.S.C. § 706(2). Nor does the presence of MMAA as a party justify a nationwide injunction. Even if MMAA has standing itself, it still lacks standing to seek nationwide relief running to individuals it does not purport to represent. Like any plaintiff, MMAA must "demonstrate standing separately for each form of relief sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). Accordingly, the fact that some of the organization's members may be dispersed geographically cannot, by itself, justify nationwide injunctive relief that would also cover non-parties or non-members.

If the Court does order relief that covers non-parties, any such relief must still be logically tethered to the claims before the Court. Thus, in *Harrison*, relief should not run with respect to *all* accessions, but only to those similarly situated to Plaintiff Harrison: those seeking to commission from an enlisted position. In *Roe*, any relief should be limited to asymptomatic HIV-positive airmen, who are otherwise eligible to continue their enlistment, who wish to do so, and who are not in specialty occupations.[37] And in both cases, any relief should permit the military to maintain

_____

[37] For certain military occupations, such as pilots and submariners, HIV is a disqualifying condition for reasons not raised or challenged in this litigation.

79

individualized reviews of service members' medical condition, to ensure their HIV infection remains asymptomatic with an undetectable viral load.

The Court also should not order Plaintiff Harrison commissioned, to the extent Plaintiffs request such relief.[38] Any order requiring commissioning as an officer and would run afoul of settled constitutional principles. *See, e.g.*, *Orloff v. Willoughby*, 345 U.S. 83, 90 (1953) ("It is obvious that the commissioning of officers in the Army is a matter of discretion within the province of the President as Commander in Chief."); *Randall v. United States*, 95 F.3d 339, 348 (4th Cir. 1996). It would also violate more basic remedial principles by placing Harrison, who was never offered a commission, in a better position than he would have been absent his HIV-positive status. Even if he prevails, Harrison's candidacy for a future JAG Officer vacancy should, at most, be re-evaluated without regard to any of the HIV-related policies that this Court declares unlawful.

Similarly, if the Court rules for Plaintiffs Roe and Voe on their procedural APA claims, under no circumstances should the Court order the military to actually deploy a particular service member given the obvious constitutional concerns that would be raised by such an order. *See* U.S. CONST., art. II, § 2, cl. 1. Instead, at most, the appropriate remedy should be to correct any procedural defect that the Court finds in the current process. For instance, if the Court finds the DES must affirmatively request a determination from CENTCOM on a hypothetical deployment waiver for Roe or Voe, the remedy should be a remand to the DES for reconsideration of the discharge orders, alternatively, if the Court finds that the Air Force violated its own policies by referring an airmen with asymptomatic HIV to the DES for discharge evaluation, the remedy should be to vacate the airmen's referral to the DES.

## CONCLUSION

For these reasons, the Court should enter summary judgment for Defendants on all claims.

---

[38] Previously, Plaintiffs sought an order commissioning Harrison as an officer. *See* Harrison Compl. at 20, ECF 1. Now, Plaintiffs seem to recognize that, even if Harrison prevails on the merits of his claims, the only proper injunctive remedy would be to "vacate the decision denying his commission" and "order the Secretary of the Army to re-evaluate this decision without applying any of the regulations and policies" that prevent accession by reason of HIV status. Pls. Br. 69.

DATE: June 3, 2020

Respectfully submitted,

G. ZACHARY TERWILLIGER
United States Attorney

_____/s/_____
DENNIS C. BARGHAAN, JR.
Deputy Chief, Civil Division
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3891
Fax: (703) 299-3983
dennis.barghaan@usdoj.gov

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Director
Federal Programs Branch

JOSHUA C. ABBUHL
KERI L. BERMAN
REBECCA CUTRI-KOHART
STEPHEN M. PEZZI
Trial Attorneys
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 514-0265
Facsimile: (202) 616-8460
rebecca.cutri-kohart@usdoj.gov

*Counsel for the Government*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this date, I filed the foregoing using the Court's CM/ECF

system, which will send a notification of electronic filing (NEF) to the following counsel of record:

ANDREW R. SOMMER
Va. Bar Number 70304
GREENBERG TRAURIG, LLP
1750 Tysons Blvd., Suite 1000
McLean, VA 22102
T: (703) 749-1370
sommera@gtlaw.com

*Counsel for Plaintiffs*

                                          _____/s/_____
DENNIS BARGHAAN
Deputy Chief, Civil Division
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3891
Fax:    (703) 299-3983
dennis.barghaan@usdoj.gov

*Counsel for Defendants*