EXHIBIT 46

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE EASTERN DISTRICT OF VIRGINIA
 3                     ALEXANDRIA DIVISION
 4     - - - - - - - - - - - - - - - x
 5     NICHOLAS HARRISON and          :
       OUTSERVE-SLDN, INC.,           :
 6                     Plaintiffs,    :
            vs.                       : No. 1:18-cv-00641
 7     JAMES N. MATTIS, In His        : LMB-IDD
       Official Capacity As Secretary:
 8     of Defense; MARK ESPER, In His:
       Official Capacity As the      :
 9     Secretary of the Army; and the:
       UNITED STATES DEPARTMENT OF    :
10     DEFENSE,                       :
                      Defendants.     :
11     - - - - - - - - - - - - - - - x
       RICHARD ROE, VICTOR VOE, and   :
12     and OUTSERVE-SLDN, INC.,       :
                      Plaintiffs,     :
13          vs.                       : No. 1:18-cv-01565
       JAMES N. MATTIS, In His        :
14     Official Capacity As Secretary:
       of Defense; HEATHER A. WILSON,:
15     In Her Official Capacity as    :
       Secretary of the AIR FORCE;    :
16     and the UNITED STATES          :
       DEPARTMENT OF DEFENSE,         :
17                     Defendants.    :
18     - - - - - - - - - - - - - - - x
19        VIDEOTAPED 30(b)(6) DEPOSITION OF DEFENDANTS
20                 GIVEN BY AUDRA L. TAYLOR
21     DATE:          Friday, March 1, 2019
22     TIME:          10:17 a.m.
23     LOCATION:      Winston & Strawn
24                    1700 K Street, N.W.
25                    Washington, D.C.
```

Page 2

1   REPORTED BY:   Denise M. Brunet, RPR

2                        Reporter/Notary

3

4

5

6                    Veritext Legal Solutions

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1                 A P P E A R A N C E S

 2

 3      On behalf of the Plaintiffs:

 4              SCOTT A. SCHOETTES, ESQUIRE

 5              Lambda Legal

 6              11 East Adams

 7              Suite 1008

 8              Chicago, Illinois  60603

 9              (312) 663-4413

10              sschoettes@lambdalegal.org

11

12      On behalf of the U.S. Department of Justice:

13              JOSHUA ABBUHL, ESQUIRE

14              REBECCA CUTRI-KOHART, ESQUIRE

15              U.S. Department of Justice

16              Civil Division

17              1101 L Street, Northwest

18              Washington, D.C.  20005

19              (202) 353-4537

20              joshua.abbuhl@usdoj.gov

21

22

23

24

25      (Appearances continued on the next page.)
```

```
                                            Page 4
 1      APPEARANCES (continued):

 2

 3      On behalf of the U.S. Department of Defense:

 4              STUART C. SPARKER, ESQUIRE

 5              U.S. Department of Defense

 6              Office of the General Counsel

 7              1600 Defense Pentagon

 8              Room 3B688

 9              Washington, D.C.  20301

10              (703) 571-0802

11              stuart.c.sparker.civ@mail.mil

12

13      ALSO PRESENT:  Solomon Francis, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

1                      C O N T E N T S

2      EXAMINATION BY:                                PAGE:

3      Counsel for Plaintiffs                         8

4      Counsel for U.S. Department of Justice         132

5      Counsel for Plaintiffs                         136

6

7      TAYLOR DEPOSITION EXHIBITS:                    PAGE:

8    Exhibit 1 - Notice of Deposition in Harris     23

9    Exhibit 2 - Notice of Deposition in Roe        23

10   Exhibit 3 - Joint Trauma System Clinical Practice

11          Guideline (JTS CPG)                     81

12   Exhibit 4 - Armed Services Blood Program Medical

13          Conditions List                         116

14   Exhibit 5 - OraQuick Advance Rapid HIV-1/2 Antibody

15          Test, Customer Letter                   130

16

17        (*Exhibits attached to the transcript.)

18

19

20

21

22

23

24

25

Page 6

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  Good morning.  We are

3     going on the record at 10:17 a.m. on March 1st,

4     2019.  Please note that the microphones are

5     sensitive and may pick up whispering, private

6     conversations and cellular interference.  Please

7     turn off all cell phones or place them away from

8     the microphones as they can interfere with the

9     deposition audio.  Audio and video recording will

10    continue to take place unless all parties agree to

11    go off the record.

12              This is media unit 1 of the

13    video-recorded deposition of Colonel Audra L.

14    Taylor taken by counsel for plaintiffs in the

15    matter of Nicholas Harrison and Outserve-SLDN,

16    Inc., plaintiffs, versus James N. Mattis, in his

17    official capacity as Secretary of Defense, et al.,

18    defendants, and Richard Roe and Victor Voe and

19    Outserve-SLDN, Inc., plaintiffs, versus James N.

20    Mattis, in his official capacity as Secretary of

21    Defense, et al., defendants, case numbers

22    1:18-CV-01565 and case number 1:18-CV-00641, filed

23    in the United States District Court for the

24    Eastern District of Virginia.

25              This deposition is being held at the law

Page 50

1          Q     Are individuals who have not been

2     pre-screened as donors ever used as part of the

3     walking blood bank?

4          A     Not routinely.  They are not the first

5     priority.  The first priority is a screened donor.

6          Q     But it's possible that a non-screened

7     donor could be used if screened donors were not

8     available or had been exhausted?

9          A     Yes, that is possible.

10          Q     Are donors of fresh whole blood to the

11     walking blood bank also sometimes called

12     battlefield donors?

13          A     Not officially, but I won't say that

14     you've never seen that term.  I could see someone

15     using it, but...

16          Q     Let me ask this a different way.  Is a

17     battlefield donor something different than a donor

18     through the walking blood bank?

19          A     Not to me.

20          Q     Are transfusions of fresh whole blood

21     sometimes called battlefield transfusions?

22          A     Yes.

23               MR. ABBUHL:  Counsel, could we take a

24     short break on the soon side?

25               MR. SCHOETTES:  On the soon?  Sure.  Let

Page 54

1    guideline -- is slightly different than the form

2    that is used in one of the donor centers for -- if

3    you were to walk in today and donate blood.

4         MR. SCHOETTES:  I don't think we have the

5    form from the donor center, and I'd like to have

6    that.

7         MR. ABBUHL:  Okay.

8         MR. SCHOETTES:  And I think it's

9    responsive to one of our requests.

10         MR. ABBUHL:  I'd have to double-check if

11    we produced it, but I'll look into it.

12         MR. SCHOETTES:  Okay.

13    BY MR. SCHOETTES:

14    Q    So you described blood being -- tubes of

15    blood from the unit being -- from the unit of

16    blood collected being sent to the United States

17    for testing.  Are the tests that are performed on

18    those tubes of fresh whole blood the same as the

19    tests that would -- that are performed on blood

20    collected at a blood center?

21    A    Yes.

22    Q    And in addition, you indicated that rapid

23    testing was also conducted on fresh whole blood,

24    correct?

25    A    Yes, to the greatest extent possible.

Page 55

1        Q    And for what transmitted TTDs are rapid

2    tests conducted?

3        A    HIV, HCV, hep B surface antigen, malaria.

4        Q    Is that it?  Any others?

5        A    That's it.

6        Q    Is fresh whole blood FDA-approved?

7        A    Not in theater.

8        Q    And why is that?

9        A    If you collect the donor and then

10   transfuse it before all of the FDA-required

11   testing is performed, it is not an FDA-licensed

12   product.

13       Q    And so the rapid tests that are

14   performed, are those -- would those meet the

15   standard required by the FDA?

16       A    No.

17       Q    And the rapid tests are always performed,

18   but sometimes not completed before the blood is

19   transfused, correct?

20            MR. ABBUHL:  Objection.  I think assumes

21   facts not in evidence.

22   BY MR. SCHOETTES:

23       Q    Let me ask this question:  Are the rapid

24   tests always conducted on the fresh whole blood

25   collected in a deployed environment?

Page 56

1        A     I can't say that for certainty.

2        Q     According to the standard operating

3    procedures, are the rapid tests supposed to be

4    performed for all fresh whole blood collected in a

5    deployed environment?

6        A     To the greatest extent possible.

7        Q     So explain to me what that means.

8        A     That means if time is an issue and the

9    unit is needed before that testing can be

10   completed, it's a -- it's a medical decision and

11   the physician would assume responsibility for the

12   unit.

13            If it's a logistical issue and the

14   location doesn't have all of the rapid testing --

15   let's say they had one of the four kits or two of

16   the four, for whatever reason -- then they would

17   perform what they have.  So to the greatest extent

18   possible, just -- they'll do what they can with

19   what they have in the amount of time they have.

20            However, testing would continue.  So if

21   the transfusion goes and they have the kits,

22   they -- they should continue the testing.

23       Q     So that's what I was trying to get at, I

24   think.  So for the tests -- the rapid tests that

25   are available in a particular situation, they are

Page 57

1    performed on the individual regardless of whether

2    the results are going to be available by the time

3    the blood is transfused?

4        A    Correct.

5            MR. SCHOETTES:  I could go a few more

6    questions or I could break now.  Up to you.

7            THE WITNESS:  You can go a few more, then

8    we can break.

9            MR. SCHOETTES:  Actually, no.  Let's

10   break -- let's break now.

11           THE VIDEOGRAPHER:  The time is 11:27 a.m.

12   This completes media unit number 1.  We are now

13   off the record.

14           (Whereupon, a short recess was taken.)

15           THE VIDEOGRAPHER:  The time is 11:40 a.m.

16   This begins media unit number 2.  We are now on

17   the record.  Please proceed, Counsel.

18   BY MR. SCHOETTES:

19       Q    When is the walking blood bank activated,

20   in what circumstances?

21       A    It would be at the discretion of the --

22   of the physician.  They would take into account

23   what products are on hand, the potential for

24   resupply of blood products, as well as the

25   condition of the patient.  And then they would

1    make that decision to activate the walking blood

2    bank.

3         Q    Is the decision always made on an

4    individual basis per patient?

5         A    I don't know if you would want to confine

6    that per patient or per event.  Like, it could be

7    more than one patient.  So that would dictate

8    the -- the need to activate it if the number of

9    patients in an event or mass -- mass casualty are

10   going to go require more than what you have on

11   hand of what you can be resupplied within the time

12   frame.

13        Q    And is a mass casualty event sometimes

14   referred to as a MASCAL?

15        A    Yes.

16        Q    And is that -- the acronym for that

17   M-A-S-C-A-L?

18        A    All caps.  Yes.

19        Q    All caps.  So what you've described would

20   be a situation where the walking blood bank was

21   activated based on injuries that had already

22   occurred?

23        A    Right.  An assessment of what -- what

24   they have coming in, yeah.  So, yeah, they would

25   need to assess the injuries, know what they have

1    on hand blood-wise, and then make a decision.

2         Q    Are decisions ever made to activate the

3    walking blood bank in anticipation of casualties?

4         A    I don't know.  I can't confirm or...

5         Q    Does the supply of stored whole blood --

6    let me try again.

7              Is fresh whole blood generally used only

8    when the supply of stored whole blood has been

9    exhausted or is unavailable?

10        A    Stored whole blood is fairly new into

11   theater.  It's not a practice that's been going on

12   for years.  So, yes, they -- they should use

13   stored whole blood before activating a walking

14   blood bank.

15        Q    For how many years has stored whole blood

16   been used in theater?

17        A    Is it 2019 -- within the last two years.

18        Q    So stored whole blood was not used during

19   Operation Enduring Freedom?

20        A    No, not -- it's called something else

21   now.  So, no.  No, it was not.

22        Q    Did you say it was called something else?

23        A    No, I'm saying it's -- you know how they

24   change the name of the campaigns?  So when you

25   said Operation Enduring Freedom, no, it has not

Page 60

1    historically been used in Operation Enduring

2    Freedom.

3         Q    And was it used during Operation Iraqi

4    Freedom?

5         A    Stored whole blood, no, not per clinical

6    practice guideline, no.

7         Q    What about appropriate blood component

8    products?  Are those generally exhausted or

9    unavailable before fresh whole blood is used?

10        A    They should be exhausted, but again, I

11   believe the decision -- the medical decision is

12   made based on the number of casualties, the type

13   of injury, the casualties, and what the physician

14   feels is best for that casualty.

15             So depending on the nature of the -- the

16   injury and how many -- I think that they -- they

17   have to make that decision.  They're not going to

18   exhaust the entire supply of components, I don't

19   believe, because you don't know what's coming in

20   next.  So you have to take a lot of factors into

21   consideration when you decide to activate the

22   walking blood bank and collect fresh units.

23        Q    And are there some injuries for which

24   blood component products might be better than

25   fresh whole blood?

Page 92

1      Q     Actually, I should rephrase that.
2   Ideally the test results are obtained before the
3   blood is used, correct?
4      A     Correct.
5      Q     Under what circumstances would the blood
6   be used before the results of the rapid screening
7   tests are obtained?
8      A     The patient's condition and the
9   physician -- the physician requesting the unit
10  immediately.
11     Q     So presumably, it would be at a point
12  where the need for that unit of blood exceeds the
13  risk of a TTI at that point?
14     A     Yes.
15     Q     If a unit has not been used prior to
16  obtaining a result, what happens to the units that
17  return a positive result after rapid testing for
18  any of these conditions?
19     A     Say that again.
20     Q     If a unit has not been transfused -- and
21  we're talking about in the context of the walking
22  blood bank -- and then a positive result occurs on
23  the blood that was tested from that unit, what
24  happens to the unit of blood?
25     A     Quarantined and destroyed.

1      A      FF -- which product is on the horizon

2    or --

3      Q      Yes.

4      A      -- which one would be augmented?

5      Q      Which one would be augmented?

6      A      Fresh frozen plasma would be augmented

7    with freeze-dried plasma.  That's a product that's

8    on the horizon.  So I don't want to -- I

9    wouldn't -- I wouldn't say substitute, because

10   that's not the plan to substitute one of the

11   current components with something, but it's a

12   product that doesn't require the extensive cold

13   chain management and something that could go to

14   POI.

15     Q      Point of injury?

16     A      Point of injury, yes.

17     Q      When it is used, the -- this new product

18   for plasma, freeze-dried plasma, would it be used

19   on its own or would it need to be combined with

20   some liquid plasma?

21     A      It would not be combined with liquid

22   plasma because FFP, liquid plasma and freeze-dried

23   plasma are all plasma products.  The liquid plasma

24   and the FFP require freezer, refrigerators, the

25   cold chain management.  Freeze-dried plasma would

Page 124

1    not.  So it would be in that plasma suite of

2    products that would be available.

3         Q    I guess what I'm trying to ask is, when

4    you said augmented, it isn't that you would use

5    freeze-dried plasma to augment a unit of fresh

6    frozen plasma.  It is that you're augmenting the

7    supply?

8         A    Yes.  Yes.

9         Q    What specific infections would be tracked

10   in terms of transfusion-transmitted infections

11   that have resulted through the walking blood bank?

12        A    Any of the -- any of the tests that we

13   screen the supply for would be tracked.

14        Q    So HIV, HBV, HCV --

15        A    Correct.

16        Q    -- et cetera?

17        A    Correct.

18        Q    Have there been any documented

19   transmissions of HIV through the Armed Services

20   Blood Program blood supply in the past ten years?

21        A    Not that I'm aware of.

22        Q    In the past 20 years?

23        A    I don't know.

24        Q    What about HBV?  Have there been any

25   transmissions of HBV through the Armed Services

Page 125

1    Blood Program blood in the past 20 years?

2         A    Not that I'm aware of.

3         Q    Have there been any transmissions of HTLV

4    through the Armed Services Blood Program in the

5    past 20 years?

6         A    I believe there is one case potentially

7    linked to the transfusion.

8         Q    Have there been any transmissions of HCV

9    through the Armed Services Blood Program in the

10   past 20 years?

11        A    Maybe one.  And I don't know for certain

12   if either one of those was definitely linked to

13   the transfusion or suspected.  I'm not sure.

14        Q    Is testing for HBV required prior to

15   deployment?

16        A    I don't know.

17        Q    I'm going to ask you some questions about

18   the process by which diagnostic and other blood

19   tests are handled for service members who are

20   deployed --

21        A    Okay.

22        Q    -- to foreign bases, including those in

23   combat zones.  If an individual needs a blood

24   sample tested -- let's say they needed an HIV

25   viral load test done --

Page 130

1      A    -- products won't reach their destination

2   in the correct --

3      Q    At the correct temperature.

4      A    At the correct temperature, no.

5           MR. SCHOETTES:  One last thing.  We're

6   going to mark this as Exhibit 5.

7           (Taylor Deposition Exhibit Number 5 was

8   marked for identification.)

9   BY MR. SCHOETTES:

10     Q    Do you recognize Exhibit 5?

11     A    Yes.

12     Q    What is it?

13     A    It's the OraQuick Advance Rapid HIV-1/2

14  Antibody Test customer letter.

15     Q    Is this the insert that you were

16  describing earlier?

17     A    Yes.

18     Q    If you could turn to page 2.

19     A    Uh-huh.

20     Q    And under biological principles of the

21  test --

22     A    Uh-huh.

23     Q    -- it says, "The OraQuick Advance Rapid

24  HIV-1/2 Antibody Test is a manually performed,

25  visually read, 20-minute immunoassay for the

1    qualitative detection of antibodies to HIV-1 and

2    HIV-2 in human oral fluid, whole blood obtained

3    from a finger puncture or a venipuncture, and

4    plasma," correct?

5        A    Correct.

6        Q    Is it the case, then, that this test is

7    one that can be -- results can be obtained

8    within -- at 20 minutes?

9        A    Per the package insert, yes.  It says 20

10   minutes.

11       Q    If you'll turn to page 10, the paragraph

12   underneath the chart, table 3 --

13       A    Uh-huh.

14       Q    -- talks about the sensitivity of the

15   OraQuick Advance Rapid HIV-1/2 antibody test in

16   these studies was calculated to be 536 divided by

17   538, which is equal to 99.6 percent.

18           Do you agree that 99.6 percent is the

19   sensitivity of the HIV rapid test used in the

20   walking blood bank?

21       A    Yes.

22           MR. SCHOETTES:  I am done.

23           MR. ABBUHL:  We're going to need to take

24   a few minutes, but before going off the record, I

25   just want, before I forget, say that we will

Page 132

1    reserve our right to read and sign the transcript.

2            But if we can go off the record for just

3    a bit while we confer.

4            MR. SCHOETTES:  Sure.

5            THE VIDEOGRAPHER:  The time is 1:57 p.m.

6    We are going off the record.

7            (Whereupon, a short recess was taken.)

8            THE VIDEOGRAPHER:  The time is 2:21 p.m.

9    We are back on the record.  Please proceed,

10   Counsel.

11            EXAMINATION BY COUNSEL FOR

12            THE U.S. DEPARTMENT OF JUSTICE

13   BY MR. ABBUHL:

14       Q    Colonel, if you could please pick up the

15   document marked Exhibit 5 in front of you and turn

16   to page 10.  This is the document about the rapid

17   test for HIV, correct?

18       A    Correct.

19       Q    And if you look at the text below

20   table 3, it says that -- it essentially says that

21   the sensitivity of the HIV test was about

22   99 percent, correct?

23       A    Correct.

24       Q    Do you know the conditions under which

25   that sensitivity was measured?

Page 133

1        A     No.

2        Q     Do you know if it was measured in a

3   battlefield environment?

4        A     No.  I don't know.

5        Q     Okay.  You can put away Exhibit 5 for

6   now.

7              You've discussed various testing and

8   precautions that are done to protect the blood

9   supply; is that correct?

10       A     Correct.

11       Q     And you testified that those protections

12  are done to the extent possible, correct?

13       A     Correct.

14       Q     So there are situations where tests might

15  not happen that you would do in an ideal

16  situation, correct?

17       A     Correct.

18       Q     And there's screening that you might do

19  in an ideal situation, but sometimes, in a

20  military situation, you might not be able to do

21  it; is that correct?

22       A     Correct.

23       Q     Is that particularly true in situations

24  involving being near a battlefield?

25       A     Yes.

Page 134

1          Q    If you could also look at Exhibit 3,
2     which is in front of you.  This is the joint
3     trauma system clinical practice guideline,
4     correct?
5          A    Correct.
6          Q    Could you please turn to page 17?  Could
7     you remind me what page 17 is?
8          A    It's the blood donor pre-screening SOP
9     enclosure 1, ASBP 572, emergency whole blood
10    (front).
11         Q    And at the bottom of the page, there's a
12    place for donor's signature; is that correct?
13         A    Correct.
14         Q    And could you please read the text above
15    that line, please?
16         A    "I verify"?  That part?
17         Q    Yes.
18         A    "I verify that I have answered the
19    questions honestly, I had an opportunity to ask
20    questions.  I consent to donating blood today and
21    I feel my blood is safe to be transfused.  If I am
22    donating a unit of whole blood today, my blood
23    will not be tested for viral diseases prior to
24    transfusions due to the emergency situation.  If
25    for any reason I feel that my blood may not be

Page 135

1    safe, I will not donate today."

2        Q    Did you testify earlier that a donor

3    should sign that line before donating blood?

4        A    They should.

5        Q    Are there instances where blood would be

6    collected without a signature on this form?

7        A    Yes.

8        Q    And if you would also on that same

9    page -- there's a footer at the very bottom.  Do

10   you see that?

11       A    Yes.

12       Q    Could you please read the footer?

13       A    Are you talking about the blue?

14       Q    Yes, the blue text.

15       A    "Guideline only/not a substitute for

16   clinical judgment."

17       Q    Thank you.  And you can also put that

18   exhibit down.

19            Earlier in your testimony, you said if

20   someone was permanently deferred from donating

21   blood, they would not be recruited to donate

22   blood; is that correct?

23       A    Correct.

24       Q    That is what you testified to earlier,

25   correct?

Page 136

1        A     I believe so, yes.

2        Q     Are there any military situations where

3    you would transfuse blood before screening it?

4        A     I'm not sure I --

5        Q     Is it possible that a blood transfusion

6    would take place in the military without it having

7    been screened and then you could screen the

8    transfusion afterward?

9        A     In theater?

10       Q     Correct.

11       A     In a theater situation?

12       Q     Is it possible?

13       A     You're asking is it possible for a

14   transfusion to take place prior to screening of

15   the unit or the donor or --

16       Q     Of the blood being transfused.

17       A     Yes.  A transfusion can take place prior

18   to the screening --

19             MR. ABBUHL:  I have no further questions.

20             THE WITNESS:  -- being completed.

21             MR. SCHOETTES:  I just have one or two.

22      FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS

23   BY MR. SCHOETTES:

24       Q     Going back to Exhibit 3, page 17, you

25   just testified that there would be some instances

Page 137

1    in which blood would be donated without the --

2    there could be instances in which the blood would

3    be donated without the signature of the donor on

4    this form.  Can you tell me in what instances?

5         A    I believe there are -- well, I used -- I

6    think I used the word "should."  It should be

7    signed.  There could be instances, maybe at a --

8    at a role two, if they urgently, you know, based

9    on the number of personnel, the number of

10   casualties and the scenario or the situation where

11   they might not be able to get everything completed

12   and signed ahead of time.

13        There could be even at point of injury,

14   if they are to take like one of the pre --

15   pre-made kits that are available on the market and

16   they're going out and they need to collect, I

17   believe there's a form, a donor questionnaire in

18   those kits should be signed, but, you know,

19   depending on what the scenario is and how it's

20   going, it may or may not be signed.  So I just

21   think it's situation and scenario-driven.  It

22   should be -- to the greatest extent possible, they

23   should all be screened, they should all answer all

24   the questions, have a chance to ask their

25   questions, but I can't for certainty say that that

Page 138

1    happens 100 percent of the time.

2         Q    Have you ever been in a situation where

3    the blood -- the walking blood bank was being used

4    in which a form like this was not signed?

5         A    Not that I recall.  With the combat

6    support hospital, no.  As the JBPO, you're not --

7    I wasn't that -- I wasn't close to the situations,

8    so I'm not certain if there were any that happened

9    without the signature on the 572.

10        Q    And then, just a clarifying a question.

11   Counsel asked you if there could be a blood

12   donation in the military without screening.  In

13   your answer, you talked about screening of the

14   donor or screening of the blood.  Were you indeed

15   talking about without the blood being tested?

16        A    Yes.  That's the way I interpreted the

17   question.

18             MR. SCHOETTES:  That's all I have.

19             MR. ABBUHL:  We will -- again, we'd like

20   to be able to review the record and sign it.

21             THE VIDEOGRAPHER:  The time is 2:30 p.m.

22   This conclude today's testimony given by Colonel

23   Audra L. Taylor.  We are now off the record.

24             Whereupon, at 2:30 p.m., the deposition

25   of AUDRA L. TAYLOR was concluded.)

Page 139

1               CERTIFICATE OF NOTARY PUBLIC

2               I, Denise M. Brunet, the officer before

3       whom the foregoing deposition was taken, do hereby

4       certify that the witness whose testimony appears

5       in the foregoing deposition was sworn by me; that

6       the testimony of said witness was taken by me

7       stenographically and thereafter reduced to print

8       by means of computer-assisted transcription by me

9       to the best of my ability; that I am neither

10      counsel for, related to, nor employed by any of

11      the parties to this litigation and have no

12      interest, financial or otherwise, in the outcome

13      of this matter.

14

15                          Denise M. Brunet

16                          Denise M. Brunet

17                          Notary Public in and for

18                          The District of Columbia

19

20      My commission expires:

21      December 14, 2022

22

23

24

25

Page 140

```
 1                        Veritext Legal Solutions
                              1100 Superior Ave
 2                                Suite 1820
                             Cleveland, Ohio 44114
 3                            Phone: 216-523-1313
 4
        March 18, 2019
 5
        To: Joshua Abbuhl, Esq.
 6
        Case Name: Roe, Richard, et al. v. Shanahan, Patrick M., Et Al.
 7
        Veritext Reference Number: 3235702
 8
        Witness:  Audra L. Taylor        Deposition Date:  3/1/2019
 9
10      Dear Sir/Madam:
11
        Enclosed please find a deposition transcript.  Please have the witness
12
        review the transcript and note any changes or corrections on the
13
        included errata sheet, indicating the page, line number, change, and
14
        the reason for the change.  Have the witness' signature notarized and
15
        forward the completed page(s) back to us at the Production address
16      shown
17      above, or email to production-midwest@veritext.com.
18
        If the errata is not returned within thirty days of your receipt of
19
        this letter, the reading and signing will be deemed waived.
20
21      Sincerely,
22      Production Department
23
24
25      NO NOTARY REQUIRED IN CA
```

Page 141

1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS

2

       ASSIGNMENT REFERENCE NO: 3235702

3       CASE NAME: Roe, Richard, et al. v. Shanahan, Patrick M.
       DATE OF DEPOSITION: 3/1/2019

4       WITNESS' NAME: Audra L. Taylor

5       In accordance with the Rules of Civil
Procedure, I have read the entire transcript of

6  my testimony or it has been read to me.

7       I have made no changes to the testimony
as transcribed by the court reporter.

8

9  Date                     Audra L. Taylor

10      Sworn to and subscribed before me, a
Notary Public in and for the State and County,

11  the referenced witness did personally appear
and acknowledge that:

12

       They have read the transcript;

13       They signed the foregoing Sworn
       Statement; and

14       Their execution of this Statement is of
       their free act and deed.

15

       I have affixed my name and official seal

16  this 16th day of April_____, 20 19.

17

18  Notary Public

19  September 30, 2020
      Commission Expiration Date

20

21                      MY
                   COMMISSION

22                   NUMBER

23                   106091

24                 My Commission Expires

25                 September 30, 2020

Page 142

1               DEPOSITION REVIEW
              CERTIFICATION OF WITNESS

2

        ASSIGNMENT REFERENCE NO: 3235702
3       CASE NAME: Roe, Richard, et al. v. Shanahan, Patrick M.
        DATE OF DEPOSITION: 3/1/2019
4       WITNESS' NAME: Audra L. Taylor
5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7       I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9       I request that these changes be entered
    as part of the record of my testimony.
10

        I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____      _____
    Date                         Audra L. Taylor
14

        Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17          They have read the transcript;
            They have listed all of their corrections
18          in the appended Errata Sheet;
            They signed the foregoing Sworn
19          Statement; and
            Their execution of this Statement is of
20          their free act and deed.
21      I have affixed my name and official seal
22  this 16th  day of April          , 20 19 .
23      _____
        Notary Public
24      September 30, 2020

My Commission Expires
September 30, 2020

25      Commission Expiration Date

Page 143

1                           ERRATA SHEET

                VERITEXT LEGAL SOLUTIONS MIDWEST

2                      ASSIGNMENT NO: 3/1/2019

3      PAGE/LINE(S) /          CHANGE           /REASON

4       89 / 12    Alginate to Allogeneic not spelled correctly

5      123 / 1     FFP to FDP           acronym

6      123 / 12    Freeze Dried Plasma  missing word

7       34 / 21    Collect              missing word

8       35 / 6 and 7  Units are shipped from our

9                  donor centers to these distribution

10                 centers.

11                 Note: can use "shipped or "Fed Exed"

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19

20     _16 April 2019_____        _Audra Taylor_____
       Date                          Audra L. Taylor

21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _16th_

22     DAY OF _April_____ 20 _19_.

23     _Windy Regina Rowland_____
       Notary Public

24     _September 30, 2020_____      My Commission Expires
                                         September 30, 2020

25     Commission Expiration Date

                       Veritext Legal Solutions

**[& - abbuhl]**

Page 1

**&**

**&**   1:23

**0**

**00641**   1:6 6:22
**01565**   1:13 6:22

**1**

**1**   1:21 5:8 6:12
   23:2,3,23 38:12,16
   57:12 98:18 131:1
   134:9
**1/2**   5:14 130:13,24
   131:15
**10**   38:16 90:6
   105:15 131:11
   132:16
**100**   83:24 109:4
   138:1
**1008**   3:7
**10:17**   1:22 6:3
**11**   3:6
**1100**   140:1
**1101**   3:17
**116**   5:13
**11:27**   57:11
**11:40**   57:15
**11:52**   65:1
**11:59**   65:4
**12**   106:15,19,21
   107:24 108:6,20
   109:7,16,24 110:7
   110:12,19 111:6,8
   111:19 116:10,10
**120**   33:10 65:20
   87:3
**13**   25:12 94:8 98:4
   98:6,7
**130**   5:15
**132**   5:4
**136**   5:5

**14**   139:21
**14541**   139:15
**15**   70:21 71:6 90:6
   107:8
**15-6**   12:7,10
**1600**   4:7
**17**   96:15,17 134:6
   134:7 136:24
**1700**   1:24 7:2
**18**   39:11,13 107:23
   114:1 140:4
**1820**   140:2
**1994**   13:4,15
**1:15**   115:2
**1:18**   1:6,13 6:22
   6:22
**1:30**   114:24 115:6
**1:57**   132:5
**1st**   6:3

**2**

**2**   5:9 23:11,12
   25:11 57:16 85:25
   86:11,16 94:24
   98:7,12,13,25 99:5
   99:8 115:3 130:18
   131:2
**20**   16:15 23:25,25
   24:4 124:22 125:1
   125:5,10 130:25
   131:8,9 141:16
   142:22 143:22
**20005**   3:18
**2004**   13:6
**2008**   22:19
**2009**   22:12,20
**2010**   21:25
**2013**   21:5,7
**2014**   18:13 19:1
**2018**   13:25 16:14
**2019**   1:21 6:4
   59:17 140:4

**202**   3:19
**2022**   139:21
**20301**   4:9
**216-523-1313**
   140:3
**22**   85:20 86:9
**23**   5:8,9
**24**   24:25
**28th**   22:4,6,10
**2:21**   132:8
**2:30**   138:21,24

**3**

**3**   5:10 64:13 81:1
   81:2 94:12 96:16
   96:17 115:7
   131:12 132:20
   134:1 136:24
**3/1/2019**   140:8
   141:3 142:3 143:2
**30**   1:19 69:18
**312**   3:9
**3235702**   140:7
   141:2 142:2
**353-4537**   3:19
**365**   87:10
**3b688**   4:8

**4**

**4**   5:12 64:23 81:13
   116:20,21,24
   118:3
**4.0**   86:15
**44114**   140:2

**5**

**5**   5:14 78:18 82:17
   130:6,7,10 132:15
   133:5
**536**   131:16
**538**   131:17
**571-0802**   4:10

**572**   51:11 53:2
   80:22 95:4,18
   96:18 134:9 138:9

**6**

**6**   1:19 38:12 69:18
**60603**   3:8
**65**   39:19
**663-4413**   3:9

**7**

**703**   4:10
**7700**   8:15

**8**

**8**   5:3 98:14
**81**   5:11

**9**

**90**   86:23 87:6,10
**99**   132:22
**99.6**   131:17,18

**a**

**a.m.**   1:22 6:3
   57:11,15 65:1,4
**ab**   42:1
**abbreviated**   40:22
   53:1,17
**abbuhl**   3:13 7:12
   7:12 24:12 26:21
   28:9,22 29:4,11,21
   29:24 30:3 31:13
   38:6 47:16 48:21
   48:25 50:23 51:4
   53:22 54:7,10
   55:20 64:16,18,22
   69:17 71:10 74:8
   77:23 78:21 79:5
   83:8 86:3,10
   88:25 94:4,9
   99:21 102:7 118:8
   119:5 129:20
   131:23 132:13