# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KEVIN DEESE, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. RDB-18-2669 |
| MARK T. ESPER, *et al.*, | * | |
| Defendants. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## **MEMORANDUM OPINION**

Plaintiffs Kevin Deese ("Deese"), a United States Naval Academy graduate, and John Doe[1] ("Doe"), a graduate of the United States Air Force Academy, both tested positive for the human immunodeficiency virus ("HIV") prior to their graduation. Both Plaintiffs were discharged by Defendants[2] under Department of Defense, Navy, and Air Force regulations which categorically bar service academy graduates living with HIV from commissioning as officers. Those same regulations would not have required Deese and Doe's separation from ordinary military service had they been serving as enlisted men during the time of their HIV diagnosis. In this action, Plaintiffs challenge the military's regulations and the Defendants' actions under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 500-706 (Counts I, II, III, IV, and V). They also bring claims under the Fifth Amendment's equal protection

---

[1] Plaintiff John Doe's unopposed Motion to Proceed Under a Pseudonym (ECF No. 2), which includes a request to withhold Deese's address from the Complaint, is GRANTED.

[2] The Defendants in this action are the Department of Defense, Mark T. Esper, in his official capacity as Secretary of Defense, Thomas B. Modly, in his official capacity as Secretary of the Navy, Vice Admiral Sean S. Buck, in his official capacity as Superintendent of the United States Naval Academy, Captain Thomas R. Buchanan, in his official capacity as Commandant of the United States Naval Academy, and Barbara M. Barrett, in her official capacity as Secretary of the Air Force.

components (Counts IX and X).  Separately, Plaintiff Doe brings a claim under the Fifth

Amendment's procedural due process guarantee (Count VI), as well as an equitable estoppel

claim (Count VII), and seeks a declaratory judgment (Count VIII).

Now pending is the Defendants' Motion to Dismiss or for Summary Judgment.  (ECF

No. 42.)  The parties' submissions have been reviewed and a telephonic hearing was conducted

in this matter on the record on July 16, 2020.[3]  *See* Local Rule 105.6 (D. Md. 2018).  For the

reasons that follow, Defendants' Motion to Dismiss or for Summary Judgment (ECF No. 42)

is GRANTED IN PART and DENIED IN PART.  Summary Judgment is ENTERED in

favor of Defendants on Count I. Count II is REMANDED IN PART to permit disability

evaluation system ("DES") review of Doe's claims.  Summary Judgment is ENTERED in

favor of Defendants on the remaining claims in Count II.  Counts VI, VII, and VIII are

DISMISSED WITH PREJUDICE.  The Motion to Dismiss is DENIED as to Counts III,

IV, V, IX, and X.  Specifically, Counts III, IV, and V (the "categorical bar" APA claims) may

proceed, as well as Counts IX and X (the equal protection claims).[4]

## BACKGROUND

Defendants seek Summary Judgment in their favor as to Plaintiffs' Administrative

Procedure Act claims (Counts I, II, III, IV, and V) and dismissal as to the remaining counts.

In ruling on a motion for summary judgment, this Court reviews the facts and all reasonable

inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372,

---

[3] To prevent the spread of COVID-19, Standing Orders of this Court have suspended some in-person proceedings. Accordingly, the hearing took place telephonically and was accessible by the public.

[4] The parties are instructed to contact chambers to schedule a telephone conference concerning the best manner of proceeding in this case.

378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013). When reviewing a motion to dismiss, this Court accepts as true the facts alleged in the plaintiffs' complaint. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011). Accordingly, the background of this case is drawn from both the allegations of the Amended Complaint and its attachments (ECF Nos. 1 and 33) and the voluminous administrative records filed in connection with Plaintiffs' APA claims. (ECF Nos. 38, 39 *SEALED*.)

## I.   The State of HIV Treatment.

Once a deadly diagnosis, the human immunodeficiency virus ("HIV") is now manageable thanks to the advent of new antiretroviral medications. (Am. Compl. ¶ 28, ECF No. 33.) The effectiveness of these medications is measured by their impact on the "viral load", *i.e.*, the number of copies of the virus in one milliliter of a person's blood. (*Id.* ¶ 29.) A person in successful treatment will have a viral load of less than 200, which is considered "virally suppressed," or a viral load of less than 48-50, which is called an "undetectable" viral load. (*Id.*) Today, antiretroviral drugs have few or no side effects for most people and are prescribed immediately after an HIV diagnosis. (*Id.* ¶ 30.) With timely and appropriate treatment, a 25-year-old who has been diagnosed with HIV has nearly the same life expectancy as one who does not have HIV. (*Id.* ¶ 31.)

A person with a suppressed viral load is incapable of transmitting HIV. (*Id.* ¶ 32.) Even without treatment, HIV is not as easily transmitted as was once believed. Transmission of HIV is rare outside of the context of sexual activity, sharing of injecting drug equipment, blood transfusion, needle sticks, or perinatal exposure. (*Id.* ¶ 33.) According to the Centers

for Disease Control and Prevention ("CDC"), the risk of exposure through other means is "negligible." (*Id.*)

## II.   Military Regulations Governing HIV.

Congress has restricted the appointment of commissioned officers to persons who are "physically qualified for active service." 10 U.S.C. § 532(a)(3).  The Departments of Defense, Navy, and Air Force have promulgated regulations designed to implement this restriction.  In accordance with those regulations, individuals who have tested positive for HIV may not be commissioned as officers.  The same regulations would not require the immediate discharge of active duty service members who have been diagnosed with HIV after enlisting.

Since 1985, the Department of Defense has instituted uniform policies governing HIV.[5]  Department of Defense Instruction ("DoDI") 6130.03 (ECF No. 1-1) governs the medical standards for appointment, enlistment, or induction in the military services.  The regulation generally provides that members of the military must be free of contagious disease and otherwise medically fit for duty.  DoDI 6130.03 ¶ 4 (ECF No. 1-1 at 3.)  The bulk of the regulation is devoted to listing a myriad of medical conditions which are disqualifying for military service.  *Id.* Encl. 4 (ECF No. 1-1 at 11-50.)  The presence of HIV or serological evidence of infection is listed among these disqualifying conditions. *Id.* ¶ 24(b) (ECF No. 1-1 at 39.)  The policy permits the "Secretaries of the Military Departments" to waive the medical qualification standards on a case-by-case basis. *Id.* Encl. 2 ¶ 3(b) (ECF No. 1-1 at 8.)

---

[5] *See* D. Burelli, CONG. RESEARCH SERVICE, ACQUIRED IMMUNE DEFICIENCY SYNDROME AND MILITARY MANPOWER POLICY, IB87202 (Feb. 12, 1988) (ECF No. 42-5.)

DoDI 6485.01 (ECF No. 1-3) governs the monitoring and management of HIV among military service members.  The instruction states that it is Department of Defense policy to "[d]eny eligibility for military service to persons with laboratory evidence of HIV infection for appointment, enlistment, pre-appointment, or initial entry training for military service pursuant to DoDI 6130.03" and to "[p]eriodically screen Service members for HIV infection." DoDI 6485.01 ¶ 3 (ECF No. 1-3 at 2.)  Active-duty and reserve component service member who test positive for HIV are not automatically separated from the military, but instead are referred for "appropriate treatment and a medical evaluation of fitness for continued service in the same manner as a Service member with other chronic or progressive illnesses. . . ." *Id.* ¶ 2(c) (ECF No. 1-3 at 7.)

The Navy and the Air Force have issued HIV instructions tailored to their branches of the military.  Secretary of the Navy Instruction ("SECNAV") 5300.30E (ECF No. 1-4) concerns the management of HIV, Hepatitis B, and Hepatitis C infection in the Navy and Marine Corps.  The Instruction's accession policy—applicable to prospective recruits— provides that "[i]ndividuals confirmed HIV antibody positive, or who have evidence of chronic HBV or HCV infection are not eligible for military service." SECNAV 5300.30E ¶ 4(a) (ECF No. 1-4 at 5.)  Active duty personnel who test positive after induction are not immediately discharged.  The Navy's retention policy states that "on a case-by-case basis" individuals with controlled HIV "may be considered for [duty outside of the continental United States] or large ship platform tours."  *Id.* ¶ 9(b) (ECF No. 1-4 at 10.)

Specific procedures apply to Naval Academy midshipmen who test positive for HIV:

USNA midshipmen shall be processed for separation from the Naval Academy and discharged when confirmed HIV positive, or when diagnosed with chronic

> HBV or HCV infection. SECNAV may elect to delay separation to the end of
> the current academic year. A midshipman who is otherwise qualified and
> granted such a delay in the final academic year may be graduated without
> commission and thereafter discharged. An honorable discharge shall be issued
> if the sole basis for discharge is HIV seropositivity or chronic HBV or HCV
> infection. Recoupment of educational expenses shall be in accordance with
> existing statutory requirements and Navy personnel policies.

*Id.* ¶ 4(c)(3) (ECF No. 1-4 at 7.)  The Assistant Secretary of the Navy for Manpower and

Reserve Affairs is ultimately responsible for carrying out these procedures, and all other

procedures, set forth in SECNAV 5300.30E.  *Id.* ¶ 17(a) (ECF No. 1-4 at 23.)

The Air Force's HIV instruction, AFI 44-178 (ECF No. 1-11), is similar. The Air

Force's accession policy states that "[a]pplicants infected with HIV are ineligible for enlistment

or appointment.  Waiver for HIV infection is not authorized."  AFI 44-178 ¶ 2.2.1 (ECF No.

1-11 at 6.)  As in the Navy, Air Force retention policies applicable to active duty personnel are

more lenient.  An Air Force Service member cannot be discharged solely because he has tested

positive for HIV after enlistment.  *Id.* ¶ A9.1.1 (ECF No. 1-11 at 37.)

Air Force academy cadets are subject to HIV screening prior to their appointment as

officers. AFI 44-178 ¶ A2.1 (ECF No. 1-11 at 16.)  Should they test positive, the following

procedure applies:

> Separate Air Force Academy cadets . . . from the Academy . . . and discharge
> them. The superintendent of the Academy may delay separation to the end of
> the current academic year. A cadet granted such a delay in the final academic
> year, who is otherwise qualified, may graduate without commission and then is
> discharged. If the sole basis for discharge is serologic evidence of HIV infection,
> issue an honorable discharge.

*Id.* ¶ A.2.5.3 (ECF No. 1-11 at 16.)  Ordinarily, the Surgeon General of the Air Force Academy

may grant a waiver and commission Air Force cadets with disqualifying medical conditions.

AFI 48-123 ¶ 6.3 (ECF No. 1-9 at 45.)

6

III.   **Plaintiff Deese's Discharge from the Navy.**

Deese entered the Naval Academy as a midshipman in 2010.  (ECF No. 33 ¶¶ 35-36.)

Deese performed well academically and earned numerous accolades during his training.  (*Id.* ¶

37.)  By his final year in the Academy, Deese had earned the National Defense Service Medal,

the Navy Rifleman Marksmanship Medal, and the Navy Pistol Marksmanship Medal (Expert),

and was serving as a Training Officer and Platoon Commander.  (*Id.* ¶¶ 37-38.) Weeks before

his graduation in May 2014, Deese applied for an optional and selective dive program.  (*Id.* ¶

41.)  The program required additional medical screening which would prove disastrous for

Deese's Navy career.  (*Id.* ¶ 41.)

On April 1, 2014, Captain Bill Byrne, then the Commandant of the Naval Academy,

informed Deese that the dive program medical testing revealed that he was HIV positive.

(ECF No. 33 ¶ 42.)  Captain Byrne explained that Deese would not be commissioned as an

officer upon graduation because of this test result.  (*Id.* ¶ 42.)  At that time, Deese was also

diagnosed with thrombocytopenia, *i.e.*, a low platelet count.  (Navy Administrative Record

("NAR") 016, ECF No. 38 *SEALED*.)[6]  On April 12, 2014, the Chief of the Navy's Bureau

of Medicine and Surgery ("BUMED") submitted correspondence to the Secretary of the Naval

Academy which concluded that Deese did not meet the physical qualifications for

commissioning due to a history of thrombocytopenia and V08.  (NAR 022.)  BUMED did not

recommend a waiver of the physical standards in Deese's case.  (*Id.*)

---

[6] When referencing the Administrative Record, this Court utilizes the pagination supplied by the exhibit
Bates stamps, not the Court's CM/ECF system.

Deese graduated from the Naval Academy in May 2014, but was not commissioned as an officer. (ECF No. 33 ¶ 45.) On October 17, 2014, the Superintendent of the Naval Academy, Vice Admiral Walter E. Carter, Jr., forwarded BUMED's April 2014 letter to the Assistant Secretary of the Navy for Manpower and Reserve Affairs. (NAR 020-021.) Vice Admiral Carter recommended Deese's honorable discharge from the United States Navy based on his thrombocytopenia and asymptomatic HIV diagnoses. (*Id.*) The letter explained that Vice Admiral Carter's recommendation was based on a "careful review of Midshipman Deese's medical history" and "recommendations from BUMED and Naval Health Clinic, Annapolis." (NAR 020.)

Deese did not immediately challenge the Naval Academy's decision not to issue him a commission or the Superintendent's discharge recommendation. After learning more about his diagnosis and Navy regulations governing HIV, he began to seek a medical waiver. (ECF No. 33 ¶ 50.) In September and October 2016, Deese obtained recommendations to commission from several Navy personnel. (*Id.* ¶¶ 50-52; NAR 009-012.) On October 27, 2016, Deese submitted a formal request for a waiver to commission into the Navy to the Secretary of the Navy via Vice Admiral Carter, who at that time was still serving as Superintendent of the United States Naval Academy. (ECF No. 33 ¶ 53; NAR 007.)

In response to Deese's formal request, the Superintendent reversed his prior recommendation. (NAR 005; ECF No. 33 ¶ 55.) In a November 8, 2016 letter to the Secretary of the Navy via Assistant Secretary of the Navy for Manpower and Reserve Affairs, Vice Admiral Carter reviewed Navy accession and retention policies and noted that, had Deese received his HIV diagnosis a few weeks later, after commissioning, Navy policy would not

8

have required his separation.  (NAR 005.)  Vice Admiral Carter recommended that Deese receive a commission, finding that he was more akin to an active duty service member than a prospective recruit to whom accession standards ordinarily apply, that he was "capable of performing his duties," and that an "exception to policy would achieve the DoD objective of retaining service members after they have been extensively trained."  (NAR 005.)

On March 15, 2017, the Assistant Secretary of the Navy for Manpower and Reserve Affairs denied the Superintendent's request to commission Deese.  (NAR 004.)  The Assistant Secretary reasoned that "one of the two conditions [(thrombocytopenia and asymptomatic HIV)] is non-waivable pursuant to Department of Defense Instruction 6485.01 and the other condition could place him in extraordinary risk should he be injured."  (*Id.*)  The Assistant Secretary concluded, based on the advice of BUMED and his own review of the case, that commissioning Deese would be "imprudent" under such circumstances.  (*Id.*)

On May 2017, Deese received his honorable discharge papers.  (NAR 001; ECF No. 33 ¶ 56.)  The paperwork indicated that he was separated because he did not "meet established medical/physical standards during entry level status."  (NAR 001.)

## IV.  Plaintiff Doe's Discharge from the Air Force.

On January 13, 2009 Plaintiff Doe enlisted in the United States Air Force for a term of six years and became a Space Systems Operations Journeyman.  (ECF No. 33 ¶ 65.)  In February 2014, a routine physical examination revealed that Doe was HIV positive.  (*Id.* ¶ 68.)  Pursuant to AFI 44-178, the Air Force convened a medical evaluation board to assess Doe's qualifications for continued service.  (*Id.* ¶ 68; Air Force Administrative Record ("AAR") 012, ECF No. 39 *SEALED*.)  On June 2, 2014, the Medical Evaluation Board issued a Return to

9

Duty determination, permitting Doe to continue to serve in the Air Force.  (ECF No. 33 ¶ 69.)

In August 2014, at the beginning of his third year at the Air Force Academy, Doe took a "commitment oath," vowing to serve for two additional years at the Academy and five years thereafter as an officer.  (ECF No. 33 ¶ 73.)  In January 2015, Doe's term of enlistment expired.  (*Id.* ¶ 75.)  Doe did not re-enlist in the Air Force because he had already vowed to continue his service at the Academy.  (*Id.*)

On September 15, 2015, Doe received correspondence from the Air Force Academy informing him that he was being recommended for potential disenrollment from the Academy and discharge from the Air Force, pursuant AFI 44-178, because of his HIV diagnosis.  (AAR 015, 018.)  On September 25, 2015, Doe requested a waiver to allow him to complete his studies at the Academy and an "exception-to-policy" ("ETP"), which would permit him to be commissioned an officer.  (AAR 022.)  On November 3, 2015, the Superintendent of the Air Force Academy granted Doe a medical waiver and cleared him to graduate in June 2016. (ECF No. 33 ¶ 72; AAR 012-014.)  Doe received support for his ETP from every single officer in his chain of command, including all medical officers responsible for his evaluation and treatment.  (ECF No. 33 ¶¶ 82, 83.)

Doe graduated on June 2, 2016.  (ECF No. 33 ¶ 85.)  At that time, Doe received a Bachelor of Science degree and a certificate of commissioning, signed by the Secretary of the Air Force, stating that he had been commissioned as a Second Lieutenant in the Regular component of the United States Air Force.  (*Id.* ¶ 86.)  Nevertheless, after graduation, the Air

Force did not recognize Doe as a commissioned Second Lieutenant.  (*Id.* ¶ 90.)  Instead, Doe remained in "cadet status" while his ETP was being processed.  (*Id.*)

On October 5, 2016, a colonel at the Air Force Academy informally notified Doe that the Chief of Staff of the Air Force was recommending that he not be commissioned as an officer.  (ECF No. 33 ¶ 96.)  On October 26, 2016, the Air Force Secretary's Office formally notified the Commander of the Air Force Academy that Doe's ETP request had been disapproved by the Secretary on September 28, 2016.  (*Id.* ¶ 100.)  On November 1, 2016, Doe was honorably discharged from the Air Force.  (*Id.* ¶ 101.)

## STANDARD OF REVIEW

### I.   Motion to Dismiss for Lack of Subject Matter Jurisdiction.

Defendants assert that Plaintiffs claims are not justiciable, and, accordingly, this Court lacks subject matter jurisdiction.  A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction challenges a court's authority to hear the matter brought by a complaint.  *See Davis v. Thompson*, 367 F.Supp.2d 792, 799 (D. Md. 2005). A challenge to jurisdiction under Rule 12(b)(1) may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted). In a facial challenge, a court will grant a motion to dismiss for lack of subject matter jurisdiction "where a claim fails to allege facts upon which the court may base jurisdiction." *Davis*, 367 F. Supp. 2d at 799.  In this case, Defendants argue that Plaintiffs' claims are non-justiciable, even accepting all of the factual allegations in the Complaint.

## II.    Motion to Dismiss for Failure to State a Claim.

Defendants seek dismissal of Counts VI, VII, VIII, IX, and X for failure to state a claim.  Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P 8(a)(2).  Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted.  The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Supreme Court's opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "require that complaints in civil actions be alleged with greater specificity than previously was required."  *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).   In *Twombly*, the Supreme Court articulated "[t]wo working principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss.  *Iqbal*, 556 U.S. at 678.  First, while a court must accept as true the factual allegations contained in the complaint, the court is not so constrained when the factual allegations are conclusory or devoid of any reference to actual events. *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). Moreover, a court need not accept any asserted legal conclusions drawn from the proffered facts.  *Iqbal*, 556 U.S. at 678. (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim); *see also Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) ("Although we are constrained to take the facts in the light most favorable to the plaintiff, we need not accept

legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." (internal quotation marks omitted)).

Second, a complaint must be dismissed if it does not allege "a plausible claim for relief." *Iqbal*, 556 U.S. at 679. Although a "plaintiff need not plead the evidentiary standard for proving" her claim, she may no longer rely on the mere possibility that she could later establish her claim. *McCleary-Evans v. Maryland Department of Transportation, State Highway Administration*, 780 F.3d 582, 584 (4th Cir. 2015) (emphasis omitted) (discussing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) in light of *Twombly* and *Iqbal*). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. While the plausibility requirement does not impose a "probability requirement," *id.* at 556, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012) ("A complaint need not make a case against a defendant or *forecast evidence* sufficient to *prove* an element of the claim. It need only *allege facts* sufficient to *state* elements of the claim." (emphasis in original) (internal quotation marks and citation omitted)). In making this assessment, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Iqbal*, 556 U.S. at 679. "At bottom, a plaintiff must nudge [its] claims across the line from conceivable to plausible to resist dismissal." *Wag More Dogs, LLC*, 680 F.3d at 365 (internal quotation marks omitted).

## III.    Motion for Summary Judgment.

Defendants seek Summary Judgment on Plaintiffs' APA claims. (Counts I, II, III, IV, and V).  The Administrative Procedures Act ("APA"), 5 U.S.C. § 701, *et seq.*, in conjunction with the federal-question jurisdiction statute, provides the statutory basis for a court to review a final agency action. Claims seeking review of an agency action under the APA "are adjudicated without a trial or discovery, on the basis of an existing administrative record . . . [and accordingly] are properly decided on summary judgment. *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 659 (D. Md. 2007). The standard set forth in Rule 56 of the Federal Rules of Civil Procedure governing summary judgment, however, "does not apply because of the limited role of a court reviewing the administrative record." *Hospira, Inc. v. Burwell*, GJH-14-2662, 2014 WL 4406901, at *9 (D. Md. Sept. 5, 2014) (citing *Roberts v. United States*, 883 F. Supp. 2d 56, 62–63 (D.D.C. Mar. 23, 2012); *Kaiser Found. Hosps. v. Sebelius*, 828 F. Supp. 2d 193, 197–98 (D.D.C. 2011)). Rather, summary judgment is the mechanism by which the court decides as a matter of law whether "the administrative record permitted the agency to make the decision it did." *Id.* (quoting *Kaiser Found. Hosps. v. Sebelius*, 828 F. Supp. 2d 193, 198 (D.D.C. 2011)).

## ANALYSIS

### I.    Justiciability.

Defendants initially argue that the present controversy is non-justiciable because it involves a "quintessential military judgment."  (ECF No. 42-1 at 5.)  The United States Supreme Court has traditionally afforded great deference to the military when called to review the "complex, subtle and professional decisions as to the composition, training, equipping,

and control of a military force." *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S. Ct. 2440 (1973). Such issues are often properly reserved to "branches of the government which are periodically subject to electoral accountability," not the judiciary. *Id.* In particular, the discretion to commission an officer falls "within the province of the President as Commander in Chief." *Orloff v. Willoughby*, 345 U.S. 83, 90, 73 S. Ct. 534 (1953). Nevertheless, Deference to military judgment does not require abdication of the judicial function. *See, e.g.*, *Emory v. Secretary of the Navy*, 819 F.2d 291, 294 (D.C. Cir. 1987) (finding as justiciable suit alleging that plaintiff was denied promotion in Navy ranks because of alleged racially discriminatory practices).

The United States Court of Appeals for the Fourth Circuit has permitted judicial review of the military's decisions on a case-by-case basis, weighing the nature of the Plaintiff's claims against the risks of interference with the military function. To determine whether judicial review is appropriate, the Fourth Circuit applies the framework articulated in *Mindes v. Seaman*, 453 F.2d 192 (5th Cir. 1971). *Roe v. Dep't of Defense*, 947 F.3d 207, 217-18 (4th Cir. 2020) (citing *Mindes*, 453 F.2d at 201-02). To present a justiciable case under *Mindes*, the plaintiff must satisfy two threshold requirements. First, the plaintiff must allege "the deprivation of a constitutional right, or . . . that the military has acted in violation of applicable statutes or its own regulations." *Mindes*, 453 F.2d at 201. Second, "the plaintiff must have exhausted the available intraservice corrective measures." *Roe*, 947 F.3d at 218 (citing *Guerra v. Scruggs*, 942 F.2d 270, 276 (4th Cir. 1991)). Where these requirements have been satisfied, the court balances four factors to determine whether the military controversy is justiciable:

1. The nature and strength of the plaintiff's challenge to the military determination.

2. The potential injury to the plaintiff if review is refused.

3.  The type and degree of anticipated interference with the military function.

4.  The extent to which the exercise of military expertise of discretion is involved.

*Roe*, 947 F.3d at 218 (citing *Guerra*, 942 F.2d at 276.

Applying these factors in *Roe v. Dep't of Defense*, 947 F.3d 207 (4th Cir. 2020), the Fourth Circuit permitted a challenge to the Air Force's decision to discharge two service members based on their HIV status.  Plaintiffs Richard Roe and Victor Voe, proceeding under pseudonyms, were scheduled to be discharged from the Air Force after they were diagnosed with HIV.  Both Roe and Voe had achieved an undetectable viral load.  *Id.* at 216. Nevertheless, pursuant to an Air Force policy known as "Modification 13," Roe and Voe's HIV status precluded their deployment to Central Command's ("CENTCOM") area of responsibility, where eighty percent of all Air Force deployments occur.  *Id.* at 215.  In both Roe and Voe's case, the Air Force concluded that their inability to deploy to this theater of operation necessitated their separation from the Service.  *Id.* at 216-17.

Plaintiffs challenged the Air Force's decisions and the military's deployment policies under the Administrative Procedure Act and the equal protection component of the Fifth Amendment's Due Process Clause, and sought a preliminary injunction prohibiting their discharge.  *Roe*, 947 F.3d at 217.  On appeal from the district court's grant of the requested injunction, Defendants argued that the case presented a nonjusticiable military controversy. *Id.*  Applying the *Mindes* factors, the Fourth Circuit found otherwise.  First, the Court held that Plaintiffs were likely to succeed on at least one claim.  *Id.* at 218.  As to the second factor, the Court found that Plaintiffs' scheduled discharge and "the prospect of being forced to disclose their HIV status to explain the change in their intended careers" constituted irreparable harm.

*Id.*  Third, judicial review would create only minimal interference with military functions because Plaintiffs' claims were premised, in part, on an allegation that the Defendants had failed to follow their own policies, and "[r]equiring the military to follow its own policies does not interfere with its functions."  *Id.*  Finally, as to the fourth factor, the Court found that the military had not "appl[ied] its expertise to the evidence before it" because it had not made "individualized determinations regarding servicemembers' fitness for service."  *Id.*  Balancing these factors, the Court concluded that Plaintiffs had presented a justiciable controversy because it did not unduly interfere with military expertise or discretion.  *Id.* at 219.

As in *Roe*, this case is justiciable despite the involvement of military decision-making. The Plaintiffs in this case, like the *Roe* plaintiffs, allege that the military's decision was motivated by discrimination based on their HIV status, and that the military's actions violated its own policies. The alleged injury in this case is nearly identical to the injuries identified in *Roe*: Plaintiffs allege that they will be forced to disclose their HIV status to others as the only explanation for the abrupt termination of their military careers. Although *Roe* primarily concerned the Air Force's retention standards, which were not applied to Plaintiffs in this case, that distinction does not render this case unreviewable. On its face, it makes little sense to decide, on the one hand, that a challenge to the military's *retention* standards concerning HIV-positive service members is justiciable, but, on the other hand, that a nearly identical challenge to the *accession* standards is not.  Judicial review of both sets of standards merely requires this Court to determine whether the military acted in accordance with its own policies and in a constitutionally permissible manner.  A decision in this case will not require this Court to

exceed its expertise and interfere with military decision-making.  Accordingly, this case is justiciable.

## II.  Standing.

Defendants next argue that this Court lacks standing to decide Deese's case because he was diagnosed not only with HIV, but with thrombocytopenia (a low platelet count).[7]  Faced with a separate disqualifying diagnosis which is not the subject of this lawsuit, Defendants contend that Deese's challenge to the Navy HIV protocols will not afford him any relief, even if he were to prevail on all of his claims.  Accordingly, they argue, Deese lacks standing to bring this suit.  Deese responds that his thrombocytopenia condition is, essentially, part-and-parcel of his HIV diagnosis and would not pose a barrier to his requested commissioning or other sought-after relief.

"Standing is an 'essential and unchanging part' of Article III's case or controversy requirement." James M. Wagstaffe, Federal Civil Procedure Before Trial § 24-III (2019) (quoting *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771, 120 S. Ct. 1858 (2000)).  To establish Article III standing, a plaintiff must (1) show an injury in fact, (2) demonstrate a causal connection between the defendants' actions and the alleged injury, and (3) show that the injury will likely be redressed by a favorable outcome. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130 (1992).  The third requirement, sometimes called "redressability," requires the Plaintiff to show that he "personally would benefit in a tangible

---

[7] Defendants did not challenge John Doe's standing, nor have they raised any venue or personal jurisdiction challenges.  Venue and personal jurisdiction challenges may be waived for failure to raise them on a Rule 12 motion.  *See* James M. Wagstaffe, FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 12-VI (2020).  Standing issues cannot be waived because they implicate subject matter jurisdiction.  *Id.* § 24-III.

way from the court's intervention."  *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204

F.3d 149, 162 (4th Cir. 2000) (en banc) (citation and internal quotation marks omitted).

   The record does not elucidate the degree to which thrombocytopenia and HIV are

linked.  Plaintiffs' Amended Complaint contains no factual allegations about this condition.

Deese has proffered a medical study which purportedly supports the contention that

thrombocytopenia commonly accompanies an HIV diagnosis, and that the two conditions are

typically resolved by the same treatment.  (ECF No. 48-6.)[8]  Nevertheless, the study alone

does not adequately demonstrate the purported link between thrombocytopenia and HIV.

While the study expresses optimism about the efficacy of treating thrombocytopenia with

antiretroviral drugs, it cautions that "cases [of thrombocytopenia] continue to occur" even

after treatment. (ECF No. 48-6 at 2.)   Although Deese's medical records show that his platelet

count has, in fact, returned to the normal range with the use of HIV medication, there is

insufficient evidence to conclude that the same medication regimen will remain as effective in

treating both his thrombocytopenia and HIV conditions. (ECF No. 49-2 *SEALED*).

   The record also does not sufficiently indicate how Navy officials would assess a

combined thrombocytopenia/HIV diagnosis should this Court order relief modifying the

Navy's current HIV protocols or require the Navy to re-assess Deese for commissioning, as

he has requested.  Defendants currently note that a mere *history* of thrombocytopenia is enough

to disqualify Deese from service.  DoDI 6130.03 ¶ 23 (ECF 1-1 at 39.)   Nevertheless, it is

unclear how the Navy would assess these combined conditions should this Court determine

---

[8] O'Bryan et al., *Impact of the Highly Active Antiretroviral Therapy Era on the Epidemiology of Primary HIV-Associated Thrombocytopenia*, 8 BMC Res. Notes 595 (2015), at 3.

that its approach to HIV-positive service members is improper and that further assessment of

Deese's case is needed.  If waiver is permitted as to Deese's HIV condition, and if Deese's

HIV and thrombocytopenia are linked in some way, then it may also be appropriate to waive

Deese's thrombocytopenia diagnosis.

In summary, it is not appropriate at this early stage—with so many unresolved factual

issues—to determine that Deese lacks standing to challenge Navy HIV policy.  Further

discovery is necessary to determine whether these two conditions are linked and, if they are,

whether the Navy would be likely to grant a waiver as to both should it grant a waiver as to

one.

## III.   Plaintiffs' Administrative Procedure Act Claims (Counts I, II, III, IV, and V).

Plaintiffs' Administrative Procedure Act ("APA") claims, presented in Counts I

through V of the Amended Complaint, are at the heart of this lawsuit.  The APA commands

courts to "hold unlawful and set aside agency action, findings, and conclusions" that are

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2)(A).  Plaintiffs allege that Defendants violated the APA by:

> 1. failing to recognize the proper Navy and Air Force officials responsible for
> issuing waivers and granting exceptions-to-policy (Counts I and II);
>
> 2. not processing Plaintiff Doe through the disability evaluation system
> ("DES") (Count II);
>
> 3. applying HIV policies (DoDI 6485.01, SECNAV 5300.30E, and AFI 44-178)
> to categorically bar United States Naval Academy midshipmen and United
> States Air Force Academy cadets living with HIV from commissioning as
> officers (Counts III, IV, and V);
>
> 4. failing to publish DoDI 6485.01, the Department of Defense Instruction
> governing the monitoring and management of HIV among military service

members, in the *Federal Register* or to submit it to notice and comment rulemaking (Count V).

(*See* ECF No. 48 at 44-45; ECF No. 55 at 20-21.)

Plaintiffs have now withdrawn their claim that DoDI 6485.01 was promulgated improperly. (ECF No. 48 at 37 n.14.)  Accordingly, Count V is DISMISSED IN PART as to that particular claim.   Additionally, Defendants concede that Plaintiff Doe should have been processed through DES before he was separated from the Air Force Academy. (ECF No. 48 at 37 n.14.)  This case was previously stayed to permit that procedure to advance, but the process is still ongoing. (*Id.*)  Defendants do not object to a limited remand to DES for this purpose. (*Id.*)  Accordingly, Count II shall be REMANDED IN PART to permit DES review of Doe's claims.

Defendants argue that the remaining claims are not reviewable under the APA because the military's actions in this case were "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).   Alternatively, Defendants argue that Plaintiffs have not demonstrated that their actions were "arbitrary and capricious" in violation of the APA.[9]   These arguments are addressed in turn.  In summary, the APA claims are reviewable because the agency action may be adjudged based on the standards supplied in the military's own regulations.  Counts I and II fail to state a claim because the Defendants' identification of the relevant waiver authorities comports with the military's regulations.  Counts III, IV, and V (in part) may proceed based

---

[9] Defendants also contend that Deese's challenge to SECNAV 5300.30E (the subject of Count III) is barred by the statute of limitations governing APA claims because this lawsuit was filed just over six years after the policy was issued on August 13, 2012. *See* 28 U.S.C. § 2401(a) (setting forth a six-year statute of limitations applicable to claims against the United States).  The Court rejects this argument because Deese did not suffer a legally cognizable injury, and accordingly could not challenge the Defendants' policies, until his May 2017 discharge. (ECF No. 33 ¶ 56.)

on the Plaintiffs' claim that the Defendants' categorical bar on commissioning officers is arbitrary and capricious and violates their own regulations.  These latter claims withstand Summary Judgment both because the record does not provide a rational basis for the military's decision to categorically bar HIV-positive academy graduates from being commissioned as officers, and because the record does not provide a sufficient basis for applying different HIV policies to officer candidates and regular enlisted service members.

### A.  The challenged actions are reviewable under the APA.

Defendants argue that the challenged agency actions in this case are not reviewable under the APA because they are committed to agency discretion by law. To prevail with this argument, the Defendants must overcome "a strong presumption in favor of judicial review of agency action." *Casa de Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 697 (4th Cir. 2019) (citing *Speed Mining, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 528 F.3d 310, 316 (4th Cir. 2008)).  Only in certain "rare circumstances," *Lincoln v. Vigil*, 508 U.S. 182, 191, 113 S. Ct. 2024 (1993), does the APA prohibit judicial review of matters "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).  This prohibition against judicial intervention is triggered when the agency has been granted authority so broad that there exists "no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S. Ct. 1649 (1985).

Even broad statutory grants of agency authority can contain enough content to guide judicial review. *See Overton Park v. Volpe*, 470 U.S. 821, 105 S. Ct. 1649 (1985) (holding that statute directing Secretary of Transportation to divert roads from federal parks whenever "feasible and prudent" did not commit such decisions to agency discretion); *Mach Mining, LLC*

22

*v. EEOC*, 575 U.S. 480, 135 S. Ct. 1645 (2015) (finding that statute requiring Equal Employment Opportunity Commission to "endeavor to eliminate alleged unlawful employment practice[s] by informal methods of conference, conciliation, and persuasion" provided judicially manageable standards); *see also* Wright & Miller, Federal Practice and Procedure § 8325 (2d Ed.) (collecting cases in which the Supreme Court and lower courts found "sufficient constraints on agency discretion" even when agencies were granted broad authority).

The statute at issue in this case, 10 U.S.C. § 532(a)(3), states as follows: "Under regulations prescribed by the Secretary of Defense, an original appointment as a commissioned officer (other than as a commissioned warrant officer) in the Regular Army, Regular Navy, Regular Air Force, or Regular Marine Corps may be given only to a person who . . . (3) is physically qualified for active service." 10 U.S.C § 532(a)(3). With this language, the Secretary of Defense is authorized to commission officers but must ensure that officer candidates are "physically qualified." *Id.* The statue delegates broad authority to the Defendants. Nevertheless, that discretion is not unlimited.

Defendants' regulations and policies may be scrutinized to determine whether they have departed from the military's statutory mandate to ensure that officers are "physically qualified for active service." 10 U.S.C § 532(a)(3). The phrase "physically qualified for active service" provides a standard by which to adjudge the agencies' actions. If regulations appear to limit the attainment of officer roles for reasons unrelated to the officer's physical qualifications, or for reasons not otherwise contemplated by the statute, then the courts may intervene. In this case, the Defendants regulations categorically bar academy graduates from

being commissioned as officers because of their HIV status, even if the same HIV diagnoses would not preclude them from "active service" in another capacity (*e.g.*, service on a large ship platform tour as provided in SECNAV 5300.30E ¶ 9(b)).   Additionally, and as discussed in greater detail below, there is no basis to support the military's assumption that well-managed HIV renders an individual physically unqualified for service.   At least as the record is presently constituted, unfounded and contradictory policies like these appear to depart from the military's statutory mission of ensuring that officers are "physically qualified for active service."

Furthermore, even if the underlying statute does not appear to constrain the agency's authority, the agency's own regulations can provide a standard by which to review its conduct. *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 347 (4th Cir. 2001).   In *Inova*, the Provider Reimbursement Review Board ("the Board") of the United States Department of Health and Human Services ("HHS") dismissed a hospital's Medicare reimbursement appeal because the hospital had failed to file a position paper. *Id.* at 345.   The hospital filed suit challenging the dismissal under the APA.   *Id.* at 346.   HHS argued that the Board's dismissal was unreviewable because it was committed to agency discretion by law.   Specifically, the Medicare Act granted the Board "full power and authority to make rules and establish procedures . . . which are necessary or appropriate to carry out the provisions of this section." *Id.* at 346.   Exercising that authority, the Board adopted a rule permitting it to dismiss an appeal based on the Medicare provider's failure to submit a position paper. *Id.* at 347.

The United States Court of Appeals for the Fourth Circuit declined to determine whether the Medicare Act provided a standard to guide its analysis. *Id.* at 347.   Nevertheless,

the Court concluded that review was appropriate because the Board's procedural rule provided a standard by which the agency's action could be assessed. *Id.* Though acknowledging that the rule contained broad, permissive language, which set forth that "the Board may dismiss" for failure to file a position paper, the Court sided with several prior cases holding that "language allowing for discretion does not create unlimited discretion." *Id.* at 348 (collecting cases). Noting that the Board's procedural rule was of a familiar type ordinarily applied by courts, the Court determined that the rule provided a sufficient standard by which to assess the Board's actions. *Id.* at 347-48. The Court also noted the "substantial interests at stake in the provider reimbursement arena" and that, if left unchecked, Board's rule could be "enforce[d] in a manner that is quite imperious." *Id.* at 348.

The permissive language of 10 U.S.C § 532(a)(3) does not shield the agencies' actions from review because the Defendants' own regulations provide content by which to judge their commissioning decisions. In other words, there is law to apply. For example, DoDI 6130.03 ¶ 4, states that "[i]t is DoD policy to . . . ensure that individuals under consideration for appointment, enlistment, or induction into the Military Services" are:

> (1) Free of contagious diseases that will probably endanger the health of other personnel.
>
> (2) Free of medical conditions or physical defects that may require excessive time lost from duty for necessary treatment or hospitalization, or probably will result in separation from the Service for medical unfitness.
>
> (3) Medically capable of satisfactorily completing required training.
>
> (4) Medically adaptable to the military environment without the necessity of geographical area limitations.
>
> (5) Medically capable of performing duties without aggravation of existing physical defects or medical conditions.

(ECF 1-1 at 3.)

To determine whether the Defendants have correctly assessed a service member's fitness for duty in a given case, this Court need only look to regulations like these to determine whether the Defendants' assessment conforms to this policy.

As in *Inova*, this Court need not determine the degree to which the statute itself constrains agency authority; it is sufficient to conclude that the Defendants' regulations provide the means of measuring their actions. A familiar legal analysis is required to assess the Defendants' actions in light of their regulations. For example, any analysis of the regulations concerning authority over the waiver process—the subject of Counts I and II—merely requires this Court to employ familiar canons of statutory construction to determine which entities had authority to make the final waiver determinations in the Plaintiffs' cases. Once that analysis is complete, and the proper authority identified, this Court need only determine whether the proper authority was allowed to resolve the Plaintiffs' waiver requests. If it appears that the Defendants did not allow the proper authority to do its job, then the agency's actions are arbitrary and capricious because they violate their own regulations. The familiar method of interpreting these regulations, and the mechanical ease with which the proper legal interpretation may be applied to the facts, is the natural result of a regulatory scheme that provides standards for this Court to apply.

The same is true of Plaintiffs' challenge to the HIV policies of the Defendants, which are the subject of Counts III, IV, and V. The content of these regulations provide standards for this Court to apply. For example, the Navy's instruction governing HIV-positive service members, SECNAV 5300.30E, states that such members are ineligible for military service

26

based on certain explicitly stated assumptions or conditions, including that "[t]he condition existed prior to appointment or enlistment" and that an "[i]ndividual with HIV may suffer potentially life threatening reactions to some live-virus immunizations administered at basic training." (ECF No. 1-4 at 5.) These assumptions, or conditions, may be subject to scrutiny. If these assumptions or conditions are not in fact based on reality, or do not hold in a given case, then this Court may conclude that the agency's actions against an HIV-positive service member were arbitrary and capricious.

In summary, Defendants' actions are not "committed to agency discretion by law" because the underlying statute provides a meaningful standard to apply and, as in *Inova*, the agencies' own regulations provide additional standards by which to adjudge their actions.

## B. Judgment is entered in favor of Defendants on Counts I and II.

In Counts I and II, Plaintiffs allege that the Defendants violated the APA by failing to recognize the proper Navy and Air Force officials responsible for issuing waivers and granting exceptions-to-policy ("ETP"). Specifically, Plaintiffs argue that Navy and Air Force regulations permit the United States Naval Academy Superintendent and the Surgeon General of the United States Air Force Academy to decide whether to grant waivers to Deese and Doe. (ECF No. 33 ¶¶ 111-28.) Plaintiffs additionally allege that the Defendants violated their own regulations by failing to submit Plaintiffs' ETP requests to the Undersecretary of Defense for Personnel and Readiness. (*Id.* ¶¶ 44, 77.)

The Plaintiffs must overcome a high bar to prevail on these claims. The Supreme Court has long recognized that "provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given 'controlling weight

unless it is plainly erroneous or inconsistent with the regulation.'" *Stinson v. United States*, 508 U.S. 36, 45, 113 S. Ct. 1913 (1993) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S. Ct. 1215 (1945)).  Likewise, the Fourth Circuit has held that "[w]hen the question before the court is whether an agency has properly interpreted and applied its own regulation[s], the reviewing court must give the agency's interpretation substantial deference." *Almy v. Sebelius*, 679 F.3d 297, 307 (4th Cir. 2012) (citing *Md. Gen. Hosp., Inc. v. Thompson*, 308 F.3d 340, 343 (4th Cir. 2002)).

In this case, the military interpreted its own regulations governing the waiver process, and determined that the Assistant Secretary of the Navy for Manpower and Reserve Affairs and the Secretary of the Air Force could make the final waiver decisions with respect to Deese and Doe.  Although both the Superintendent of the Naval Academy and the Superintendent of Air Force advocated for waivers in these cases, their correspondence evince an understanding that the Secretaries had final say on the issue.  (A.R. 014, 017; N.A.R. 005, 020-021.)

That interpretation is consistent with the governing statute and the military's regulations.  Pursuant to 10 U.S.C. § 532(a)(3), the Secretary of Defense is required to promulgate regulations governing the commissioning of officers to ensure that they are physically qualified for service. The relevant Department of Defense regulation, DoDI 6130.03, states that the "Secretaries of the Military Departments . . . shall . . . [a]uthorize the waiver of the [medical] standards in individual cases for applicable reasons and ensure uniform waiver determinations." *Id.* Encl. 2. ¶ 3(b) (ECF No. 1-1 at 8); *accord* 32 C.F.R. § 66.7(a) (waiver determinations are made "by the Secretary of the Military Department").  The Navy

instruction governing HIV, SECNAV Instruction 5300.30E, grants overall responsibility for administering Navy HIV policy to the Assistant Secretary of the Navy for Manpower and Reserve Affairs. (ECF No. 1-4 at 23.) AFI-178 states that a waiver for HIV is not available at all. (ECF No. 1-11 at 6.) By delegating the final waiver authority in Deese's case to the Assistant Secretary of the Navy for Manpower and Reserve Affairs, Defendants comported with 10 U.S.C. § 532(a)(3) and SECNAV 5300.30E. When the Secretary of the Air Force denied a waiver in Doe's case, she acted in accordance with the statute, DoDI 6130.03, and the Air Force's own explicit policy against denying waivers in all HIV cases.

Plaintiffs object that the Defendants overlooked Academy-level regulations which vested the Superintendent of the Naval Academy and Surgeon General of the Air Force Academy with waiver authority. *See* USNA Instruction 6130.1B ¶ 6(c)(1) ("As the commissioning authority, the Superintendent may choose to waive a medical commissioning standard . . . and commission any midshipman."); AFI 44-178 at Attach. 2, Table A2.1 (designating the Air Force Academy Surgeon General as the "Waiver Authority" for "Initial Commission[ing]" of Force Academy cadets).

The military's specific HIV instructions override the more general commissioning instructions cited by Plaintiffs. In statutory interpretation, it is common that "the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645, 132 S. Ct. 2065 (2012) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384, 112 S. Ct. 2031 (1992). When a statute—or, in this case, a regulation—targets "specific problems with specific solutions," those specific provisions overcome any general provisions which might

appear to contrary. *RadLAX*, 566 U.S. at 645, 132 S. Ct. 2065 (citing *Varity Corp. v. Howe*, 516 U.S. 489, 519, 116 S. Ct. 1065 (1996) (Thomas, J., dissenting)).

In this case, the Department of Defense, the Navy, and the Air Force have developed a comprehensive series of instructions governing a specific issue—HIV. When HIV is at issue, those regulations control over the more general provisions concerning the commissioning of officers. The Navy has specifically designated the Assistant Secretary of the Navy for Manpower and Reserve Affairs as responsible for its HIV policies. When waiver for HIV is in question, the Assistant Secretary of the Navy for Manpower and Reserve Affairs settles the issue. Likewise in the Air Force. Under Department of Defense regulations, the Secretary of the Air Force holds ultimate authority over medical waivers. Under regulations promulgated by the Secretary, waivers are not authorized for HIV. Accordingly, when waiver of HIV is at issue, the Secretary of the Air Force's regulation controls despite the recommendation of the Air Force Academy Surgeon General. In both branches of the military, specific instructions governing HIV override the more general ones concerning commissioning. Under that proper reading of the regulations, the Defendants identified the correct waiver authorities.

Finally, Defendants appropriately processed Plaintiffs' exception-to-policy requests. Defendants readily admit that an exception to DoDI 6485.01 must ultimately be approved by the Department of Defense. Nevertheless, contrary to Plaintiffs' assertion, an ETP request does not need to be transmitted to the Undersecretary of Defense for Personnel and Readiness in every case. DoDI 6485.01 places upon "the Secretaries of the Military Departments" the responsibility for "[i]mplement[ing] this instruction and any guidance issued under the

authority of this instruction."  DoDI 6485.01 Encl. 2 ¶ 4(a) (ECF No. 1-3 at 6.)  Accordingly, it was appropriate for Defendants to terminate the ETP process at the Navy and Air Force level, rather than elevate it to the Department of Defense.   For these reasons, Summary Judgment is ENTERED in favor of Defendants as to Counts I and II.

### C. Plaintiffs may proceed on the "categorical bar" claims advanced in Counts III, IV, and V.

In Counts III, IV, and V, Plaintiffs allege that Defendants violated the APA by applying Department of Defense, Navy, and Air Force policies to categorically bar United States Naval Academy midshipmen and United States Air Force Academy cadets living with HIV from commissioning as officers.  Plaintiffs advance two independent theories in support of these claims.  They argue that the Defendants' alleged categorical bar violates the APA because (1) it is contrary to science, and is therefore arbitrary and capricious; and (2) it is "inconsistent and in conflict with military regulations governing the accession or retention of active duty service members with HIV."  (ECF No. 48 at 45-46.)

In reviewing the Plaintiffs' claims, this Court is mindful that its "scope of review is narrow" under the APA.  *Roe v. Dep't of Defense*, 947 F.3d 207, 220 (4th Cir. 2020) (citing *Dep't of Commerce v. New York*, —— U.S. ——, 139 S. Ct. 2551, 2569 (2019)).  Nevertheless, the court retains authority to ensure that "agencies . . . engage[] in reasoned decisionmaking." *Roe*, 947 F.3d at 220 (citing *Judulang v. Holder*, 565 U.S. 42, 53, 132 S. Ct. 476 (2011)).  Agency action is arbitrary and capricious if it is found that the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856 (1983). An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S. Ct. 239, 245-46 (1962)).

Defendants contend that a 2018 Department of Defense Report to Congress demonstrates the military's awareness of the current medical science and justifies its policies in light of that science. (ECF No. 42-3.) In the report, the Department of Defense demonstrates an awareness of medical advances in AIDS treatment and represents that its policies "reflect current medical literature and expert opinion . . . regarding transmission and treatment of HIV." (ECF No. 42-at at 7-8.) The Report expresses concerns that there "remain significant risks" associated with HIV even with proper treatment. (*Id.* at 24.) Specifically, the Report states that "highly stressful combat conditions" and "extremely austere and dangerous places" may cause "disrupted medication maintenance" and "potential communicability," including under circumstances when a soldier is called to render "aid to a seriously injured member in combat." (*Id.* at 9.)

In *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020), discussed *supra*, the Fourth Circuit rejected these same justifications for the military's decision to discharge two members of the Air Force based on their HIV status. In *Roe*, the Fourth Circuit held that the 2018 Report to Congress "cannot substitute for the judicial review provided by the APA." *Id.* at 225. The Fourth Circuit then rejected the specific rationales advanced in the Report. The Fourth Circuit discredited the assertion that "austere conditions" could "disrupt" treatment

and found that there was little risk of battlefield blood transmission of HIV.  *Id.* at 226-27.  The Court broadly held that "*any* understanding of HIV that could justify [a categorical bar on deploying HIV-positive service members] is outmoded and at odds with current science.  Such obsolete understandings cannot justify a ban, even under a deferential standard of review."  *Id.* at 228.

The broad language in *Roe* applies with equal force in this case.  On this record, the Court cannot conclude that a categorical bar against commissioning HIV-positive service members is acceptable under the APA in spite of *Roe*'s rejection of a similar military policy.  Although *Roe* did not have a complete record before it, very little additional justifications for the Defendants' actions have been presented in this case.  Defendants once again rely on the 2018 Department of Defense Report to Congress, which the Fourth Circuit in *Roe* deemed insufficient for purposes of APA review.  *Roe*, 947 F.3d at 225.  To hold that this same Report is nevertheless sufficient in this case would run afoul of the Fourth Circuit's broad, condemnatory language in *Roe*.

Plaintiff's claims in Counts III, IV, and V that the categorical bar is "inconsistent and in conflict with military regulations governing the accession or retention of active duty service members with HIV" also survive the Defendant's challenge.   Under this second, alternative theory of recovery, Plaintiffs allege that the military has violated its own policies by applying accession standards to service academy graduates, even though such graduates are considered "active duty" service members to whom retention standards ordinarily apply.  As a result of applying the more restrictive accession standards, rather than the retention standards, service academy graduates with HIV are categorically barred from commissioning as officers.

Once again, this Court is mindful that "provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Stinson v. United States*, 508 U.S. 36, 45, 113 S. Ct. 1913 (1993) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S. Ct. 1215 (1945)).  Nevertheless, the categorical bar at issue in this case conflicts with Department of Defense regulations. DoDI 6485.01 specifically provides that "active duty" service members are not to be separated merely because of an HIV diagnosis. DoDI 6485.01 ¶ 2(c) (ECF No. 1-3 at 7.) The term "active duty" includes those attending a military service academy. *See* 10 U.S.C. § 101(d)(1).  Accordingly, express Department of Defense policy shields service academy graduates from automatic discharge upon an HIV-diagnosis.  Navy and Air Force HIV policies which categorically bar HIV-positive service members from commissioning, and which have been enforced to automatically effectuate their discharge, expressly conflict with DoDI 6485.01 and other retention standards with would ordinarily apply to active duty service members.  Defendants have not articulated an adequate basis for applying accession standards to academy graduates despite this apparent contradictory result. Accordingly, Counts III, IV and V may proceed on the grounds that the categorical bar violates the APA because it does not properly account for the current state of medical science and because it conflicts with Department of Defense regulations.

## IV.   Doe's Procedural Due Process Claim (Count VI).

In Count VI, Doe alleges that Defendants' actions violated the Due Process Clause because he was discharged from the Air Force without being processed through the disability evaluation system ("DES").  (ECF No. 33 ¶¶ 156-57.)  Defendants agree that Doe was entitled

to pursue this avenue of relief under the military's policies.  Nevertheless, they argue that the failure to provide DES review does not amount to a due process violation because Doe does not have a protected interest in receiving an officer's commission.

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893 (1976).  In order to prevail, the plaintiff must show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 314 (4th Cir. 2012) (citing *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011)).

Military service members do not have a property interest in their term of enlistment, attendance in military service academies, command position, or officer status.  *See Downey v. United States Dep't of the Army*, 685 F. App'x 184, 193 (4th Cir. 2017) (no protected interest in "command position or attendance at the National War College"); *Guerra v. Scruggs*, 942 F.2d 270 (4th Cir. 1991) (no protected interest in continued military service); *Knehans v. Alexander*, 566 F.2d 312, 314 (D.C. Cir. 1977) (no protected interest in "continued active duty as a commissioned officer in the Army").  Accordingly, Doe cannot claim that his inability to exhaust the DES system offended due process because he did not have a property interest in receiving a commission in the first place.

Relying on *Sciolino v. City of Newport News, Va.*, 480 F.3d 642 (4th Cir. 2007) Doe

nevertheless argues that he has a protected liberty interest "premised on the [Department of Defense's] false statement that he is medically unfit for duty." (ECF No. 48 at 51-52.) In *Sciolino*, the Fourth Circuit held that a Due Process Clause "liberty interest is implicated by public announcement of reasons for an employee's discharge." *Sciolino*, 480 F.3d at 645-46 (quoting *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir.1990)). To state this type of liberty interest claim, a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false. *Sciolino*, 480 F.3d at 646 (citing *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 n. 5 (4th Cir.1988)).

Doe has not alleged a violation of this kind of liberty interest. Doe alleges that the military declared him medically unfit for duty, and that this statement was false. (ECF No. 33 ¶ 158.) Critically, however, Doe does not allege that the Air Force made the reason for his discharge public. Although he alleges that he may need to explain to prospective employers that he was discharged because of a medical condition, there is no allegation that the Air Force would make, or has made, that disclosure. (*Id.* ¶ 159.) Accordingly, Doe's procedural Due Process Claim (Count VI) is DISMISSED WITH PREJUDICE.

## V. Doe's Equitable Estoppel Claim (Count VII).

In Count VII, Doe brings an "equitable estoppel" claim, in which he seeks a "declaration that Defendants Esper, Barrett, and DoD are estopped from discharging him based on his HIV status." (ECF No. 33 ¶ 169.) Assuming, *arguendo*, that Doe can even bring such a claim, he faces an uphill battle. In general, federal courts are very reluctant to apply equitable estoppel against the Government. *OPM v. Richmond*, 496 U.S. 414, 419, 110 S. Ct.

2465 (1990); *United States v. Browning*, 630 F.2d 694, 702 (10th Cir. 1980). Indeed, the Supreme

Court has "reversed every finding of estoppel that [it] ha[s] reviewed." *Richmond*, 496 U.S. at

422. As this Court has previously summarized:

> The law of estoppel against the government is very narrow and can lead to harsh
> results. An estoppel claim against the government must make out the traditional
> elements of estoppel, must show affirmative misconduct going beyond mere
> negligence or mistakes by an individual government employee, and must not
> threaten the public fisc or public policy.

*Angeles v. District Director*, 729 F. Supp. 479, 485 (D. Md. 1990).

The "traditional elements" of equitable estoppel are variously formulated. In Maryland,

equitable estoppel consists of the following elements: "(1) a voluntary misrepresentation of

one party, (2) that is relied upon by the other party, (3) to the other party's detriment." *Johnson

v. United States*, 610 F. Supp. 2d 491, 498 (D. Md. 2009) (citing *Chawla v. Transam. Occidental Life

Ins. Co.*, 440 F.3d 639, 646 (4th Cir. 2006)).

In this case, Doe alleges that between August 2014 through 2016 he was "encouraged"

to complete the commission process, and that he relied on this encouragement to his

detriment. (ECF No. 33 ¶¶ 73-75, 84-89; ECF No. 48 at 57.) For example, Doe claims that

he chose not to re-enlist because he "was led to believe by officials in the Air Force that he

would be able to commission." (ECF No. 33 ¶ 75.) It was only "well after he took his

commitment oath and began his third year at the [Air Force Academy]" that Doe was informed

that his HIV status might justify his ability to commission. (ECF No. 33 ¶ 165.) Consistent

with these allegations, the Administrative Record reveals that, in September 2015, Deese

received a memorandum indicating that his discharge was being considered based on his

February 2014 HIV diagnosis. (AAR 015, 018.)

Regardless of whether he initially received mixed signals from the Air Force, Doe's claim fails because has not alleged "affirmative misconduct" going beyond mere negligence. Doe alleges that in August 2014 Air Force officials "did not inform him" that he may not receive a commission and that, in January 2015, he was "led to believe" that he would be able to commission. (ECF No. 33 ¶¶ 73, 75.)  These vague allegations at best describe negligence, not "affirmative misconduct."  Furthermore, whatever error was originally committed by these anonymous Academy officials was rectified by the September 2015 memorandum Doe received informing him of his potential disenrollment and discharge, and subsequent correspondence regarding his commissioning.  (AAR 015, 018.)  Accordingly, Plaintiff's Equitable Estoppel claim is DISMISSED WITH PREJUDICE.

## VI.   Doe's Declaratory Judgment Claim (Count VIII).

In Count VIII, Doe seeks a declaratory judgment that he commissioned as an officer in the Air Force on June 2, 2016 because he received a commissioning certificate signed by the Secretary of the Air Force (ECF No. 33 ¶¶ 86-89, 172) and because his discharge paperwork once indicated that he was a Second Lieutenant, but has since been amended to list his rank as "Cadet." (*Id.* ¶ 104.)

Do does not offer any response to Defendants' motion to dismiss this claim, and for good reason.  In his Amended Complaint, Doe admits that he has always been held in "cadet status." (*Id.* ¶ 90.)   Regardless of whether an administrative error resulted in his receipt of commissioning paperwork, it is clear to all parties that Doe was never a commissioned officer. To hold otherwise would render Doe's administrative pursuit of a waiver or exception-to-policy absurd.  Accordingly, Count VIII is DISMISSED WITH PREJUDICE.

**VII.    Plaintiffs' Equal Protection Claims (Counts IX and X).**

In Counts IX and X, Deese and Doe allege that Defendants' accession policies violate the equal protection guaranty of the Fifth Amendment's Due Process Clause, both on their face and "as applied by barring people living with HIV from enlistment in the military and appointment as officers in the military based solely on their HIV status." (ECF No. 33 ¶¶ 177, 186.)  The crux of Plaintiffs' claims is that the offending policies "stigmatize[] them as second-class citizens in violation of equal protection guarantees."  (*Id.* ¶¶ 182, 191.)

The equal protection component of the Fifth Amendment's Due Process Clause "prohibits the government from intentionally treating one group differently than other similarly situated groups where no rational basis exists for doing so." *Mayor and City Council of Baltimore v. Trump*, ELH-18-3636, 2019 WL 6970631, at *9 (D. Md. Dec. 19, 2019) (citing *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249 (1985)); *see also Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S. Ct. 693 (1954).  "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).  Once that threshold showing is made, the court "'proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny.'" *Kolbe v. Hogan*, 849 F.3d 114, 146 (4th Cir. 2017) (en banc) (quoting *Morrison*, 239 F.3d at 654).

The Fourth Circuit has held that rational-basis review applies to claims of disparate treatment based on HIV status.  *Doe v. Univ. of Maryland Med. Sys. Corp.*, 50 F.3d 1261, 1267 (4th Cir. 1995).  Under rational-basis review, the Defendants actions "must be upheld against

equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Comm., Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096 (1993).

In this case, the Plaintiffs have plausibly alleged they were treated differently from their similarly situated academy graduates on the basis of their HIV status, that the discrimination was intentional, and that Defendants' discriminatory practices have no rational basis. Both Plaintiffs were exemplary military service academy graduates who, save for their HIV status, would have received commissions with the rest of their graduating class. As the Fourth Circuit stated in *Roe*, "*any* understanding of HIV that could justify [a categorical bar on deploying HIV-positive service members] is outmoded and at odds with current science. Such obsolete understandings cannot justify a ban, even under a deferential standard of review." *Roe*, 947 F.3d at 228. This Court cannot ignore such sweeping language, which is equally applicable to the arbitrary and capricious standard applied in *Roe* as it is to rational basis review.

Additionally, accepting Plaintiffs' allegations as true, there is no rational basis for permitting service members with HIV to perform ordinary military duties but to deny them officer commissions. There is simply no basis to hold that officers must be free from HIV even if they are physically capable of service and would otherwise be able to deploy. The military's policy of withholding officer commissions from HIV-positive service members renders those service members second-class citizens. That is precisely what the equal protection clause forbids. Accordingly, Counts IX and X may proceed.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss or for Summary Judgment (ECF No. 42) is GRANTED IN PART and DENIED IN PART.  Summary Judgment is ENTERED in favor of Defendants on Count I. Count II is REMANDED IN PART to permit disability evaluation system ("DES") review of Doe's claims.  Summary Judgment is ENTERED in favor of Defendant on the remaining claims in Count II.  Counts VI, VII, and VIII are DISMISSED.  Counts III, IV, and V (the "categorical bar" APA claims) may proceed, as well as Counts IX and X (the equal protection claims).


A separate Order follows.


Dated:          September 2, 2020

                                                    ____/s/_____
                                                    Richard D. Bennett
                                                    United States District Judge

41