IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

NICHOLAS HARRISON, et al.,                )
                                          )
            Plaintiffs,                   )
                                          )
    v.                                    )      1:18-cv-641 (LMB/IDD)
                                          )      UNDER SEAL
LLOYD J. AUSTIN, Secretary of Defense, et al.,   )
                                          )
            Defendants.                   )

RICHARD ROE, et al.,                      )
                                          )
            Plaintiffs,                   )
                                          )
    v.                                    )      1:18-cv-1565 (LMB/IDD)
                                          )      UNDER SEAL
LLOYD J. AUSTIN, Secretary of Defense, et al.,   )
                                          )
            Defendants.                   )

MEMORANDUM OPINION

Harrison v. Austin, Case No. 1:18-cv-641, and Roe v. Austin, Case No. 1:18-cv-1565, are

two closely related civil actions challenging the United States military's commissioning and

retention policies concerning service members who have tested positive for the human

immunodeficiency virus ("HIV") but are being treated, are asymptomatic, and have undetectable

viral loads. Both sets of policies are based on a virtually categorical determination by the military

that such individuals cannot safely deploy worldwide. Before the Court are the parties' cross-

motions for summary judgment. For the following reasons, the plaintiffs' Motions[1] for Summary

Judgment will be granted and the defendants' Motion for Summary Judgment will be denied.

---

[1] Although the plaintiffs filed separate motions for summary judgment, they supported their
motions with a joint memorandum given the extensive overlap of the key legal and factual issues

# I. BACKGROUND

## A. **Procedural History**

On May 30, 2018, plaintiff Nicholas Harrison ("Harrison") filed a one-count complaint alleging that the Army's accession policies prevent him from commissioning as an officer in the Judge Advocate General ("JAG") Corps of the District of Columbia National Guard based on his HIV-positive status.[2] [Harrison, Dkt. No. 1].[3] On December 19, 2018, pseudonymous plaintiffs Richard Roe ("Roe") and Victor Voe ("Voe") filed a five-count complaint alleging that the Air Force's retention policies require their discharge from their respective positions as a Staff Sergeant and Senior Airman based on their HIV-positive status. [Roe, Dkt. No. 1]. Both actions were also brought by OutServe-SLDN, Inc. ("OutServe"), an organization that represents the LGBTQ+ and HIV-positive military communities; however, after OutServe merged with another organization, OutServe was replaced in this litigation by the entity resulting from that merger, the Modern Military Association of America ("MMAA"), a non-profit organization primarily dedicated to promoting the interests of service members and veterans who are LGBTQ+ and/or HIV-positive. [Harrison, Dkt. No. 1, 247, 248]; [Roe, Dkt. No. 1, 259]. The defendants are the United States Department of Defense, Lloyd J. Austin in his official capacity as Secretary of Defense, Christine Wormuth in her official capacity as Secretary of the Army, and Frank Kendall in his official capacity as Secretary of the Air Force (collectively, "defendants" or "the

_____

in these two civil actions. The defendants filed a joint motion for summary judgment and accompanying memorandum. Following this practice, the Court is issuing one Memorandum Opinion to explain its decision in both civil actions but will issue a separate order for each action.

[2] "Accession" refers to appointment, enlistment, or induction into a military service. [Harrison, Dkt. No. 264] at ¶ 1. Appointment includes commissioning as an officer. Id. at ¶ 5.

[3] References to filings in each civil action will be indicated by the respective plaintiff's name followed by the filing's docket number in that plaintiff's civil action.

2

government").[4] Although no military branch other than the Army and Air Force is before the Court, nor are any policies directly implicated other than those relating to the commissioning or retention of HIV-positive service members, many of the conclusions in this opinion may have broader implications.[5]

The restrictions on commissioning and retaining HIV-positive service members are grounded on the same underlying policy, which is an essentially categorical ban on the worldwide deployment of any service member who is HIV-positive, regardless of whether the service member has been successfully treated such that he is asymptomatic and has an undetectable viral load. The only claim asserted in Harrison and the core claim asserted in Roe is that this categorical bar violates the Equal Protection Clause of the Fifth Amendment because it is at odds with current medical evidence concerning HIV treatment and transmission and is, therefore, a policy for which there is no rational basis. In addition, the plaintiffs in Roe assert that this categorical deployment bar, including the defendants' discharge decisions based on it, violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), for similar reasons.[6]

---

[4] Defendants Austin, Wormuth, and Kendall assumed their positions in 2021 and have been automatically substituted as defendants pursuant to Federal Rule of Civil Procedure 25(d).

[5] Although the complaint in Harrison also nominally challenges policies prohibiting the enlistment of individuals with HIV, plaintiffs do not have standing to challenge that policy because neither Harrison nor the MMAA were injured by a decision to reject their enlistment. As discussed below, Harrison has successfully enlisted, and MMAA does not appear to represent the interests of HIV-positive individuals who are not in the service but are trying to enlist. Indeed, the government persuasively argues that relief should be limited to those similarly situated to Harrison: "those seeking to commission from an enlisted position." [Harrison, Dkt. No. 272] at 79; see also [Harrison, Dkt. No. 290] at 7 ("Sgt. Harrison's claim arises from his inability to commission, not from the entire accessions policy.").

[6] Specifically, the one-count Complaint in Harrison asserts an Equal Protection claim and the five-count Complaint in Roe asserts an Equal Protection claim (Count 1), two APA claims regarding the challenged retention policies (Counts 4 and 5), and two APA claims regarding the individual discharge decisions (Counts 2 and 3).

As a remedy for these alleged constitutional and statutory violations, plaintiffs seek nationwide injunctive and declaratory relief as well as recovery of their reasonable attorneys' fees and costs. Harrison also seeks an order vacating the Army's decision denying his commission and requiring the Secretary of the Army to reevaluate Harrison's application for a commission in the JAG Corps for the D.C. National Guard. Roe and Voe seek an order vacating their separation decisions and any other separation decisions for currently serving Air Force personnel who face separation based solely on their inability to be considered for worldwide deployment due to being HIV-positive.

The parties' cross-motions for summary judgment are before the Court on an extensive record, most of which was developed during litigation over the Roe plaintiffs' Motion for Preliminary Injunction. [Roe, Dkt. No. 33]. On February 15, 2019, the Court issued a Memorandum Opinion—based on a record that included over 1,500 pages of materials—granting the plaintiffs a preliminary injunction. [Roe, Dkt. No. 72-73]. In that opinion, the Court found that the Roe plaintiffs "ha[d] made a strong preliminary showing that the Air Force's approach to servicemembers living with HIV is irrational, inconsistent, and at variance with modern science," and enjoined the government "from separating or discharging from military service [Roe], [Voe], and any other similarly situated active-duty member of the Air Force because they are classified as ineligible for worldwide deployment . . . due to their HIV-positive status." [Roe Dkt. No. 72] at 54; [Roe Dkt. No. 73]. On April 16, 2019, the government appealed the preliminary injunction to the Fourth Circuit, and both Roe and Harrison were subsequently stayed pending the outcome of that appeal.[7]

_____

[7] The parties in both Roe and Harrison had previously agreed to consolidate pretrial discovery.

4

On January 14, 2020, after over 300 pages of additional briefing and the submission of several amicus briefs—including an amicus brief submitted by former Secretaries of the Army, Air Force, and Navy, among other former high-ranking military officials, in support of plaintiffs—the Fourth Circuit affirmed the preliminary injunction issued in Roe in a unanimous, 46-page opinion. Roe v. Department of Defense, 947 F.3d 207 (4th Cir. 2020). The Fourth Circuit's opinion, which is quoted and discussed in detail below, rejected the defendants' explanations for their categorical bar to the deployment of HIV-positive service members as either "unsupported by the record or contradicted by scientific evidence." Id. at 225. The government did not pursue a further appeal of that decision. After the mandate was returned, the stays were lifted in both civil actions and a summary judgment briefing schedule was set. The parties subsequently filed the pending cross-motions for summary judgment, which have been fully briefed and on which oral argument has been held. Significantly, in that argument, counsel for the government could identify very little new, material evidence in the summary judgment record that was not already before this Court during the preliminary injunction proceeding or before the Fourth Circuit during the appellate proceeding. [Harrison, Dkt. No. 299] at 6-7.

## B. Factual Background

### 1. HIV Treatment and Transmission

The following factual background describing the current methods for treating HIV and the risks of transmitting the infection is taken from the beginning of the Fourth Circuit's opinion in Roe:

> In the early 1980s, many young and otherwise healthy people became ill with "a wide array of rare and often deadly infections." In the United States alone, thousands died. Researchers identified acquired immunodeficiency syndrome (AIDS) as the reason so many otherwise healthy people died from these infections, but they did not understand the cause of AIDS. The people most frequently diagnosed with AIDS belonged to marginalized and stigmatized groups—gay men, intravenous drug users, Haitians, and hemophiliacs—and the

5

disease acquired the colloquial moniker "gay cancer." In 1984, researchers discovered that AIDS was caused by the human immunodeficiency virus (HIV), which could infect any person sufficiently exposed. However, "by that time, many Americans already believed the cause of the disease to be a deviant lifestyle, a stigmatizing belief that . . . AIDS was a punishment from God." Stigma, fear, and misinformation about HIV persist today.

Unlike some viruses, HIV is not easily transmitted. It cannot be spread by saliva, tears, or sweat, and it is not transmitted through hugging, handshaking, sharing toilets, exercising together, or closed-mouth kissing. HIV may be transmitted when certain infected body fluids—blood, semen, pre-seminal fluid, rectal and vaginal fluids, and breastmilk—encounter damaged tissue, a mucous membrane, or the bloodstream. However, even then, transmission is unlikely. The Centers for Disease Control and Prevention estimate the per-exposure risk of transmitting untreated HIV during the riskiest sexual activity—receptive anal intercourse—to be 1.38%. For other sexual activities, the per-exposure risk of transmitting untreated HIV drops to between 0% and 0.11%. And although the risk of transmitting untreated HIV through blood transfusion is high, people who have been diagnosed with HIV are not permitted to donate blood. Untreated HIV can also be transmitted through other types of exposure, but the risk is low. For needle sharing, the per-exposure risk is 0.63%, and for percutaneous needlestick injuries, the per-exposure risk is 0.23%. For other exposures to untreated HIV—like biting, spitting, and throwing bodily fluids—the CDC found the risk to be "negligible," meaning transmission of untreated HIV is "technically possible but unlikely and not well documented."

In 1996, antiretroviral therapy for HIV became widely available. Today, there is "an effective treatment regimen for virtually every person living with HIV," and 75% to 80% of people living with HIV are on a one-tablet antiretroviral regimen, which combines the required medications into a single pill taken daily. The pills have no special handling or storage requirements and tolerate extreme temperatures well. They have minimal side effects and impose no dietary restrictions. And with adherence to treatment, an HIV-positive person's viral load becomes "suppressed" within several months and the virus reaches "undetectable" levels shortly thereafter, meaning there are less than 50 virus copies per milliliter of blood. In addition to medication, individuals with HIV receive viral load testing, which is usually conducted quarterly until the patient reaches an undetectable viral load. Then, testing is reduced to three times a year, and finally, once the viral load is undetectable for two years, testing is reduced to a semiannual basis. Testing is routine and can be performed by a general practitioner. Where on-site testing is unavailable, a blood sample can be shipped to a lab.

Antiretroviral therapy is effective for virtually every person living with HIV. Usually, the virus develops resistance to antiretroviral therapy only when individuals fail to adhere to their treatment regimens. But even then, switching to

a different regimen returns the individual to viral suppression. And failing to adhere to treatment does not result in immediate adverse health consequences. It "often takes weeks for an individual's viral load to reach a level that would not be considered 'suppressed.'" If nonadherence continues, the person enters a clinical latency period during which the person may not have any symptoms or negative health outcomes. This clinical latency period "can last for years," and "can be reversed by restarting treatment."

Antiretroviral therapy has both increased the quality of life of individuals with HIV and decreased the chance of transmission. In contrast to the fraction-of-a-percent exposure risks for untreated HIV addressed above, according to the CDC, "people who take antiretroviral medication daily as prescribed and achieve and maintain an undetectable viral load have effectively no risk of sexually transmitting the virus to an HIV negative partner." And other than through blood transfusions—again, "HIV infection is among a number of medical conditions that preclude blood donation"—risk of transmission from a person with an undetectable viral load through non-sexual means such as percutaneous needlestick injuries is very low, if such a risk exists at all. An HIV diagnosis was "once considered invariably fatal within approximately eight to ten years," but now, HIV is a "chronic, treatable condition." Those who are timely diagnosed and treated "experience few, if any, noticeable effects on their physical health and enjoy a life expectancy approaching that of those who do not have HIV."

Roe, 947 F.3d at 212-14 (record citations omitted).

### 2. **HIV Policy in the Military**

The military's accession and retention policies concerning individuals living with HIV, and the underlying bar to the deployment of such individuals, are set out in a series of regulations promulgated by three distinct entities. See generally [Harrison, Dkt. No. 257-2]. First, the Department of Defense has issued Department of Defense Instructions on accession, retention, and deployment that apply to all military branches. Second, the individual military branches have issued their own regulations, such as Army Regulations and Air Force Instructions, that implement, and can be more stringent than, the Department of Defense Instructions on accession, retention, and deployment. Lastly, the Combatant Commands—the entities that conduct military operations in specific geographic areas of responsibility—have issued their own deployment policies that implement, and can be more stringent than, both the Department of Defense

7

Instructions and the branch-specific regulations on deployment. Although the deployment policies of the United States Central Command ("CENTCOM") have been central to this litigation, plaintiffs' claims implicate all of these regulations.

### i.   Department of Defense and Army Accession Policies

As the Fourth Circuit recognized in Roe, "[t]he United States military does not permit HIV-positive individuals to enlist, nor does the military allow a servicemember who acquired HIV after joining to be appointed as an officer." 947 F.3d at 214. The Department of Defense has said as much itself, reporting to Congress that "persons infected with HIV are neither enlisted nor commissioned into military service." [Harrison, Dkt. No. 257-2] at 8. This restriction is based, in part, on the "medical standards" for accession set out in Department of Defense Instruction 6130.03, which states that "[i]t is [Department of Defense] policy to . . . [e]nsure that individuals considered" for accession are:

> (1) Free of contagious diseases that may endanger the health of other personnel.
> (2) Free of medical conditions or physical defects that may reasonably be expected to require excessive time lost from duty for necessary treatment or hospitalization, or may result in separation from the Military Service for medical unfitness.
> (3) Medically capable of satisfactorily completing required training and initial period of contracted service.
> (4) Medically adaptable to the military environment without geographical area limitations.
> (5) Medically capable of performing duties without aggravating existing physical defects or medical conditions.

Department of Defense Instruction [hereinafter DoDI] 6130.03 § 1.2(c).[8] The government's position in this litigation is that individuals with HIV, including those with "well-managed HIV," "fail[] to meet each of the[se] five policy criteria." [Harrison, Dkt. No. 264] at ¶ 9. Indeed,

---

[8] A copy of Department of Defense Instruction 6130.03 is available at docket number 257-1 in Harrison.

Department of Defense Instruction 6130.03 includes a list of "conditions . . . that do <u>not</u> meet" the medical standards for accession "by virtue of current diagnosis" or "verified past medical history." <u>Id.</u> § 5.1 (emphasis in original). One such condition is the "[p]resence of [HIV]." <u>Id.</u> § 5.23(b). Pursuant to this standard, Department of Defense Instruction 6485.01, which "prescribe[s] procedures for the identification, surveillance, and management of members of the Military Services infected with HIV," states that "[i]t is [Department of Defense] policy to . . . [d]eny eligibility for military service to persons with laboratory evidence of HIV infection."[9] DoDI 6485.01 §§ 1, 3(a).

Although Department of Defense Instruction 6130.03 permits individuals who do not meet the medical standards for accession "to be considered for a medical waiver," the government's position in this litigation is that individuals with HIV are not eligible for a medical waiver. DoDI 6130.03 § 1.2(d); [Harrison, Dkt. No. 257-2] at 8; [Harrison, Dkt. No. 264] at ¶ 2. According to Colonel Scott Frazier, Director of Interagency Liaison Affairs for the Office of the Secretary of Defense, this absolute bar on waivers is based on Department of Defense Instruction 6485.01, which "contains no [medical] waiver mechanism" and "takes precedence" over Department of Defense Instruction 6130.03 because it is "[t]he more specific policy." [Harrison, Dkt. No. 265-9] at ¶ 10 ("Thus, under [Department of Defense] policy, applicants with HIV are not qualified for accession.").

Because the Army's medical standards for accession "cannot be less stringent" than the Department of Defense's medical standards for accession, the Army "also designates the presence of HIV as a disqualifying medical condition that precludes accession." <u>Id.</u> at ¶ 11.

---

[9] A copy of Department of Defense Instruction 6485.01 is available at docket number 257-28 in <u>Harrison</u>.

Specifically, Army Regulation 40-501—which implements Department of Defense Instruction 6130.03—provides for a waiver mechanism but states that the Army's medical standards for accession "will not be waived" for applicants who are HIV-positive.[10] Army Regulation [hereinafter AR] 40-501 §§ 2.2(b), 2-30(a); [Harrison, Dkt. No. 264] at ¶ 3; [Harrison, Dkt. No. 265-9] at ¶ 9. Similarly, Army Regulation 600-110—which implements Department of Defense Instruction 6485.01 and does not have a waiver mechanism—states that "HIV infected personnel are not eligible for appointment or enlistment into the . . . [Army National Guard]."[11] AR 600-110 § 1-16(a); [Harrison, Dkt. No. 264] at ¶ 4; [Harrison, Dkt. No. 265-9] at ¶ 11.

Notwithstanding these Department of Defense Instructions and Army Regulations, there is a mechanism to obtain a general policy waiver, referred to as an "exception to policy" ("ETP"), that is technically available to applicants with HIV seeking accession into the military. [Harrison, Dkt. No. 265-9] at ¶ 12 ("If an applicant with HIV wishes to be considered for accession into the Army, the applicant must request an [ETP] to both [Army Regulation] 600-110 and [Department of Defense Instruction] 6485.01, both of which bar accession of HIV positive candidates."). Procedurally, the applicant must submit a request for an ETP to the Army Deputy Chief of Staff, who "may favorably endorse [the] request" and "forward the action" to the Department of Defense for further consideration, or "deny the request" and "refuse to forward the action for further consideration." Id. If the request is endorsed and forwarded to the Department of Defense, it is then considered by the Undersecretary of Defense, Personnel and Readiness, who has the authority to grant an ETP to Department of Defense Instruction 6485.01. Id. Because the "Army cannot grant an exception to [Army Regulation] 600-110 until it is

---

[10] A copy of Army Regulation 40-501 is available at docket number 264-5 in Harrison.

[11] A copy of Army Regulation 600-110 is available at docket number 264-6 in Harrison.

relieved of the minimum requirements of [Department of Defense Instruction] 6485.01," it is "only after the [Department of Defense] grants an exception to [Department of Defense Instruction] 6485.01" that "the Army ha[s] the discretion to grant an exception to [Army Regulation] 600-110" and "ultimately to allow the accession of an individual with HIV." Id.

Nonetheless, the ETP mechanism appears to be nothing more than window dressing in this context because the evidence in the summary judgment record is that the Department of Defense is "not aware of any time an HIV-positive individual has received a waiver for accession" into the military. [Harrison, Dkt. No. 264] at Response to Plaintiffs' Statement of Undisputed Facts ("Resp. PSUF") ¶ 37.

### ii.  Department of Defense and Air Force Retention Policies

Department of Defense policies "permit HIV-positive service members to continue to serve, so long as they are determined to be fit," which partly turns on a service member's "deployability." Roe, 947 F.3d at 214-15. Active duty service members are screened for HIV "every 2 years unless more frequent screenings are clinically indicated." DoDI 6485.01 Encl. 3 § 1(c)(1). Active duty service members whose screenings show "laboratory evidence of HIV infection" are "referred for appropriate treatment and a medical evaluation of fitness for continued service." Id. § 2(c). "[T]he mechanism for determining fitness for duty . . . of Service members because of disability" is the Disability Evaluation System ("DES"). DoDI 1332.18 § 3(a). Pursuant to Department of Defense Instruction 1332.18—which governs the DES—"[a] service member will be considered unfit when the evidence establishes that the member, due to disability, is unable to reasonably perform the duties of his or her office, grade, rank, or rating."[12]

---

[12] A copy of Department of Defense Instruction 1332.18 is available at docket number 265-2 in Harrison.

Id. Encl. 3, App. 2 § 2(a). "A service member may also be considered unfit" when the service member's disability "represents a decided medical risk to the health of the member or to the welfare and safety of other members" or "imposes unreasonable requirements on the military to maintain or protect the Service member." Id. Encl. 3, App. 2 § 2(b).

When determining fitness, "all relevant evidence" must be considered, including whether the service member "can perform the common military tasks required for [his or her] office, grade, rank, or rating," whether the service member "is medically prohibited from taking the . . . required physical fitness test," and whether the service member "is deployable individually or as part of a unit, with or without prior notification, to any vessel or location." Id. Encl. 3, App. 2 §§ 3-4. "[T]o determine a Service member is unfit because of disability," there must be "objective evidence in the record, as distinguished from personal opinion, speculation, or conjecture," and "[d]oubt that cannot be resolved with evidence will be resolved in favor of the Service member's fitness." Id. Encl. 3, App. 2 § 6(a).

All service members who are "deployed and deploying on contingency deployments"— which are deployments "outside the continental United States, over 30 days in duration, and in a location with medical support only from non-fixed (temporary) military medical treatment facilities"—must meet the medical standards set forth in Department of Defense Instruction 6490.07.[13] DoDI 6490.07 §§ 1, 2(c), 3(b), 4(a). Under Department of Defense Instruction 6490.07, service members "with existing medical conditions may deploy" under the following circumstances: (1) "[t]he condition is not of such a nature or duration that an unexpected worsening or physical trauma is likely to have a grave medical outcome or negative impact on

_____

[13] A copy of Department of Defense Instruction 6490.07 is available at docket number 264-7 in Harrison.

mission execution"; (2) "[t]he condition is stable and reasonably anticipated by the pre-deployment medical evaluator not to worsen during the deployment in light of physical, physiological, psychological, and nutritional effects of the duties and location"; (3) "ongoing health care or medications anticipated to be needed for the duration of the deployment are available" in the location of deployment, do not require "special handling, storage, or other requirements," and are "well tolerated within harsh environmental conditions"; and (4) "[t]here is no need for routine evacuation" out of the location of deployment "for continuing diagnostics or other evaluations." Id. § 4(b).

Department of Defense Instruction 6490.07 includes a list of "deployment-limiting medical conditions" and states that service members with those conditions "shall not deploy unless a waiver can be granted." Id. §§ 1, 4(c). One such condition is "[a] diagnosis of [HIV] antibody positive with the presence of progressive clinical illness or immunological deficiency." Id. Encl. 3(e)(2). For a service member with HIV to get a waiver, that service member's "commander or supervisor" must submit a waiver request "to the applicable Combatant Commander" along with "a summary of a detailed medical evaluation or consultation concerning the medical condition(s)" as well as "statements indicating service experience, position to be placed in, any known specific hazards of the position, anticipated availability and need for care while deployed, the benefit expected to accrue from the waiver, [and] the recommendation of the commander or supervisor." Id. Encl. 2 § 3(a).

Branch-specific regulations implement the Department of Defense Instructions regarding retention. According to Air Force Instruction 44-178—which implements Department of Defense Instruction 6485.01—"HIV seropositivity alone is not grounds for medical separation or retirement" and "[m]embers with laboratory evidence of HIV infection who are able to perform

the duties of their office, grade, rank and/or rating, may not be separated solely on the basis of laboratory evidence of HIV infection."[14] Air Force Instruction [hereinafter AFI] 44-178 §§ 2.4.1, A9.1.1. Similarly, "HIV-infected employees are allowed to continue working as long as they are able to maintain acceptable performance and do not pose a safety or health threat to themselves or others in the workplace." Id. § 2.10. Although the Air Force used to "automatically return[] service members with asymptomatic HIV infection to service," the Air Force determined in 2017 "that [this] practice . . . conflicted with the plain requirements of [Department of Defense Instruction] 6485.01" and consequently began "routinely referr[ing]" such service members "to the DES." [Dkt. No. 264] at ¶ 28.

### iii. Combatant Commands Deployment Policies

As previously discussed, Department of Defense Instruction 6490.07 requires that requests for deployment waivers be submitted to "the applicable Combatant Commander." DoDI 6490.07 Enclosure 2 § 3. According to Martha Soper, the Assistant Deputy of Health Policy for the Assistant Secretary of the Air Force for Manpower and Reserve Affairs, the Air Force is like the other military branches in that it "does not itself conduct military operations, but rather it supplies necessary resources (e.g., manpower and equipment) to the Combatant Commands, which are the entities that actually conduct military operations." [Harrison, Dkt. No. 265-19] at ¶ 18. Accordingly, Combatant Commands may also "promulgate policies setting out eligibility requirements for individuals deploying to their respective areas of operations." Id. The Combatant Command central to this litigation is the United States Central Command, or CENTCOM. Id. According to Lieutenant Colonel Kevin Cron ("Cron"), who previously served as the Preventive Medicine Officer and "primary waiver action officer" for CENTCOM,

---

[14] A copy of Air Force Instruction 44-178 is available at docket number 265-3 in Harrison.

CENTCOM "is one of six geographic Combatant Commands, with an area of responsibility . . . covering 20 nations in the Middle East, Central Asia, and South Asia, and the strategic waterways that surround them." [Harrison, Dkt. No. 266-1] at ¶¶ 1, 5.

"Deployment to the CENTCOM area of responsibility is governed by a variety of regulations," including Department of Defense Instruction 6490.07, branch-specific regulations, and Modification 13 to CENTCOM's Individual Protection and Individual Unit Deployment Policy ("Modification-13").[15] Id. ¶¶ 7, 12. Modification-13 establishes "the minimum standards of fitness for deployment to the CENTCOM area of responsibility." Modification-13 [hereinafter Mod-13] Tab A § 1.[16] It "may be more stringent" than both Department of Defense Instruction 6490.07 and branch-specific regulations. Id. ¶¶ 9, 12. Pursuant to Modification-13, "individuals deemed unable to comply with CENTCOM deployment requirements are disqualified for deployment." Mod-13 § 15(C). Modification-13 also states that service members with an enumerated medical condition "will not deploy without an approved [medical] waiver." Mod-13 Tab A § 7. One such condition is a "[c]onfirmed HIV infection," which is expressly "disqualifying for deployment." Id. § 7(C)(2). Although CENTCOM's Combatant Command Surgeon has "medical waiver approval authority," Mod-13 § 15(C)(3)(A)(1), Cron—the former "wa[iver] authority for CENTCOM"—agreed in his deposition that a waiver has never been granted to allow an HIV-positive service member to deploy to CENTCOM's area of responsibility. [Harrison, Dkt. No. 257-3] at 41; [Harrison, Dkt. No. 257-40] at ¶ 11.

"Because it is the Air Force's role to maintain a dependable supply of manpower that will be useful to the Combatant Commands, the Air Force necessarily considers whether an airman

---

[15] A copy of Modification-13 is available at docket number 264-8 in Harrison.

[16] A copy of Tab A to Modification-13 is available at docket number 265-1 in Harrison.

can satisfy deployment restrictions imposed by the Combatant Commands when deciding whether to retain the airman." [Harrison, Dkt. No. 265-19] at ¶ 18. Because a majority of Air Force and Army deployments are to CENTCOM, [Harrison, Dkt. No. 255] at ¶ 52, CENTCOM's "limitations on the deployability of HIV-positive individuals play a large role in retention decisions for HIV-positive personnel," [Harrison, Dkt. No. 265-19] at ¶ 20.

### 3. The Plaintiffs

#### i. Harrison

Harrison enlisted in the Army in 2000 at the age of 23. [Harrison, Dkt. No. 273-3] at 41. In 2003, he left active duty and joined the Oklahoma National Guard. Id. at 46. In 2005, he graduated from the University of Central Oklahoma with a degree in general studies and began working towards a juris doctor at Oklahoma City University Law School. Id. at 30-33, 46, 48. In 2006, his legal education was interrupted when his national guard unit was deployed to Afghanistan for approximately 16 months. Id. at 48-50. Upon his return, Harrison received an Army commendation medal for his service. Id. at 50. In 2011, following a transfer to the University of Oklahoma, he received a Juris Doctor and a Master of Business Administration. Id. at 37, 40. Shortly thereafter, his national guard unit was deployed again, this time to Kuwait for approximately 8 months. Id. at 54. In 2012, after returning from Kuwait, Harrison was diagnosed with HIV and immediately placed on antiretroviral medication. Id. at 123-124. He was virally suppressed within several weeks and has remained so ever since. [Harrison, Dkt. No. 255] at ¶ 3. In 2013, he moved to Washington, D.C. for the Presidential Management Fellow Program and transferred to the D.C. National Guard. [Harrison, Dkt. No. 273-3] at 43, 57. He was subsequently preselected and applied for a position as an attorney in the JAG Corps for the D.C.

National Guard and received the highest possible score on his physical fitness test. [Harrison, Dkt. No. 257-5] at 136-37, 182, 187-88; see also [Harrison, Dkt. No. 273-1] at ¶ 18.

Harrison's application to commission as a JAG was rejected on the basis of his HIV-positive status, which precluded him from meeting the Department of Defense and Army medical standards for accession. [Harrison, Dkt. No. 273-1] at ¶ 19. Accordingly, he submitted a request for a medical waiver of the accession standards. Id. His request was denied because Army Regulation 40-501 "does not permit an accessions waiver for HIV." Id. He then submitted a request to the Army Deputy Chief of Staff for an ETP to Army Regulation 600-110 and Department of Defense 6485.01. Id. ¶ 20. After consulting several stakeholders, including the Army Office of the Surgeon General and the D.C. National Guard, who provided additional information and recommendations, the Army Deputy Chief of Staff declined to endorse Harrison's request for an ETP. Id. ¶¶ 21-22. As a result, the request was not forwarded to the Department of Defense for further consideration. Id. ¶ 23. Had the Army Deputy Chief of Staff endorsed Harrison's request for an ETP, Harrison would still have needed to satisfy several additional requirements before commissioning, such as completing "any outstanding steps in the medical accessions screening process with no deficits"; completing "the additional non-medical accession screening requirements including verification of physical fitness, dependency status, and conduct qualification"; seeking "approval for an age waiver"; securing "an open position" as a JAG corps officer; and obtaining both "an endorsement from the National Guard Bureau Judge Advocate accessions board" and "the certification of [The Judge Advocate General]." Id. ¶ 24. He never had the opportunity to address these additional steps because his request for further consideration was blocked solely because of his HIV-positive status.

ii.  **Roe and Voe**

Richard Roe enlisted in the Air Force in 2012 at the age of 18 and currently serves as a

Staff Sergeant. [Roe, Dkt. No. 268-2] at 19, 32; [Roe, Dkt. No. 268] at 7. "During his time in the

Air Force, he has received numerous awards and has been entrusted with increasing levels of

responsibility. He mentors other airmen, describing that mentorship role as 'one of the highlights

of [his] military career.' In October 2017, Roe was diagnosed with HIV. He immediately began

antiretroviral treatment. And now, he takes one pill per day and has an undetectable viral load.

The pills are stored in an ordinary bottle, do not require special storage, and are refilled every 90

days. His doctors have not recommended his daily work be restricted as a result of his

diagnosis." Roe, 947 F.3d at 215-16 (record citations omitted).

Victor Voe enlisted in the Air Force in 2011 at the age of 19 and currently serves as a

Senior Airman. [Roe, Dkt. No. 268-4] at 20-22. He "deployed twice in his time in the Air Force.

In March 2017, Voe was diagnosed with HIV. He began antiretroviral treatment within two

weeks, and his viral load reached undetectable levels in August 2017. He takes two pills a day.

The pills are stored in an ordinary bottle, do not require special storage, and are refilled every 90

days. Voe takes his medication as prescribed and continues to have an undetectable viral load.

His doctors have not recommended restricting his daily work as a result of his diagnosis. Voe

would like to continue to serve and is 'willing to go anywhere in the world to fulfill [his]

duties.'" Roe, 947 F.3d at 216 (record citations omitted).

After becoming virally suppressed, both Roe and Voe were, nevertheless, referred to the

DES for an evaluation of their medical fitness for duty. Id. Various officials who knew Roe and

Voe recommended that they be retained. For example, "Roe's commanding officer described

him as 'a valued team member' and recommended he be retained. And Roe's primary care

18

doctor recommended he be returned to duty." Roe, 947 F.3d at 216 (internal citation omitted).

Similarly, Voe's commanding officer called him a "valuable [Air Force] asset" and

recommended that he be retained, and Voe's doctors opined that his HIV status did not affect his

ability to serve. [Roe, Dkt. No. 268] at ¶ 14. Nonetheless, at the conclusion of the DES process,

the Secretary of the Air Force directed that both Roe and Voe be discharged. [Roe, Dkt. No. 285-

4] at 460-62, 747-49. In near-identical three-page decisions, the following "rationale" was

provided:

> The [Air Force Personnel] Board considered the member's contention that he is fit
> and should be returned to duty. The Board noted the member has been compliant
> with all treatment, is currently asymptomatic, and has an undetectable [HIV] viral
> load. Additionally, he is able to perform all in garrison duties, has passed his most
> recent fitness assessment without any component exemptions, and his commander
> strongly supports his retention. However, the Board noted the member's condition
> precludes him from being able to deploy world-wide without a waiver and renders
> him ineligible for deployment to [CENTCOM] Area of Responsibility, where the
> majority of Air Force members are expected to deploy. Deployability is a key
> factor in determining fitness for duty and the Board recognized the member
> belongs to a career field with a comparatively high deployment rate/tempo.
> Therefore, based on his inability to deploy and considering his current career
> point, the Board determined he is unfit for continued military service and shall be
> discharged with severance pay.

Id. at 460, 747. Roe's and Voe's discharges were halted by this Court's preliminary injunction.

### iii. **MMAA**

MMAA is a non-profit organization dedicated to promoting the interests of service

members and veterans who are LGBTQ+ and/or HIV-positive, as well as their partners, spouses,

and families. [Harrison, Dkt. No. 255-8] at 25-26; [Harrison, Dkt. No. 168] at 1. MMAA has

identified several other HIV-positive Air Force members who also were found unfit for duty

based on the same reasoning applied to Roe and Voe. See Roe, 947 F.3d at 217. Indeed, since

September 2018, at least 11 Air Force members with HIV have been referred to the DES and

subsequently found unfit for duty. [Harrison, Dkt. No. 273-2] at ¶¶ 32-33. Five such members

have been referred to the DES but subsequently found fit for duty based on a low likelihood of deployment. Id.

## II. DISCUSSION

Plaintiffs' core claim in these actions is that the military's bar to the worldwide deployment, and more specifically deployment to CENTCOM's area of responsibility, of HIV-positive service members—on which the challenged accession and retention policies are based—is unlawful because it is irreconcilable with current medical evidence concerning HIV treatment and transmission. Although plaintiffs contend the deployment bar is categorical, the government argues it is not because a waiver could be granted; however, the government also qualifies that argument by limiting such waivers: "only in extraordinary circumstances for an [HIV-positive] individual with highly specialized skills to complete a mission with an extraordinary need." As the government has to concede, "[t]o date, no service member with HIV has possessed these rare characteristics required for a waiver." [Harrison, Dkt. No. 272] at 74. Accordingly, the Court finds that the deployment bar is, for all intents and purposes, categorical.

The government's primary argument on summary judgment is that the deployment bar—whether categorical or not—must be upheld because it is rationally related to mitigating several risks, such as risks of deployment to the HIV-positive service member's health, risks of transmitting HIV to other service members, and the burdens on the military to prevent those risks. Although the government argues that the acceptability of these risks should be left solely to the military's professional judgment, both this Court and the Fourth Circuit have previously held that plaintiffs have the better argument, and this Court finds that nothing in the summary judgment record undercuts that conclusion because each of the government's explanations for

the military's deployment bar remains either contradicted by medical evidence or unsupported by the record.

### A. Standard of Review

"The standard of review for cross motions for summary judgment is well settled in the Fourth Circuit." Adamson v. Columbia Gas Transmission, LLC, 987 F. Supp. 2d 700, 703 (E.D. Va. 2013). Normally, when considering cross-motions for summary judgment, a district court should consider "each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard." Id. (quoting Monumental Paving & Excavating, Inc. v. Pa. Mfrs. Ass'n Ins. Co., 176 F.3d 794, 797 (4th Cir. 1999)). Under the Rule 56 standard, "[s]ummary judgment is appropriate only if the record 'shows there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Id. (quoting Norfolk S. Ry. Co. v. City of Alexandria, 608 F.3d 150, 156 (4th Cir. 2010)). "A 'genuine' issue concerning a 'material' fact only arises when the evidence, viewed in the light most favorable to the nonmoving party, is sufficient to allow a reasonable [trier of fact] to return a verdict in that party's favor." Id.

### B. Analysis

Although the Court has considered each motion separately, the parties' cross-motions for summary judgment generally focus on the same four main issues. First, whether the government has asserted any defenses that preclude its liability on some or all of plaintiffs' claims. Second, whether there is a material difference between the APA claims that the Fourth Circuit addressed in Roe and the Equal Protection claims asserted in both Roe and Harrison. Third, whether there is new evidence in the record that sufficiently supports defendants' bar to the deployment of HIV-positive service members to CENTCOM's area of responsibility, and whether such evidence is reconcilable with current medical evidence concerning HIV treatment and

21

transmission. Lastly, whether there is a material difference between the retention policies that the Fourth Circuit addressed in Roe and the accession policies challenged in Harrison. Each issue will be addressed in turn.

### 1. New Defenses

The government asserts three new defenses which it argues preclude some or all of plaintiffs' claims.[17] First, the government argues that Harrison "lack[s] . . . standing" to bring his claims because he "faced a number of other hurdles" to commissioning as an officer, all of which were "completely unrelated to his HIV status." [Harrison, Dkt. No. 290] at 7. Among other things, the government points to Harrison's need to "overcome[e] potential ethical and conduct concerns regarding his failure to disclose his medical history and his failure to follow the orders in his HIV counseling statement," and the requirement that he "receive an age waiver" and "approval from the National Guard Accessions Board and The Judge Advocate General of the United States." Id. As a result, the government contends that Harrison has not demonstrated "that the Army declined to endorse Harrison's request for an [ETP] based exclusively on his HIV status." Id. at 8.

This argument does not raise a genuine issue of material fact. Although the parties dispute the additional requirements which Harrison needed to satisfy before commissioning as an

---

[17] The government also re-asserts two defenses that have previously been considered by this Court and the Fourth Circuit. The government appears merely to be preserving these arguments for appeal. First, the government argues that all of the plaintiffs' claims raise "nonjusticiable military controversies." The government offers no new factual or legal support for this argument, which has been rejected by both this Court and the Fourth Circuit. See, e.g., Roe, 947 F.3d at 217-19. Second, the government argues that MMAA lacks standing to bring its claims. Again, the government offers no new factual or legal support for this argument, which was recently rejected by this Court. [Harrison, Dkt. No. 250] at 7-16. The relevant portions of this Court's prior memorandum opinions in Roe and Harrison and of the Fourth Circuit's opinion in Roe are hereby adopted in full and deemed part of this Opinion.

officer, none of those disputes is material to whether Harrison has standing to bring his claims. To establish standing, a plaintiff must show that he has "(1) . . . suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Sierra Club v. U.S. Dep't of the Interior, 899 F.3d 260, 283-84 (4th Cir. 2018) (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)). The causation aspect requires only that a plaintiff's injury be "fairly traceable" to the challenged action—i.e., that the challenged action be "in part responsible for" the plaintiff's injury—and therefore "does not require the challenged action to be the sole or even immediate cause of the injury." Id. (quoting Libertarian Party of Va. v. Judd, 718 F.3d 308, 316 (4th Cir. 2013)). Similarly, the redressability aspect of standing requires only that a plaintiff "would benefit in a tangible way from the court's intervention"—i.e., that "granting the requested relief would at least mitigate, if not eliminate, the alleged harm" to the plaintiff—and therefore is satisfied by "[t]he removal of even one obstacle to the exercise of one's rights, even if other barriers remain." Id. at 284-85 (quoting Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 209 F.3d 149, 162 (4th Cir. 2000) (en banc)). Here, it cannot be disputed that the military's accession policies regarding HIV-positive service members prevented Harrison from obtaining an ETP, which was a necessary step in the process to commission as an officer. A favorable decision in this lawsuit will remove that obstacle from his path, regardless of what other obstacles may remain.

Second, the government argues that Counts 4 and 5 in Roe must be dismissed because they "raise APA challenges to the underlying, substantive deployment policies of the military" and are therefore "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). An agency

action is "committed to agency discretion by law" if there are "no judicially manageable standards . . . for judging how and when an agency should exercise its discretion." Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n, 528 F.3d 310, 317 (quoting Heckler v. Chaney, 470 U.S. 821, 832 (1985)). Here, the government argues that "courts . . . lack manageable standards to oversee military decisions regarding who to deploy." [Harrison, Dkt. No. 264] at 40-42.

This argument is unpersuasive for several reasons. Not only does this argument fail to raise a genuine issue of material fact, it also fails to accept that both this Court and the Fourth Circuit have previously evaluated the plaintiffs' claims under the APA, which confirms that there are manageable standards for such an evaluation. Moreover, the exception to judicial review for actions committed to agency discretion by law "is a 'very narrow one,' reserved for 'those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'" Inova Alexandria Hosp. v. Shalala, 244 F.3d 342, 346 (4th Cir. 2001) (quoting Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)). The government has identified no such statute here, instead summarily asserting that "[w]hether to deploy an individual with a particular medical condition requires considerations of myriad military factors" and therefore "is a question for which the courts should defer to the military." [Harrison, Dkt. No. 264] at 43. In fact, the military's deployment policies for HIV-positive service members are more akin to the "[m]ajor policy decisions" to which this exception to judicial review does not apply rather than to the "day-to-day agency enforcement decisions" to which it does apply. Casa de Md. v. U.S. Dep't of Homeland Sec., 924 F.3d 684, 699 (4th Cir. 2019). A similar argument was also recently rejected in a related action in which asymptomatic HIV-positive Naval Academy and Air Force Academy

graduates have asserted claims under the APA challenging similar military policies that prevent them from commissioning as officers. Deese v. Esper, 483 F. Supp. 3d 290, 308-11 (D. Md. 2020) ("Defendants' actions are not 'committed to agency discretion by law' because . . . the agencies' own regulations provide additional standards by which to adjudge their actions.").

Third, the government argues that Counts 4 and 5 in Roe must be dismissed under the "military authority exception" to the APA, which precludes a court from reviewing "military authority exercised in the field in time of war or in occupied territory." 5 U.S.C. § 701(b)(1)(G). The government argues that the challenged policies implicate this exception because "an order to deploy is a 'military command' made 'in preparation for . . . battle.'" [Harrison, Dkt. No. 264] at 43 (quoting Doe v. Sullivan, 938 F.2d 1370, 1380 (D.D.C. 1991)). Although plaintiffs have not directly addressed this argument, the government has failed to present sufficient evidence for the Court to find that the decisions to exclude asymptomatic HIV-positive service members with undetectable viral loads from worldwide deployment were made "in the field in time of war." First, the government has not identified a war—either declared or undeclared—implicated by these decisions. Compare Zaidan v. Trump, 317 F. Supp. 3d 8, 22 (D.D.C. 2018) (not applying the military authority exception where "[d]efendants fail to identify the war in which the United States is or was engaged"), with Anderson v. Carter, 802 F.3d 4, 8-9 (D.C. Cir. 2015) (applying the exception where the challenged decisions were made during the war in Afghanistan), Nattah v. Bush, 770 F. Supp. 2d 193, 203 (D.D.C. 2011) (applying the exception where the challenged decisions were made "in preparation for, and during the course of, combat in Iraq"). Second, there is no evidence that the deployment ban was a decision made "in the field." If anything, the evidence indicates that these were high-level policy decisions "made far from the field of battle," which is insufficient to invoke the military authority exception. Zaidan, 317 F. Supp. 3d at 22-

23; compare id. (not applying the military authority exception where the challenged decision was "discussed, debated, and decided in Washington, D.C."), with Nattah, 770 F. Supp. 2d at 203 (applying the exception where the challenged decisions were "made by commanders in the field," including orders for plaintiff to "translate documents for [the] military" and "participate in war activities"). Accordingly, there is no evidence in this record upon which to find that the decisions were made "in the field in time of war," and none of the government's newly asserted defenses defeat plaintiffs' claims.

### 2. APA vs. Equal Protection

Having addressed the government's threshold defenses, the Court turns to the merits of the APA and Equal Protection claims. Although the Fourth Circuit addressed only the APA claims asserted in Roe and did not address the Equal Protection claims asserted in both Roe and Harrison, there are no material differences in the legal analysis applicable to both claims. "To succeed on an [E]qual [P]rotection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Martin v. Duffy, 858 F.3d 239, 252 (4th Cir. 2017) (quoting Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001)). "Once the plaintiff makes this showing, 'the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny.'" Id. (quoting Morrison, 239 F.3d at 654). Although plaintiffs argue that heightened scrutiny is warranted because defendants' classification of HIV-positive service members is suspect, that argument "can be left for another day," as this Court recognized at the preliminary injunction stage, because their Equal Protection claims are meritorious under rational basis review. See [Roe, Dkt. No. 72] at 33 n.31.

As this Court observed when it issued the preliminary injunction in Roe, in the context of agency action, "review of an [E]qual [P]rotection claim . . . is similar to that under the APA." [Roe, Dkt. No. 72]. Indeed, at least three circuits have held that rational basis review under the Equal Protection Clause and arbitrary and capricious review under the APA are "fundamentally indistinguishable" in the context of agency action. Grant Med. Ctr. v. Hargan, 875 F.3d 701, 708 (D.C. Cir. 2017); see also Real Alternatives, Inc. v. Dep't of Health & Human Servs., 867 F.3d 338, 353 (3d Cir. 2017); Ursack Inc. v. Sierra Interagency Black Bear Grp., 639 F.3d 949, 955 (9th Cir. 2011). Accordingly, as long as the two threshold requirements for an Equal Protection claim have been satisfied, the Equal Protection claims asserted in Harrison and Roe can be "folded into" the APA claims asserted in Roe, which have been thoroughly addressed by the Fourth Circuit. Ursack Inc., 639 F.3d at 955 (finding that "the equal protection argument can be folded into the APA argument, since no suspect class is involved and the only question is whether the defendants' treatment of Ursack was rational (i.e., not arbitrary and capricious)").

The government argues that this Court need not address whether any disparity in the military's treatment of HIV-positive service members can be justified under rational basis review because plaintiffs have "failed to meet either of their two initial burdens to succeed on an [E]qual [P]rotection claim." [Harrison, Dkt. No. 264] at 48. First, the government argues that plaintiffs "have not, and cannot, identify any other group or groups . . . who are similarly situated to HIV-positive [individuals] . . . because there are no sufficiently similar conditions that are infectious, bloodborne, incurable, with no vaccine, and require daily medication and periodic blood testing to remain stable." Id. This argument does not raise a genuine issue of material fact and is unpersuasive. Individuals are similarly situated for Equal Protection purposes if they are "in all relevant respects alike." Fauconier v. Clarke, 966 F.3d 265, 277 (4th Cir. 2020) (quoting

Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)). Here, plaintiffs have alleged from the outset that the
military "routinely permit[s] similarly situated individuals who are not HIV positive, including
but not limited to people with comparable chronic, manageable conditions," to "enlist in the
military," "commission as officers," "deploy worldwide," and "continue to serve." [Harrison,
Dkt. No. 1] at ¶ 73; [Roe, Dkt. No. 1] at ¶ 95.

In stark contrast to the military's treatment of HIV-positive service members, service
members with various chronic but manageable conditions can qualify for accession and
deployment without a medical waiver based on individualized considerations of the severity of
their diagnoses which are expressly set out in the relevant Department of Defense Instructions.
Compare [Harrison, Dkt. No. 257] at ¶¶ 61, 64, with [Harrison, Dkt. No. 264] at Resp. PSUF
¶¶ 61, 64. For example, most individuals with dyslipidemia[18] can qualify for accession and
deployment without a medical waiver even if they have to take daily medication as long as they
do not have "low-density lipoprotein greater than 200 milligrams per deciliter (mg/dL) or
triglycerides greater than 400 mg/dL," do not have "low-density lipoprotein greater than 190
mg/dL on therapy," do not require "more than one medication," and "have demonstrated no
medication side effects . . . for a period of six months." DoDI 6130.03 § 5.24(n); see also DoDI
6490.07 Encl. 3. Similarly, it appears that most individuals with a history of Gastro-Esophageal
Reflux Disease[19] can qualify for accession and deployment without a medical waiver even if they

_____

[18] Dyslipidemia is "the elevation of plasma cholesterol, triglycerides (TGs), or both."
Dyslipidemia, Merck Manual, https://www.merckmanuals.com/professional/endocrine-and-
metabolic-disorders/lipid-disorders/dyslipidemia?query=dyslipidemia (last visited March 28,
2022).

[19] Gastro-Esophageal Reflux Disease is "[i]ncompetence of the lower esophageal sphincter,"
which "allows reflux of gastric contents into the esophagus, causing burning pain." See
Gastroesophageal Reflux Disease, Merck Manual, available at:
https://www.merckmanuals.com/professional/gastrointestinal-disorders/esophageal-and-

have to take daily medication as long as they do not have various "complications" such as "[s]tricture," "[d]ysphagia," "[r]ecurrent symptoms or esophagitis despite maintenance medication," "Barrett's esophagus," or "[e]xtraesophageal complications such as reactive airway disease; recurrent sinusitis or dental complications; [or] unresponsive[ness] to acid suppression." DoDI 6130.03 § 5.12(a); see also DoDI 6490.07 Encl. 3.

In addition, most service members with vision impairment can qualify for accession and deployment without a medical waiver as long they do not have "[c]urrent distant visual acuity of any degree that does not correct with [glasses] to at least 20/40 in each eye," "[c]urrent near visual acuity of any degree that does not correct to 20/40 in the better eye," "[c]urrent refractive error (hyperopia, myopia, astigmatism) in excess of -8.00 or +8.00 diopters spherical equivalent or astigmatism in excess of 3.00 diopters," or "any condition that specifically requires contact lenses for adequate correction of vision, such as corneal scars and opacities and irregular astigmatism." DoDI 6130.03 § 5.4; see also DoDI 6490.07 Encl. 3. Lastly, most individuals with asthma can qualify for deployment without a medical waiver even if they have to take daily medication as long as they do not have "a forced expiratory volume-1 (FEV-1) of less than or equal to 60 percent of predicted FEV-1 despite appropriate therapy," have not "required hospitalization at least 2 times in the last 12 months," and do not "require[] daily systemic (not inhalational) steroids." DoDI 6490.07 Encl. 3(d). The government's protest that "in some instances each of these conditions," as well as other conditions which may necessitate daily

---

swallowing-disorders/gastroesophageal-reflux-disease-
gerd?query=gastroesophageal%20reflux%20disease (last visited March 28, 2022).

medication such as hypothyroidism[20] and dysmenorrhea,[21] "is medically disqualifying" or "requires a [medical] waiver," only serves to underscore the individualized consideration that individuals with HIV are categorically denied. [Harrison, Dkt. No. 264] at Resp. PSUF ¶ 61.

Moreover, service members with these and other chronic medical conditions may be able to qualify for accession and deployment even if their diagnosis is more severe than the relevant Department of Defense Instructions deem permissible if they can obtain a medical waiver. This medical waiver process typically entails even further individualized consideration. In contrast, as previously discussed, the government's position in this litigation is that no HIV-positive service member can obtain a medical waiver for accession. See [Harrison, Dkt. No. 264] at Resp. PSUF ¶ 37 (the Department of Defense is "not aware of any time an HIV-positive individual has received a waiver for accession"); [Harrison, Dkt. No. 257] at ¶ 54 ("[T]he Combatant Command Surgeon for CENTCOM has never granted a [deployment] waiver to a service member living with HIV . . . ."). Meanwhile, since 2015, CENTCOM has received "over 30,000 applications for a medical waiver to deploy," and has granted "[a]pproximately 70-80%" of those applications, which equates to between 21,000 and 24,000 deployment waivers. [Harrison, Dkt. No. 257] at ¶ 54.

In response, the government relies on several district court opinions that it argues "have specifically noted that because HIV is an infectious disease, HIV-positive individuals are not similarly situated to other individuals not carrying contagious diseases." [Harrison, Dkt. No. 264]

---

[20] Hypothyroidism is "thyroid hormone deficiency." See Hypothyroidism, Merck Manual, https://www.merckmanuals.com/professional/endocrine-and-metabolic-disorders/thyroid-disorders/hypothyroidism?query=hypothyroidism (last visited March 28, 2022).

[21] Dysmenorrhea is "uterine pain around the time of menses." See Dysmenorrhea, Merck Manual, https://www.merckmanuals.com/professional/gynecology-and-obstetrics/menstrual-abnormalities/dysmenorrhea?query=dysmenorrhea (last visited March 28, 2022).

at 49. These cases do not help the government's position, because all of them are either over a decade old or rely on other cases which are over a decade old, if they rely on any cases at all; none contains more than a two-sentence discussion of this issue; and all involve Equal Protection challenges to prison policies and actions, the review of which "is tempered by the recognition that 'lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" Morrison, 239 F.3d at 654 (quoting O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987)); see Nolley v. Cnty. of Erie, 776 F. Supp. 715, 739 (W.D.N.Y. 1991) (citing cases from the 1980s); Johnson v. N.C. Dep't of Pub. Safety, No. 1:16-cv-267, 2018 WL 443002, at *8 (W.D.N.C. Jan. 16, 2018) (citing no cases); Moore v. Ozmint, No. 3:10-3041, 2012 WL 762460, at *11 (D.S.C. Feb. 16, 2012) (citing cases from 2008, 1996, and 1991). Moreover, as the Fourth Circuit observed in Roe, although "[s]tigma, fear, and misinformation about HIV persist today," the overwhelming medical evidence demonstrates that HIV "is not easily transmitted." Roe, 947 F.3d at 212-13. Other than through receptive anal intercourse and blood transfusions, there is only "[a] fraction-of-a-percent exposure risk[]" of transmitting even untreated HIV. Id. And for HIV-positive individuals who are fully compliant with the very effective treatments currently available, the possibility of transmission outside the context of blood transfusions is "very low." Id. at 214.

The government also argues that plaintiffs cannot prevail on their Equal Protection claims because they have "fail[ed] to identify any purposeful and intentional discrimination by the [Department of Defense]" and "[t]here is no evidence whatsoever suggesting that the military decisionmakers acted out of animus towards individuals with HIV." [Harrison, Dkt. No. 264] at 49-50. In response, plaintiffs correctly argue that "a showing of animus is not necessary." [Harrison, Dkt. No. 286] at 24-25. Indeed, "[t]o say that a plaintiff must show discriminatory

intent is not to say she must show that the government's [action] was 'invidious,' malicious, or 'in bad faith' . . . . All that is required in this circuit is a showing that plaintiff 'was irrationally or arbitrarily treated differently from similarly situated parties.'" Bruce & Tanya & Assocs., Inc. v. Bd. of Supervisors of Fairfax Cnty., 355 F. Supp. 3d 386, 414 n.14 (E.D. Va. 2018) (first quoting LeClair v. Saunders, 627 F.2d 606, 609 (2d Cir. 1980), then quoting Tri Cnty. Paving, Inc. v. Ashe Cnty., 281 F.3d 430, 440 (4th Cir. 2002)). As discussed in detail below, plaintiffs have satisfied that requirement here. Moreover, the government's reliance on the proposition that discriminatory intent "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," is not to the contrary. Id. at 414 (quoting Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 819 n.2 (4th Cir. 1995)). Regardless of the government's explanations for the challenged policies, it cannot be reasonably disputed that these policies were promulgated at least in part because they would limit the ability of HIV-positive individuals to serve in the military.

### 3. New Evidence

Because plaintiffs have satisfied the two threshold requirements for an Equal Protection claim, the Court turns to the question of whether the policies were rational. Under the rational basis standard, defendants' policies are entitled to a "strong presumption of validity" and must be sustained if "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Thomasson v. Perry, 80 F.3d 915, 928 (4th Cir. 1996) (en banc) (quoting Heller v. Doe, 509 U.S. 312, 319-20 (1993)); see also Roe, 947 F.3d at 220 ("To comply with the APA, the 'agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" (quoting

32

Sierra Club, 899 F.3d at 293)). In Roe, the Fourth Circuit rejected each of the government's explanations for the military's categorical determination that individuals with HIV cannot safely deploy worldwide as "unsupported by the record or contradicted by scientific evidence" and found that Roe, Voe, and other similarly situated active-duty members of the Air Force had been denied "an individualized determination of their fitness for military service." 947 F.3d at 225, 234. Although the record has since been supplemented through additional discovery, the government offers essentially the same explanations for its policies in its summary judgment briefing. Accordingly, at oral argument, the first question the government was asked was what new evidence it had adduced. None of the evidence described in the government's answer to that question, and none of the limited evidence identified as new in the government's summary judgment briefing, justifies reaching a different conclusion than that reached by the Fourth Circuit in Roe. All but one of the government's explanations continue to focus on the risk of HIV transmission to other service members during difficult deployments.[22] These explanations remain either contradicted by scientific evidence or unsupported by the record.

First, the government argues that "a deployed HIV-positive service member could experience viral rebound" due to either "lost or destroyed medication" or "insufficient adherence to medication," and then transmit HIV to other service members. [Harrison, Dkt. No. 264] at 57-

---

[22] In the one argument unrelated to HIV transmission, the government points out that some countries in CENTCOM's area of responsibility are known to expel or deport HIV-positive foreigners; however, it is undisputed that "[h]ost nation restrictions have never been the basis for denying an HIV-positive individual a waiver to deploy to CENTCOM," and there is no evidence in the summary judgment record "that indicates an active-duty service member has ever been deported from a foreign country due to a change in HIV status." [Harrison, Dkt. No. 257] at ¶ 104; [Harrison, Dkt. No. 264] at Resp. PSUF ¶ 104. Moreover, the Fourth Circuit in Roe rejected this argument in part because the record before it did not show whether the laws of host nations "appl[y] to both military servicemembers and civilians" or whether "the inability to enter one nation would preclude deployment to the entire area." 947 F.3d at 225-26. The summary judgment record is no different on these points.

59. But this argument has been rejected by the Fourth Circuit, and the government offers no new evidence that would alter the Court's analysis. As the Fourth Circuit explained, "[b]ecause [HIV] medications have no special storage requirements, servicemembers with HIV can be prescribed several months' worth of their medication at a time, just as the military does for servicemembers deploying with other chronic but managed conditions," and "for patients with undetectable viral levels," such as Roe, Voe, and similarly situated active-duty Air Force members, "the required treatment is no different in time or effort than other treatments prescribed to servicemembers deployed overseas, including to CENTCOM's area of responsibility." Roe, 947 F.3d at 226-27. Again, relying on the current medical evidence in the record, the Fourth Circuit further explained that "[e]ven if treatment were disrupted, HIV-positive service members would 'not immediately suffer negative health outcomes'" because "[i]t often takes weeks for an individual's viral load to reach a level that would not be considered 'suppressed,'" and "[e]ven then, the virus enters a period of clinical latency that can last years, often with no symptoms or negative health outcomes." Id. at 227. Moreover, "when an individual resumes treatment, even supposing the virus developed a resistance to the previous treatment regimen, a switch to a different regimen will return that patient to viral suppression." Id. Nothing in the summary judgment record undercuts the Fourth Circuit's reasoning. The government does not identify much of its evidence as new, and it offers little more than speculation that in future combat situations the "resupply" of medications that are lost or destroyed "might be rendered impossible."[23] [Harrison, Dkt. No. 264] at 59.

---

[23] In an amicus brief before the Fourth Circuit, former Secretaries of the Army, Navy, and Air Force also rejected this argument, observing, "Frankly, if the military cannot resupply medication within a few months, it is experiencing much bigger problems with much bigger consequences." Amici Curiae Brief of Former Military Officials in Support of Appellees and for

Second, the government argues that "HIV could be transmitted by deployed service members" through battlefield "blood transfusions." [Harrison, Dkt. No. 264] at 60-61. The Fourth Circuit squarely addressed this argument as well, explaining that "service members who test positive for HIV are ordered not to donate blood," and therefore "any risk of HIV transmission through transfusion is by servicemembers who are unaware of their HIV positive-status." This is "of course, not the case here" because the plaintiffs in both Harrison and Roe and the similarly situated active-duty service members "are all aware of their HIV-positive status." Roe, 947 F.3d at 227. The Fourth Circuit further explained that "[e]ven in the case of a servicemember unaware of his or her status, the risk of HIV transmission through blood transfusion is low because of rigorous transfusion procedures." Id. at 227 n.4. Specifically, "the FDA screens the military blood supply for various diseases, including HIV," and "[w]here FDA-screened blood is unavailable, the military turns to a 'walking blood bank,' a volunteer servicemember who is pre-screened to donate blood." It is only "[i]f no such servicemember is available" that "the military turns to volunteers who have donated recently" and then to "other volunteers." Id. Because of these safety protocols, the Fourth Circuit emphasized that "only 2% of all units of blood transfused to servicemembers were non-screened units" according to a study conducted from 2006 through 2012. There is no reason in this record to think that HIV-positive service members contributed to the small percentage of non-screened units, because those service members have been ordered not to donate blood, and according to a different study conducted from 2001 through 2007, "among the 1.13 million servicemembers deployed to Afghanistan or Iraq during the six-year study period, the military found no instances of [HIV]

---

Affirmance of the District Court Below at 18, Roe v. Dep't of Defense, 947 F.3d 207 (4th Cir. 2020) (No. 19-1410).

transmission through trauma care, blood splash, transfusion, or other battlefield circumstances." Id. at 227-28. In fact, on the record before it, the Fourth Circuit concluded that the government "ha[d] not identified any case of HIV transmission through blood transfusion under its screening procedures." Id. at 227 n.4.

Nothing in the summary judgment record changes the facts underlying the Fourth Circuit's conclusion. The only evidence the government identifies as new is the deposition testimony of several military officials who merely offer conjecture about why service members who are aware of their HIV diagnosis may nevertheless disobey the military's order not to donate blood. For example, one military official testified that "[t]here are a variety of reasons why an individual might do that," describing instances where "[t]hey could have forgotten" or "[t]hey could have made a value judgment that the need of [an] individual outweighed the theoretical risk of the blood donation." [Harrison, Dkt. No. 265-14] at 70. Another official similarly conjectured that "in circumstances where there is no ability to provide a walking donor capability and a service member is faced with watching one of their peers, a friend, a battle buddy die if they do not receive blood, then they may elect to take actions that may be contrary to what the regulation has prescribed." That official acknowledged, "That would be my speculation." [Harrison, Dkt. No. 265-17] at 58. Indeed, this deposition testimony amounts to nothing more than conjecture and speculation that is not based on any hard evidence. As such, it would not be admissible at trial and is wholly insufficient to create a genuine issue of material fact. See Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (speculation insufficient to create genuine issue of material fact); see also Cox v. Cnty. of Prince William, 249 F.3d 295, 299 (4th Cir. 2001) ("Mere speculation by the non-moving party cannot create a genuine issue of material fact.").

The government argues these concerns are not speculative because "[t]here have been actual incidents of service members donating blood despite knowledge that they are carrying a bloodborne pathogen and counseling and orders not [to] give blood." [Harrison, Dkt. No. 272] at 63. To support that argument, defendants first rely on the declaration of Lieutenant Colonel Jason Blaylock, who stated that he was "aware of at least one case where an HIV-infected service member knowingly donated blood in the United States," but he also admitted that it was "fortunately identified by the American Red Cross screening procedures that are not readily available in combat situations." [Harrison, Dkt. No. 266-12] at ¶ 38. Second, Lieutenant Colonel Lisa Lute testified in a deposition that she was "only aware of one time" when someone "with HIV in the military who knew their status attempt[ed] to donate blood"; however, Lute could not answer when that occurred, saying "I was in San Antonio, and that's as close as I can get you, okay? So I was there from, let me see, . . . 2014 to 2016." [Harrison, Dkt. No. 266-21] at 48. It is unclear whether Blaylock and Lute were referring to the same incident or separate incidents, but they both said it occurred in the United States. A third official, Colonel Clinton Murray, testified in a deposition that as part of "an emergency walking blood bank," a service member with Hepatitis C who "actually knew he had hepatitis C" donated blood because "[s]omewhere it got lost in translation that you don't donate blood with hepatitis C." [Harrison, Dkt. No. 265-16] at 130-31. Such miscommunication is exceedingly unlikely here, because "[s]ervicemembers who test positive for HIV are ordered not to donate blood." Roe, 947 F.3d at 227.

Even if the testimony were admissible, which is doubtful given that it appears to be inadmissible hearsay, the statements of Blaylock, Lute, and Murray do not show anything more than one or two isolated incidents of a soldier trying to give blood despite knowing he was HIV-positive and having been ordered not to donate blood. It is irrational to categorically bar the

deployment of every asymptomatic HIV-positive service member with an undetectable viral load who is otherwise fit to serve based on speculation about aberrant conduct. Not only that, but these statements still fail to show any occasion where HIV was actually transmitted from one service member to another through a blood transfusion. Accordingly, if a concern underlying the deployment bar was a risk of transmitting the virus to HIV-negative service members, these statements do nothing to support it.

Lastly, the government argues that HIV could be transmitted by deployed service members—even those with undetectable viral loads—through battlefield "medical care." [Harrison, Dkt. No. 264] at 60-64. The Fourth Circuit already addressed this argument, explaining that "the risk of battlefield transmission [was] unsupported by the record" because the record before it showed that "the chance of transmitting untreated HIV by needlestick is 0.23% per needlestick exposure," "the chance of transmitting untreated HIV by throwing bodily fluids is 'negligible,'" and for persons with undetectable viral loads, "medical experts consider transmission risks to be even lower." Roe, 947 F.3d at 227 (record citations omitted). The Fourth Circuit again relied on the 2001-2007 study discussed above to support its finding that "among the 1.13 million servicemembers deployed to Afghanistan or Iraq during the six-year study period, the military found no instances of transmission through trauma care . . . or other battlefield circumstances." Id. at 228. Indeed, in that study, only 1 of the 131 service members who tested positive for HIV after previously testing negative was even infected "during deployment"; the 130 others were infected "prior to deployment, after deployment, or during leave for rest and relaxation." Id. at 227-28.

The only evidence on this issue that the government appears to identify as new is an Updated U.S. Public Health Service Guidelines for the Management of Occupational Exposures

to HIV and Recommendations for Postexposure Prophylaxis ("PHS Guidelines") that were issued to "update[] U.S. Public Health Service recommendations for the management of health-care personnel . . . who have occupational exposure to blood and/or other body fluids that might contain [HIV]." [Harrison, Dkt. No. 267-8] at 2. The government emphasizes that the PHS Guidelines state that "[e]xposure to a source patient with an undetectable serum viral load does not eliminate the possibility of HIV transmission or the need for [postexposure prophylaxis] and follow-up testing"; however, the same guidelines also state that "the risk of transmission from an occupational exposure to a source patient with an undetectable serum viral load is thought to be very low" (although postexposure prophylaxis "should still be offered"), and they explain that the documented instances of such transmission "ha[ve] been described in cases of sexual and mother-to-child transmissions," which are not at issue here. Id. at 10-11.

Similarly, although the government emphasizes that the PHS Guidelines mention a study which found that "increased risk of HIV infection was associated with exposure to a larger quantity of blood from the source person," such as blood from "a deep injury," and offers additional testimony from military officials about the increased risk of such injuries in combat situations, this does not call into question the evidence regarding incredibly low exposure risks on which the Fourth Circuit relied. Id. at 10. Indeed, the government's reliance on these statements in the PHS Guidelines underscores its flawed belief that any non-zero risk of HIV transmission to other service members is sufficient to justify a categorical bar of HIV-positive individuals from deployment. As the Fourth Circuit stated in Roe, "[a] ban on deployment may have been justified at a time when HIV treatment was less effective at managing the virus and reducing transmission risks," but "any understanding of HIV that could justify this ban is outmoded and at odds with current science." Id. at 228. According to the Fourth Circuit, "[s]uch

39

obsolete understandings cannot justify a ban, even under a deferential standard of review and even according appropriate deference to the military's professional judgments." Id. The government has offered no new evidence which undermines that conclusion.

### 4. Accession vs. Retention

The Fourth Circuit's reasoning in Roe is equally applicable to Harrison. Indeed, in a related action in which HIV-positive Naval Academy and Air Force Academy graduates challenge similar accession policies to those at issue in Harrison, the court found that "[t]he broad language in Roe applies with equal force in this case." Deese, 483 F. Supp. 3d at 314. It is undisputed that both the military's accession and retention policies about individuals with HIV are based on the categorical determination that such individuals cannot safely deploy worldwide. For example, plaintiffs emphasize that "[t]he categorical bar to the deployment of service members living with HIV is at the heart of all of [their] claims," because "[j]ust as the decisions to discharge . . . Roe and Voe were based on the categorical bar to deployment to the area controlled by [CENTCOM], the refusal to commission . . . Harrison is rooted in his purported inability to deploy worldwide, as required by [Department of Defense] and Army accession standards." [Harrison, Dkt. No. 257] at 2. In response, the government acknowledges that "[b]oth the accession policies at issue in Harrison and the retention policies at issue in Roe rely in part on the deployability of HIV-positive service members, and in particular to their deployability to the CENTCOM region." [Harrison, Dkt. No. 264] at 55. These statements are consistent with the relevant Department of Defense Instructions on accession and retention. See DoDI 6130.03 § 1.2 ("It is [Department of Defense] policy to . . . [e]nsure that individuals considered for appointment, enlistment, or induction into the Military Services are . . . [m]edically adaptable to the military environment without geographical area limitations."); DoDI 1332.18 Encl. 3, App. 2

§§ 3-4 ("The Secretaries of the Military Departments will consider all relevant evidence in assessing Service member fitness," including whether the service member "is deployable individually or as part of a unit, with or without prior notification, to any vessel or location . . . .").

Against this backdrop, it is unsurprising that although the government addresses the accession and retention policies separately in its briefs, it offers the risk of HIV transmission to other service members during difficult deployments as the primary justification for both sets of policies. As demonstrated in this record, that justification is not rational given the current medical evidence concerning HIV treatment and transmission. Therefore, all that is left to be addressed is the government's two additional justifications which it proffers only as to the military's accession policies: the risk of medication side effects and comorbidities in HIV-positive service members and the cost of caring for these service members.

The government correctly cautions against "blur[ring] the distinctions between the Harrison and Roe cases" by assuming that the "military's accessions policy is entirely based on CENTCOM's current deployment restriction," when in actuality "the accessions policy is a broader, more general policy independent of any specific combatant command limitation." [Harrison, Dkt. No. 288] at 11. It is undisputed that the military's accession standards are more restrictive than its retention standards. The "rationale" for this distinction is that "once a member has been fully trained and has experience in performing the duties of his or her position, whether as an enlisted member or officer, the needs of the [military] incline decidedly toward allowing the member to continue to perform those duties and return the investment the [military] has made in the member," whereas "[a]t the accession stage, the needs of the [military] incline towards selecting members in whom to make the training and mentoring investment who minimize any

41

risk of inability due to medical conditions to complete an initial period of service and potentially a longer military commitment." [Harrison, Dkt. No. 265-8] at 5.

The defendants support this distinction by first arguing that "the military has a legitimate interest in barring conditions that could result in lost duty time or inability to continue service," and that "[s]ome well-managed patients with HIV will experience side effects from their medication or develop comorbidities, both of which could result in lost duty time and prevent or limit continued service." [Harrison, Dkt. No. 264] at 52. That explanation is not supported by the record evidence and contradicts the Fourth Circuit's observation in Roe that "HIV is a 'chronic, treatable condition,'" the medications for which "have minimal side effects," and that "[t]hose who are timely diagnosed and treated 'experience few, if any, noticeable effects on their physical health . . . .'" 947 F.3d at 213-14 (record citations omitted). Moreover, medication side effects and comorbidities are a risk associated with almost every chronic medical condition, including many which do not categorically bar accession, such as dyslipidemia and Gastro-Esophageal Reflux Disease.[24] See DoDI 6130.03 §§ 5.12(a), 5.24(n). To the extent that defendants emphasize neurocognitive impairments as a specific, potential comorbidity of HIV, a recent Department of Defense study found a "low prevalence" of such impairments in HIV-positive patients whose infections were diagnosed and managed early, which was "comparable to matched HIV-uninfected persons." [Harrison, Dkt. No. 265-8] at 20.

---

[24] For example, dyslipidemia "can lead to symptomatic vascular disease, including coronary artery disease (CAD), stroke, and peripheral arterial disease," and Gastro-Esophageal Reflux Disease "may lead to esophagitis, esophageal ulcer, esophageal stricture, Barrett esophagus . . . , and esophageal adenocarcinoma." Dyslipidemia, Merck Manual, https://www.merckmanuals.com/professional/endocrine-and-metabolic-disorders/lipid-disorders/dyslipidemia?query=dyslipidemia (last visited March 29, 2022); Gastroesophageal Reflux Disease, Merck Manual, https://www.merckmanuals.com/professional/gastrointestinal-disorders/esophageal-and-swallowing-disorders/gastroesophageal-reflux-disease-gerd?query=gastroesophageal%20reflux%20disease (last visited March 29, 2022).

Defendants also argue that "the increased burden of caring for an HIV-positive patient . . . is a rational basis for excluding their accession." [Harrison, Dkt. No. 264] at 53. Specifically, the government claims that the military will incur significant costs to care for even a "well-managed HIV patient," including the costs of antiretroviral therapy—which it estimates to be "between $10,000 and $25,000" per year—and the costs of "clinical testing, neurological monitoring, flying the HIV patients in and out of theater as part of regular clinical monitoring, and adding [post exposure prophylaxis] to medical kits." Id. at 53-54. This argument is not taken lightly, but it does not apply with equal force to all types of accessions.

This cost-based justification is largely irrelevant for service members like Harrison who contracted HIV during their military service because the military is already paying for their medical treatment and it is unclear whether commissioning would increase the cost of that treatment. The government appears to argue that the military would bear additional costs if Harrison and similarly situated HIV-positive service members are deployed. For example, the military may need to fly HIV-positive service members in and out of theater for regular clinical monitoring; however, this argument is unpersuasive for two reasons. First, the Fourth Circuit has already found that "the required treatment [for asymptomatic HIV-positive service members] is no different in time or effort than other treatments prescribed to servicemembers deployed overseas, including to CENTCOM's area of responsibility." Roe, 947 F.3d at 226-27. Second, the government has not provided any evidence that the costs of caring for HIV-positive service members while deployed exceeds the costs of caring for service members with other chronic medical conditions while deployed. Without that comparator, the Court cannot find that the cost of caring for HIV-positive service members in the field is a rational reason for prohibiting their worldwide deployment.

It appears that the "additional cost burdens" the military is primarily concerned about are the additional costs it would incur if it allowed HIV-positive individuals to enlist. [Harrison, Dkt. No. 288] at 11 n.6. This concern is stated explicitly not just in the government's brief, see id., but also in an "Information Paper" dated September 2015, in which the government stated, "If the standard [disqualifying HIV-positive service members from accessing into the military] did not exist, it could incentivize HIV-infected individuals without health care coverage to join the military to get their medical expenses covered equating to an extra $20K annual benefit." [Harrison, Dkt. No. 273-6] at 2. Obviously, this concern does not apply to Harrison, because he has already enlisted and therefore his medical costs are not "additional" costs. Although this concern of "additional costs" may apply to HIV-positive individuals who wish to enlist, the enlistment policies are not before the Court. See supra note 5. Accordingly, the government's cost-based justification, which plaintiffs correctly point out was not offered until late in this litigation, is not rational as applied to enlisted service members seeking to commission as officers, in whom the military has already invested significant time and money. Accordingly, there is no rational basis for reaching a different conclusion in Harrison than in Roe.

### 5.   Individual Discharge Decisions

Having concluded that the military's categorical bar to the worldwide deployment of HIV-positive service members is irrational and therefore unlawful, it is clear that the individual discharge decisions concerning Roe, Voe, and the similarly situated active-duty Air Force members, which were based entirely on that deployment bar, also constitute unlawful agency action under the APA. In addition, the plaintiffs in Roe argue that these decisions are independently unlawful because they conflict with Air Force Instruction 44-178, which states that "HIV seropositivity alone is not grounds for medical separation or retirement" and that

"[m]embers with laboratory evidence of HIV infection who are able to perform the duties of their office, grade, rank and/or rating, may not be separated solely on the basis of laboratory evidence of HIV infection." AFI 44-178 §§ 2.4.1, A9.1.

Here, Roe, Voe, and the other similarly situated active-duty Air Force members were ordered to be discharged based solely on their HIV-positive status, and because those discharge decisions do not "comport with" Air Force Instruction 44-178, they are "'not in accordance with law' and must be set aside." J.E.C.M. v. Lloyd, 352 F. Supp. 3d 559, 583 (E.D. Va. 2019) (quoting 5 U.S.C. § 706(2)(A)). The government insists that "Roe and Voe were not separated because of HIV seropositivity 'alone'" given that "[t]he Air Force determined that Roe and Voe should be discharged because: (i) they were expected to deploy relatively frequently to [CENTCOM]'s area of responsibility because of their individual career fields, and tenure within those fields; and (ii) they were unlikely to be able to deploy to CENTCOM because of their HIV status." [Harrison, Dkt. No. 264] at 77. According to the government, that deployment determination "was based on the conjunction of two factors, only one of which took HIV status into account" and "is not based on HIV status 'alone.'" Id. This hyper-technical and circular argument misses the mark. Although the Air Force considered Roe's and Voe's deployability, "[t]he only bar to [their] deployment was [the military's] own regulations, which restrict deployability based on HIV 'alone.' Thus, they are being discharged because of HIV 'alone.'"[25] [Harrison, Dkt. No. 286] at 37.

In sum, there is no genuine issue of material fact regarding any of the bases on which the government seeks to distinguish the Fourth Circuit's forceful, unanimous opinion in Roe. As a

_____

[25] For the same reason, it is of minimal, if any, import that the DES has found some HIV-positive service members fit for duty based on a low likelihood of deployment. [Harrison, Dkt. No. 273-2] at ¶¶ 32-33.

result, the plaintiffs in <u>Roe</u> have established that the military's categorical bar to the deployment of asymptomatic HIV-positive service members with an undetectable viral load is not rational and that their individual discharge decisions based on that deployment bar were arbitrary and capricious. Therefore, the plaintiffs in <u>Roe</u> are entitled to summary judgment on their APA claims. In addition, the plaintiffs in <u>Roe</u> and <u>Harrison</u> have established that the military's categorical deployment bar irrationally treats HIV-positive service members who are asymptomatic with undetectable viral loads differently than service members with other chronic but manageable conditions. Therefore, the plaintiffs in <u>Roe</u> and <u>Harrison</u> are entitled to summary judgment on their Equal Protection claims. All that remains is to determine the scope of the appropriate relief.

### C. Remedy

As the Fourth Circuit recognized in <u>Roe</u>, the Supreme Court has "affirmed the equitable power of district courts, in appropriate cases, to issue nationwide injunctions extending relief to those similarly situated to the litigants." 947 F.3d at 232 (citing <u>Trump v. Int'l Refugee Assistance Project</u>, 137 S. Ct. 2080, 2087 (2017)). The Fourth Circuit cautioned district courts to "mold [their] decree[s] to meet the exigencies of the particular case," "carefully consider[] the equities," and "'focus[] specifically on the concrete burdens that would fall' on the parties and on the public consequences of an injunction." <u>Id.</u> (quoting <u>Int'l Refugee Assistance Project</u>, 137 S. Ct. at 2087). Although "district courts have broad discretion when fashioning injunctive relief," this Court must be cognizant of the Fourth Circuit's guidance. <u>Ostergren v. Cuccinelli</u>, 615 F.3d 263, 288 (4th Cir. 2010).

With that guidance in mind, the Court finds that the proper remedy is a permanent injunction enjoining defendants from: (1) categorically barring the worldwide deployment of

asymptomatic HIV-positive service members with undetectable viral loads based on their HIV-positive status; (2) denying applications by Harrison and any other HIV-positive service members with undetectable viral loads to commission as officers based on their HIV-positive status; and (3) discharging or otherwise separating Roe, Voe, and any other asymptomatic HIV-positive service members with undetectable viral loads based on their HIV-positive status. In addition, the pending referrals to the DES of Roe, Voe, and any other asymptomatic HIV-positive service members with undetectable viral loads will be vacated.

### III. CONCLUSION

Defendants' policies prohibiting the commissioning and retention of HIV-positive service members who are asymptomatic and have undetectable viral loads are irrational as well as arbitrary and capricious. To the extent the government has objected that the judicial branch should not second-guess deployment policies, the amicus brief filed in the Fourth Circuit by an impressive array of former high-ranking military officials, including the former Secretaries of the Army, Air Force, and Navy, fully supports the conclusion of this Court. Those officials stated:

> The United States' all-volunteer military depends on allowing every citizen who is fit to serve to do so. In our professional military judgment, any policy that discharges willing and able service members based on chronic, but well-managed, medical conditions should be based on the most up-to-date science and be justified by credible—not theoretical—risks. Unfortunately, the Department of Defense's ("DoD") categorical restriction on deployment of service members with HIV lacks such scientific support and justification. HIV no longer qualifies as a chronic medical condition requiring a waiver under the DoD's general policies, yet the DoD's outdated policy persists.
>
> . . .
>
> It is our professional military judgment that there is no legitimate reason to deny HIV positive service members the opportunity to deploy. We base this judgment on decades of military experience and the current understanding of HIV—its treatment, its transmission, and the capability of and prognosis for those in care. . . .

Amici Curiae Brief of Former Military Officials in Support of Appellees and for Affirmance of the District Court Below, supra note 23, at 6-7.

For the reasons stated above, by Orders accompanying this Memorandum Opinion, plaintiffs' Motions for Summary Judgment will be granted and the government's Motion for Summary Judgment will be denied.

Entered this 6ᵗʰ day of April, 2022.

Alexandria, Virginia

/s/ _____

Leonie M. Brinkema
United States District Judge